EXHIBIT "A"

COUNCIL AGENDA:   1/25/22
FILE:   22-045
ITEM:   4.1



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

# *Memorandum*

**TO:** HONORABLE MAYOR
AND CITY COUNCIL

**FROM:** Nora Frimann
City Attorney

**SUBJECT: GUN HARM REDUCTION
ORDINANCE**

**DATE:** January 14, 2022

## RECOMMENDATION

Consider approving an ordinance amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by: (a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs.

## BACKGROUND

On June 29, 2021, the City Council directed the City Attorney to return to Council with an ordinance for Council consideration that would require every gun owner residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage.

Council directed that the ordinance include the following provisions:

- Compliance:
    - The gun owner shall sign and complete an insurance attestation, describing the specific policy number and issuer, and sign the attestation under penalty of perjury. Acceptable insurance coverage may include any homeowner's or renter's policy that provides for a minimum coverage amount.
    - The attestation document (or signed waiver) shall be kept wherever guns are stored or transported with the owner (in-home gun safe, in car, etc.).
- Exemptions and waivers:
    - A written, discretionary waiver of the fee requirement and the insurance coverage will be permitted for all low-income individuals who qualify under Cal. Govt. Code §68632. However, the owner must store and maintain the waiver document with the gun.
    - An exemption from these requirements for sworn law enforcement.
    - An exemption from these requirements for holders of a concealed carry weapon (CCW) permit.

1889106

HONORABLE MAYOR AND CITY COUNCIL
January 14, 2022
**Subject:  Gun Harm Reduction Ordinance**
Page 2

- Penalties: Failure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine.

## ANALYSIS

The proposed ordinance includes provisions that are in accordance with the direction from Council.  The proposed ordinance authorizes an annual gun harm reduction fee to be paid by gun owners to a designated nonprofit organization that will, in turn, use the fees collected to provide certain services, as specified in the ordinance, to residents of the City who own or possess a gun or to members of their household.  The proposed ordinance also authorizes the City Manager to charge and collect any and all City cost recovery fees associated with fulfilling the policies of the ordinance relating to the reduction of gun harm, including any associated third-party costs.

The recitals within the draft ordinance contain the data and other information that supports the proposed ordinance.

The effective date of the proposed ordinance will be six months from the date of adoption.  This is to allow for time for the City Manager's Office to potentially do outreach, develop regulations, and work through any other issues related to the implementation of the proposed ordinance.

## CONCLUSION

If approved, the proposed ordinance will require, with certain exceptions, that San José residents who own firearms: (a) obtain and maintain liability insurance; (b) pay an annual gun harm reduction fee to a designated nonprofit organization that will use the fee proceeds to provide gun harm reduction services to residents of the City who own or possess a gun or to members of their household; and (c) pay any City cost recovery fees associated with program implementation, including any associated third-party costs.

## CLIMATE SMART SAN JOSE

The recommendation in this memo has no effect on Climate Smart San José energy, water, or mobility goals.

## COORDINATION

This memorandum has been coordinated with the City Manager's Office.

1889106

HONORABLE MAYOR AND CITY COUNCIL
January 14, 2022
**Subject: Gun Harm Reduction Ordinance**
Page 3

## CEQA

Not a Project, File No. PP17-008, General Procedure & Policy Making resulting in no changes to the physical environment.

/s/
NORA FRIMANN
City Attorney

For questions please contact Nora Frimann, City Attorney, at (408) 535-1900.

1889106

EXHIBIT "B"



DAVID A. WARRINGTON
DWARRINGTON@DHILLONLAW.COM

HARMEET DHILLON
HARMEET@DHILLONLAW.COM

July 14, 2021

VIA ELECTRONIC AND CERTIFIED MAIL

San Jose City Council
200 E. Santa Clara St.
San Jose, CA 95113

Mayor Sam Liccardo
mayoremail@sanjoseca.gov

Vice Mayor Charles Jones
District1@sanjoseca.gov

Sergio Jimenez, City Council Dist. 2
District2@sanjoseca.gov

Raul Peralez, City Council Dist. 3
District3@sanjoseca.gov

David Cohen, City Council Dist. 4
District4@sanjoseca.gov

Magdalena Carrasco, City Council Dist. 5
District5@sanjoseca.gov

Devora Davis, City Council Dist. 6
district6@sanjoseca.gov

Maya Esparza, City Council Dist. 7
District7@sanjoseca.gov

Sylvia Arenas, City Council Dist. 8
district8@sanjoseca.gov

Pam Foley, City Council Dist. 9
District9@sanjoseca.gov

Matt Mahan, City Council Dist. 10
District10@sanjoseca.gov

**Re:    Ordinance Shifting the Public Burden of Criminal Behavior to Gun Owners
Your File NO - 21-1579**

Dear Mayor and City Council,

This Firm represents the National Foundation for Gun Rights. It has come to our attention that on June 29, 2021, you voted unanimously to have the City Attorney research and draft an ordinance that would impose a mandatory fee on gun owners and require them to buy gun liability insurance.  Given that the city's own press release regarding the proposed ordinance, concedes that "criminals won't obey these mandates," the City of San Jose is seeking to impose a tax on a select group of law abiding citizens simply for exercising their right to keep and bear arms.

**DHILLON LAW GROUP INC.**
**A CALIFORNIA PROFESSIONAL CORPORATION**
177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)

July 14, 2021
Page 2 of 4

The right to keep and bear arms of the citizens of the United States, which includes the City of San Jose, is protected by the Second Amendment to the United States Constitution, that states in pertinent part that, "the right of the people to keep and bear Arms shall not be infringed." The proposed ordinance would be an unconstitutional infringement on that right and we are prepared to litigate to protect the Second Amendment rights of the citizens of San Jose should the City Council enact such an ordinance.

The law on this issue is clear.

The City of San Jose is prohibited from enacting laws that infringe upon the Second Amendment rights of its citizens. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 790 (2010) (holding that the Second Amendment right is protected against infringement by the individual states through the Fourteenth Amendment); *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (holding that the Second Amendment right is "fundamental and is incorporated against state and municipalities" like the City of San Jose).

Further, courts have found that the right to keep and bear arms "implies a corresponding right to obtain the bullets necessary to use them," *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). It also protects the right "to acquire and maintain proficiency in their use," *Ezell v. Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). The Second Amendment protects the implicit right to train with weapons. *District of Columbia v. Heller*, 665 U.S. 570, 617-618 (2008). It also protects the implicit right to possess ammunition. *United States v. Miller*, 307 U.S. 174, 180 (1939).

What you propose to do strikes at the very core of this fundamental right and seeks to punish (though registration[1] and taxation) citizens of your city who have committed no crime or offense. This type of government overreach was rejected by our Founders and the Bill of Rights was adopted in direct response to then recent examples of such conduct by the British.

First-hand experience with the British Parliament's 1765 enactment of the Stamp Act led to the protections for the freedoms of Speech and Press found in the First Amendment. Like the tax you propose here, the Stamp Act imposed a direct tax on printed material, resulting in a selective tax imposed on those who desired to read the news or communicate with others via printed material.

Indeed, many of the Bill of Rights' protections that citizens of the United States enjoy are a direct result of the abuses by the British Parliament and Crown in the years leading up to the Declaration of Independence, to wit: the 1774 Massachusetts Government Act – First Amendment Right to Assemble; 1774 The Quartering Act – Third Amendment; and 1774 Administration of

---

[1] In order to implement your proposed taxation scheme, there is no doubt that a gun registration scheme will accompany it.

July 14, 2021
Page 3 of 4

Justice Act – Sixth and Seventh Amendment Right to a Jury Trial.  Americans enjoy the protections of the Second Amendment today because the British attempted to confiscate the guns and ammunition of the colonist on April 19, 1775, in Concord Massachusetts.

Unfortunately, the City Council of the City of San Jose is not the first government entity that has forgotten the lessons of the Founding and attempted to use a selective tax against a fundamental constitutional right.

In 1936, the United States Supreme Court stopped the State of Louisiana from imposing a selective tax on newspapers with circulation of more than 20,000 copies per week. The Court found that this selective tax "might result in destroying both advertising and circulation." *Grosjean v. American Press Co.*, 297 U.S. 233, 245 (1936).  The Court held that the Louisiana law was "bad because … it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." *Grosjean* at 250. The Louisiana tax penalized certain publishers from being able to fully exercise their constitutional rights.

More recently, in 1983, the Supreme Court dealt with a case where the state tax scheme of Minnesota "singled out the press for special treatment." *Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 582 (1983).  The Court held that "differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Minneapolis Star* at 585.

There is no "special characteristic" of the law abiding gun owner that would justify imposition of a special tax, therefore, as in *Minneapolis Star*, it is easily understood that the goal of the proposed ordinance is to suppress and discourage the exercise of the right to keep and bear arms and that goal is "presumptively unconstitutional."  *See id*.

Simply put, a discriminatory tax that singles out citizens exercising their constitutional rights is unconstitutional.

Please be advised that should you pass the proposed ordinance and blatantly violate the constitutional rights of the residents of San Jose, my clients have authorized our firm to file a lawsuit against the City to protect the constitutional rights of their members. This lawsuit will be brought pursuant to 42 U.S.C. §1983 for the deprivation of constitutional rights. As such, once we prevail in protecting the residents of San Jose's constitutional rights, our firm will then seek our reasonable attorney fees under 42 U.S.C. §1988(b).

We thereby strongly encourage you to reconsider moving forward with the proposed ordinance.

DHILLON LAW GROUP INC.
A CALIFORNIA PROFESSIONAL CORPORATION
177 POST STREET, SUITE 700 | SAN FRANCISCO, CA 94108 | 415.433.1700 | 415.520.6593 (F)

July 14, 2021
Page 4 of 4

Regards,

David A. Warrington          Harmeet K. Dhillon

*Counsel for the National Foundation for Gun Rights*

Cc: National Foundation for Gun Rights

EXHIBIT "C"

Case 5:22-cv-00501-BLF Document 25-3 Filed 03/08/22 Page 11 of 63

≡

# Los Angeles Times

LOG IN   🔍

BREAKING NEWS

Join our live video commentary of the Rams' Super Bowl parade and rally

ADVERTISEMENT



**Inflation is Back**

SPONSORED BY **MERRILL**          SEE MORE

OPINION

# Op-Ed: My city's new gun control laws will help more than waiting on Congress to do something



Shown are guns and ammunition that were found in the home of a man who killed nine people in San Jose last May, before killing himself. (Santa Clara County Sheriff's Department)

BY SAM LICCARDO

JAN. 19, 2022 3:05 AM PT



A [gunman holding four people hostage at a Colleyville, Texas, synagogue this weekend](#) provides another reminder of [the daily threat of gun violence to our local communities](#). San Jose, where I am mayor, is hardly immune: Our 1 million residents have endured three mass shootings in three years, along with hundreds of gun-inflicted killings, suicides and serious injuries.

Last June our City Council [unanimously approved](#) my proposals that will mitigate gun harm in our community — and a final vote on Jan. 25 should turn them into law. The proposals include two requirements for gun owners that no city or state in the U.S. has ever implemented: the purchase of liability insurance and the payment of annual fees to

Case 5:22-cv-00501-BLF Document 25-3 Filed 03/08/22 Page 13 of 63

fund violence-reduction initiatives. We anticipate that a barrage of lawsuits from the firearm industry and gun rights advocates will follow.

Why should any city subject itself to litigation? Because now-common horrific reports of shootings throughout the nation do little more than elicit a performative parade of prayers and platitudes from Congress. Because problem-solving must be elevated over political posturing.



**OPINION**

**Op-Ed: Disbanding the NRA won't be a magic bullet for gun control**

Nov. 8, 2021

ADVERTISEMENT

Because, as one grieving mother urged as I hugged her at her son's memorial, "we just need somebody to do something."

My proposals take a page from [public health approaches that have reduced auto-related deaths, tobacco use and teen pregnancy](#) in the U.S. They incentivize responsibility, draw on multi-disciplinary learning and invest in proven harm-reduction initiatives with the guidance of experts.

Case 5:22-cv-00501-BLF Document 25-3 Filed 03/08/22 Page 14 of 63

Requiring every gun owner in my city to carry liability insurance will better compensate unintentional shooting victims and their families for medical and related expenses. More importantly, insurance can also incentivize safer gun ownership. Risk-adjusted premiums will encourage owners to take gun-safety courses, use gun safes or install child-safe trigger locks to reduce the annual toll of accidental gun harm.

Unintentional shootings — often involving children — annually claim the lives of 500 Americans and injure another 26,000. The new laws coming to San Jose apply lessons from the insurance industry's impact on auto safety. Reducing premiums on policyholders who drive more safely or buy cars with airbags or anti-lock brakes helped to reduce per-mile auto fatalities by nearly 80% over the last five decades, saving 3.5 million lives. We need a similar approach to address unintentional firearm risk because approximately 4.6 million children live in a household where a gun is kept unlocked and loaded, and shootings have become the second-leading cause of death among U.S. children and adolescents.

---

OPINION

**Op-Ed: My daughter lost her life in a 'ghost gun' shooting. It's time to regulate homemade firearms**

Nov. 11, 2020

---

Imposing a modest annual fee on gun owners can support underfunded domestic violence and suicide prevention programs, gun-safety classes, mental health services and addiction intervention. We've invited doctors, public health experts, and yes, gun owners, to help identify how to allocate the money from these fees in ways that will reduce gun violence. Prioritizing those investments to serve residents in gun-owning households will have the biggest impact because studies suggest that even a properly stored firearm in the home significantly increases occupants' risk of death by homicide and suicide.

Gun rights advocates argue that gun owners should not have to pay a fee to exercise their constitutional right to bear arms. To be sure, the 2nd Amendment protects the rights of citizens to own guns, but it doesn't require the public to subsidize gun ownership. Every day, taxpayers bear the financial burden of police officers, ambulances and trauma surgeons responding to gun violence. These direct costs of gun violence total $40 million annually for San Jose taxpayers, and $1.4 billion for taxpayers statewide.

Critics say that criminals won't obey insurance or fee mandates — and they are right. But these ordinances create a legal mandate that gives police the means for at least the temporary forfeiture of guns from dangerous law-breakers. Particularly given the legally frail status of concealed-carry regulations before the current Supreme Court, law enforcement agencies face steep challenges keeping communities safe amid the ubiquitous presence of guns. Giving the police the ability to distinguish the scofflaws from the law-abiding among gun owners will have tremendous public safety benefits.

These new laws won't end all gun violence. We're deploying other interventions as well, such as bolstering gun violence restraining orders, banning untraceable "ghost guns" and preventing the illegal purchasing of firearms for people such as felons or minors who are not allowed to buy guns themselves. We need to coordinate early mental health interventions for individuals showing signs of distress as well.

---

OPINION

**Op-Ed: Fight the gun violence epidemic like we fight cancer — one small step at a time**

April 14, 2021

---

While Congress dallies, communities don't have the luxury of dismissing the devastation of gun violence. We live among grieving family members; we hear echoes of painful eulogies and we work with traumatized friends. These new laws are no panacea,

Case 5:22-cv-00501-BLF Document 25-3 Filed 03/08/22 Page 16 of 63

but they can reduce the unnecessary suffering in our community during a crisis that it is long past time to "do something" about.

*Sam Liccardo is the mayor of San Jose, America's 10th largest city.*

OPINION    OP-ED



## A cure for the common opinion

Get thought-provoking perspectives with our weekly newsletter.

Enter email address

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.

EXHIBIT "D"



COUNCIL AGENDA: 01/25/2022
FILE: 22-045
ITEM: 4.1

*Memorandum*

**TO:** HONORABLE CITY COUNCIL

**FROM:** Mayor Liccardo,
Vice Mayor Jones,
Councilmember Cohen
Councilmember Carrasco

**SUBJECT: SEE BELOW**

**DATE:** 01/21/2022

Approved

Date 01/21/2022

---

## DIRECTION:

1. Establish that the gun harm reduction fee in the initial year shall amount to $25 per gun-owning household—or an approximate amount close to $25 that assists with the rounding of the final fee—plus that amount strictly reflecting only the administrative cost incurred by:
   a. The Designated Non-profit Organization,
   b. The State of California for its use of the Department of Justice's Automated Firearm System and/or California Firearms Application Reporting System to communicate legal obligations and available services to gun-owning residents in San Jose, and
   c. The City, if any.

2. Determine that until or unless the Council determines otherwise,
   a. The City shall not be engaged in the collection of fees, the transmittal of information through the Department of Justice Database, nor the accounting nor distribution of the funds.
   b. After the initial implementation of the ordinance, the City's role will remain largely limited to setting the fee, engaging in contractual arrangements with the State of California and other entities necessary for the implementation of the ordinance, and enforcement.
   c. All administrative tasks shall be the responsibility of the Designated Nonprofit Organization, and all administrative costs shall be borne by that organization, and recovered by a portion of the fee revenue.

    d.   No fees shall be collected nor required of any gun owner until the City Attorney has determined that there is resolution of pending facial legal challenges to the ordinance for any claim which is not *res judicata,* that is, for any claim that is not precluded by a prior final judgment.

3.  Approve the proposed ordinance, with modifications in the following sections:
    a.  Expenditure of Gun Harm Reduction Fee, Section 10.32.220
- Insert the following italicized language into A. to read, "All monies from the Gun Harm Reduction Fee shall be expended by the Designated Nonprofit Organization on providing services to residents of the City that own or possess a Firearm in the City or to members of their household, *or to those with whom they have a close familial or intimate relationship."*
- Insert within the itemized list under A., "Addiction intervention and substance abuse treatment"
- Revise provisions under C. to read: "C.  *The Designated Nonprofit Organization shall spend every dollar generated from the Gun Harm Reduction Fee, minus administrative expenses, exclusively for programs and initiatives designed to (a) reduce the risk or likelihood of harm from the use of firearms in the City of San José, and (b) mitigate the risk of physical harm or financial, civil, or criminal liability that a San José firearm owner or her family will incur through her possession of firearms.  Otherwise, t*he City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended*"*

    b.  Exceptions, Section 10.32.225
- Insert the following italicized language into B. to read, "Those persons who have a license to carry a concealed weapon issued pursuant to California Penal Code § 26150 or § 26155, *for as long as these statutes are legally enforceable."*

    c.  Compliance, Section 10.32.230
- Delete the following stricken language and insert the italicized language into A. to read, "Each person required to obtain and maintain insurance under Section 10.32.210 shall demonstrate compliance with the insurance requirement by completing and executing a City-designated attestation form. Each such person shall state both the name of the insurance company issuing the policy and the number of the insurance policy on the attestation form, sign the form under penalty of perjury and keep the attestation form with the Firearms where they are being stored or transported. ~~There is no requirement to submit the attestation form to the City. However, each~~  *Each* person shall complete and sign a new attestation form under penalty of perjury in the event any of the information on the form changes.  *Each person shall present the form when lawfully requested to do so by a peace officer who knows or has reason to believe that a person possesses a firearm."*

    d.  Purpose and Findings, 10.32.200
Among the findings listed in B., add:

- "Based upon a November 2021 analysis by Dr. Ted Miller, Ph.D. and the Pacific for Institute Research and Evaluation (PIRE), on average, 206 people suffer death or serious injury from gunshots each year in the City of San José.
- Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning.
- Including private costs to individuals and families in the calculation, San José residents incur an annual financial burden of $442 million per year for gun deaths and injuries."

## DISCUSSION:

When our current pandemic passes, an epidemic of gun violence will continue to take its grim toll throughout our nation.  In response, we propose that the City of San Jose become the first city—or U.S. jurisdiction—to use liability insurance and a fee-supported non-profit organization to reduce gun violence and harm.   We consider the merits for each of these two elements.

### Insurance

Requiring every gun owner in my city to carry liability insurance will better compensate unintentional shooting victims and their families for medical and related expenses.  More importantly, insurance can also incentivize safer gun ownership.  Risk-adjusted premiums can—and in some cases, do—reduce the risk of gun harm, by encouraging firearm owners to take gun-safety courses, use gun safes, install child-safe trigger locks, or utilize chamber-load indicators.  Unintentional shootings–often involving children–annually claim the lives of 500 Americans and injure another 26,000.   We should apply the lessons of the insurance industry's impact on auto safety: reducing premiums on policyholders who drive more safely or buy cars with airbags or anti-lock brakes helped to reduce per-mile auto fatalities by 80% over the past five decades, saving 3.5 million lives. We need a similar approach to address unintentional firearm risk, because we live in a nation in which 4.6 million children live in a household where a gun is kept unlocked and loaded, and 72% of gun injuries occur at home, resulting in too many child victims.   As in other contexts, an insurance requirement can help make our community safer.

### Fees and Investment in Evidence-Based Prevention

Second, we propose the payment of a modest fee to support evidence-based community-led initiatives to reduce the harm of gun violence in our community, such as through domestic violence and suicide prevention efforts, gun-safety classes, mental health services, and addiction intervention.

Why should the funding nonprofit focus these services for occupants of gun-owning households?  Because that's where the greatest risk is.  Epidemiological studies show that even a properly stored firearm in the home doubles occupants' risk of becoming a victim of homicide and triples the likelihood of suicide.  A more recent Stanford study concluded that male handgun owners may be eight times more likely to commit suicide by gun than other men, and gun-

owning women are 35 times more likely to do so than their gender peers.  Prioritizing those investments for residents living with guns in the home will provide the most direct path for reducing gun harm.

Some gun owners will express the view that the 2nd Amendment renders any imposition of a gun-related fee unconstitutional.  While the Second Amendment protects the rights of citizens to own guns, it doesn't require the public to subsidize gun ownership.  Every day, our taxpaying residents bear the financial burden for police officers, ambulances, and trauma surgeons to respond to gun violence.  These direct costs of gun violence to San Jose taxpayers-- to say nothing of the human and financial toll to victims' families—exceeds $39 million annually, and $1.4 billion for all Californians.   Using fees to fund initiatives to reduce gun violence reduces the financial burdens of gun use on all of us.

Moreover, courts have long upheld the imposition of taxes on the purchase of guns and ammunition ever since Congress imposed the federal gun tax in 1919.  This history affirms the consistent position of courts to allow the imposition of modest fees on the exercise of constitutional rights, such as IRS filing fees on the formation of nonprofit advocacy organizations (1st Amendment), taxes on newspapers (1st Amendment), and court filing fees (7th Amendment), the cost of counsel for defendants of financial means (6th Amendment), or on filing to become a candidate for elected office (1st and 14th Amendments).   The constitutional question is whether a modest fee substantially burdens the exercise of that right.  Given that we provide an explicit exemption for those unable to pay, it imposes no such burden.

We are grateful for the many community leaders and experts—such as NextDoor Solutions to Domestic Violence CEO Esther Peralez-Dieckman, Health Trust CEO Michele Lew, Gardner Healthcare CEO Reymundo Espinoza, Stanford University Medical Center Epidemiologist Dr. Julie Parsonnet, National Rifle Association San Jose Chapter President Dave Truslow, Community Health Partnership CEO Dolores Alvarado and Deputy Director Cathryn Hyde, and Brady United Director Shikha Hamilton, and Moms Demand Action California Chapter representative Rachel Michelson, and SAFE Legislative Affairs Director Dr. Susie MacLean MD, who have stepped up to advise or participate in the creation of a nonprofit organization that will identify high-impact violence reduction programs for investment.

**Compliance**

The ordinance will impose fines and other administrative sanctions on violators. Of course, criminals won't obey insurance or fee mandates. Yet, given the legally frail status of concealed-carry regulations before the current U.S. Supreme Court, we will likely see many more guns out on the street—and in bars, nightclubs, and other contexts that will increase our peril.  Law enforcement agencies face steep challenges keeping communities safe amid the ubiquitous presence of guns in America.  Members of the California legislature are exploring bills to have law enforcement agencies seize guns as a sanction for violations of local gun regulations, with subsequent restoration of ownership as required by constitutional due process. Giving the police the ability to distinguish the scofflaws from law-abiding gun owners could provide a lawful basis for forfeiture of the gun in a context—where an officer responds to a bar brawl or domestic violence allegation—where even temporarily extracting a gun from a combustible situation could dramatically reduce the risk of deadly violence.

**Thanks**

Our gratitude goes to City Attorney Nora Frimann, Terra Chaffee, and the rest of her team for their extensive research and work in fashioning this ordinance, and to Christina Guimera and Paul Pereira in the Mayor's office for their mighty efforts to bring forward this initiative, and to convene partners to help.

In addition to those community leaders mentioned above, we also thank the many supporters, advocates, thought partners, and active partners of this initiative, including Rachel Michelson, Yvonne Murray, Maria Ines Ortega Barrera, and all of the volunteers and staff at Mom's Demand Action, Everytown, Brady United, and many of our Project Hope community leaders. We also thank local leaders who have stepped up to offer critical help, including District Attorney Jeff Rosen, Assemblymember Phil Ting and his lead expert on staff, Mark Chekal-Bain, Senator Josh Becker, California Attorney General Rob Bonta and his team, and Golden State Warriors Coach Steve Kerr.

We are deeply appreciative of the philanthropic support of the policy and research work necessary for the crafting of this initiative by the Heising-Simons Foundation—particularly Deanna Gomby and Holly Kreider—and by SV Angel CEO Ron Conway. We also appreciate the willingness of the Silicon Valley Community Foundation to serve as a fiscal agent for these funds.

Finally, we offer our very deep gratitude to the *pro bono* efforts of our legal team, led by Joe Cotchett and Tamarah Prevost of Cotchett, Pitre & McCarthy, LLP. We have had great support, advice, research, and legal assistance provided by Allison Anderman and Esther Sanchez-Gomez at the Giffords Law Center to Prevent Gun Violence; Tanya Schardt and Steve Lindley at Brady United; UC Berkeley School of Law Dean Erwin Chemerinsky; Stanford Law Professor and Economist John J. Donohue III; Michael Redding, John Marsh, and team at the California Attorney General's office, and Keker, Van Nest & Peters LLP.

*The signers of this memorandum have not had, and will not have, any private conversation with any other member of the City Council, or that member's staff, concerning any action discussed in the memorandum, and that each signer's staff members have not had, and have been instructed not to have, any such conversation with any other member of the City Council or that member's staff.*

EXHIBIT "E"

---

CONTENT ARCHIVE

## ARCHIVE OF MAYOR LICCARDO'S WRITING

To view a complete archive of Mayor Liccardo's first-person writing and opinion pieces, please <u>visit his medium blog</u>.

## MAYOR LICCARDO PHOTO ARCHIVE

To access this archive of photos featuring Mayor Liccardo -- including updated headshots -- <u>please visit this photostream on Flikr</u>.

## MAYOR LICCARDO VIDEO ARCHIVE

For a complete archive of Mayor Liccardo's videos of special events -- like the annual State of the City events -- <u>please visit the Mayor's Youtube channel.</u>

---

## PRESS ROOM

## SAN JOSÉ MAYOR STATEMENT ON HISTORIC PASSING OF FIRST IN THE NATION GUN VIOLENCE REDUCTION ORDINANCE

**Post Date:**           01/25/2022 10:50 PM

**FOR IMMEDIATE RELEASE**

January 25, 2022

**Media Contact:**

Rachel Davis, Communications Director/Press Secretary, Office of Mayor Sam Liccardo,
 <u>rachel.davis@sanjoseca.gov</u>

SAN JOSÉ, CA - Today, San José City Council voted to become the <u>first city, state, or jurisdiction in the nation</u> to adopt a <u>law</u> requiring gun owners to have insurance coverage for their firearms, and use fees paid by gun owners to invest in evidence-based initiatives to reduce gun harm.  He released the following statement:

**"Tonight San José became the first city in the United States to enact an ordinance to require gun owners to purchase liability insurance, and to invest funds generated from fees paid by gun owners into evidence-based initiatives to reduce gun violence and gun harm.   Thank you to my council colleagues who continue to show their commitment to reducing  gun violence and its devastation in our community.  I am deeply grateful also to our advocacy and legal partners with Cotchett, Pitre & McCarthy, LLP,  EveryTown, Moms Demand Action, SAFE, the Gifford Law Alliance and ma**

others who work tirelessly to help us craft a constitutionally compliant path to mitigate the unnecessary suffering from gun harm in our community.  I look forward to supporting the efforts of others to replicate these initiatives across the nation."

## Statements of Support:

### Shannon Watts, Founder, Moms Demand Action

"Following unthinkable tragedies from gun violence, San José has taken action that will save lives. Our grassroots volunteers have been proud to work hand-in-hand with the mayor, city council, and community partners to help get this innovative package of gun safety laws crafted and across the finish line."

### Rachel Michelson, Volunteer Leader with the California Chapter, Moms Demand Action, San José

"Once again, San José has taken initiative to be a leader in the gun violence prevention movement**.** This ordinance is an innovative approach to address the costs of gun violence and incentivize safer practices that can help prevent firearm deaths and injuries. Other cities should follow San José's lead and prioritize safer cities."

### Ewan Barker Plummer, Volunteer Leader, Students Demand Action, Bay Area

"This vote is a victory for gun safety. Thanks to the tireless advocacy of volunteers and commitment to gun safety from San José leaders San José is leading the charge against gun violence. We all want a safer San José, a safer California, and a safer nation. With this approach, we can move closer to that goal."

*Return to full list >>*



EXHIBIT "F"

BAY AREA

# Gun owners in San Jose must buy liability insurance under newly passed first-in-the-nation law

Lauren Hernández

Jan. 25, 2022Updated: Jan. 26, 2022 6:03 p.m.



This file photograph shows San Jose Mayor Sam Liccardo on Tuesday, March 24, 2015, in San Jose, Calif.
Santiago Mejia/The Chronicle

The San Jose City Council adopted a measure Tuesday night requiring gun owners in the South Bay city to buy liability insurance for their firearms, city officials said.

The ordinance — which city officials said marks the first such law for a city, state or other jurisdiction in the country — also calls for gun owners to pay fees that will be invested "into evidence-based initiatives to reduce gun violence and gun harm," San Jose Mayor Sam Liccardo said in a statement on Tuesday night.

According to the ordinance, "A person who resides in the City and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy from an admitted insurer or insurer as defined by the California Insurance Code, specifically covering losses or

damages resulting from any negligent or accidental use of the Firearm, including but not limited to death, injury or property damage."

Residents who do not comply could have their firearms confiscated under the new law, which takes effect in six months.

The ordinance notes that each year 23,000 people in the U.S. die by firearm suicide, 14,000 die by firearm homicide and another 500 die from unintentional gun injuries.



Liccardo thanked the council and advocacy groups including Moms Demand Action, SAFE, the Gifford Law Alliance and others for their commitment to "reducing gun violence and devastation in our community."

Liccardo said these groups helped "craft a constitutionally compliant path to mitigate the unnecessary suffering from gun harm in our community." He said that he will support other jurisdictions who choose to launch similar ordinances across the United States.

https://www.sfchronicle.com/bayarea/article/Gun-owners-in-San-Jose-must-buy-liability-16804951.php

Shannon Watts, the founder of Moms Demand Action, said in a statement that the ordinance will "save lives."

Ewan Barker Plummer, volunteer leader with the Bay Area chapter of Students Demand Action said the vote was "a victory for gun safety."

"We all want a safer San Jose, a safer California, and a safer nation," Barker Plummer said. "With this approach, we can move closer to that goal."

*Lauren Hernández is a San Francisco Chronicle staff writer.*
*Email: lauren.hernandez@sfchronicle.com Twitter: @ByLHernandez*

Written By
Lauren Hernández
Reach Lauren on
Lauren Hernández joined The San Francisco Chronicle in 2018. She covers breaking news, crime and general news. Previously, she was a breaking news reporter for the USA TODAY Network's Statesman Journal in Salem, Oregon. She studied journalism at San Jose State University. She is a member of the National Association of Hispanic Journalists. Hernández has bylines in the Silicon Valley Business Journal and The Desert Sun. Her journalism has received awards in California and Oregon.

EXHIBIT "G"

# Los Angeles Times

# San Jose approves first law in U.S. requiring gun owners to have insurance



San Jose Mayor Sam Liccardo speaks during a news conference in May 2021 after nine people died in a shooting in his city. (Associated Press)

BY OLGA R. RODRIGUEZ AND JULIET WILLIAMS
ASSOCIATED PRESS

JAN. 25, 2022 **UPDATED** 11:08 PM PT

The city of San Jose voted Tuesday night to require gun owners to carry liability insurance in what's believed to be the first measure of its kind in the United States.

The San Jose City Council overwhelmingly approved the measure despite opposition from some gun owners who said it would violate their 2nd Amendment rights.

The council also voted to require thousands of gun owners in the city to pay a small fee, which would be used for firearm safety education and services such as domestic violence prevention and mental health services.

The proposal seeks to reduce gun violence in the San Francisco Bay Area city.

EXHIBIT "H"

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

# ORDINANCE NO. 30716

## AN ORDINANCE OF THE CITY OF SAN JOSE ADDING PART 6 TO CHAPTER 10.32 OF TITLE 10 OF THE SAN JOSE MUNICIPAL CODE TO REDUCE GUN HARM BY REQUIRING GUN OWNERS TO OBTAIN AND MAINTAIN LIABILITY INSURANCE AND ESTABLISHMENT OF ANNUAL GUN HARM REDUCTION FEE

**WHEREAS,** the Constitution of the United States of America affords certain protections to the ownership of firearms; and

**WHEREAS,** the United States Supreme Court has recognized that the Constitutional protections related to firearms ownership are not unlimited, and can be subject to certain types of governmental regulations; and

**WHEREAS,** a city's police power includes the power to regulate firearms and many courts throughout the nation have upheld local regulations related to the ownership or possession of firearms; and

**WHEREAS,** firearm injuries have a significant adverse public health and safety impact nationally, in the State of California, and locally; and

**WHEREAS,** each year more than 23,000 United States residents die by firearm suicide, 14,000 die by firearm homicide, and nearly 500 die from unintentional firearm injuries; and

**WHEREAS,** in California, between 2005 and 2015, nearly 4,000 children and teenagers were killed or injured with firearms, and 533 children and teenagers committed suicide with firearms, according to data from the Center for Disease Control and Prevention; and

NVF:TLC:KML
2/3/2022

**WHEREAS,** the Santa Clara County Public Health Department issued a report on firearm injuries in April 2018.  In 2016, 11% of injury deaths were due to firearms injuries.  During the period 2007-2016, there were an average of 46 deaths per year due to self-inflicted/suicide from firearms injuries, and an average of 28 deaths per year due to assault/homicide from firearms injuries.  Self-inflicted/suicide accounted for the highest percentage of deaths (59%) from firearms injuries, with assault/homicide accounting for 36% of deaths from firearm injuries; and

**WHEREAS,** the April 2018 Santa Clara County Public Health Department report on firearm injuries reported that during the period from 2010-2014, there were an annual average of 28 emergency department visits and 12 hospitalizations due to unintentional firearms injuries.  During 2010-2014, 31% of emergency department visits and 16% of hospitalizations from firearms injuries were due to unintentional shootings; and

**WHEREAS,** research published in the American Journal of Epidemiology in 2004 found that regardless of storage practice, type of gun, or number of firearms in the home, having a gun in the home was associated with an increased risk of firearm homicide and firearm suicide in the home; and

**WHEREAS,** a 2014 review in the Annals of Internal Medicine suggests that access to firearms within the home doubles the risk that family members will become a victim of homicide, and triples the risk of suicide; and

**WHEREAS,** a study in the New England Journal of Medicine in 2020 found that handgun ownership is associated with eight times greater likelihood for firearm suicide among men, and 35 times greater likelihood of firearm suicide among women; and

**WHEREAS,** according to the American Academy of Pediatrics, in homes with guns, suicide rates in children and adolescents and the likelihood of accidental death by shooting are each four times higher than in homes without guns; and

T-887.014.004\1894578
Council Agenda: 1-25-2022
Item Number: 4.1

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**WHEREAS,** in the past decade, 40% of the suicides committed by children and teens involved guns, and 90% of these suicides were with guns that the victims accessed at their own homes or from a relative's home; and

**WHEREAS,** 58% of shooting deaths in children and teens are homicides, and the risk of homicide is three times higher when there are guns in the home; and

**WHEREAS**, a June 2014 report published by Everytown for Gun Safety and Moms Demand Action which analyzed publicly reported gun deaths nation-wide over a one-year period from December 15, 2012 to December 12, 2013, showed that at least 100 children were killed in unintentional shootings, amounting to nearly two each week; and

**WHEREAS,** according to research published in Social Science and Medicine in 2007 based on data over a three-year study period from 2001 to 2003, states with higher rates of household firearm ownership had higher rates of firearm homicide but not of non-firearm homicide, and this relationship held across gender, age, income and multiple other variables; and

**WHEREAS,** a study in the Journal of Urban Health conducted in 2015 estimated there are as many as 4.6 million children in the United States living in homes with loaded unsecured guns; and

**WHEREAS,** injuries from unintentional shootings, which are generally insurable, comprise more than a third of all gun-related injuries nationally; and

**WHEREAS,** in some instances, gun owners have been successfully sued for harm resulting from the use of the owner's firearm by themselves or a third party; and

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**WHEREAS,** auto insurers have used risk-adjusted premiums to reward good driving and incentivize use of airbags and other safety features, and by using a comprehensive public health approach to car safety the United States reduced per-mile auto fatalities by nearly 80% from 1967 to 2017; and

**WHEREAS,** similarly, insurance-based mechanisms can encourage firearm owners to take safety classes, use gun safes, install trigger locks, or utilize chamber-load indicators, and according to 2018 research published in The Actuary there is evidence that some actuaries and insurance companies are recognizing firearm-related risk through their product offerings, pricing and underwriting decisions; and

**WHEREAS**, pursuant to the provisions and requirements of the California Environmental Quality Act of 1970, together with related State CEQA Guidelines and Title 21 of the San José Municipal Code (collectively, "CEQA"), the Director of Planning, Building and Code Enforcement has determined that the provisions of this Ordinance do not constitute a project, under File No. PP17-008 (General Procedure & Policy Making resulting in no changes to the physical environment); and

**WHEREAS**, the City Council of the City of San José is the decision-making body for this Ordinance; and

**WHEREAS**, this Council has reviewed and considered the "not a project" determination under CEQA prior to taking any approval actions on this Ordinance;

**NOW, THEREFORE,** BE IT ORDAINED BY THE COUNCIL OF THE CITY OF SAN JOSE:

<u>**SECTION 1**</u>.  Chapter 10.32 of Title 10 of the San José Municipal Code is hereby amended by adding a Part to be numbered, entitled and to read as follows:

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**Part 6**

**REDUCTION OF GUN HARM – LIABILITY INSURANCE REQUIREMENT AND GUN HARM REDUCTION FEE**

## 10.32.200  <u>Purpose and Findings</u>

A.     This Part is passed and adopted in the exercise of the police power of the City, and for the protection of the welfare, peace and comfort of the residents of the City of San José.  Specifically, it is the intent of this Ordinance to reduce gun harm.

B.     Findings:

1.     Firearm injuries have a significant adverse public health and safety impact nationally, in the State of California, and locally; and

2.     Each year more than twenty-three thousand (23,000) United States residents die by firearm suicide, fourteen thousand (14,000) die by firearm homicide, and nearly five hundred (500) die from unintentional firearm injuries; and

3.     In California, between 2005 and 2015, nearly four thousand (4,000) children and teenagers were killed or injured with firearms, and five hundred thirty-three (533) children and teenagers committed suicide with firearms, according to data from the Center for Disease Control and Prevention; and

4.     During 2010-2014 in Santa Clara County, thirty-one percent (31%) of emergency department visits and sixteen percent (16%) of

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

hospitalizations from firearms injuries were due to unintentional shootings; and

5.      A 2014 review in the Annals of Internal Medicine suggests that access to firearms within the home doubles the risk that family members will become a victim of homicide, and triples the risk of suicide; and

6.      A study in the New England Journal of Medicine in 2020 found that handgun ownership is associated with eight (8) times greater likelihood for firearm suicide among men, and thirty-five (35) times greater likelihood of firearm suicide among women; and

7.      Based upon a November 2021 analysis by Dr. Ted Miller, Ph.D. and the Pacific for Institute Research and Evaluation (PIRE), on average, 206 people suffer death or serious injury from gunshots each year in the City of San José; and

8.      Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning; and

9.      Including private costs to individuals and families in the calculation, San José residents incur an annual financial burden of $442 million per year for gun deaths and injuries; and

10.     Injuries from unintentional shootings, which are generally insurable, comprise more than a third of all gun-related injuries nationally; and

NVF:TLC:KML
2/3/2022

11.     Auto insurers have used risk-adjusted premiums to reward good driving and incentivize use of airbags and other safety features, and by using a comprehensive public health approach to car safety the United States reduced per-mile auto fatalities by nearly eighty percent (80%) from 1967 to 2017; and

12.     Liability insurance can reduce the number of gun incidents by encouraging safer behavior and it can also provide coverage for losses and damages related to gun incidents; and

13.     Programs and services to gun owners and their households can also encourage safer behavior, and provide education and resources to those residents.

## 10.32.205  Definitions

As used in this Part, the following terms have the following meaning:

A.     "Firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion.  Firearm does not include antique firearms as defined by 18 U.S.C. Section 921(a).

B.     "Designated Nonprofit Organization" means an entity that qualifies as a nonprofit corporation under the federal internal revenue code and is designated pursuant to the City Manager's authority under Section 10.32.235. No City official or employee shall sit on the board of directors of the Designated Nonprofit Organization.

## 10.32.210  Liability Insurance Required

NVF:TLC:KML                                                                    ORD. NO. 30716
2/3/2022

A.      **Insurance required.**  A person who resides in the City and owns or possesses a
        Firearm in the City shall obtain and continuously maintain in full force and effect
        a homeowner's, renter's or gun liability insurance policy from an admitted insurer
        or insurer as defined by the California Insurance Code, specifically covering
        losses or damages resulting from any accidental use of the Firearm, including but
        not limited to death, injury or property damage.

B.      For purposes of this Section, a person shall be deemed to be the owner of a
        Firearm if such Firearm is lost or stolen until such loss or theft is reported to the
        police department or sheriff which has jurisdiction in which such Firearm owner
        resides.

C.      Any person who owns a Firearm on the effective date of this Section shall obtain
        the insurance required by this Section within thirty (30) days of the effective date
        of this Ordinance, or by a later date certain established in the regulations
        promulgated by City Manager pursuant to Section 10.32.235.

## 10.32.215  Annual Gun Harm Reduction Fee

A person who resides in the City and owns or possesses a Firearm in the City shall
pay an Annual Gun Harm Reduction Fee to the Designated Nonprofit Organization
each year.  The date by which payment shall be made annually shall be established in
the regulations promulgated by City Manager pursuant to Section 10.32.235. The
annual fee will be set forth in the schedule of fees and charges established by
resolution of the City Council.

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

## 10.32.220  Expenditure of Gun Harm Reduction Fee

A.     All monies from the Gun Harm Reduction Fee shall be expended by the Designated Nonprofit Organization on providing services to residents of the City that own or possess a Firearm in the City, to members of their household, or to those with whom they have a close familial or intimate relationship.  Such expenditures may include, but are not necessarily limited to the following:

1.     Suicide prevention services or programs;

2.     Violence reduction or gender based violence services or programs;

3.     Addiction intervention and substance abuse treatment;

4.     Mental health services related to gun violence; or

5.     Firearms safety education or training.

B.     No portion of the monies from the Gun Harm Reduction Fee shall be used for litigation, political advocacy, or lobbying activities.

C.     The Designated Nonprofit Organization shall spend every dollar generated from the Gun Harm Reduction Fee, minus administrative expenses, exclusively for programs and initiatives designed to (a) reduce the risk or likelihood of harm from the use of firearms in the City of San José, and (b) mitigate the risk of physical harm or financial, civil, or criminal liability that a San José firearm owner or her family will incur through her possession of firearms. Otherwise, the City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended.

NVF:TLC:KML
2/3/2022

D.      The designated non-profit shall provide a biannual report to an appropriate council committee and the report may also be provided to the City Council, as directed by the council committee.

## 10.32.225  Exceptions

The provisions of this Part shall not apply to any of the following:

A.      Those persons designated as peace officers pursuant to Chapter 4.5 of Title 3 of Part 2 of the California Penal Code (§830 et seq.), including sworn peace officers, active reserve peace officers and retired peace officers.

B.      Those persons who have a license to carry a concealed weapon issued pursuant to California Penal Code § 26150 or § 26155, for as long as these statutes are legally enforceable.

C.      Those persons for which compliance with this Part would create a financial hardship.

## 10.32.230  Compliance

A.      Insurance requirement.  Each person required to obtain and maintain insurance under Section 10.32.210 shall demonstrate compliance with the insurance requirement by completing and executing a City-designated attestation form. Each such person shall state both the name of the insurance company issuing the policy and the number of the insurance policy on the attestation form, sign the form under penalty of perjury and keep the attestation form with the Firearms where they are being stored or transported.  Each person shall complete and sign a new attestation form under penalty of perjury in the event any of the information on the form changes.  Each person shall present the form when

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

lawfully requested to do so by a peace officer who knows or has reason to believe that a person possesses a firearm.

B.  Fee provisions.  Each person shall affix proof of payment of the annual Gun Harm Reduction Fee to the attestation form and keep it with the Firearm or Firearms where they are being stored or transported.

## 10.32.235  Authority of the City Manager

A.  The City Manager is authorized to promulgate all regulations necessary to implement the requirements and fulfill the policies of this Part relating to the reduction of gun harm, including, but not limited, to the following subjects:

  1.  Processes and procedures related to the implementation of the liability insurance requirement, and forms necessary thereto.

  2.  Designation of the nonprofit organization that will receive the Gun Harm Reduction Fee, any processes and procedures related to the payment of the fee, and any additional guidelines or auditing of the use of the monies from the fee.

  3.  Designation of any third-party agency and/or organization that will aid in the implementation of the noticing of the requirements of this Part or any other administrative tasks related to the requirements of this Part.

  4.  The criteria by which a person can claim a financial hardship exemption from this Part pursuant to Section 10.32.225.C.

B.  Regulations shall be published on the City's website.

NVF:TLC:KML                                                          ORD. NO. 30716
2/3/2022

C.      Regulations promulgated by the City Manager shall have the same force and
effect of law.  Unless a later date is specified in a regulation, a regulation shall
become effective upon date of publication.

## 10.32.240  <u>Enforcement</u>

A.      Any violation of this Part shall be punishable by an administrative citation in
accordance with the procedures set forth in Chapter 1.15 of Title 1 of this Code
relating to the issuance of administrative citations, imposing of administrative
fines, right to appeal, and the right to an administrative hearing.

B.      The amounts of the fines for violations imposed pursuant to this Part shall be
set forth in the schedule of fines established by resolution of the City Council.

C.      A violation of this Part is also enforceable through all other civil and
administrative remedies available to the City.

## 10.32.245  <u>Impoundment</u>

To the extent allowed by law, the Firearm or Firearms of a person that is not in
compliance with this Part may be impounded subject to a due process hearing.

## 10.32.250  <u>Fees and Charges</u>

The City Manager is hereby authorized to charge and collect any and all cost recovery
fees associated with fulfilling the policies of this Part relating to the reduction of gun
harm, including any associated third-party costs.  All fees shall be as set forth in the
schedule of fees and charges established by resolution of the City Council.

NVF:TLC:KML
2/3/2022

ORD. NO. 30716

**SECTION 2.**  This Ordinance shall become effective at the expiration of one hundred eighty (180) days after its adoption.

**SECTION 3.**  Consistent with Section 1.04.160 of the San José Municipal Code, should any provision of this Ordinance or its application to any person or circumstance be determined by a court of competent jurisdiction to be unlawful, unenforceable or otherwise void, that determination shall have no effect on any other provision of this Ordinance or the application of this Ordinance to any other person or circumstance and, to that end, the provisions hereof are severable.

**SECTION 4.**  The City Council of the City of San José takes action on this Ordinance based upon the totality of the administrative record including the facts stated above, the facts stated in the memorandums to the City Council for the January 25, 2022 City Council Meeting, as well as any oral or written testimony at the January 25, 2022 City Council meeting.

NVF:TLC:KML                                                           ORD. NO. 30716
2/3/2022

**PASSED FOR PUBLICATION of title this 25th day of January, 2022, by the
following bifurcated vote:**

**Including Insurance Requirements; Excluding Sections 10.32.215, 10.32.220, and
10.32.230(b)**

|  |  |
|---|---|
| AYES: | ARENAS, CARRASCO, COHEN, ESPARZA, FOLEY, JONES, JIMENEZ, MAHAN, PERALEZ, LICCARDO. |
| NOES: | DAVIS. |
| ABSENT: | NONE. |
| DISQUALIFIED: | NONE. |

**PASSED FOR PUBLICATION of title this 25th day of January, 2022, by the
following bifurcated vote:**

**Excluding Insurance Requirements; Sections 10.32.215, 10.32.220, and 10.32.230(b) only:**

|  |  |
|---|---|
| AYES: | ARENAS, CARRASCO, COHEN, ESPARZA, JONES, JIMENEZ, PERALEZ, LICCARDO. |
| NOES: | DAVIS, FOLEY, MAHAN. |
| ABSENT: | NONE. |
| DISQUALIFIED: | NONE. |

_____

SAM LICCARDO
Mayor

ATTEST:

_____

TONI J. TABER, CMC
City Clerk

EXHIBIT "I"

COUNCIL AGENDA: 1/25/22

FILE: 22-045



*Memorandum*

TO:  HONORABLE CITY COUNCIL          FROM:  MAYOR LICCARDO

SUBJECT:  GUN HARM REDUCTION ORDINANCE   DATE:  JANUARY 19, 2022

Approved                                                        Date 1/19/22

## DISCUSSION

A more substantive memorandum—with specific recommendations—will follow, but it is important for the entire City Council to have access to all of the data available to us in evaluating this proposed ordinance. When we initially proposed the imposition of a fee paid by gun owners in San Jose, it became apparent that under Proposition 26, it would be helpful to establish the legal baseline and ceiling for that fee, by identifying the cost burden to San Jose taxpayers of gun-inflicted injuries and death in San Jose. Doing so requires rigorous study of demographics and cost data from healthcare and other service providers, public agencies, and other sources.

Accordingly, we sought to identify a qualified consultant, and multiple references recommended the Pacific Institute on Research and Evaluation (PIRE), an independent, nonprofit organization, headed by health economist Dr. Ted Miller, Ph.D. Dr. Miller and his team–consisting of David Swedler, Ph.D  and Bruce Lawrence, Ph.D, gathered data, conducted research, and prepared the attached document, reflecting their calculations. Dr. Miller summarized their preliminary findings in a June report, and the attached provides a fuller description of PIRE's assumptions, methods, and findings. Among those findings:

- On average, 206 people suffered death or serious injury from gunshots each year in the City of San José between 2012 and 2018.

- Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with publicly-funded services such as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning.

1

- When private financial costs to individuals and families are included in the calculation, San José residents incur an annual burden of $442 million per year.

This report was peer-reviewed by economist Dr. John J Donohue III, JD, PhD, a law professor at Stanford Law School, and epidemiologist Julie Parsonnet, MD, a health policy expert at Stanford University School of Medicine.  My thanks for their commitment of time.

This work was funded by a grant from the Silicon Valley Community Foundation using philanthropic funds that originated from two donors. My deep gratitude to Director Holly Kreider and CEO Deanna Gomby at the Heising-Simons Foundation, and to SV Angel founder Ron Conway for their generous support. I also thank Gina Dalma and Nicole Taylor of the SVCF for their support of our efforts. None of these funders or supporters have reviewed the report, so it may or may not reflect their views.



PACIFIC INSTITUTE FOR RESEARCH AND EVALUATION

# Incidence and Cost of Firearm Injuries in San Jose, CA

**January 19, 2022**

**Pacific Institute for Research and Evaluation**
4061 Powder Mill Road, Suite 350
Beltsville, MD 20705-3113
www.pire.org

**Prepared by:**
Ted R Miller, PhD
David I Swedler, PhD
Bruce A Lawrence, PhD

The City of San José is considering legislation that would reduce the public cost of firearm injury. This report examines how many firearm injuries occur annually in the city and how much the city spends responding to them. It then analyzes the number of guns in the city and uses that information to calculate the city's annual firearm injury spending per gun. A report appendix provides the costs of firearm injuries in San José from the perspectives of society and of Federal, state, county, and city governments combined.

## Gunfire Annually Kills or Injures More Than 200 People in San José

Annually, more than 200 people are killed or injured by gunfire in San José. Assaults and homicides are the most common. Almost 30% of those injured die. Suicide deaths by firearm also are frequent. Unintentional gunshot wounds tend to be less serious. Notably, those incidents virtually all involve a single bullet. Table 1 summarizes official statistics on the average annual number of firearm deaths and injuries in San José over the most recent 6 years of data. The table uses 6-year averages to protect confidentiality.

Table 1. Average Annual Number of People Killed or Injured by Gunfire in San José

|  | Deaths | Nonfatal Hospital Inpatient Admissions | Emergency Department Treated & Discharged Without Admission | Total |
|---|---|---|---|---|
| Assault/Homicide/Legal Intervention | 28 | 32 | 29 | 89 |
| Self-Inflicted/Suicide | 28 | 3 | * | 31 |
| Unintentional/Undetermined | 2 | 25 | 59 | 86 |
| Total | 58 | 60 | 88 | 206 |

* Included with unintentional/undetermined to meet minimum count requirements that protect confidentiality.
Source: Tabulations of 2013-2019 Vital Statistics Multiple Cause of Death data and 2013-2018 California Hospital Discharge and Emergency Department Discharge Data censuses.

Many people are assaulted or robbed at gunpoint but not injured. Annually between 2017 and 2019, San José police responded to an average of 869 firearm robberies and assaults without physical injury.

## Annually, San José Spends at Least $7,937,000 Responding to Shootings

The primary costs that the City of San José incurs in responding to a shooting are for fire department and police response including police investigation and participation in the criminal justice process. Table 2 summarizes those costs. The San José Fire Department delivered emergency medical services to 48 shooting victims in 2018, 57 in 2019, and 82 in 2020, with an average annual cost of $137,000. The fire department response volume for gunshot injuries in this calculation comes from the department's call database that includes a variable indicating if calls responded to a shooting. The $2,199 cost per call in 2020 is a performance measure reported in the 2021 department budget.

The annual police response costs totaled  $7,800,000 annually. Of that amount, 72% involved homicides. The police cost estimates come from US average police response costs by crime from Hunt et al.[1] as refined by Miller et al.[2] The Hunt simulation model builds police costs per crime from the average police spending per capita in California in 2010 ($235.29 from Table A1). To adapt its estimates to San José, we therefore multiplied its mean costs by type of incident times the ratio of per capita costs in San José in 2020 versus the state in 2010. The San José per capita cost of $434.49 was computed as the average police cost per sworn officer hour of $144.34 according to the police budget office multiplied times 2080 hours per year times 1,151 sworn officers in 2020 times the ratio of 1.274 (sworn and nonsworn police labor payments) per sworn officer labor payment in the San José Police Department in 2016.[3] Hunt gave police costs for homicide, aggravated assault, motor vehicle crash, and a few other offenses. We did not vary police costs of an aggravated assault depending on whether the victim was injured, meaning our assault costs for cases with injury may be an underestimate. More likely than not, the police time required for a suicide or unintentional shooting death is comparable to the time required by an aggravated assault, whereas other nonfatal shootings involve modest costs comparable to a motor vehicle crash. Conservatively, we do not attribute any costs to robberies and assaults involving firearms but no injuries as these crimes might have happened even if the perpetrator lacked firearm access. The cost is even more conservative because it omits police costs of weapons violations and gun thefts. No data are available on the frequency of those crimes.

Table 2. Costs the City of San José Incurs Annually Responding to Firearm Injuries

|  | Unintentional/ Undetermined | Suicide Act | Homicide/ Assault | Total |
|---|---|---|---|---|
| Fire Department EMS | $69,403 | $10,136 | $57,531 | $137,071 |
| Police Fatal Injury Response | $29,224 | $624,663 | $5,680,080 | $6,333,967 |
| Police Nonfatal Injury Response | $135,072 | $4,556 | $1,329,692 | $1,469,320 |
| Total | $233,699 | $639,355 | $7,067,303 | $7,940,358 |

## 50,000-55,000 Households in San José Own Guns

We estimate that between 50,000 and 55,000 households in San Jose own guns.  This count was calculated using two approaches that have different limitations. Both approaches yielded counts for Santa Clara County in 2013-2015 (the most recent data available) that were used to calculate San José's share, then adjusted to account for firearms acquired in 2016-2020.

The first approach uses State of California background check data that show 363,725 guns were sold in Santa Clara County (SCC) between 2002 and 2015.[4] The County treats that count as the number of guns in SCC. The resulting count, however, has wide uncertainty because (a) people in SCC bought some of their guns before 2002, (b) some SCC residents purchased guns elsewhere and brought them to SCC, (c)

[1] Hunt PE, Saunders J, Kilmer B. Estimates of law enforcement costs by crime type for benefit-cost analyses. *Journal of Benefit-Cost Analysis, 10*(1), 95-123, 2019.

[2] Miller TR, Cohen M, Swedler D, Ali B, Hendrie D. Incidence and costs of personal and property crimes in the United States, 2017. *Journal of Benefit Cost Analysis. 12*(1), 24-54, 2021.

[3] Hyland S. Justice expenditure and employment extracts, 2016 – Preliminary. NCJ Number 254126, Bureau of Justice Statistics. 2019. https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/jeee16p.zip

[4] Santa Clara County Public Health. Guns in Santa Clara County. April 2018. The State requires that all gun sales in California go through its system.

some purchasers in SCC did not live in SCC and brought the guns they purchased elsewhere, (d) some SCC residents who purchased guns in SCC moved out of the County or stored their guns out of county, e.g., at a vacation home, (e) some people moved to SCC and brought guns with them, (f) some guns were sold in transactions outside SCC or were stolen and transported into or out of SCC, and (g) some guns were decommissioned (i.e., they became inoperative, were destroyed, or were otherwise removed from the stock of guns in San Jose). The count also excludes "ghost guns" that owners built themselves from parts they bought or printed on a 3-D printer.

The second approach uses 2013-14 Behavioral Risk Factor Surveillance System survey data that found 11% of households in Santa Clara County owned guns[5] (70,424 households when 11% is multiplied by the Census Bureau count of 640,215 households in SCC in 2015[6]). A national survey calculates that the average gun owner owns 4.8 guns, while Federal gun excise tax data adjusted for some guns being decommissioned arrived at an average of 5.16.[7] Multiplying the number of households with guns in SCC times the number of guns per household with guns yields a range of 338,034 to 363,545 guns in SCC in 2015.

These two approaches using different methods and data yield virtually identical counts when one uses the 5.16 average count of guns per household with guns. The similarity of results strengthens confidence in the accuracy of the calculated count.

The figures calculated above for Santa Clara County can be used to estimate the number of gun-owning households in San José . This calculation also can be approached in two ways. If we apply the 11% ownership rate to the 2014 household count of 325,114 for San José.[8] It yields a range of 164,856 to 177,298 guns in San José in 2014. Alternatively, we can build on published findings that the number of guns in a jurisdiction tracks the number of suicide deaths by firearm in the jurisdiction.[9,10] That alternative can be used with either the survey-based or sales-based SCC counts. It indicates that San José had 154,530 to 166,274 guns in 2015. Across the 5 calculated counts, the mean number of guns in San José in 2014-15 is 165,830, with a range from 154,530 to 177,298.

From 2015 to 2020, the number of guns in California rose by 55.3%. With that growth rate, people in San José owned 257,500 guns in 2020, with a range from 240,000 to 287,000. Dividing by the number of guns per household, 50,000 to 55,500 household owned guns.

---

[5] Idem.

[6] https://www.census.gov/quickfacts/fact/table/santaclaracountycalifornia,sanjosecitycalifornia/INC110219? , accessed June 2021.

[7] Azrael D, Hepburn L, Hemenway D, Miller M. The stock and flow of US firearms: results from the 2015 National Firearms Survey. RSF: The Russell Sage Foundation Journal of the Social Sciences. 2017;3(5):38–57. The 5.16 average was computed by extending Table A1 in the article from 2013 to 2015, then multiplying the 4.8 average for 2015 from the survey by the 285-million-gun count from Table A1 divided by  the 265 million survey count.

[8] https://www.sanjoseca.gov/home/showpublisheddocument/23765/636689378693570000 , accessed August 2021. A 2015 count is not readily available.

[9] Miller M, Barber C, White RA, Azrael D. Firearms and suicide in the United States: is risk independent of underlying suicidal behavior? Am J Epidemiol. 15;178(6):946-955, 2013.

[10]

**San José Incurs an Annual Average Costs of $151 per Gun-owning Household Providing Services to Fatal and Nonfatal Firearm Injury Shooters and Victims**

Dividing the total annual costs by the number of gun-owning household reveals that San José spends an average of $151 per gun-owning household providing injury-related services to firearm injury shooters and those they shoot. Given the range around the number of guns in the city, the cost per gun-owning household has an uncertainty range of $143 to $159. These figures incorporate a conservative estimate of total city expenditures on shooting response. The cost per gun averages $31, with a range from $28 to $33.

## ACKNOWLEDGEMENT

For insightful peer reviews of our draft report that improved its clarity and quality, we thank economist John J Donohue III, JD, PhD, who is the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School, and Julie Parsonnet, MD, who is the George deForest Barnett Professor of Medicine and Professor of Health Research and Policy at Stanford University. Dr. Parsonnet also is the President and Chair of the Board of Directors of Scrubs Addressing the Firearm Epidemic (SAFE). We also thank The City of San José and The County of Santa Clara government personnel for promptly providing us with data we requested, as well as helpful guidance and insights. This work was funded by a grant from the Silicon Valley Community Foundation using funds that originated from Ron Conway and the Heising-Simons Foundation. The funders have not reviewed the report so it may not reflect their views.

## APPENDIX: COSTS OF FIREARM INJURIES IN SAN JOSÉ TO SOCIETY AND GOVERNMENT

**Annually Firearm Injuries in San José Cost $442 Million**

We assessed the cost to society of gunfire in San José. Firearm deaths and injuries in San José annually impose losses valued at $442 million (Table 3). That's $432 per San José resident. Societal costs are comprehensive. The total includes costs paid by victims and their families, perpetrators, employers, insurers, and taxpayers. The value of pain, suffering, and lost quality of life accounts for the largest share of societal costs, with work losses of victims and perpetrators also large. Direct out-of-pocket costs total $35 million annually. These costs encompass medical and mental health care, police and emergency services, victim services, criminal justice, and employer spending because workers are absent temporarily or need to be replaced due to death or permanent disability.

Table 3. Annual Cost of Firearm Injury by Cost Category in San José, CA, 2013-2019

| Cost Category | Annual Cost | % of Total |
|---|---|---|
| Direct | $35,068,500 | 8% |
| Lost Work | $78,275,000 | 18% |
| Quality of Life | $328,355,500 | 74% |
| Total | $441,699,000 | 100% |

Source: Computations by Ted Miller, Pacific Institute for Research and Evaluation, 2021.

The societal costs here are tied to specific shootings. They exclude prevention costs and the impact on residents and businesses when gunfire harms neighborhoods.

Homicide and assault cause most (57%) of the firearm costs, followed by suicide acts (37%) and unintentional shootings (6%), per Table 4. The cost per shooting is highest for suicides, since so many of those incidents are fatal.

Table 4. Annual Incidence and Societal Cost of Firearm Injury by Intent in San José, CA, 2013-2019

| | People Shot | Cost/Person Shot | Total Cost | Cost to Federal, State & Local Government |
|---|---|---|---|---|
| Homicide/Assault/ Legal Intervention | 89 | $2,851,000 | $253,828,000 | $34,180,000 |
| Suicide | 31 | $5,238,000 | $164,122,000 | $4,298,000 |
| Unintentional/Undetermined | 86 | $290,000 | $24,749,000 | $1,260,000 |
| Total | 206 | $2,151,000 | $441,699,000 | $39,738,000 |

Source: Computations by Ted Miller, Pacific Institute for Research and Evaluation, 2021.

Governments across all levels pay almost $40 million annually due to firearm injuries in San José (Table 4). The taxpayer bill includes contributions to the costs of acute and long-term health care; public services including emergency response, victim assistance, incident investigation, and perpetrator adjudication and sanctioning; as well as tax revenue lost when someone is killed or unable to work.

The societal cost assessment used a peer-reviewed framework for costing gun violence that PIRE developed more than 20 years ago and periodically updates.[11] This framework consists of an economic analysis of direct out-of-pocket costs across the continuum of public services and employer responses associated with injury and death, as well as indirect cost data following an event. Direct costs include police, emergency response, hospital-related expenses, healthcare claims, family mental health services, court, criminal justice, and employer costs. Indirect costs include victim loss of wages and the estimated value of lost quality of life. For most of these cost elements, we use injury cost models and methods that we developed and have widely published to price injuries from all causes. That model is documented in considerable detail.[12] Other costs were adapted from our well-known crime cost model.[13] The indirect costs of fatalities were computed for each victim in San José, taking account of the victim's age and sex, then summed.

As explained above, we incorporated police and fire department EMS costs that are specific to San José. For other cost categories, the current estimates use national average costs per firearm incident by intent and severity adjusted to San José prices. We are working with Santa Clara County public health staff to

---

[11] Miller TR, Cohen MA**.** Costs of gunshot and cut/stab wounds in the United States, with some Canadian comparisons. *Accident Analysis and Prevention. 29*(3):329-341, 1997.  Follman M, Lurie J, Lee J, West J. The True Cost of Gun Violence in America: The data the NRA doesn't want you to see. Mother Jones. 2015.

[12] Zonfrillo MR, Spicer RS, Lawrence BA, Miller TR. Incidence and costs of injuries to children and adults in the United States. *Injury Epidemiology. 5*(1), article 37, 2018. Miller TR, Pindus NM, Douglass JB, Rossman SB. Databook on nonfatal injury: Incidence, costs, and consequences. Washington, DC: The Urban Institute Press, 1993. Lawrence BA, Miller TR. Medical and work loss cost estimation methods for the WISQARS cost of injury module. Calverton, MD: PIRE, 2014.
https://www.researchgate.net/publication/265162679_Medical_and_Work_Loss_Cost_Estimation_Methods_for_the_WISQARS_Cost_of_Injury_Module .

[13] Miller TR, Cohen MA, Wiersema B. Victim costs and consequences—A new look. Washington, DC: National Institute of Justice, 1996. Miller TR, Cohen M, Swedler D, Ali B, Hendrie D. Incidence and costs of personal and property crimes in the United States, 2017. *Journal of Benefit Cost Analysis. 12*(1), 24-54, 2021.

update the medical costs by applying our models to local hospital data, as well as to replace selected other direct costs with local data.

## About PIRE and Dr. Miller

The Pacific Institute for Research and Evaluation (PIRE) is an independent, nonprofit organization merging scientific knowledge and proven practice to create solutions that improve the health, safety, and well-being of individuals, communities, and nations around the world. PIRE's mission is to promote, undertake, and evaluate activities, studies, and programs that improve individual and public health, welfare, and safety.

Founded in 1974, PIRE has a longstanding reputation for research integrity. Its work is funded with a balance of National Institutes of Health (NIH) grants, other federal grants and contracts, and foundation awards. PIRE has held a NIH/National Institute on Alcohol Abuse and Alcoholism Center Grant -- Berkeley's Prevention Research Center -- since 1980.

Ted R Miller, PhD, is a widely cited health economist who has more than 30 years of experience studying the costs of injury and violence. He has published more than 350 books and journal articles on the costs of societal ills and savings from prevention. Dr. Miller received the Excellence in Science and Distinguished Career Awards from the Injury Control and Emergency Health Services Section of the American Public Health Association and the Vision Award from the State and Territorial Injury Prevention Director's Association. He is a Principal Research Scientist at PIRE and an Adjunct Professor at the Curtin University School of Public Health.

EXHIBIT "J"



✳ THE ONCE-HOT MP3 MARKET

# San Jose's New Gun Law Is the First of Its Kind

The mayor hopes it won't be the last.

BY **MARY HARRIS**
FEB 03, 2022 2:26 PM



San Jose Mayor Sam Liccardo with then New York City mayoral candidate Eric Adams in Washington on July 12, after attending a meeting with President Joe Biden about reducing gun violence. Saul Loeb/AFP via Getty Images

This is Sam Liccardo's last year as mayor of San Jose, California, and one of the things he wanted to get done before leaving office is pass a few ordinances around guns. He's really leaned in. First, San Jose required all gun purchases to be recorded, to ensure they're legal. Then, just last month, the city instituted another rule, believed to be the first of its kind in the country. This ordinance will require gun owners to both have liability insurance and pay a fee to the city; that money will fund gun safety initiatives. It's the beginning of a new kind of framework for gun safety—less about gun control, more about harm reduction. On Thursday's episode of What Next, I spoke to Liccardo about how the ordinance will work and why he's taken this approach. Our conversation has been condensed and edited for clarity.

**Mary Harris: Did you expect that you were going to finish out your time as mayor talking about gun violence?**

**Sam Liccardo:** Not really. Although I'm a criminal prosecutor by background, this is not a particularly violent city. In fact, I think we had the lowest homicide rate of any big city in the country last year.

**So why the push?**

Well, we've been rocked by three mass shootings in the last three years. And as I delve deeper into this subject, about guns and their impact in our community, you recognize that the headlines only tell a very small fraction of the harm and the devastation that families feel, whether it's a suicide, which comprises the majority of gun-

related deaths in our country, or unintentional shootings. I talked to a mom who lost a son that way just a couple years ago and, you know, about a little more than a third of emergency room admissions in this country result from unintentional shooting from guns.

**I read that you started working on gun violence prevention in earnest after the shooting at the Gilroy Garlic Festival in July 2019.**

I had a couple of encounters after that horrible event, one with the mother of one of the two children who had been shot, who just posed a question that stuck with me in my mind, which was, "Can't you or can't anybody do anything about this?" I had a much more contentious encounter at a memorial, it may have been a cousin or a friend who was Spanish-speaking, who confronted me very publicly and said, "Look, you guys talk a lot, but you don't really do anything." And she's right. What's the city doing about this? And that question just rang over and over in my head as I thought about what we can do as a city. Is there some space here for us to be able to stand up for our residents?

**"We see the coastline of gun violence in our communities, which are these horrible, devastating mass shootings. But the larger ocean is largely ignored."**— Sam Liccardo

**After the garlic festival, was the idea immediately how do we find a way to extract money from gun owners, and what would that look like?**

Well, I had been thinking for some time about this idea of gun insurance, and it's not a new idea. It's not my idea. Other legislatures have proposed these things. … Then I realized, well, that's nice, but it's not actually going to generate the resources we need to actually reduce gun harm. And so came up with this notion of a fee along with it.

We all agree the Second Amendment protects the right for all of us to own or possess a gun, but it doesn't require taxpayers to subsidize that right. And when people become aware of the fact that, hey, whether you own a gun or not, you're actually paying for this, it starts to get folks thinking about, well, how could we better distribute the costs of gun ownership and gun harm?

**And then in May 2021, you were dealing with another mass shooting right at the San Jose rail yard. Nine people were killed, plus the gunman died by suicide. How did that impact the conversation around this rule?**

I think it provided further impetus for us to start to move forward. What was particularly poignant to me, beyond the horrific event that happened, was over the next 13 days, we looked at gun violence in our city. We saw eight separate deaths or serious injuries that resulted from gun-inflicted wounds over those next 13 days. Not a single one of them really made the headlines. And what became so apparent was that we see the coastline of gun violence in our communities, which are these horrible, devastating mass shootings. But the larger ocean is largely ignored.

Take the horrible shooting at the transit facility. Within weeks, one of the witnesses to that shooting had turned a gun on himself. He was a VTA, a transit employee, obviously forlorn over the loss of his friends and undoubtedly suffered from some kind of PTSD from seeing this shooting, and he shot himself. Now, that was a preventable loss.

Could we have gotten to him with mental health treatment? Could we have gotten to him with suicide prevention initiatives? I can't know for sure if we could have changed the trajectory of the devastation that that family felt, but I sure would have liked to have tried.

https://slate.com/news-and-politics/2022/02/san-jose-gun-law-mayor-sam-liccardo-interview.html

**So the City Council voted last month on this ordinance, and it requires gun owners in San Jose to carry liability insurance and to pay an annual $25 fee, a harm reduction fee. The fee seems a little bit new to me. The insurance seems like something people may already have, through homeowners insurance or something like that. So tell me how this ordinance will change things.**

Yeah, all fair. So let me start with the insurance. It is true that many homeowners and renters already have liability insurance for possession of guns. They may not be reporting the guns to the insurance companies as they ought to be. It all depends, obviously, on the policy. But this is insurance that's widely available. We want to make sure that, first of all, folks have it, because that's important to compensate those who are injured and harmed by guns, but also because when you notify the insurance company, the insurance company can start to ask questions like, do you have a gun safe? Do you have a trigger lock? Have you taken gun safety classes? And those kinds of actions can help to reduce the premium for the insured, just as drivers got safe driver discounts on our premiums.

We got discounts back in the day when they came out with anti-lock brakes and airbags and other kinds of devices that have made driving safer. In fact, we've seen on a per-mile basis that the fatalities related to automobiles have dropped about 80 percent over the last five decades. And a big part of that is insurance companies that are incentivizing people to be safer, to drive safer cars. So in the same way, we're hoping that insurance companies will really get in the game, roll up their sleeves, not just obviously as San Jose does this, but hopefully as more cities and states do it.

**The $25 fee, what will that go toward? Who decides what it goes toward?**

We're forming a 501(c)(3) foundation, which is going to receive the dollars, and the board, which will be comprised of a host of folks, including, for example, Stanford professors, an epidemiologist who has been focused on gun harm, and nonprofit experts who understand domestic violence prevention programs, suicide prevention. We've invited and at least one member of a gun group has actually joined this effort to create this nonprofit, because we want organizations representing gun owners to be at the table, helping us to understand, how do we best communicate, how do we best invest? And overwhelmingly, under the ordinance, these dollars are going to serve occupants of gun-owning households or significant others who are in relationship with those who own guns.

**How?**

Well, a letter will go out to all gun-owning households and say, "Hey, you got a gun. Here's a lot of services that are available to you—mental health, suicide prevention, domestic violence prevention, gun safety classes, whatever it might be that is evidence-based that shows that we can reduce gun violence. Here's a host of services, and by the way here's your obligation. You've got to pay a $25 fee."

**So it's almost like joining a club.**

Yeah, and look, I don't pretend to believe these are overwhelmingly folks who are willing to want to do this. I recognize that this is by government fiat, and many would prefer not to pay the fee. But if we're in the business of reducing harm and devastation from guns, you go to where the risk is.

**How much are you expecting that people will pay this fee? Is there an enforcement mechanism? What happens if they don't?**

https://slate.com/news-and-politics/2022/02/san-jose-gun-law-mayor-sam-liccardo-interview.html

So it's a civil requirement. We have not created a criminal sanction here, for various reasons. So anyone who doesn't comply will pay a fine. In terms of enforcement, how that happens, what we see right now in the judicial landscape—the Supreme Court looks like they're about to invalidate New York's concealed carry restrictions. California also had concealed carry permit requirements. And when those get pushed aside, as we expect they will, we're going to have a lot more law enforcement.

Encountering people with guns, out on the street, in bars and nightclubs—you can imagine a host of different venues where a police officer would really like to have the ability to remove a gun from a potentially combustible situation. For example, there's a bar brawl and they're patting down everybody and someone's got a gun. "Have you paid your fee? You have insurance?" "No." OK, well, there's an opportunity for us to remove the gun. And then when the gun owner comes back and demonstrates that they comply with the law and they're a lawful gun owner, they get their gun back. But in the meantime, you've taken a gun out of a bar brawl. And that's not a bad thing.

**I watched the City Council meeting when the ordinance passed. You had dozens of people calling in to comment from all over the spectrum. The main criticism I heard is that this law is taxing a constitutional right and I don't get taxed for my freedom of speech. And I wonder what you'd say to someone who feels like their rights are being infringed on by a law like this one.**

Yeah, I don't blame anyone for being emotional about this. These are really important issues that go to the core of what we believe about freedoms and rights and our own safety. But I'd say this. First, it's a fee, it's not a tax, and I won't go into the details about what the difference is, but the reality is that in this country, there have been taxes on guns and ammunition since at least 1919, and they've been upheld by the courts. So the fact that there's a constitutional right attached somewhere to the exercise of a particular activity doesn't mean it can't be regulated, taxed, or have a fee imposed. Newspapers pay taxes, even though that's an important First Amendment right. For the litigants who filed a lawsuit against us who were exercising their Seventh Amendment rights, they paid a filing fee at the courthouse.

These are all constitutional rights. They're all important. The question is not whether or not government can regulate them or not, or post fees or taxes. The question is whether or not those pose barriers that are unduly onerous to the exercise of those rights. And, given the fact that buying a gun in this country costs hundreds if not thousands of dollars, depending on the model you take, a $25 fee is probably not terribly onerous, it seems to me. Nor is insurance, which can be obtained at little or no additional cost.

**Some constituents said things like you're making law-abiding citizens pay for the bad actions of other people, that this isn't fair. Like, I'm doing everything right, and yet I'm going to be made to pay more for people who aren't handling a gun safely. What would you say to that?**

I guess I would say it's not fair to 250,000 families in my city that don't own guns, but still have to pay taxes to respond to the harm inflicted by those who do own guns. And as I mentioned, an awful lot of that harm is inflicted by people who may be well intentioned and may be law-abiding. But they own guns. So we have to recognize that the burden, the financial burden, is shifted on taxpayers who certainly don't benefit, because they don't own guns in any way and in many ways are often harmed.

**"Nothing that has been tried is working. It's critical for us to try something different."**— Sam Liccardo

**You've been anticipating a barrage of lawsuits over this ordinance. How are you getting ready for this barrage of lawsuits, which is already beginning?**

https://slate.com/news-and-politics/2022/02/san-jose-gun-law-mayor-sam-liccardo-interview.html

Yeah, one suit's been filed, there may be others. The complaint we saw that was filed in court a few days ago was very much what we'd expected. We'd been working for a year and a half with teams of lawyers from great organizations throughout the country, like Brady United and Everytown and Giffords, that have been helping us understand the nature of the legal challenges we'll be facing, and we certainly crafted the ordinance in various ways to try to ensure this would be lawful and upheld. We're fortunate to have a private law firm that stepped up immediately and said we're willing to represent the city pro bono, so taxpayers aren't on the hook. The big issue will probably be attorneys' fees—that would be the cost and the risk that we have.

**You say the lawsuit's what you expected. What do you mean by that?**

I've often said, in the world of gun regulation, no good deed goes unlitigated. I've had a lot of mayors approaching me, legislators from the statehouse, approaching me, saying, "Hey, we want to do it too. We just got to figure out, is it going to get through the courts?" Well, we understand that's the nature. It's all going to get challenged because that seems to be, in a deeply divided country, the way to resolve difficult political issues.

**You don't sound concerned.**

Well, look, I'm a recovering lawyer. And so I feel fairly confident about our position. I think that the Constitution certainly allows cities and states to do this. At the same time, I also recognize we critically need innovation in this space. This is sort of the Silicon Valley spirit. Nothing that has been tried is working. You can read the headlines and figure that out pretty quickly. You look at the data about gun deaths in this country—it's atrocious compared to any other industrialized nation on the planet. It's critical for us to try something different.

**This ordinance makes a lot of sense for all the reasons that you've laid out. But also, it seems to me that in order to really work and have a lasting impact, it needs much more support, and not just financial support. But one city putting in place these kinds of rules—it's like a drop in the bucket.**

Well, Mary, you're right. We're not doing this because we think San Jose is suddenly going to stop gun violence by itself. We're doing this because we want the state of California to be doing this. We want every state to be doing this, so that we view gun insurance in the same way that every driver views auto insurance. This is simply part of the responsibility of having this very deadly instrument, whether it's an automobile or a gun, in one's possession.

We need to do something. We need to do more. And it's not just this idea. There are gonna be other innovative ideas in other cities throughout the country, and we encourage all of them. As mayors, we often steal each other's good ideas, and that's appropriate. I'm confident others will join us just as soon as they know that there's a path. And so we're going to blaze that path.