# Exhibit 7



COUNCIL AGENDA: 01/25/2022
FILE: 22-045
ITEM: 4.1

# Memorandum

**TO:** HONORABLE CITY COUNCIL

**FROM:** Mayor Liccardo,
Vice Mayor Jones,
Councilmember Cohen
Councilmember Carrasco

**SUBJECT:** SEE BELOW

**DATE:** 01/21/2022

Approved *[signatures]*   Date 01/21/2022

## DIRECTION:

1. Establish that the gun harm reduction fee in the initial year shall amount to $25 per gun-owning household—or an approximate amount close to $25 that assists with the rounding of the final fee—plus that amount strictly reflecting only the administrative cost incurred by:
    a. The Designated Non-profit Organization,
    b. The State of California for its use of the Department of Justice's Automated Firearm System and/or California Firearms Application Reporting System to communicate legal obligations and available services to gun-owning residents in San Jose, and
    c. The City, if any.

2. Determine that until or unless the Council determines otherwise,
    a. The City shall not be engaged in the collection of fees, the transmittal of information through the Department of Justice Database, nor the accounting nor distribution of the funds.
    b. After the initial implementation of the ordinance, the City's role will remain largely limited to setting the fee, engaging in contractual arrangements with the State of California and other entities necessary for the implementation of the ordinance, and enforcement.
    c. All administrative tasks shall be the responsibility of the Designated Nonprofit Organization, and all administrative costs shall be borne by that organization, and recovered by a portion of the fee revenue.

d. No fees shall be collected nor required of any gun owner until the City Attorney has determined that there is resolution of pending facial legal challenges to the ordinance for any claim which is not *res judicata,* that is, for any claim that is not precluded by a prior final judgment.

3. Approve the proposed ordinance, with modifications in the following sections:
    a. Expenditure of Gun Harm Reduction Fee, Section 10.32.220
        - Insert the following italicized language into A. to read, "All monies from the Gun Harm Reduction Fee shall be expended by the Designated Nonprofit Organization on providing services to residents of the City that own or possess a Firearm in the City or to members of their household, *or to those with whom they have a close familial or intimate relationship.*"
        - Insert within the itemized list under A., "Addiction intervention and substance abuse treatment"
        - Revise provisions under C. to read: "C. *The Designated Nonprofit Organization shall spend every dollar generated from the Gun Harm Reduction Fee, minus administrative expenses, exclusively for programs and initiatives designed to (a) reduce the risk or likelihood of harm from the use of firearms in the City of San José, and (b) mitigate the risk of physical harm or financial, civil, or criminal liability that a San José firearm owner or her family will incur through her possession of firearms.  Otherwise, t*he City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended*"*
    b. Exceptions, Section 10.32.225
        - Insert the following italicized language into B. to read, "Those persons who have a license to carry a concealed weapon issued pursuant to California Penal Code § 26150 or § 26155, *for as long as these statutes are legally enforceable.*"
    c. Compliance, Section 10.32.230
        - Delete the following stricken language and insert the italicized language into A. to read, "Each person required to obtain and maintain insurance under Section 10.32.210 shall demonstrate compliance with the insurance requirement by completing and executing a City-designated attestation form. Each such person shall state both the name of the insurance company issuing the policy and the number of the insurance policy on the attestation form, sign the form under penalty of perjury and keep the attestation form with the Firearms where they are being stored or transported. ~~There is no requirement to submit the attestation form to the City. However, each~~ *Each* person shall complete and sign a new attestation form under penalty of perjury in the event any of the information on the form changes. *Each person shall present the form when lawfully requested to do so by a peace officer who knows or has reason to believe that a person possesses a firearm.*"
    d. Purpose and Findings, 10.32.200
    Among the findings listed in B., add:

- "Based upon a November 2021 analysis by Dr. Ted Miller, Ph.D. and the Pacific for Institute Research and Evaluation (PIRE), on average, 206 people suffer death or serious injury from gunshots each year in the City of San José.
- Conservatively, San José taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term health care, and perpetrator adjudication and judicial sanctioning.
- Including private costs to individuals and families in the calculation, San José residents incur an annual financial burden of $442 million per year for gun deaths and injuries."

**DISCUSSION:**

When our current pandemic passes, an epidemic of gun violence will continue to take its grim toll throughout our nation.  In response, we propose that the City of San Jose become the first city—or U.S. jurisdiction—to use liability insurance and a fee-supported non-profit organization to reduce gun violence and harm.   We consider the merits for each of these two elements.

**Insurance**

Requiring every gun owner in my city to carry liability insurance will better compensate unintentional shooting victims and their families for medical and related expenses.  More importantly, insurance can also incentivize safer gun ownership.  Risk-adjusted premiums can—and in some cases, do—reduce the risk of gun harm, by encouraging firearm owners to take gun-safety courses, use gun safes, install child-safe trigger locks, or utilize chamber-load indicators.  Unintentional shootings–often involving children–annually claim the lives of 500 Americans and injure another 26,000.   We should apply the lessons of the insurance industry's impact on auto safety: reducing premiums on policyholders who drive more safely or buy cars with airbags or anti-lock brakes helped to reduce per-mile auto fatalities by 80% over the past five decades, saving 3.5 million lives. We need a similar approach to address unintentional firearm risk, because we live in a nation in which 4.6 million children live in a household where a gun is kept unlocked and loaded, and 72% of gun injuries occur at home, resulting in too many child victims.   As in other contexts, an insurance requirement can help make our community safer.

**Fees and Investment in Evidence-Based Prevention**

Second, we propose the payment of a modest fee to support evidence-based community-led initiatives to reduce the harm of gun violence in our community, such as through domestic violence and suicide prevention efforts, gun-safety classes, mental health services, and addiction intervention.
Why should the funding nonprofit focus these services for occupants of gun-owning households?   Because that's where the greatest risk is.  Epidemiological studies show that even a properly stored firearm in the home doubles occupants' risk of becoming a victim of homicide and triples the likelihood of suicide.  A more recent Stanford study concluded that male handgun owners may be eight times more likely to commit suicide by gun than other men, and gun-

owning women are 35 times more likely to do so than their gender peers.  Prioritizing those investments for residents living with guns in the home will provide the most direct path for reducing gun harm.

Some gun owners will express the view that the 2nd Amendment renders any imposition of a gun-related fee unconstitutional.  While the Second Amendment protects the rights of citizens to own guns, it doesn't require the public to subsidize gun ownership.  Every day, our taxpaying residents bear the financial burden for police officers, ambulances, and trauma surgeons to respond to gun violence.  These direct costs of gun violence to San Jose taxpayers-- to say nothing of the human and financial toll to victims' families—exceeds $39 million annually, and $1.4 billion for all Californians.   Using fees to fund initiatives to reduce gun violence reduces the financial burdens of gun use on all of us.

Moreover, courts have long upheld the imposition of taxes on the purchase of guns and ammunition ever since Congress imposed the federal gun tax in 1919.  This history affirms the consistent position of courts to allow the imposition of modest fees on the exercise of constitutional rights, such as IRS filing fees on the formation of nonprofit advocacy organizations (1st Amendment), taxes on newspapers (1st Amendment), and court filing fees (7th Amendment), the cost of counsel for defendants of financial means (6th Amendment), or on filing to become a candidate for elected office (1st and 14th Amendments).   The constitutional question is whether a modest fee substantially burdens the exercise of that right.  Given that we provide an explicit exemption for those unable to pay, it imposes no such burden.

We are grateful for the many community leaders and experts—such as NextDoor Solutions to Domestic Violence CEO Esther Peralez-Dieckman, Health Trust CEO Michele Lew, Gardner Healthcare CEO Reymundo Espinoza, Stanford University Medical Center Epidemiologist Dr. Julie Parsonnet, National Rifle Association San Jose Chapter President Dave Truslow, Community Health Partnership CEO Dolores Alvarado and Deputy Director Cathryn Hyde, and Brady United Director Shikha Hamilton, and Moms Demand Action California Chapter representative Rachel Michelson, and SAFE Legislative Affairs Director Dr. Susie MacLean MD, who have stepped up to advise or participate in the creation of a nonprofit organization that will identify high-impact violence reduction programs for investment.

**Compliance**

The ordinance will impose fines and other administrative sanctions on violators. Of course, criminals won't obey insurance or fee mandates. Yet, given the legally frail status of concealed-carry regulations before the current U.S. Supreme Court, we will likely see many more guns out on the street—and in bars, nightclubs, and other contexts that will increase our peril.  Law enforcement agencies face steep challenges keeping communities safe amid the ubiquitous presence of guns in America.  Members of the California legislature are exploring bills to have law enforcement agencies seize guns as a sanction for violations of local gun regulations, with subsequent restoration of ownership as required by constitutional due process.  Giving the police the ability to distinguish the scofflaws from law-abiding gun owners could provide a lawful basis for forfeiture of the gun in a context—where an officer responds to a bar brawl or domestic violence allegation—where even temporarily extracting a gun from a combustible situation could dramatically reduce the risk of deadly violence.

**Thanks**

Our gratitude goes to City Attorney Nora Frimann, Terra Chaffee, and the rest of her team for their extensive research and work in fashioning this ordinance, and to Christina Guimera and Paul Pereira in the Mayor's office for their mighty efforts to bring forward this initiative, and to convene partners to help.

In addition to those community leaders mentioned above, we also thank the many supporters, advocates, thought partners, and active partners of this initiative, including Rachel Michelson, Yvonne Murray, Maria Ines Ortega Barrera, and all of the volunteers and staff at Mom's Demand Action, Everytown, Brady United, and many of our Project Hope community leaders. We also thank local leaders who have stepped up to offer critical help, including District Attorney Jeff Rosen, Assemblymember Phil Ting and his lead expert on staff, Mark Chekal-Bain, Senator Josh Becker, California Attorney General Rob Bonta and his team, and Golden State Warriors Coach Steve Kerr.

 We are deeply appreciative of the philanthropic support of the policy and research work necessary for the crafting of this initiative by the Heising-Simons Foundation—particularly Deanna Gomby and Holly Kreider—and by SV Angel CEO Ron Conway. We also appreciate the willingness of the Silicon Valley Community Foundation to serve as a fiscal agent for these funds.

Finally, we offer our very deep gratitude to the *pro bono* efforts of our legal team, led by Joe Cotchett and Tamarah Prevost of Cotchett, Pitre & McCarthy, LLP. We have had great support, advice, research, and legal assistance provided by Allison Anderman and Esther Sanchez-Gomez at the Giffords Law Center to Prevent Gun Violence; Tanya Schardt and Steve Lindley at Brady United; UC Berkeley School of Law Dean Erwin Chemerinsky; Stanford Law Professor and Economist John J. Donohue III; Michael Redding, John Marsh, and team at the California Attorney General's office, and Keker, Van Nest & Peters LLP.

*The signers of this memorandum have not had, and will not have, any private conversation with any other member of the City Council, or that member's staff, concerning any action discussed in the memorandum, and that each signer's staff members have not had, and have been instructed not to have, any such conversation with any other member of the City Council or that member's staff.*