# Exhibit 1

RULES AGENDA: 06/16/21
ITEM: G.2



# Memorandum

**TO:** HONORABLE CITY COUNCIL

**FROM:** Mayor Liccardo
Vice Mayor Jones
Councilmember Carrasco
Councilmember Peralez
Councilmember Cohen

**SUBJECT:** SEE BELOW

**DATE:** June 16, 2021

**APPROVED:** /s/    Date: 06/10/21

---

**SUBJECT: Reducing Gun Harm, and the Public Burdens of Gun Violence**

## RECOMMENDATION

1. **Reducing Gun Harm, and the Public Burdens of Gun Violence**: Direct the City Attorney to return to Council in September with an ordinance for Council approval that would require every gun owner residing in the City of San José—with exceptions delimited below—to obtain and maintain a City-issued document evincing (i) payment of an annual fee, and (ii) attestation of insurance coverage for unintentional firearm-related death, injury, or property damage.

   a. Compliance:
      1) The gun owner shall sign and complete the insurance attestation, describing her specific policy number and issuer, and sign it under penalty of perjury. Acceptable coverage may include any homeowner's or renter's policy providing a minimum coverage amount.
      2) The document (or signed waiver) shall be kept wherever guns are stored or transported with the owner (in-home gun safe, in car, etc.).
   b. Exemptions and waivers:
      1) A written, discretionary waiver of the fee requirement and the insurance coverage will be permitted for all low-income individuals who qualify under Cal. Govt. Code §68632. However, the owner must store and maintain the waiver document with the gun.

2) An exemption from these requirements will exist for sworn law enforcement.
3) An exemption from these requirements will exist for holders of a concealed carry weapon (CCW) permits, if the City Attorney deems it necessary to do so to avoid conflicts with state preemption over CCW regulation.

c. Penalties: Failure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine. Subsequent failure to yield firearms upon the lawful demand of a law enforcement official under this ordinance would constitute a misdemeanor.

d. Legal issues:
1) To minimize financial risk against the City, the City Manager is directed to retain fee revenue in a segregated account until the conclusion of active litigation seeking to overturn the ordinance.
2) The City Attorney shall evaluate the legal feasibility of applying these requirements upon all persons possessing a firearm in the City of San Jose, whether they reside here or not.
3) The City Attorney shall evaluate the constitutionality of permanent seizure of the firearm as a consequence of noncompliance.

e. Fee Calculation and Revenue:
1) Pursuant to state law, fee revenue may only be utilized to fund city services provided specifically to respond to gun harm, including police officer response, fire/emergency medical response, and any City assistance to victims and their families.
2) Return in September with the final report from the Pacific Institute for Research and Evaluation (PIRE) detailing the financial burden carried by City taxpayers for the use of firearms in the City, pursuant to Proposition 26. Calculate a fee substantially below each gun owner's pro-rata share of that cost, to ensure clear legal satisfaction of Proposition 26's dictates. As Proposition 26 allows, the fee should provide full cost recovery for the City's cost of processing the fee application.
3) Should the County of Santa Clara indicate a willingness to participate in and enforce a fee mandate, fee revenue would be shared with the County to fund such services as emergency room treatment, victim assistance, jail, criminal prosecution, and mental health services within the constraints of Prop 26.

f. Ghost Guns: ensure that the definition of "firearm" under the ordinance includes unfinished frames and receivers commonly sold as do-it-yourself guns and/or assembled after downloading and 3D printing.

2. **Gun Violence Restraining Orders (GVRO):** Direct the City Manager to return to Council in the Fall to identify ways to increase access and use of GVRO's, including:

   a. Better inform residents in multiple languages about accessing GVROs, such as by:
   - requiring protocols in our gang prevention outreach by employees of PRNS and affiliated non-profits to clients and family members;
   - reviewing and revising SJPD protocols and training about proactively informing reporting parties of domestic violence about the availability of GVRO's (rather than doing so only upon their affirmative disclosure of the existence of a firearm in the home);

- publicly displaying information in our police lobbies, on our city website, and other prominent locations;
- Communicating to key HR/risk officers among employers and school districts; and
- participating in a convening of stakeholders by the District Attorney's Office to explore other options for enhancing public awareness.

   b.  Update training protocols for officers regarding recent changes in state law that enable police officers to complete DVRO's on behalf of residents afraid or otherwise constrained from doing so.

   c.  Return to Council during the time for identifying City-sponsored legislation, and add for Council consideration a bill that would strengthen the effectiveness of GVRO's, including (a) broadening authority to search the subject's residence to ensure compliance; (b) enhancing sanction for violating a GVRO from a misdemeanor to a wobbler/felony; (c) enabling District Attorneys' offices to submit GVRO's on behalf of concerned witnesses and victims.

3. **Assault Weapons Ban:** Direct the City Attorney to file an amicus curia or to join other cities and counties throughout the state in jointly filing to appeal the June 4, 2021, District Court decision in *Miller v. Bonta* that overturned California's three-decade ban on assault weapons.

4. **Ghost Guns:** Direct the City Attorney to craft a prohibition on the possession, assembly, and manufacturing of any untraceable gun lacking a serial number, in collaboration with partner organizations such as Brady United and Gifford Law Center, to cover gaps in California state prohibitions, most of which do not take effect until July 2022.

5. **Straw Purchasing and Suicide Prevention:** Direct the City Attorney to bring to Council this June the final ordinance of the measures upon which Council had already voted in 2019, to regulate gun sale transactions to counter "straw purchasing"—such as by videotaping transactions and training gun store staff—and to post suicide prevention information prominently at the point of sale. Gun store staff training should include vigilance for circumstances of the purchase of guns by domestic violence victims for their disqualified abusers.

6. **Ammunition Checks:** If <u>pending federal litigation overturns the 2016 California mandate for background checks on all ammunition purchasers</u>, return to Council to consider several options, including (a) assessing the legality of an SJPD-issued permit for ammunition purchases, and (b) evaluate whether to mandate fingerprinting on all ammunition purchases within the City of San José, modeled on the successful efforts of sixteen other cities.

7. **"Looking out for One Another":** Convene with County leaders to discuss how we can create a public campaign to encourage appropriate notification to mental health or law enforcement authorities of implied or explicit threats of violence, planning or preparatory steps to commit violence, or apparent fascination with prior acts of violence.

8. **Gun Buy-Back programs:** Direct the City Manager to return to Council to discuss how the City could more frequently host gun buy-backs and strengthen partnerships for buy-back programs with Santa Clara County and other public, private, and non-profit organizations.

9. **Leveraging Federal Information for Early Intervention**: Direct the City Manager to work with the Santa Clara County District Attorney to enhance communication between the San José Police Department and other local law enforcement with key Federal agencies—specifically the Special Agents in Charge (SAC) for local Federal Bureau of Investigations, Bureau of Alcohol, Tobacco, and Firearms, DEA, DHS, and U.S. Customs and Border Control—to improve protocols that will enable local law enforcement access to critical information about high-risk individuals in San José. Report back to Council the findings from such efforts.

## Discussion

Let's begin by putting aside the obvious: none of these proposals will magically prevent all horrific mass shootings like those that took the lives of our community members on May 26, 2021, or July 28, 2019, or four other occasions in the past three years. A vaccine may control a single virus, but in a nation burdened with more than 300 million guns, <u>no panacea exists to halt our nation's epidemic of mass shootings</u>.

Yet beyond these mass shootings remain an even more horrific reality, the frequency of which has sadly desensitized us: daily gun violence. During the thirteen days that friends and family grieved the devastating loss of their nine loved ones at the VTA rail yard, San José has suffered eight more episodes of gun violence. Every year, too many San José families endure the devastating pain of dozens of gun killings and many more emergency room admissions for gunshot injuries.
We can take action to save lives. To do so, we must not focus our efforts on mass shootings, but rather on the more routine—and more deadly—gun harm that we see weekly in emergency rooms throughout our City. Firearm use leaves our nation with approximately 40,000 annual deaths, 71,000 annual non-fatal injuries, and too many grieving loved ones.
Since no city or state in the United States has yet implemented an insurance or fee mandate, these proposals will attract naysayers. In the current political climate, even modest harm-reduction approaches draw intense opposition. The gun lobby has beaten back similar proposals introduced in California, Massachusetts, New York, and Congress, where a bill currently exists. Yet, as we consider our nation's deadly daily toll of gun victims, future generations will reserve their criticism for those who chose to do nothing.

It has become axiomatic to say that America suffers from an "epidemic" of gun violence, and it's long past time for us to treat gun violence as a public health problem. <u>A public health approach focuses our efforts on multiple and other varied interventions that can reduce risk factors and the ultimate harm of gun violence.</u> As with other epidemics in which public health approaches have been applied, such as smoking and automobile-related deaths, we must use many different interventions, including market-based solutions, behavioral insights, regulation, and education. Implementation of these varied approaches has reduced <u>per-mile auto fatalities by 80% in five</u>

decades, saving an estimated 3.5 million lives. We must identify interventions, monitor results, and scale the impact of best practices for other cities and states. While the powerful gun lobby halts progress in Congress and state legislatures, cities have become laboratories of civic innovation, from which others can learn, adopt, and adapt.

**Insurance and Fee Mandates**
The insurance and fee mandates will accomplish several important goals:

- **Compensate the public for the cost of gun harm:** Direct costs of gun violence to California taxpayers for gunshot-related medical treatment, police response, ambulance transport, and the like exceeded $1.4 billion in 2018. While the Second Amendment protects the rights of citizens to own guns, it has never mandated that the public subsidize gun owners' exercise of that right.

- **Incentivize safer behavior:** Insurance-based mechanisms can encourage firearm owners to take safety classes, use gun safes, install trigger locks, or utilize chamber-load indicators. Insurers have long used risk-adjusted premiums to reward good driving and incentivize the use of airbags and other safety features, reducing per-mile auto fatalities by 80% in five decades. We need a similar approach to address gun accident risk, because 4.6 million children live in a household where a gun is kept unlocked and loaded, and 72% of gun injuries occur at home. Nearly 500 Americans also die from preventable, unintentional shootings every year—including many children.

- **Provide care to injured victims:** Injuries from unintentional shootings—which are generally insurable—comprise more than a third of all gun-related injuries. An insurance mandate will ensure proper medical care and rehabilitation for many of the 26,000 injured victims of unintentional shootings annually, including more than 7,000 children.

- **Take guns away from criminals:** This ordinance can provide a straightforward, constitutionally compliant mechanism for the temporary or permanent seizure of guns from individuals who have no intention of being law-abiding. Where an owner lacks the City-issued document, police could temporarily or permanently seize an identified gun immediately on-site, such as after responding to a domestic violence call, more immediately and effectively than a GVRO.

- **Fund critical public services:** Pursuant to Proposition 26, fees must support the provision of public services, such as medical treatment, emergency response, and police, in response to gun violence. Fines—for non-compliance—could compensate victims, and fund violence prevention, mental health care for trauma, or gun buy-backs.

- **Broaden impact:** With a successful effort, other cities could adopt similar ordinances, and—particularly with statewide adoption—enable greater impact, while engaging the insurance industry more broadly in incentivizing safer behavior.

To be sure, critics will assert that criminals won't pay a fee, and won't get insurance. That's precisely the point; they may not get driver's licenses either, nor update their registration, but the failure to do so provides a basis for a lawful seizure.

**Ghost Guns**
SJPD has reported a rapid rise in the possession and use of unserialized firearms seized from criminals, matching reports nationally.  State law contains gaps, the most significant of which lies in its delayed application--another year away.   San Francisco, San Mateo County, and other communities have taken action to ban the assembly, manufacture, and possession of these untraceable weapons, and non-profit partners have offered Constitutionally-compliant language for a proposed ordinance in San Jose. We should move forward quickly.

**Gun Violence Restraining Orders**
Many employers, family members, and educators become aware when a gun-owning individual poses a risk of harming themselves or others, but often feel helpless to do much about it. Identifying those high-risk individuals, and separating them from their guns—even temporarily—can make everyone safer. This appears particularly true within the home, where family members see the signs of mental distress most clearly; in one study, 54% of mass shootings involved domestic or family violence, and in 42% of those incidents, the shooter showed clear signs of intent to others. In another survey of survivors living in 67 California domestic violence shelters, 38% of respondents reported a gun in the household, of whom 2/3 reported that the abuser had used the gun to threaten or scare them.

Gun Violence Restraining Orders provide family members, neighbors, coworkers, and others who fear violent conduct by a gun owner a means to seek court-mandated seizure of those guns for 21 days, and with a permanent order, up to five years. While the rate of obtaining GVRO's has increased substantially in Santa Clara County in recent years—from four in 2017 to 122 in 2019, with much credit to the outreach of the Crime Strategies Unit at the District Attorney's Office and the combined work of the San José Police Department and City Attorney's Office—it remains an underutilized tool that can markedly reduce the risk of gun harm. Education is key—and not merely for community members, but also for police officers, employers, non-profit providers, schools, and many others.

From conversations with police officers and prosecutors, there appears to be a consensus that GVRO's could use more teeth, for example, by authorizing searches to verify full compliance, and enabling felony conviction for egregious violations. It also appears that the complexity of the multi-form GVRO application seems too daunting for many community members needing help, and requires that they provide information well beyond their likely knowledge, e.g., to describe all of the guns owned by the person, and whether there are "no less restrictive alternatives." Some recent changes in the law—for example, enabling police officers to submit GVRO's on behalf of potential victims—will help, but it's far from clear whether most SJPD officers even know of the new law, and how they can use this tool. The recommendations above include what we can accomplish as a City, but also suggested legislative reforms from local experts for making DVRO's more effective statewide.

**Straw Purchasing and Suicide Prevention**

Previously, Council approved direction to draft an ordinance requiring gun stores to conduct video and audio recording of all firearm and ammunition transactions, and training staff to detect straw purchases. We further required that all gun stores display County-approved suicide prevention materials at the point of sale. We understand that the ordinance appears near completion, and we urge its implementation this month.

While additional sensible restrictions on gun sales—particularly federal action that would meaningfully enforce eligibility restrictions, ban semiautomatic assault weapons with large ammunition clips, and the like—appear long overdue, their impact seems modest given the ubiquity of gun ownership and access. Gun sales amount to the shoreline to a much larger sea—the ocean of 300 million guns currently in circulation—we focus our attention on that larger source of risk.

**Regulating Ammunition Purchases**
Regulation of ammunition sales can reduce gun harm, but California's statewide ammunition database and background checks have come under scrutiny and legal challenge. If the Ninth Circuit invalidates the California law, we'll need to look for alternatives locally. The direction calls for staff to return to Council to discuss options, including a City-issued permit. Another promising alternative involves fingerprinting at the point of sale, which cities like Sacramento have used effectively to identify 156 persons illegally possessing guns, resulting in dozens of arrests and gun seizures in one year (2008) alone.  Sixteen other communities in California have enacted similar ordinances.

**Looking Out for Each Other**
Among the best practices in cities globally are community-based efforts to reduce gun violence through vigilance—engaging community members to spot the signs of emotional and mental distress in coworkers, students, and family members that will result in preventative outreach by mental health and public safety officials. With new funding available from the State of California—and likely, federal dollars—the County will have opportunities to expand mental health services, and a collaboration with the City and the community could "crowd-source" early intervention. New York offers one example of an effective community outreach program, Cure Violence in the City of New York, utilizing community-based "outreach workers" and "violence interrupters" in neighborhoods most vulnerable to gun violence. In an area of East New York, Brooklyn, gun injuries fell 50 percent following the implementation of this program.  Similarly, Berlin offers a compelling model focused on schools.

**Collaboration of Partners**
Our sincere thanks go to many partners who have helped to support this work—including Ron Conway and the Heising-Simons Foundation—and to the many partners who have helped to shape, inform, and provide feedback on these proposals, including the Santa Clara County Office of the District Attorney, The Gifford Law Center, local advocates with Moms Demand Action, the Office of the City Attorney, the San José Police Department, the Santa Clara County Public Health Department, the Santa Clara County Counsel's Office, Everytown for Gun Safety, Brady United, and attorneys at the offices of Keker Van Nest and Cotchett, Pitre who have graciously offered their guidance *pro bono*.

**Conclusion**
Plenty of criticism will emerge for these solutions. I encourage critics to come up with better ones—let's have a discussion of the best ideas, but above all, let's move forward. We don't have the luxury of remaining mired in discussing and posturing—our community demands action.

*BROWN ACT: The signers of this memorandum have not had, and will not have, any private conversation with any other member of the City Council, or that member's staff, concerning any action discussed in the memorandum, and that each signer's staff members have not had, and have been instructed not to have, any such conversation with any other member of the City Council or that member's staff.*