# Exhibit 7

COUNCIL AGENDA: **1/25/22**
FILE: **22-045**
ITEM: **4.1**



CITY OF
**SAN JOSE**
CAPITAL OF SILICON VALLEY

*Memorandum*

**TO:** HONORABLE MAYOR
AND CITY COUNCIL

**FROM:** Nora Frimann
City Attorney

**SUBJECT:** GUN HARM REDUCTION
ORDINANCE

**DATE:** January 21, 2022

---

## SUPPLEMENTAL

### REASON FOR SUPPLEMENTAL

The attached list provides the citations for the various research and data sources used in the recitals of the proposed ordinance that is being considered at the City Council's January 25, 2022 meeting. It may be useful in Council's deliberations on the matter.

/s/
NORA FRIMANN
City Attorney

**STUDIES CITED IN GUN HARM REDUCTION ORDINANCE RECITALS**

| | Source |
|---|---|
| 1. | The Educational Fund to Stop Gun Violence. "Public Health Approach to Gun Violence Prevention." https://efsgv.org/learn/learn-more-about-gun-violence/public-health-approach-to-gun-violence-prevention/ <br><br> Data sourced from Centers for Disease Control and Prevention "Underlying Cause of Death" reports https://wonder.cdc.gov/ucd-icd10.html |
| 2. | Data from the Centers for Disease Control and Prevention: https://wisqars.cdc.gov/data/explore-data/home |
| 3. | Santa Clara County Public Health. "Firearms in Santa Clara County." https://publichealth.sccgov.org/sites/g/files/exjcpb916/files/firearms-facts-2018.pdf |
| 4. | American Journal of Epidemiology. "Guns in the home and risk of a violent death in the jome: findings from a national study." https://pubmed.ncbi.nlm.nih.gov/15522849/ |
| 5. | Annals of Internal Medicine. "The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members." https://www.acpjournals.org/doi/10.7326/M13-1301 |
| 6. | The New England Journal of Medicine. "Handgun Ownership and Suicide in California." https://www.nejm.org/doi/full/10.1056/NEJMsa1916744 |
| 7. | American Academy of Pediatrics. "Guns in the Home." https://www.healthychildren.org/English/safety-prevention/at-home/Pages/Handguns-in-the-Home.aspx |
| 8. | Everytown for Gun Safety and Moms Demand Action. "Innocents Lost: A year of unintentional child gun deaths, June 2014." https://momsdemandaction.org/new-analysis-one-year-unintentional-child-gun-deaths-u-s-finds-nearly-two-children-killed-every-week-60-percent-higher-federal-data-reflect/ |
| 9. | Social Science and Medicine. "State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003." https://pubmed.ncbi.nlm.nih.gov/17070975/ |
| 10. | Journal of Urban Health. "Firearm Storage in Gun-Owning Household with Children: Results of a 2015 National Survey." https://www.thetrace.org/wp-content/uploads/2018/05/Firearm-Storage-in-Households-with-Children_JUH.pdf |
| 11. | The Educational Fund to Stop Gun Violence. "Unintentional Shootings." https://efsgv.org/learn/type-of-gun-violence/unintentional-shootings/ |

| 12. | Hartford Courant. "Sandy Hook Families Settle Lawsuits Against Lanza Estate for $1.5M." https://www.courant.com/news/connecticut/hc-sandy-hook-lawsuit-settled-20150803-story.html<br><br>Gilman & Bedigian, LLC. "Man who shot intruder in his home sued for wrongful death." https://www.gilmanbedigian.com/man-who-shot-intruder-in-his-home-sued-for-wrongful-death/<br><br>CBS News. "Burglar sues Calif. Homeowner, 90, who returned fire." https://www.cbsnews.com/news/burglar-sues-calif-homeowner-90-who-returned-fire/ |
|---|---|
| 13. | The Educational Fund to Stop Gun Violence. "Public Health Approach to Gun Violence Prevention." https://efsgv.org/learn/learn-more-about-gun-violence/public-health-approach-to-gun-violence-prevention/ |
| 14. | The Actuary. "Firearm Risk: An Insurance Perspective." https://theactuarymagazine.org/firearm-risk/ |



# The Public Health Approach to Gun Violence Prevention

November 2020



# Table of Contents

3   Introduction

4   What is Public Health?

5   Why is Gun Violence a Public Health Epidemic?

7   What is the Public Health Approach?

10   Health Impact Pyramid

11   How Do We Address Gun Violence Through the Public Health Approach?

13   Recommendations

14   Resources

# Introduction

Each day more than 100 Americans die by firearms and nearly 200 are shot and injured. These deaths are preventable. A comprehensive public health approach is needed to address the gun violence epidemic. Public health is the science of reducing and preventing injury, disease, and death and promoting the health and well-being of populations through the use of data, research, and effective policies and practices. A public health approach to prevent gun violence is a population level approach that addresses both firearm access and the factors that contribute to and protect from gun violence. This approach brings together institutions and experts across disciplines in a common effort to: 1) define and monitor the problem, 2) identify risk and protective factors, 3) develop and test prevention strategies, and 4) ensure widespread adoption of effective strategies.

We have used the public health approach to successfully eradicate diseases, reduce smoking-related deaths, and decrease car crashes. We can use this same approach to prevent gun violence in all its forms and strive towards a society where everyone can live free from gun violence.

# What is Public Health?

Public health is the science of reducing and preventing injury, disease, and death and promoting the health and well-being of populations through the use of data, research, and effective policies and practices. Public health works to address the underlying causes of a disease or injury before they occur, promote healthy behaviors, and control the spread of outbreaks.

Public health researchers and practitioners then work with communities and populations to implement and evaluate programs and policies that are based on research. Policymakers, researchers, and advocates have successfully used the public health approach in the United States to drastically decrease premature death rates, reduce injury, and improve the health and well-being of the population, including by eradicating diseases like polio, promoting widespread usage of vaccines, reducing smoking-related deaths, addressing environmental toxins, and decreasing motor vehicle crashes.

## How Public Health differs from Healthcare

People often assume that public health is the same as healthcare. While both strive to improve health and well-being, they approach this goal differently. In healthcare, the focus is on improving the health of the individual. In contrast, public health focuses on improving the health of an entire population through large-scale interventions and prevention programs.

Public health works to address the many factors that determine the health and well-being of populations. These factors are often referred to as risk and protective factors. They are characteristics or behaviors in individuals, families, communities, and the larger society that increase or decrease the likelihood of premature death, injury, or poor health.

**PUBLIC HEALTH APPROACH**

 VS. 

# Why is Gun Violence a Public Health Epidemic?

Gun violence is a public health epidemic that affects the well-being and public safety of all Americans. In 2018, nearly 40,000 Americans were killed by gun violence, more than the number of Americans killed in car crashes.[2] An additional 71,000 Americans suffer nonfatal firearm injuries,[3] and millions of Americans face the trauma of losing a loved one or living in fear of being shot. The impacts of gun violence, both direct and indirect, inflict an enormous burden on American society. When a child is shot and killed, they lose decades of potential: the potential to grow up, have a family, contribute to society, and pursue their passions in life. When compared to other communicable and infectious diseases, gun violence often poses a larger burden on society in terms of potential years of life lost. In 2018, firearm deaths accounted for 919,185 years of potential life lost before the age of 65 – more than diabetes, stroke, and liver disease combined.[4]

# Scope of Gun Violence

Americans are impacted by various forms of gun violence – including suicide, homicide, and unintentional deaths, as well as nonfatal gunshot injuries, threats, and exposure to gun violence in communities and society.

## 1. Firearm Suicide:

- Each year, nearly 23,000 Americans die by firearm suicide.[5]
- Half of all suicide deaths are by firearm.[6]
- Suicide attempts by firearm are almost always deadly — 9 out of 10 firearm suicide attempts result in death.[7]
- Access to a firearm in the home increases the odds of suicide more than three-fold.[8]

## 2. Firearm Homicide:

- Each year, more than 13,000 Americans die by firearm homicide.[9]
- Nearly three out of four homicides are committed with a firearm.[10]
- Access to firearms — such as the presence of a gun in the home — doubles the risk for homicide victimization.[11,12]
- The firearm homicide rate in the United States is 25.2 times higher than other industrialized countries.[13]

## 3. Domestic Violence:

- More than half of female intimate partner homicides are committed with a gun.[14]
- There are about 4.5 million women in America who have been threatened with a gun and nearly 1 million women who have been shot or shot at by an intimate partner.[15]
- A woman is five times more likely to be murdered when her abuser has access to a gun.[16]

## 4. Police-Involved Shootings:

- 1,000 Americans are shot and killed by police every year.[17]
- Black Americans are disproportionately impacted by police-involved shootings and are killed at more than twice the rate of White Americans.[18]

## 5. Unintentional Shootings:

- Each year, nearly 500 people die from unintentional firearm injuries — more than one person every single day.
- More than 100 children and youth die each year due to unintentional gun injuries.[20]
- Americans are four times more likely to die from an unintentional gun injury than people living in other high-income countries.[21]

## 6. Nonfatal Firearm Injuries:

- For every individual in the United States who dies by firearm, more than two individuals survive.[22]
- Each year, there are over 71,000 nonfatal gunshot injuries, costing hospitals an estimated $2.8 billion annually.[23]
- Each year, there are more than 7,100 emergency room visits for nonfatal gunshot wounds among children under the age of 18 and 36,000 visits among those ages 18-29.[24]

## 7. Exposure to Gun Violence:

- One-third of American adults say that their fear of mass shootings prevents them from going to certain places or events.[25]
- An estimated 15% of American adults state that they have witnessed a shooting and 15% of American adults also state that someone they care for has been killed with a gun.[26]
- An estimated 25% of American adults report being threatened or intimidated with a gun.[27]



# What is the Public Health Approach?

The Centers for Disease Control and Prevention and World Health Organization outline a public health approach to violence prevention based on four steps: [28,29]



1. Define and monitor the problem
Define the violence problem through systematic data collection.

2. Identify risk factors and protective factors
Conduct research to find out why violence occurs and who it affects

3. Develop and test prevention strategies
Design, implement and evaluate interventions to see what works

4. Ensure widespread adoption of effective strategies
Scale-up effective and promising interventions and evaluate their impact and cost-effectiveness

**STEP 1 – DEFINE AND MONITOR THE PROBLEM**

Researchers and policymakers need reliable data to understand the scope and complexity of gun violence. There are many different types of gun violence, and each type often requires different prevention strategies. Collecting and distributing reliable firearm data is essential to combating gun violence through a public health approach. Gun violence prevention researchers need reliable and timely data around the number of firearm fatalities and nonfatal injuries that occur in the United States each year. This data should include the demographics of the victim and shooter (if applicable), the location and time of the shooting, and the type of gun violence that occurred. Databases should classify the types of gun violence (suicides, intimate partner violence, mass shootings, interpersonal violence, police shootings, unintentional injuries) based on clearly defined and standardized definitions. This data should be made widely available and easily accessible to the general public free of charge.

**STEP 2 – IDENTIFY RISK AND PROTECTIVE FACTORS**

The public health approach focuses on prevention and addresses population level risk factors that lead to gun violence and protective factors that reduce gun violence. A thorough body of research has identified specific risk factors, both at the individual level and at the community and societal level, which increase the likelihood of engaging in gun violence. At an individual level, having access to guns is a risk factor for violence, increasing the likelihood that a dangerous situation will become fatal. Simply having a gun in one's home doubles the chance of dying by homicide and increases the likelihood of suicide death by over three-fold.[30] Other individual risk factors closely linked to gun violence include: a history of violent behavior, exposure to violence, and risky alcohol and drug use.[31] Community level factors also increase the likelihood of gun violence. Under-resourced neighborhoods with high concentrations of poverty, lack of economic opportunity, and social mobility are more likely to experience high rates of violence. These community level factors are often the result of deep structural inequities rooted in racism.[32],[33] Policies and programs should mitigate risk factors and promote protective factors at the individual and community levels.

# Applying the Public Health Approach to Prevent Firearm Suicide

The social ecological model is a public health framework that is used to show the interplay between risk and protective factors for health outcomes and to develop parallel policies and programs that address these factors. The model spans four levels: individual, relationship, community, and society.

Access to firearms is a significant risk factor for firearm suicide, and addressing firearm access is a critical component of any suicide prevention strategy. Prevent Firearm Suicide is a project of the Educational Fund to Stop Gun Violence that applies the social ecological model for firearm suicide prevention, by sharing the available programs and policies that reduce access to firearms from individuals when they are at an elevated risk for suicide. These interventions span the four levels of the model and include safer firearm storage (individual), lethal means safety counseling (relationship), gun shop projects (community), and extreme risk laws (society).



**Prevent Firearm Suicide**

| **Individual** Safer Storage | **Relationship** Lethal Means Safety Counseling | **Community** Gun Shop Project | **Society** Extreme Risk Laws |

To learn more, visit **PreventFirearmSuicide.com**

**STEP 3 – DEVELOP AND TEST PREVENTION STRATEGIES**

Policymakers and practitioners must craft interventions that address the risk factors for gun violence. These interventions should be routinely tested to ensure they are effective and equitable; rigorous evaluations should be conducted on a routine basis. The foundation for effective gun violence prevention policy is a universal background check law, ensuring that each person who seeks to purchase or transfer a firearm undergoes a background check prior to purchase. Universal background checks should be supplemented by a firearm licensing system, which regulates and tracks the flow of firearms, to ensure that firearms do not make it into the hands of prohibited individuals. Building upon this, policymakers can create interventions that target behavioral risk-factors for gun violence (e.g. extreme risk laws) and they can push for policies that address community risk factors that lead to violence (e.g. investing in community based violence prevention programs). In addition to these gun violence prevention policies, there are a number of evidence-based strategies that can reduce gun violence within communities. For example, community based violence intervention programs work to de-escalate conflicts, interrupt cycles of retaliatory violence, and support those at elevated risk for violence.

**STEP 4 – ENSURE WIDESPREAD ADOPTION OF EFFECTIVE STRATEGIES**

While it is essential to pass strong laws, it is equally important to enforce and implement these laws and to scale up evidence-based programs. Strong gun violence prevention policies are only effective if they are properly implemented and enforced in an equitable manner. A key focus of the public health approach is ensuring that these strategies are not only effective but that they also promote equity. Historically disenfranchised groups should be involved in the implementation process to ensure that public health strategies do not have unintended consequences. For example, gun violence prevention policies should be consistently evaluated to ensure that they do not stigmatize individuals living with mental illness or perpetuate the discriminatory and racist practices embedded in the criminal justice system. The public health approach includes a focus on allocating funds for implementation and evaluation of these gun violence prevention strategies at the federal, state, and local levels. Funds should be allocated to train the proper stakeholders to ensure that new policies and programs are properly adopted and achieve measurable and equitable outcomes.

# Health Impact Pyramid

The goal of public health is to maximize the overall health and well-being of populations. Public health practitioners do this by developing a wide range of interventions. These interventions address risk and protective factors ranging from factors at the individual level to the societal level. The public health pyramid helps researchers conceptualize the many different levels of intervention needed to address a public health problem like gun violence.[34]

At the top of the pyramid are narrowly tailored interventions that work with individuals at risk for gun violence. These interventions, like lethal means safety counseling and violence intervention programs, can have a tremendous impact in reducing gun violence. Yet, they also require individual action. These programs provide the tools and support to change behavior, but the individuals themselves must be willing to take action and change behavior.

The middle of the pyramid includes interventions that require less individual action. They are often laws and policies that change the environments within communities to mitigate risk factors. One such policy is universal background checks and firearm licensing. Research shows that when individuals are required to undergo a background check and obtain a license to purchase a firearm, far fewer firearms are diverted into illegal markets and used to perpetrate violence.

At the bottom of the public health pyramid are the conditions within society that lead to poor health outcomes like gun violence. These factors are often referred to as the root causes or social determinants of health. Socioeconomic factors, such as racial disparities, inequality, poverty, inadequate housing and education, are all risk factors for interpersonal gun violence. Policies that address these root causes have enormous potential to reduce gun violence and improve health. These policies, while requiring a broad collective effort to achieve, require minimal individual effort to be effective at reducing gun violence.

**The health impact pyramid helps researchers conceptualize the many different levels of intervention needed to address a public health problem like gun violence.**

Source: Adapted from Frieden TR. (2010). A framework for public health action: the health impact pyramid. American Journal of Public Health.

Increasing individual effort

**Counseling and education:** Safe storage campaigns; Firearm training courses

**Clinical intervention:** Lethal means safety counseling; violence intervention programs

**Long-lasting protective intervention:** Extreme risk laws

**Changing the context to make individual's default decisions healthy:** Pass universal background checks, firearm licensing, Repeal stand your ground laws

**Socioeconomic factors:** Address inequity and structural racism; Fund social services, education, housing, job training



# How Do We Address Gun Violence Through the Public Health Approach?

The public health approach is multifaceted and comprehensive and brings together institutions and experts across disciplines in a common effort to develop a variety of evidence-based interventions.[35] This comprehensive approach to tackling public health crises in America has been used over the last century to eradicate diseases like polio, reduce smoking deaths, and make cars safer. This public health approach has saved millions of lives. We can learn from public health successes – like car safety – and apply these lessons to preventing gun violence.

**Applying the public health successes of car safety to prevent gun violence:** One of the greatest American public health successes is our nation's work to make cars safer. By using a comprehensive public health approach to car safety, the United States reduced per-mile driving deaths by nearly 80% from 1967 to 2017.[36] This public health approach to car safety prevented more than 3.5 million deaths over these fifty years.[37] To reduce gun violence, we should apply this same time-tested public health approach.



**Per Mile Car Crash Deaths, 1967-2017**

**By using a comprehensive public health approach to car safety, the United States reduced per-mile driving deaths by nearly 80% from 1967 to 2017.**

Fatality rate per 100 million miles traveled

Source: National Traffic Highway Safety Administration (NTHSA). Motor Vehicle Traffic Fatalities and Fatality Rates, 1899-2017.

EFSGV  THE EDUCATIONAL FUND TO STOP GUN VIOLENCE

# Applying the Public Health Successes of Auto Safety to Gun Violence Prevention

|  | **Preventing Car Crashes** | **Preventing Gun Deaths** |
|---|---|---|
| **ALLOCATE** | Allocate funds to study the epidemic of motor vehicle crashes. | Allocate funds to the CDC and the NIH to research gun violence. |
| **REGULATE** | Federal agencies regulate car manufacturers and ensure car safety. | Allow federal agencies to regulate firearm manufacturers and ensure gun safety. |
| **LICENSING** | Drivers must submit an application and pass a test to obtain a driver's license. | Require firearm purchasers to submit an application, undergo a background check, and take safety education to obtain a license to own a firearm. |
| **REGISTRATION** | Car registration is required at each point of sale. | Pass firearm registration laws to ensure that firearms are registered at each point of sale. |
| **PROHIBIT RISKY PEOPLE** | Reckless and drunk driving laws ensure that risky individuals do not endanger others on the road. | Expand firearm prohibitions to include individuals who are at elevated risk for violence. |
| **MANUFACTURING STANDARDS** | Manufacturers are required to make safer cars by installing seat belts and airbags. | Require manufacturers to make firearms safer, including requiring that guns be outfitted with microstamping technology. |
| **AGE REQUIREMENTS** | Age requirements for obtaining a driver's license, including a graduated licensing system (driver's permit) for young drivers. | Enact stronger age requirements for owning or possessing all types of firearms. |
| **LICENSING RENEWAL** | Drivers are required to renew their license periodically. | Require gun owners to renew their license on a routine basis. |
| **ONGOING MONITORING AND REGULATION** | New models of cars are monitored and regulated, and recalls are issued for unsafe models. | Allow Consumer Product Safety Commission to regulate safety of firearms and ensure industry accountability. |
| **LIABILITY** | Manufacturers are held liable if they sell a dangerous vehicle. | Repeal the Protection of Lawful Commerce in Arms Act (PLCAA) to hold firearm manufacturers accountable for dangerous and reckless distribution of firearms. |

# Recommendations

Public health is the science of reducing and preventing injury, disease, and death and promoting the health and well-being of populations through the use of data, research, and effective policies and practices.

The public health approach has been successfully applied to tackle a wide variety of complex health problems at the population level. Gun violence is a public health epidemic that requires a public health solution. Based on the four steps of the public health approach to prevent gun violence, we recommend the following:

## 1. Better Data Collection

Federal, state, and local governments should collect more comprehensive gun violence data for fatal and nonfatal firearm injuries, shootings that may not involve physical injuries, and firearm-involved crimes where no shots were fired, including domestic violence-related threats. Federal, state, and local governments should make data publicly available where possible and particularly to researchers studying gun violence and its prevention.

## 2. Research Funding

Enhanced research funding is key for advancing knowledge and improving public health interventions and outcomes. Federal, state, and local governments, in addition to foundations and universities, should dedicate funding to research gun violence prevention.

## 3. Evidence-based policies and practices

Gun violence takes many forms and is a multifaceted problem that requires a multitude of data-driven solutions. Gun violence prevention policies and practices should be evidence-based.

## 4. Implementation and evaluation

Policies and practices should be continuously monitored and evaluated to ensure equitable implementation and ongoing effectiveness.

# Resources

## Research

- Allchin A, Chaplin V, & Horwitz J. (2019). Limiting access to lethal means: applying the social ecological model for firearm suicide prevention. Injury Prevention.
- Branas CC, Flescher A, Formica MK, Galea S, Hennig N, Liller KD … & Ying J. (2017). Academic public health and the firearm crisis: an agenda for action. American Journal of Public Health.
- Decker MR, Wilcox HC, Holliday CN, & Webster DW. (2018). An integrated public health approach to interpersonal violence and suicide prevention and response. Public Health Reports.
- Cook PJ. Expanding the public health approach to gun violence prevention. (2018). Annals of Internal Medicine.
- Hemenway D & Miller M. (2013). Public health approach to the prevention of gun violence. New England Journal of Medicine.
- McGinty EE, Siddiqi S, Linden S, Horwitz J, & Frattaroli S. (2019). Improving the use of evidence in public health policy development, enactment and implementation: a multiple-case study. Health Education Research.
- Mozaffarian D, Hemenway D, & Ludwig DS. (2013). Curbing gun violence: lessons from public health successes. Journal of the American Medical Association.
- Maa J & Darzi A. (2018). Firearm injuries and violence prevention—The potential power of a Surgeon General's report. New England Journal of Medicine.
- Rajan S, Branas CC, Hargarten S, & Allegrante JP. (2018). Funding for gun violence research is key to the health and safety of the nation. American Journal of Public Health.
- Zeoli AM & Webster DW. (2019). Firearm policies that work. Journal of the American Medical Association.

## Resources

- AFFIRM
- American Psychological Association: Gun Violence
- American Public Health Association: Gun Violence
- CDC Infographic: The Public Health Approach to Violence Prevention
- FACTS Consortium
- Harborview Injury Prevention & Research Center
- Johns Hopkins Center for Gun Policy and Research
- Reducing Gun Violence in America: Informing Policy with Evidence and Analysis
- Robert Wood Johnson Foundation: Gun Violence, a Public Health Epidemic
- Rutgers Center on Gun Violence Research
- Society for Advancement of Violence and Injury Research (SAVIR)
- Society for Public Health Education: Gun Violence Resolution
- University of California Firearms Violence Research Center (UCFC) and BulletPoints Project



# About the Educational Fund to Stop Gun Violence

The Educational Fund to Stop Gun Violence (Ed Fund) seeks to make gun violence rare and abnormal. Founded in 1978, the Ed Fund is a nonprofit organization that makes communities safer by translating research into policy to prevent gun violence and engaging impacted communities in the policy making process. The Ed Fund is the gun violence prevention movement's premier research intermediary and founder of the Consortium for Risk-Based Firearm Policy, a group of researchers and experts who collaborate to develop innovative recommendations for policymakers. The Ed Fund's affiliate organization, the Coalition to Stop Gun Violence, has advocated for stronger gun laws since 1974. Together, they have paved the way for the gun violence prevention movement to advance research and support evidence-based gun violence prevention programs and policies.

## Contributors

The Ed Fund would like to thank Ari Davis, Dakota Jablon, Lisa Geller, Vicka Chaplin, Adelyn Allchin, Bryan Barks, Lauren Footman, and Josh Horwitz for their contributions to the development of this report.

## Suggested Citation

Educational Fund to Stop Gun Violence. (2020). The Public Health Approach to Gun Violence Prevention. efsgv.org/PublicHealthApproachToGVP

# Citations

[1] Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2018. Average based on years 2014-2018.

[2] Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2018.

[3] Gani F, Sakran JV, & Canner JK. (2017). Emergency department visits for firearm-related injuries in the United States, 2006–14. Appendix 13. Health Affairs.

[4] National Center for Injury Prevention and Control, CDC. WISQARS Years of Potential Life Lost (YPLL) Report, 1981 - 2018.

[5] National Center for Injury Prevention and Control, CDC. WISQARS Years of Potential Life Lost (YPLL) Report, 1981 - 2018.

[6] Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2018. Average based on years 2014-2018.

[7] Suicide attempts by firearm are almost always deadly — 9 out of 10 firearm suicide attempts result in death.

[8] Anglemyer A, Horvath T, & Rutherford G. (2014). The accessibility of firearms and risk for suicide and homicide victimization among household members: A systematic review and meta-analysis. Annals of Internal Medicine.

[9] Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2017. Average based on years 2014-2018.

[10] Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2017. Average based on years 2014-2018.

[11] Anglemyer A, Horvath T, & Rutherford G. (2014). The accessibility of firearms and risk for suicide and homicide victimization among household members: a systematic review and meta-analysis. Annals of Internal Medicine.

[12] Dahlberg LL, Ikeda RM, & Kresnow MJ. (2004). Guns in the home and risk of a violent death in the home: findings from a national study. American Journal of Epidemiology.

[13] Choron R, Spitzer S, & Sakran JV. (2019). Firearm violence in America: is there a solution? Advances in Surgery.

[14] Zeoli AM, Malinski R, & Turchan B. (2016). Risks and targeted interventions: Firearms in intimate partner violence. Epidemiologic Reviews.

[15] Sorenson SB, & Schut RA. (2018). Nonfatal gun use in intimate partner violence: A systematic review of the literature. Trauma, Violence, & Abuse.

[16] Campbell JC, Webster D, Koziol-McLain J, Block C, Campbell D, Curry MA... & Laughon K. (2003). Risk factors for femicide in abusive relationships: results from a multisite case control study. American Journal of Public Health.

[17] Fatal Force database. (2020). Washington Post.

[18] Fatal Force database. (2020). Washington Post.

[19] Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2018. Average based on years 2014-2018.

[20] Centers for Disease Control and Prevention, National Center for Health Statistics. Underlying Cause of Death 1999-2018. Average based on years 2014-2018.

[21] Solnick SJ & Hemenway D. (2019). Unintentional firearm deaths in the United States 2005–2015. Injury Epidemiology.

[22] Gani F, Sakran JV, & Canner JK. (2017). Emergency department visits for firearm-related injuries in the United States, 2006–14. Health Affairs. Appendix 13.

[23] Avraham JB, Frangos SG, & DiMaggio CJ. (2018). The epidemiology of firearm injuries managed in US emergency departments. Injury Epidemiology.

[24] One-third of US adults say fear of mass shootings prevents them from going to certain places or events. (2019). Press Release. American Psychological Association.

[25] SurveyUSA. Data collected from December 7-11, 2018. Questions 28, 29 Market Research Study.

[26] SurveyUSA. Data collected from December 7-11, 2018. Questions 35. Market Research Study.

[27] Centers for Disease Control and Prevention. The National Center for Injury Prevention and Control, Division of Violence Prevention. The Public Health Approach to Violence Prevention.

[28] World Health Organization. Violence Prevention Alliance. The Public Health Approach.

[29] Anglemyer A, Horvath T, & Rutherford G. (2014). The accessibility of firearms and risk for suicide and homicide victimization among household members: a systematic review and meta-analysis. Annals of Internal Medicine.

[30] Consortium for Risk Based Firearm Policy. (2013). Guns, public health, and mental illness: An evidence-based approach for state policy.

[31] Centers for Disease Control and Prevention. (2019). Risk and Protective Factors.

[32] Sampson RJ. (2012). Great American city: Chicago and the enduring neighborhood effect. University of Chicago Press.

[33] Frieden TR. (2010). A framework for public health action: the health impact pyramid. American Journal of Public Health.

[34] Hemenway D & Miller M. (2013). Public health approach to the prevention of gun violence. New England Journal of Medicine.

[35] Traffic Safety Facts: A Compilation of Motor Vehicle Crash Data. (2020). Annual Report Tables. National Highway Traffic Safety Administration.

[36] On 50th anniversary of Ralph Nader's 'Unsafe at Any Speed,' safety group reports auto safety regulation has saved 3.5 million lives. (2015). The Nation.





# CDC WONDER

FAQs     Help     Contact Us     WONDER Search

## Underlying Cause of Death, 1999-2020 Request
### Deaths occurring through 2020

| **1. Organize table layout:** | **Help** |
| --- | --- |

**Group Results By** [ Census Region ▾ ]

**And By** [ None ▾ ]

**And By** [ None ▾ ]

**And By** [ None ▾ ]

**And By** [ None ▾ ]

**Notes:**

• Group Results By "15 Leading Causes" to see the top 15 rankable causes selected from the corresponding 113 or 130 Cause List. More information.

**Measures** (**Default measures** always checked and included. Check box to include any others.)

☑ **Deaths**   ☑ **Population**   ☑ **Crude Rate**

*For crude rates:*   ☐ **95% Confidence Interval**   ☐ **Standard Error**

☐ **Age Adjusted Rate**   ☐ 95% Confidence Interval   ☐ Standard Error

☐ **Percent of Total Deaths**

**Title** [                                                    ]

**Additional Rate Options**   *Click '+' for non-standard age adjusted rates and other options.*   **Help**

| **2. Select location:** | **Help** |
| --- | --- |

**Click a button to choose locations by State, Census Region or HHS Region.**

**States** ●    **Census Regions** ○    **HHS Regions** ○

**Browse** or **search** to find items in the States Finder Tool, then **highlight** the items to use for this request.
(The *Currently selected* box displays all current request items.)

   **Finder Tool Help**    **Advanced Finder Options**



**Browse** the list by opening and closing items.
**Use** Ctrl+Click to multiple select, Shift+Click for a range.

**Pick between:**

**2013 Urbanization** ●
**2006 Urbanization** ○

**2013 Urbanization**

All Categories
Large Central Metro
Large Fringe Metro
Medium Metro
Small Metro
Micropolitan (Nonmetro)
NonCore (Nonmetro)

---

## 3. Select demographics:　　　　　　　　　　　　　　　　　　　　　　　　　　Help

**Hint:** Use Ctrl + Click for multiple selections, or Shift + Click for a range.



Default rates per 100,000

---

## 4. Select year and month:　　　　　　　　　　　　　　　　　　　　　　　　　Help

**Browse** or **search** to find items in the Year/Month Finder Tool, then **highlight** the items to use for this request.
(The *Currently selected* box displays all current request items.)

   **Finder Tool Help**    **Advanced Finder Options**

**Year/Month**

| | *Currently selected:* |
|---|---|
| *All* (All Dates) | *All* (All Dates) |
| + 1999 (1999) | |
| + 2000 (2000) | |
| + 2001 (2001) | |
| + 2002 (2002) | |
| + 2003 (2003) | |
| + 2004 (2004) | |
| + 2005 (2005) | |
| + 2006 (2006) | |
| + 2007 (2007) | |

**Browse** the list by opening and closing items.
**Use** Ctrl+Click to multiple select, Shift+Click for a range.

---

## 5. Select weekday, autopsy and place of death:　　　　　　　　　　　　　Help

**Hint:** Use Ctrl + Click for multiple selections, or Shift + Click for a range.

**Weekday**

All Weekdays
Sunday
Monday
Tuesday
Wednesday
Thursday
Friday
Saturday
Unknown

**Autopsy**

All Values
No
Yes
Unknown

**Place of Death**

All Places
Medical Facility - Inpatient
Medical Facility - Outpatient or ER
Medical Facility - Dead on Arrival
Medical Facility - Status unknown
Decedent's home
Hospice facility
Nursing home/long term care
Other

---

### 6. Select cause of death:                                    Help

**Click a button to select ICD codes by Chapters or by Groups.**

○ **ICD-10 Codes**         ○ **ICD-10 130 Cause List (Infants)**      ○ **Drug/Alcohol Induced Causes**
○ **ICD-10 113 Cause List**    ○ **Injury Intent and Mechanism**

**Browse** or **search** to find items in the ICD-10 Codes Finder Tool to **highlight** the items to use for this request.
(The *Currently selected* box displays all current request items.)

**Finder Tool Help    Advanced Finder Options**

**ICD-10 Codes**

*All* (All Causes of Death)
+ A00-B99 (Certain infectious and parasitic diseases)
+ C00-D48 (Neoplasms)
+ D50-D89 (Diseases of the blood and blood-forming organs and certain disorders involving the i
+ E00-E88 (Endocrine, nutritional and metabolic diseases)
+ F01-F99 (Mental and behavioural disorders)
+ G00-G98 (Diseases of the nervous system)
+ H00-H57 (Diseases of the eye and adnexa)
+ H60-H93 (Diseases of the ear and mastoid process)
+ I00-I99 (Diseases of the circulatory system)

**Currently selected:**

*All* (All Causes of Death)

**Browse** the list by opening and closing items.
**Use** Ctrl+Click to multiple select, Shift+Click for a range.

---

### 7. Other options:                                            Help

**Export Results**          ☐ (Check box to download results to a file)
**Show Totals**             ☑
**Show Zero Values**        ☐
**Show Suppressed Values**  ☐
**Precision**               [1 ▾] **decimal places**
**Data Access Timeout**     [10 ▾] **minutes**



## DISTRIBUTION BY AGE

Data source: NCHS Vital Statistics System for numbers of deaths. Bureau of Census for population estimates.

Users can filter data by clicking on a chart or by selecting Filters from the Filter Data button when using keyboard navigation.

\*\* indicates Unstable values, -- indicates Suppressed values, --\* indicates Secondary Suppression



DOWNLOAD DATA / IMAGE

Show As: [Age Adjusted Rate]
View As: [Graphic]
☐ Show Breakdown by Sex

SUBMIT

Legend:

Users can filter data by clicking on a chart or by selecting Filters from the Filter Data button when using keyboard navigation.

DOWNLOAD DATA / IMAGE

Show As: [Age Adjusted Rate]
View As: [Graphic]
☐ Show Breakdown by Sex
☐ Show Hispanic vs Non-Hispanic

SUBMIT

Legend:
■ White
■ Black
■ American Indian
■ Asian/PI

HOME
ABOUT CDC
JOBS
FUNDING
POLICIES
PRIVACY

1600 CLIFTON ROAD ATLANTA, GA
30329-4037 USA
800-CDC-INFO (800-232-4636),
TTY: 888-232-6348Y
EMAIL CDC-INFO

↑GO TO TOP

Santa Clara County
**PUBLIC HEALTH**

# Firearms in Santa Clara County

## Key findings

- In 2016, 11% of injury deaths were due to firearms injuries.
- The death rate from firearms injuries fluctuated from 2007 to 2016.
- The rate of hospitalizations for firearms injuries has decreased since 2007. The rate of emergency department (ED) visits for firearm injuries increased from 2007 to 2014.
- The rates of death, hospitalizations and emergency department visits for firearms are highest among males and African Americans.
- The rates of hospitalizations and emergency department visits are highest among adults ages 18 to 44. The rate of deaths is highest among adults ages 65 and older.
- One in 10 (11%) adult residents kept a firearm in and around the house in 2013-14.  One in 10 (11%) middle and high school students saw someone carrying a gun, knife, or other weapon on school property in the past 12 months.
- Nearly a quarter (23%) of robbery crimes involved a firearm in 2016.

**Number and age-adjusted rate of deaths from firearms injuries, 2007-2016**



**Source**: Santa Clara County Public Health Department, 2007-2016 Death Statistical Master File[1]

**Number and age-adjusted rate of <u>hospitalizations</u> for firearms injuries, 2007-2014**



**Source**: Office of Statewide Health Planning and Development, 2007-2014 Patient Discharge Data[1]

**Number and age-adjusted rate of <u>emergency department (ED) visits</u> for firearms injuries, 2007-2014**



**Source**: Office of Statewide Health Planning and Development, 2007-2014 Emergency Department Data[1]
**Note**: In each graph above, the colored bars represent the number and the black line represents the age-adjusted rate per 100,000 people.

Santa Clara County
**PUBLIC HEALTH**

# Firearms in Santa Clara County

**Number, percentage, and age-adjusted/age-specific rates of <u>deaths</u> from firearms injuries by demographic characteristics, 2012-2016**

| | | Deaths | | |
|---|---|---|---|---|
| | | Average annual number of deaths± | % of deaths from firearms injuries* | Rate per 100,000 people+ |
| Santa Clara County | | 81 | N/A | 4.5 |
| Gender | Male | 72 | 89 | 8.2 |
| | Female | 9 | 11 | 1.0 |
| Age group | <18 | 3 | 4 | 0.7 |
| | 18-44 | 40 | 49 | 5.7 |
| | 45-64 | 25 | 30 | 5.5 |
| | 65+ | 13 | 17 | 6.8 |
| Race/ethnicity | African American | 4 | 5 | 8.6 |
| | Asian/Pacific Islander | 13 | 16 | 2.2 |
| | Latino | 21 | 26 | 4.3 |
| | White | 40 | 50 | 5.4 |

**Source**: Santa Clara County Public Health Department, 2012-2016 Death Statistical Master File[1]

**Number, percentage, and age-adjusted/age-specific rates of <u>hospitalizations</u> and <u>emergency department (ED) visits</u> for firearms injuries by demographic characteristics, 2010-2014**

| | | Hospitalizations | | | ED visits | | |
|---|---|---|---|---|---|---|---|
| | | Average annual number of visits± | % of hospitalizations for firearms injuries* | Rate per 100,000 people+ | Average annual number of visits± | % of visits for firearms injuries* | Rate per 100,000 people+ |
| Santa Clara County | | 71 | N/A | 4.0 | 91 | N/A | 5.1 |
| Gender | Male | 63 | 89 | 6.9 | 82 | 90 | 9.0 |
| | Female | 8 | 11 | 0.9 | 9 | 10 | 1.0 |
| Age group | <18 | 9 | 12 | 3.1 | 11 | 12 | 1.5 |
| | 18-44 | 53 | 76 | 14.9 | 69 | 77 | 5.8 |
| | 45-64 | 8 | 11 | 3.2 | 9 | 10 | 1.3 |
| | 65+ | -- | -- | -- | -- | -- | -- |
| Race/ethnicity | African American | 8 | 12 | 17.1 | 9 | 10 | 19.6 |
| | Asian/Pacific Islander | 7 | 10 | 1.1 | 11 | 12 | 1.9 |
| | Latino | 42 | 60 | 7.5 | 53 | 59 | 9.4 |
| | White | 10 | 14 | 1.6 | 13 | 15 | 2.1 |

**Source**: Office of Statewide Health Planning and Development, 2010-2014 Emergency Department Data and Patient Discharge Data[1]

**Note**: ±Represents the average annual number of deaths, hospitalizations, or ED visits in each category over a 5-year period. If the average is reported, the sum of hospitalizations or ED visits for each 5-year period is >15 cases. *Represents the percentage of deaths, hospitalizations, or ED visits in each category, e.g., the percentage of deaths or visits for firearms injuries that were male or female. +Rates for age groups are reported as age-specific rates per 100,000 people. All other rates are age-adjusted rates per 100,000 people. Numbers and percentages may not sum to county totals or 100% because some categories are not presented (race/ethnicity), due to missing data, or due to rounding. N/A indicates fields where data are not applicable. (--) indicates not reportable due to small number of deaths, hospitalizations, or ED visits.



# Firearms in Santa Clara County

**Number and percentage of <u>deaths</u>, <u>hospitalizations</u>, and <u>emergency department (ED) visits</u> for firearms injuries by <u>intent of injury</u>**

| Intent | Deaths 2007-2016 | | Hospitalizations 2010-2014 | | ED visits 2010-2014 | |
|---|---|---|---|---|---|---|
| | Average annual number of deaths | % of deaths | Average annual number of visits | % of hospitalizations | Average annual number of visits | % of ED visits |
| Unintentional | <1 | <1 | 12 | 16 | 28 | 31 |
| Self-inflicted/suicide | 46 | 59 | 4 | 6 | -- | -- |
| Assault/homicide | 28 | 36 | 52 | 73 | 45 | 50 |
| Undetermined | 1 | 2 | -- | -- | 7 | 7 |
| Legal intervention | 3 | 4 | -- | -- | 9 | 10 |

**Source:** Santa Clara County Public Health Department, 2007-2016 Death Statistical Master File; Office of Statewide Health Planning and Development, 2010-2014 Patient Discharge Data and 2010-2014 Emergency Department Data

**Note:** The number of firearms-related deaths and injuries is too small to report by intent of injury for individual years and groups. (--) indicates data are not reportable due to small number of hospitalizations or ED visits. Data presented for deaths, hospitalizations and ED visits are an annual average. If the average is reported, the sum of hospitalizations or ED visits for each 5-year period is > 15 cases.

## Annual economic cost of firearms injuries

| Costs | Deaths (N=76) | Hospitalizations (N=64) | ED visits (N=75) |
|---|---|---|---|
| Medical | $507,000 | $1,479,000 | $192,000 |
| Work loss | $118,261,000 | $5,892,000 | $313,000 |
| Combined | $118,768,000 | $7,371,000 | $505,000 |

**Source:** Santa Clara County Public Health Department, 2016 Death Statistical Master File; Office of Statewide Health Planning and Development, 2014 Emergency Department Data and 2014 Patient Discharge Data; Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System, 2018

**Note:** For annual economic costs, data are for non-fatal hospitalizations and non-fatal treat and release ED visits only and so may not match numbers reported in other tables and graphs. Costs are indexed to 2015 U.S. prices for hospitalizations and ED visits and in 2015 California prices for deaths. Hospitalizations and ED visits exclude undetermined intent.

## Self-reported firearm ownership among adults, 2013-14

| | | Any firearms now kept in or around home % | Any of the firearms are now loaded  (among those with firearms) % |
|---|---|---|---|
| Santa Clara County | | 11 | 12 |
| Gender | Male | 13 | 16 |
| | Female | 9 | 7 |
| Race/ ethnicity | African American | 13* | 10* |
| | Asian/Pacific Islander | 2 | 3* |
| | Latino | 5 | 6* |
| | White | 22 | 13 |

**Notes:** * indicates estimate is statistically unstable due to a relative standard error of greater than 30% or less than 50 respondents in the denominator. These estimates should be viewed with caution and may not be appropriate to use for planning or policy purposes.
Source: Santa Clara County Public Health Department, 2013-14 Behavioral Risk Factor Survey

Santa Clara County



# Firearms in Santa Clara County

**Self-reported carrying of firearms among middle and high school students, 2015-16**

| | | Carried a gun on school property in the past 12 months % | Saw someone carrying a gun, knife, or other weapon on school property in the past 12 months % |
|---|---|---|---|
| Santa Clara County | | 1 | 11 |
| Gender | Male | 2 | 12 |
| | Female | 1 | 9 |
| Race/ ethnicity | African American | 5 | 12 |
| | Asian/Pacific Islander | 1 | 8 |
| | Latino | 2 | 13 |
| | White | 1 | 9 |
| Grade | 7th | 1 | 10 |
| | 9th | 1 | 12 |
| | 11th | 1 | 10 |

Source: California Healthy Kids Survey, 2015-16

**Total offenses committed involving firearms among K-12 students, 2015-16**

| | Total offenses | Offenses resulting in an expulsion N (%) | Offenses resulting in a suspension N (%) | Offenses resulting in a disciplinary diversion N (%) |
|---|---|---|---|---|
| Santa Clara County | 108 | 10 (9%) | 93 (86%) | 5 (5%) |

**Note**: Counts include possession, sale, furnishing a firearm or knife and possession, sale, furnishing a firearm.
Source: California Department of Education. DataQuest. California Department of Education. https://dq.cde.ca.gov/dataquest/. Accessed 3/27/2018.

**Crimes involving firearms, 2016**

| | Robbery crimes involving a firearm N (%) | Aggravated assault crimes involving a firearm N (%) |
|---|---|---|
| Santa Clara County | 374 (23%) | 498 (16%) |

**Source**: California Department of Justice. Open Justice: Crime Statistics. California Department of Justice https://openjustice.doj.ca.gov/crime-statistics/. Accessed on 3/28/2018.

**Domestic violence-related calls for assistance, 2016**

| | Total calls N | Total calls involving a weapon N (%) | Total calls involving a firearm (among those involving a weapon) N (%) |
|---|---|---|---|
| Santa Clara County | 5,570 | 837 (15%) | 28 (3%) |

**Source**: California Department of Justice. Open Justice: Crime Statistics. California Department of Justice https://openjustice.doj.ca.gov/crime-statistics/. Accessed on 3/28/2018.



Santa Clara County
**PUBLIC HEALTH**

# Firearms in Santa Clara County

## Gun sales in Santa Clara County from 2001-2015

- 363,725 guns sold
- Average of 24,000 guns sold per year
- Santa Clara County has the 15th lowest rate of average gun sales in California at 1,337 average guns sold per 100,000 people
- Gun sales rose by156% from 2001 to 2015

## Total gun sales by type of gun sold in Santa Clara County, 2001-2015



Long gun 48%   Handgun 52%

## Growth of gun sales from 2001 to 2015



## Average gun sales per 100,000 people by county from 2001 to 2015



**Note:** Figure for average guns sold per year was calculated by the Santa Clara County Public Health Department.
**Source:** California Department of Justice. Open Justice: Gun Sales in California. California Department of Justice
https://openjustice.doj.ca.gov/firearms/overview#/avg-gun-sales-by-county-chart. Accessed on 3/28/2018.



# Firearms in Santa Clara County

## Violent Crimes - Santa Clara County - Average Annual by Zip Code - 2011-2015



Crime statistics calculated from data licensed from Public Engines, Inc., a Motorola Solutions company by Santa Clara County Public Health Department. Public Engines, Inc. provides crime reporting, mapping, and analytics solutions. It offers CrimeReportsTM, an online crime mapping solution.
Data is from January 1, 2011 through December 31, 2015 for valid zip codes and cities completely within the geographical boundary of Santa Clara County. Note that crime locations include known reporting locations such as hospitals and public safety facilities and the data may differ from crime statistics calculated, distributed and published by individual public safety agencies within Santa Clara County or, separately, by CrimeReportsTM.



Santa Clara County
**PUBLIC HEALTH**

# Firearms in Santa Clara County

## Technical notes

A firearms injury is defined as a penetrating force injury resulting from a bullet or other projectile shot from a powder-charged gun. This category includes gunshot wounds from powder-charged handguns, shotguns, and rifles.[2] This category does not include injury caused by a compressed air-powered paint gun or a nail gun, which falls in the "other specified" category.  All intents are included in this category such as unintentional, self-inflicted/suicide, homicide/assault, undetermined, and legal intervention.  Legal intervention is an injury or death that involves any law enforcement official, such as injury or death to law enforcement official, suspect, and/or bystander.

## Injury data are presented as counts and rates:

- Counts represent the total number of events (e.g., deaths, hospitalizations) that occur in a defined period of time, such as one year.
- Rates consist of the count divided by the number of people in the population at risk (e.g., Latinos in Santa Clara County), multiplied by a standard number (e.g., 100,000).  When comparing data over time or between different populations, rates are often used instead of counts to make it possible to compare outcomes between populations that differ in size.
- Rates are "age-adjusted" to account for differences in the age profiles in populations over time or between different populations, in this case using weights corresponding to the 2000 U.S. population.
- Age-specific rates are similar to overall rates. Age-specific rates represent the number of cases in a specific age group, divided by the number of people in Santa Clara County in that age group and multiplied by a standard number (e.g., 100,000) to enable comparison between age groups that differ in size.
- Trends are generally presented as single-year estimates over time. However, in some Quick Facts, a "moving average" is presented, which consists of combining data for overlapping three-year periods. Moving averages stabilize fluctuations that can be misleading when counts from a specific type of injury are low from year to year.

[1]Denominator is based on the following source: Data as of 05/26/2017; U.S. Census Bureau; 2010 Census, Tables PCT12, PCT12H, PCT12I, PCT12J, PCT12K, PCT12L, PCT12M; generated by Baath M.; using American FactFinder; Accessed June 20, 2017.[2]Centers for Disease Control and Prevention. Injury Center: 4.0 Definitions for WISQARS™ Nonfatal. http://www.cdc.gov/ncipc/wisqars/nonfatal/definitions.htm. Last modified 3/27/2007. Accessed 4/21/2014.



# American Journal of
# EPIDEMIOLOGY

Volume 160

Number 10

November 15, 2004

Copyright © 2004 by The Johns Hopkins
 Bloomberg School of Public Health
Sponsored by the Society for Epidemiologic Research
Published by Oxford University Press

## ORIGINAL CONTRIBUTIONS

## Guns in the Home and Risk of a Violent Death in the Home: Findings from a National Study

**Linda L. Dahlberg[1], Robin M. Ikeda[2], and Marcie-jo Kresnow[3]**

[1] Division of Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, GA.
[2] Epidemiology Program Office, Centers for Disease Control and Prevention, Atlanta, GA.
[3] Office of Statistics and Programming, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, GA.

Received for publication February 9, 2004; accepted for publication June 7, 2004.

Data from a US mortality follow-back survey were analyzed to determine whether having a firearm in the home increases the risk of a violent death in the home and whether risk varies by storage practice, type of gun, or number of guns in the home. Those persons with guns in the home were at greater risk than those without guns in the home of dying from a homicide in the home (adjusted odds ratio = 1.9, 95% confidence interval: 1.1, 3.4). They were also at greater risk of dying from a firearm homicide, but risk varied by age and whether the person was living with others at the time of death. The risk of dying from a suicide in the home was greater for males in homes with guns than for males without guns in the home (adjusted odds ratio = 10.4, 95% confidence interval: 5.8, 18.9). Persons with guns in the home were also more likely to have died from suicide committed with a firearm than from one committed by using a different method (adjusted odds ratio = 31.1, 95% confidence interval: 19.5, 49.6). Results show that regardless of storage practice, type of gun, or number of firearms in the home, having a gun in the home was associated with an increased risk of firearm homicide and firearm suicide in the home.

firearms; homicide; suicide; violence; wounds and injuries

Over 50,000 homicides and suicides occur each year in the United States (1), making them among the leading causes of death, particularly for young people. In 2001, homicide was the second leading cause of death and suicide the third for persons 15–24 years of age (2). Approximately 60 percent of all homicides and suicides in the United States are committed with a firearm (2).

Although an estimated 40 percent of adults in the United States report keeping a gun in the home for recreational or protective purposes (3), the risks and benefits of this practice

are widely disputed in the literature (4, 5). Ecologic analyses have suggested a link between the prevalence of gun ownership and rates of homicide and suicide (6–8) and between regulations restricting access to firearms and rates of homicide and suicide (9–12). Although these studies are useful in demonstrating an association between access to firearms and rates of homicide and suicide at the aggregate level, it is not possible with this methodology to adequately assess whether access to a gun increases the risk of a violent death at the individual level.

Reprint requests to Dr. Linda L. Dahlberg, NCIPC, Division of Violence Prevention, Mailstop K-68, Centers for Disease Control and Prevention, 4770 Buford Highway, NE, Atlanta, GA 30341 (e-mail: ldahlberg@cdc.gov).

Downloaded from https://academic.oup.com/aje/article/160/10/929/140858 by guest on 08 April 2022

Downloaded from https://academic.oup.com/aje/article/160/10/929/140858 by guest on 08 April 2022

To address these limitations, previous researchers have used case-control study methodology to evaluate the relation between gun ownership and risk of a violent death in the home. For example, Kellermann et al. (13, 14) examined the relation between gun ownership and injury outcomes. After they controlled for a number of potentially confounding factors, the presence of a gun in the home was associated with a nearly fivefold risk of suicide (adjusted odds ratio = 4.8) (13) and an almost threefold risk of homicide (adjusted odds ratio = 2.7) (14). Other case-control studies have also found an increased risk of suicide for those with firearms in the home, with relative risks ranging from 2.1 to 4.4 (15–19).

Some studies have specifically examined the association between purchase of a handgun and risk of a violent death (20, 21). In a case-control study of members of a large health maintenance organization, Cummings et al. (20) found that a history of family handgun purchase was associated with an elevated risk of both homicide and suicide. Wintemute et al. (21) reported similar findings for suicide in a population-based cohort study of persons who had purchased a handgun in California. In both studies, the effects persisted for more than 5 years. However, studies conducted in other countries have failed to find a clear link between access to a firearm and risk of a suicide (22).

Many of the studies conducted to date have been based on small samples and were limited to specific population groups such as adolescents or older adults (15–19). Most of the studies have also been limited to a few counties, geographic areas, or states. We know of only two national case-control studies that have examined the relation between access to a firearm and a violent death (23, 24). One study focused on the perpetration of homicide as opposed to victimization and found a relatively weak association (adjusted odds ratio = 1.4) between gun ownership and homicide perpetration (23). The other study focused on victimization and found a strong association for suicide (adjusted odds ratio = 3.4) but a weak association for homicide (adjusted odds ratio = 1.4) (24). In both studies, cases and controls were drawn from different data sources, and neither study was able to control for many of the potential confounders of homicide or suicide.

To evaluate the relation between firearms in the home and violent deaths in the home, we analyzed data from a US mortality follow-back survey. The purpose of our study was twofold: 1) to determine whether having a firearm in the home increases the risk of a homicide or suicide in the home relative to other causes of death in the home, and 2) to determine whether having a firearm in the home increases the risk that a homicide or suicide in the home will be committed with a firearm or by using other means. To our knowledge, this is the first national study to specifically examine the relation between firearms and violent deaths in the home.

## MATERIALS AND METHODS

### Sample

Data for this study are from the 1993 National Mortality Followback Survey, which is based on a nationally representative 10 percent systematic sample of decedents aged 15 years or older in the United States (25). All 50 states with the exception of South Dakota, which was excluded because of a state law restricting the use of death certificates for research purposes, are represented in the National Mortality Followback Survey. The sample was drawn from death certificates received by the National Center for Health Statistics from state vital registration offices. To produce more reliable estimates, Blacks, persons less than 35 years of age or older than age 100 years, and persons who died from external causes of homicide, suicide, and unintentional injury were oversampled in this survey. The study protocol was reviewed and approved by the Centers for Disease Control and Prevention Institutional Review Board.

Data on each decedent in the National Mortality Followback Survey were obtained from death certificates and proxy-respondent interviews. All deaths were classified by using the *International Classification of Diseases*, Ninth Revision. The proxy interviews were conducted with next of kin or another person familiar with the decedent's life history approximately 6 months from the date of death. The decedent's next of kin, identified on the death certificate as having provided information, were initially contacted by letter and were asked to participate in the survey. In cases where no next-of-kin information was available from the death certificate, letters were sent to funeral directors requesting contact information for the next of kin. Over 90 percent of the proxy respondents were relatives, mostly immediate family members (spouse, parent, child, or sibling).

Interviews with the proxy respondents covered a wide range of topics including the decedent's access to health care, daily activities, life events, alcohol consumption and tobacco and drug use, and history of problem behaviors. The interviews also included a number of questions on firearms in the home of the decedent. The overall response rate for the proxy respondent survey was 83 percent.

We used the death certificates for information on the decedent's cause and manner of death and proxy-respondent interviews for all other demographic and behavioral information on the decedent. The study sample consisted of deaths that occurred in the home. Included were persons who subsequently died en route to or at a hospital. Deaths were classified by whether they were homicides ($n = 490$; *International Classification of Diseases*, Ninth Revision codes E960–E969), suicides ($n = 1,049$; *International Classification of Diseases*, Ninth Revision codes E950–E959), or the result of other causes ($n = 535$). Accidental poisonings or poisonings of undetermined intent, unintentional firearm injuries and firearm injuries of undetermined intent, and other deaths of undetermined cause were excluded from the study sample on the basis that they could be homicides or suicides. Deaths for which information on firearms in the home was missing were also excluded. By cause, these deaths were distributed similarly to those in the study sample. Overall, the study sample captured 89 percent of deaths for which the incident occurred in the home ($n = 2,074/2,338$).

*Am J Epidemiol* 2004;160:929–936

Downloaded from https://academic.oup.com/aje/article/160/10/929/140858 by guest on 08 April 2022

## Measures

*Outcomes of interest.* To determine whether having a firearm in the home increases the risk of a violent death in the home relative to other causes of death in the home, two outcome variables were created: 1) homicide versus other causes, and 2) suicide versus other causes. Violent deaths, whether from suicide or homicide, were excluded, respectively, from the "other causes of death" category. To determine whether having a firearm in the home increases the risk that a homicide or suicide will be committed with a firearm, we focused on homicides and suicides separately and created two additional outcome variables: 3) homicides committed with firearms versus homicides committed by using other methods, and 4) suicides committed with firearms versus suicides committed by using other methods.

*Main exposure variable.* The main exposure variable was the presence of a firearm in or around the home. Proxy respondents were asked, "At any time during the last year of life, were there any firearms kept in or around the home where the decedent stayed? Include those kept in a garage, outdoor storage area, truck, or car." Responses were coded as follows: yes—one or more firearms were kept in or around the home; no—no firearms were kept in or around the home.

*Refined measures of exposure.* Proxy respondents were also asked how many guns were kept in or around the home; whether the firearms were handguns, shotguns, rifles, or other types of guns; and how the firearms were stored. Three refined measures of exposure were created: 1) number of guns (coded as one gun, two or more guns), 2) type of gun (coded as handguns only, long guns only, handguns and long guns), and 3) storage practice (coded as ≥1 gun unlocked, all guns locked).

*Characteristics of the decedent.* A number of demographic and behavioral characteristics identified in the literature as being associated with either homicide or suicide were included in the analysis. Included were age, sex, race/ethnicity, education, marital status, residential status (i.e., whether the decedent lived alone or with others), region of death, alcohol consumption within 4 hours of death, use and frequency of using illicit drugs (cocaine, crack cocaine, heroin, hallucinogens, amphetamines, marijuana or hashish) in the past year of life, and whether the decedent expressed a wish to die during the last month of life.

The suicide model also included whether the decedent had thoughts of attempting suicide within the last month of life and symptoms of depression and anxiety in the last month of life. Evidence of depression and anxiety was based on the mean score of responses to three or more of the following nine items: seemed worried or apprehensive, seemed drowsy or sluggish, seemed unresponsive or withdrawn, seemed impatient or annoyed, said things such as "I'm no good" or "I'm worthless," cried for long periods of time for no apparent reason, slept more or less than usual, ate more or less than usual, and had trouble concentrating or making decisions. Mean scores ranged from 1 = never to 4 = often. The nine items are similar in wording and content to those used in existing scales of depression and anxiety but are not from a specific scale or index. Existing scales of depression and anxiety are designed for individual patient or respondent administration rather than proxy administration.

## Analysis

We began with a bivariable analysis and calculated prevalence estimates for the characteristics of the decedent and the main exposure variable—presence of a firearm in or around the home. We then computed crude odds ratios and 95 percent confidence intervals to assess the association between each of the four outcome variables and the presence of a firearm in or around the home.

Next, we conducted a multivariable analysis by using logistic regression to examine the association between each of the four outcome variables and the main exposure variable, after adjusting for demographic and behavioral characteristics of the decedent. In modeling each outcome variable, we began with the main exposure variable, characteristics of the decedent (potential confounders), and all two-way interactions between the main exposure variable and characteristics of the decedent. Interactions were initially assessed simultaneously by using a likelihood ratio test and were then assessed individually in a backward stepwise fashion. The importance of interaction terms as well as main effects was assessed by using the Wald chi-square test statistic.

Finally, for models assessing whether the presence of a firearm in the home increases the risk that a homicide or suicide will be committed with a firearm, we performed a more refined analysis of exposure. We began with the final logistic regression model derived from the multivariable analysis and substituted our main exposure variable with the more refined measures of exposure (namely, type of gun, number of guns, and storage practice) to assess the association between certain firearm-related characteristics and each outcome.

All data were weighted to account for unequal selection probabilities and nonresponse and were poststratified to produce national estimates. Data were analyzed by using SUDAAN software (26) to account for the complex sampling design. *p* values of <0.05 were considered statistically significant.

## RESULTS

The demographic characteristics of the decedents are presented in table 1. Homicide victims were mostly male, less than 35 years of age, and of racial or ethnic minority status. Suicide victims were predominately male, older, and non-Hispanic White. There was a slightly higher proportion of males among persons who died of other causes. These decedents were also mostly older than 45 years of age and non-Hispanic White. Although a large proportion of homicide victims had never married, most of the suicide victims and persons who died of other causes were married at the time of death or had been previously married. The majority of decedents, regardless of cause of death, were living with other people at the time of death. A large proportion of both homicide and suicide victims died in the southern region of the United States.

Downloaded from https://academic.oup.com/aje/article/160/10/929/140858 by guest on 08 April 2022

**TABLE 1.   Distribution of deaths in the home by cause and demographic characteristics, United States**

|  | Homicide decedents | | Suicide decedents | | Other decedents | |
|---|---|---|---|---|---|---|
|  | No. | Weighted % | No. | Weighted % | No. | Weighted % |
| Total | 490 | | 1,049 | | 535 | |
| Sex | | | | | | |
|   Male | 363 | 62.6 | 741 | 80.7 | 283 | 55.8 |
|   Female | 127 | 37.4 | 308 | 19.3 | 252 | 44.2 |
| Age group (years) | | | | | | |
|   15–24 | 131 | 25.0 | 167 | 14.8 | 31 | 3.9 |
|   25–34 | 147 | 29.2 | 173 | 17.5 | 73 | 9.1 |
|   35–44 | 94 | 18.5 | 146 | 17.4 | 52 | 9.4 |
|   ≥45 | 118 | 27.3 | 563 | 50.3 | 379 | 77.6 |
| Race/ethnicity | | | | | | |
|   Non-Hispanic White | 151 | 41.8 | 865 | 87.3 | 372 | 82.6 |
|   Non-Hispanic Other | 269 | 46.8 | 99 | 7.2 | 123 | 13.6 |
|   Hispanic | 60 | 11.4 | 52 | 5.5 | 30 | 3.9 |
| Education | | | | | | |
|   Elementary <10 years | 62 | 13.9 | 139 | 13.8 | 118 | 27.4 |
|   Some high school | 152 | 30.3 | 205 | 20.7 | 99 | 12.8 |
|   High school graduate | 163 | 37.3 | 371 | 37.8 | 164 | 33.5 |
|   >High school | 87 | 18.5 | 285 | 27.7 | 117 | 26.3 |
| Marital status | | | | | | |
|   Never married | 252 | 45.5 | 292 | 28.9 | 120 | 16.1 |
|   Married | 118 | 28.1 | 448 | 44.8 | 183 | 53.8 |
|   Widowed | 36 | 9.0 | 156 | 12.2 | 158 | 19.6 |
|   Divorced/separated | 80 | 17.4 | 144 | 14.2 | 72 | 10.5 |
| Residential status | | | | | | |
|   Lived alone | 106 | 20.7 | 290 | 27.7 | 176 | 24.5 |
|   Lived with others | 373 | 79.3 | 738 | 72.3 | 352 | 75.5 |
| Region of death | | | | | | |
|   Northeast | 41 | 11.6 | 128 | 14.4 | 84 | 12.8 |
|   Midwest | 100 | 19.3 | 258 | 23.7 | 134 | 27.1 |
|   South | 244 | 49.8 | 398 | 39.8 | 205 | 30.6 |
|   West | 105 | 19.4 | 265 | 22.1 | 112 | 29.5 |

Nearly three quarters of suicide victims lived in a home where one or more firearms were present, compared with 42 percent of homicide victims and one third of those who died of other causes (table 2). A firearm was used in 68 percent of both homicides and suicides. A larger proportion of homicide decedents than suicide decedents and those who died of other causes were drinking alcohol within 4 hours of death and used illicit drugs in the past year. A larger proportion of suicide decedents than homicide decedents and those who died of other causes expressed a wish to die, suicidal ideation, and symptoms of depression and anxiety in the last month of life.

Over three quarters (76.3 percent) of the homicide victims knew their assailant. Nearly one third (31.7 percent) of the

homicides occurred during a family argument, 15.4 percent during a robbery, 4.1 percent during a drug deal, 0.2 percent during an abduction, and 44.1 percent for other unspecified reasons. In 4.5 percent of the homicides, multiple circumstances were reported.

Table 3 presents the crude and adjusted odds ratios for the presence of a firearm in the home and risk of a homicide or suicide relative to other causes of death in the home. There were no significant interaction effects in the model for homicide. After we adjusted for demographic and behavioral characteristics of the decedent, we found an increased risk of homicide for those with firearms in the home (adjusted odds ratio = 1.9, 95 percent confidence interval: 1.1, 3.4). Female sex, age less than 45 years, and being of a racial or ethnic

*Am J Epidemiol*  2004;160:929–936

**TABLE 2.   Distribution of deaths in the home by cause, presence of a firearm in the home, method, and behavioral characteristics, United States**

| | Homicide decedents | | Suicide decedents | | Other decedents | |
|---|---|---|---|---|---|---|
| | No. | Weighted % | No. | Weighted % | No. | Weighted % |
| Total | 490 | | 1,049 | | 535 | |
| Firearm in the home | 188 | 41.9 | 734 | 72.4 | 166 | 32.0 |
| Method | | | | | | |
|   Firearm | 339 | 68.1 | 687 | 67.8 | | |
|   Other method | 151 | 31.9 | 362 | 32.2 | | |
| Drank alcohol within 4 hours of death | 117 | 35.8 | 234 | 31.0 | 98 | 30.2 |
| Used illicit drugs in the past year | 102 | 23.1 | 159 | 17.8 | 49 | 8.0 |
| Expressed a wish to die in the past month | 38 | 8.6 | 388 | 42.7 | 70 | 10.6 |
| Suicidal ideation in the past month | 14 | 3.3 | 330 | 36.3 | 15 | 2.1 |
| Symptoms of depression and anxiety in the past month | 23 | 4.5 | 265 | 27.6 | 33 | 5.7 |

minority group were also important predictors of homicide risk ($p < 0.01$).

There was a significant sex-by-gun-in-the-home interaction for suicide. Males with firearms in the home were at a significantly greater risk of suicide than males without guns in the home (adjusted odds ratio = 10.4, 95 percent confidence interval: 5.8, 18.9). Females with firearms in the home were also at an elevated risk of suicide compared with females without guns in the home, but the difference was only borderline significant (adjusted odds ratio = 2.3, 95 percent confidence interval: 1.0, 5.0). Other important predictors of suicide risk included young age (<35 years), suicidal ideation, and symptoms of depression and anxiety in the last month of life ($p < 0.01$). Living alone was borderline significant ($p = 0.05$).

To determine whether having a firearm in the home increases the risk that a homicide or suicide in the home will be firearm related, we focused on homicides and suicides separately and compared those committed with a firearm with those committed by using other means. These models were adjusted for demographic characteristics but not psychological and behavioral characteristics of the decedent because there were no significant differences between those who used a firearm and those who used some other means in terms of their psychological or behavioral characteristics. These models were also adjusted for significant interaction terms, where applicable. The results of this analysis are presented in table 4.

We found two significant, two-way interaction terms in the model assessing whether a homicide in the home will be committed with a firearm versus another method: a significant gun-in-the-home-by-residential-status interaction, and a significant gun-in-the-home-by-age interaction. Among those living alone at the time of death, there was no association between the presence of a firearm in the home and method of homicide. However, for persons living with others at the time of death, there was a significant association between the presence of a firearm in the home and risk of a firearm homicide among those aged 35 years or older (adjusted odds ratio = 16.4, 95 percent confidence interval: 5.9, 45.3). We found no significant interactions in the model for suicide. Those persons with guns in the home were at significantly greater risk than those without guns in the home

**TABLE 3.   Crude and adjusted odds ratios for the presence of a firearm in the home and risk of a violent death in the home, United States**

| Firearm in the home | Homicide vs. other causes | | Suicide vs. other causes | |
|---|---|---|---|---|
| | OR† | 95% CI† | OR | 95% CI |
| Crude | 1.5 | 0.8, 3.0 | 5.6* | 2.9, 10.6 |
| Adjusted‡ | 1.9** | 1.1, 3.4 | | |
|   Males | | | 10.4* | 5.8, 18.9 |
|   Females | | | 2.3 | 1.0, 5.0 |

* $p < 0.01$, Wald chi-square test; ** $p = 0.02$, Wald chi-square test.
† OR, odds ratio; CI, confidence interval.
‡ Adjusted for sex, age group, race/ethnicity, education, marital status, residential status, region of death, alcohol consumption within 4 hours of death, illicit drug use, and an expressed wish to die. The model for suicide was also adjusted for depression/anxiety, suicidal ideation, and the interaction between the presence of a firearm in the home and sex. Because of the presence of a significant firearm-in-the-home-by-sex interaction term in the adjusted model, the association between suicide and a firearm in the home is shown separately for males and females. The reference group for males and females is, respectively, males and females without guns in the home.

Downloaded from https://academic.oup.com/aje/article/160/10/929/140858 by guest on 08 April 2022

Downloaded from https://academic.oup.com/aje/article/160/10/929/140858 by guest on 08 April 2022

**934**   Dahlberg et al.

**TABLE 4.   Crude and adjusted odds ratios for the presence of a firearm in the home and risk of a firearm homicide or firearm suicide in the home, United States**

| Firearm in the home | Firearm homicide† | | Firearm suicide‡ | |
|---|---|---|---|---|
| | OR§ | 95% CI§ | OR | 95% CI |
| Crude | 3.5* | 2.0, 6.1 | 27.9* | 18.7, 41.4 |
| Adjusted¶ | | | 31.1* | 19.5, 49.6 |
| Lived alone | | | | |
|    Aged 15–24 years | 0.3 | 0.0, 2.1 | | |
|    Aged 25–34 years | 0.9 | 0.2, 4.6 | | |
|    Aged ≥35 years | 3.5 | 1.0, 12.8 | | |
| Lived with others | | | | |
|    Aged 15–24 years | 1.2 | 0.3, 5.4 | | |
|    Aged 25–34 years | 4.0 | 0.9, 16.7 | | |
|    Aged ≥35 years | 16.4* | 5.9, 45.3 | | |

  * $p < 0.01$, Wald chi-square test.

  † Homicides committed with firearms vs. homicides committed by using other methods.

  ‡ Suicides committed with firearms vs. suicides committed by using other methods.

  § OR, odds ratio; CI, confidence interval.

  ¶ Adjusted for sex, age group, race/ethnicity, education, marital status, residential status, and region of death. The model for firearm homicide was also adjusted for the interaction between the presence of a firearm in the home and residential status, and between a firearm in the home and age. Because of the presence of two significant, two-way interactions in the model for firearm homicide, the association between a firearm in the home and firearm homicide is shown by residential status and age. The reference group for each category is those without a gun in the home.

**TABLE 5.   Adjusted odds ratios for the more refined measures of a firearm in the home and risk of a firearm homicide or firearm suicide in the home, United States**

| | Firearm homicide† | | Firearm suicide‡ | |
|---|---|---|---|---|
| | AOR§,¶ | 95% CI§ | AOR¶ | 95% CI |
| Type of gun* | | | | |
|   Handguns only | 2.8 | 0.9, 8.7 | 38.2 | 20.3, 71.9 |
|   Long guns only | 6.0 | 2.1, 16.7 | 21.1 | 11.8, 37.6 |
|   Handguns and long guns | 8.0 | 3.0, 21.4 | 36.2 | 19.9, 66.0 |
|   No gun | 1.0 | | 1.0 | |
| No. of guns* | | | | |
|   ≥2 | 6.3 | 2.3, 17.3 | 27.4 | 16.5, 45.7 |
|   1 | 3.0 | 1.1, 8.1 | 39.8 | 21.8, 72.6 |
|   None | 1.0 | | 1.0 | |
| Storage practice* | | | | |
|   ≥1 gun unlocked | 3.1 | 1.3, 7.2 | 29.2 | 17.8, 48.1 |
|   All guns locked | 7.7 | 2.0, 30.4 | 25.6 | 13.0, 50.4 |
|   No gun | 1.0 | | 1.0 | |

  * $p < 0.01$, Wald chi-square test.

  † Homicides committed with firearms vs. homicides committed by using other methods.

  ‡ Suicides committed with firearms vs. suicides committed by using other methods.

  § AOR, adjusted odds ratio; CI, confidence interval.

  ¶ Adjusted for sex, age group, race/ethnicity, education, marital status, residential status, and region of death.

**TABLE 6.   Comparison of the more refined measures of a firearm in the home and risk of a firearm homicide or firearm suicide in the home, United States**

| | Firearm homicide* | | Firearm suicide† | |
|---|---|---|---|---|
| | AOR‡,§ | 95% CI‡ | AOR§ | 95% CI |
| Type of gun | | | | |
|   Handguns only | 0.3 | 0.1, 1.2 | 1.0 | 0.5, 2.0 |
|   Long guns only | 0.7 | 0.2, 3.0 | 0.6 | 0.3, 1.0 |
|   Handguns and long guns | 1.0 | | 1.0 | |
|   Handguns only | 0.5 | 0.1, 2.1 | 1.9 | 1.0, 3.7 |
|   Long guns only | 1.0 | | 1.0 | |
| No. of guns | | | | |
|   ≥2 | 2.1 | 0.6, 8.0 | 0.7 | 0.4, 1.2 |
|   1 | 1.0 | | 1.0 | |
| Storage practice | | | | |
|   ≥1 gun unlocked | 0.3 | 0.0, 2.9 | 1.2 | 0.7, 2.2 |
|   All guns locked | 1.0 | | 1.0 | |

  * Homicides committed with firearms vs. homicides committed by using other methods.

  † Suicides committed with firearms vs. suicides committed by using other methods.

  ‡ AOR, adjusted odds ratio; CI, confidence interval.

  § Adjusted for sex, age group, race/ethnicity, education, marital status, residential status, and region of death.

of dying from a firearm suicide versus one committed by using other means (adjusted odds ratio = 31.1, 95 percent confidence interval: 19.5, 49.6). No variables other than a firearm in the home were important predictors of firearm homicide. In addition to a gun in the home, male sex and living in the South were important predictors of firearm suicide ($p < 0.01$).

The results of the analysis that examined whether the type of gun or number of guns in the home or manner of storage increased the risk that a homicide or suicide would be committed with a firearm are presented in tables 5 and 6. Those persons with guns in the home, regardless of the type of gun, number of guns, or storage practice, were at significantly greater risk of dying from a firearm homicide and firearm suicide than those without guns in the home (table 5). There were no significant differences between those with only handguns in the home and those with only long guns or both handguns and long guns, those with two or more guns, and those having one gun in the household; and between those who stored one or more guns unlocked and those who stored all guns locked (table 6).

## DISCUSSION

The findings of this study add to the body of research showing an association between guns in the home and risk of a violent death. Those persons with guns in the home were at significantly greater risk than those without guns in the home of dying from a firearm in the home relative to other causes of death. This finding was particularly the case for males, who in general have higher rates of completed suicide than females do. The findings showing an increased risk of homicide in homes with guns are also consistent with previous research (14, 20, 23, 24), although, when compared with suicide, are not as strong. Studies that have examined the risk of either violent victimization or perpetration at the individual level show relative risks between 1.4 and 2.7 (14, 20, 23, 24). Our findings are also in this range.

Our findings also suggest that the presence of a gun in the home increases the chance that a homicide or suicide in the home will be committed with a firearm rather than by using other means. Victims of suicide living in homes with guns were more than 30 times more likely to have died from a firearm-related suicide than from one committed with a different method. Guns are highly lethal, require little preparation, and may be chosen over less lethal methods to commit suicide, particularly when the suicide is impulsive. Suicidal persons may also be more likely to acquire a gun to commit suicide and, given the lethality of the weapon, are more likely to complete suicide, although the evidence on this point is mixed (20–22).

For victims of homicide, there was also a strong association between guns in the home and risk of dying from a firearm-related homicide, but this risk varied by age and whether the person was living with others at the time of death. These deaths may have been related to domestic violence or to other interpersonal disputes either involving them or someone else in the household. The majority of victims knew their assailant, suggesting that the assailant was either a family member or

was acquainted with the victim or victim's family and less likely to be an unknown intruder.

Some of the research conducted to date has found a higher risk of a violent death in homes with handguns and unlocked and loaded guns (13, 17, 19). However, many studies have either not examined the risk associated with specific firearm-related characteristics (e.g., type of gun or storage practice) (14, 15, 18, 23, 24) or have found no significant differences (16). In our study, the risk of dying from a firearm-related homicide or suicide was greater in homes with guns, but this risk did not vary by specific firearm-related characteristics. Simply having a gun in the home increased the risk of a firearm homicide or firearm suicide in the home. Whether certain types of guns or storage practices confer greater or lesser risk, or reflect recall and reporting biases when studied, is unclear. Previous research suggests that proxy respondents and nonusers of firearms are not always knowledgeable about the number or types of guns in the household or the storage practice and may be inclined to give socially desirable responses (27–29).

A number of limitations should be considered when interpreting the findings from this study. First, our study was based on data from death certificates and proxy interviews. The accuracy and completeness of information from these types of data sources can vary. With death certificates, for instance, there is the possibility of misclassification regarding the cause or manner of death. In the case of proxy interviews, knowing the outcome might have introduced bias in assessing behavioral or psychological characteristics of the decedent prior to death. The nature, degree, or direction of recall bias among proxies reporting on violent deaths versus nonviolent deaths is not known, however. Second, the gun in the home may not have been the gun used in the death. This possibility seems less likely with suicide, but, with homicide, it is certainly plausible that someone brought a gun into the home.

Third, it is possible that the association between a gun in the home and risk of a violent death may be related to other factors that we were unable to control for in our analysis. For instance, with homicide, the association may be related to certain neighborhood characteristics or the decedent's previous involvement in other violent or illegal behaviors. Persons living in high-crime neighborhoods or involved in illegal behaviors may acquire a gun for protection. The risk comes not necessarily from the presence of the gun in the house but from these types of environmental factors and exposures.

Fourth, our analysis was restricted to violent deaths in the home. The dynamics of homicides or suicides occurring in other locations may be very different. However, the degree of bias with suicide is likely to be small given that over three quarters of all suicides (76.3 percent) in this nationally representative sample occurred in the home; of those that occurred outside the home, 52.7 percent were committed with a firearm. Finally, our study focused on fatal outcomes for a sample of decedents. We were unable to ascertain the risk of a nonfatal outcome and were also unable to weigh the risk of a violent death against any protective benefits of gun ownership.

Much of the debate in the literature has focused on the risks and benefits of gun ownership in terms of lives saved versus

Downloaded from https://academic.oup.com/aje/article/160/10/929/140858 by guest on 08 April 2022

Downloaded from https://academic.oup.com/aje/article/160/10/929/140858 by guest on 08 April 2022

lives harmed. Studies of defensive gun use suggest that millions of defensive gun use incidents occur each year by people to protect themselves or their property against assaults, theft, or break-ins (30, 31). However, guns are also involved in unintentional firearm shootings and domestic altercations in the home and are the primary method used in suicides in the United States (1, 32). The body of research to date, including the findings of this study, shows a strong association between guns in the home and risk of suicide. The findings for homicide, while showing an elevated risk, have consistently been more modest. They suggest a need for more research to better distinguish the risk and protective factors associated with guns in the home, including an examination of the risk posed by forces both internal and external to the home.

## REFERENCES

1. Arias E, Anderson RN, Kung HC, et al. Deaths: final data for 2001. Natl Vital Stat Rep 2003;52:1–116.
2. Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS). Atlanta, GA: National Center for Injury Prevention and Control, 2004. (Available at the following Internet website: http://www.cdc.gov/ncipc/wisqars/default.htm).
3. Maguire K, Pastore AL. Sourcebook of criminal justice statistics, 2000. Washington, DC: United States Department of Justice, Bureau of Justice Statistics, 2001 (Publication NCJ 190251).
4. Cummings P, Koepsell TD. Does owning a firearm increase or decrease the risk of death? JAMA 1998;280:471–3.
5. Kleck G. What are the risks and benefits of keeping a gun in the home? JAMA 1998;280:473–5.
6. Birckmayer J, Hemenway D. Suicide and firearm prevalence: are youth disproportionately affected? Suicide Life Threat Behav 2001;31:303–10.
7. Miller M, Azrael D, Hemenway D. Household firearm ownership and suicide rates in the United States. Epidemiology 2002; 13:517–24.
8. Kaplan MS, Geling O. Firearm suicides and homicides in the United States: regional variations and patterns of gun ownership. Soc Sci Med 1998;46:1227–33.
9. Loftin C, McDowall D, Wiersema B, et al. Effects of restrictive licensing of handguns on homicide and suicide in the District of Columbia. N Engl J Med 1991;325:1615–20.
10. Sloan JH, Kellermann AL, Reay DT, et al. Handgun regulations, crime, assaults, and homicide: a tale of two cities. N Engl J Med 1988;319:1256–62.
11. Sloan JH, Rivara FP, Reay DT, et al. Firearm regulation and rates of suicide: a comparison of two metropolitan areas. N Engl J Med 1990;322:369–73.
12. Boor M, Bair JH. Suicide rates, handgun control laws, and sociodemographic variables. Psychol Rep 1990;66:923–30.
13. Kellermann AL, Rivara FP, Somes G, et al. Suicide in relation to gun ownership. N Engl J Med 1992;327:467–72.
14. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun owner-ship as a risk factor for homicide in the home. N Engl J Med 1993;329:1084–91.
15. Brent DA, Perper JA, Goldstein CE, et al. Risk factors for adolescent suicide: a comparison of adolescent suicide victims with suicidal inpatients. Arch Gen Psychiatry 1988;45:581–8.
16. Brent DA, Perper JA, Allman CJ, et al. The presence and accessibility of firearms in the homes of adolescent suicides: a case-control study. JAMA 1991;266:2989–95.
17. Brent DA, Perper JA, Moritz G, et al. Firearms and adolescent suicide: a community case-control study. Am J Dis Child 1993; 147:1066–71.
18. Shah S, Hoffman RE, Wake L, et al. Adolescent suicide and household access to firearms in Colorado: results of a case-control study. J Adolesc Health 2000;26:157–63.
19. Conwell Y, Duberstein PR, Connor K, et al. Access to firearms and risk for suicide in middle-aged and older adults. Am J Geriatr Psychiatry 2002;10:407–16.
20. Cummings P, Koepsell TD, Grossman DG, et al. The association between the purchase of a handgun and homicide or suicide. Am J Public Health 1997;87:974–8.
21. Wintemute GJ, Parham CA, Beaumont JJ, et al. Mortality among recent purchasers of handguns. N Engl J Med 1999;341: 1583–9.
22. Beautrais AL, Joyce PR, Mulder RT. Access to firearms and the risk of suicide: a case-control study. Aust N Z J Psychiatry 1996;30:741–8.
23. Kleck G, Hogan M. National case-control study of homicide offending and gun ownership. Soc Probl 1999;46:275–93.
24. Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case-control study. Ann Emerg Med 2003;41:771–82.
25. Centers for Disease Control and Prevention. 1993 National Mortality Followback Survey. Hyattsville, MD: National Center for Health Statistics. (Available at the following Internet website: http://www.cdc.gov/nchs/about/major/nmfs/nmfs.htm).
26. Shaw BV. SUDAAN software for the statistical analysis of correlated data, release 7.0. Research Triangle Park, NC: Research Triangle Institute, 1996.
27. Ludwig J, Cook PJ, Smith TW. The gender gap in reporting household gun ownership. Am J Public Health 1998;88:1715–18.
28. Nelson DE, Powell K, Johnson CJ, et al. Household firearm storage practices: do responses differ by whether or not individuals ever use firearms? Am J Prev Med 1999;16:298–302.
29. Azrael D, Miller M, Hemenway D. Are household firearms stored safely? It depends on whom you ask. Pediatrics 2000; 106:E31.
30. Cook PJ, Ludwig J. Guns in America: national survey on private ownership and use of firearms. Washington DC: National Institute of Justice, United States Department of Justice, 1997. (Publication NCJ 165476).
31. Kleck G, Gertz M. Armed resistance to crime: the prevalence and nature of self-defense with a gun. J Crim Law Criminol 1995;86:143–86.
32. Gotsch KE, Annest JL, Mercy JA, et al. Surveillance for fatal and nonfatal firearm-related injuries—United States, 1993–1998. MMWR Morb Mortal Wkly Rep 2001;50(SS-2):1–34.

# The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members

FREE

## A Systematic Review and Meta-analysis

Andrew Anglemyer, PhD, MPH, Tara Horvath, MA, George Rutherford, MD
Author, Article and Disclosure Information

https://doi.org/10.7326/M13-1301

# Abstract

*This article has been corrected. The original version (PDF) is appended to this article as a Supplement.*

## Background:

Research suggests that access to firearms in the home increases the risk for violent death.

## Purpose:

To understand current estimates of the association between firearm availability and suicide or homicide.

## Data Sources:

PubMed, EMBASE, the Cochrane Central Register of Controlled Trials, and Web of Science were searched without limitations and a gray-literature search was performed on 23 August 2013.

## Study Selection:

All study types that assessed firearm access and outcomes between participants with and without firearm access. There were no restrictions on age, sex, or country.

## Data Extraction:

Two authors independently extracted data into a standardized, prepiloted data extraction form.

## Data Synthesis:

Odds ratios (ORs) and 95% CIs were calculated, although published adjusted estimates were preferentially used. Summary effects were estimated using random- and fixed-effects models. Potential methodological reasons for differences in effects through subgroup analyses were explored. Data were pooled from 16 observational studies that assessed the odds of suicide or homicide, yielding pooled ORs of 3.24 (95% CI, 2.41 to 4.40) and 2.00 (CI, 1.56 to 3.02), respectively. When only studies that used interviews to determine firearm accessibility were considered, the pooled OR for suicide was 3.14 (CI, 2.29 to 4.43).

## Limitations:

Firearm accessibility was determined by survey interviews in most studies; misclassification of accessibility may have occurred. Heterogeneous populations of varying risks were synthesized to estimate pooled odds of death.

## Conclusion:

Access to firearms is associated with risk for completed suicide and being the victim of homicide.

## Primary Funding Source:

None.

---

Firearms cause an estimated 31 000 deaths annually in the United States (1). Data from the 16-state National Violent Death Reporting System indicate that 51.8% of deaths from suicide in 2009 ($n = 9949$) were firearm-related; among homicide victims ($n = 4057$), 66.5% were firearm-related. Most suicides (76.4%) occurred in the victims' homes. Homicides also frequently occurred in the home, with 45.5% of male victims and 74.0% of female victims killed at home (2).

Firearm ownership is more prevalent in the United States than in any other country; approximately 35% to 39% of households have firearms (3, 4), and 22% of persons report owning firearms. The annual rate of suicide by firearms (6.3 suicides per 100 000 residents) is higher in the United States than in any other country with reported data, and the annual rate of firearm-related homicide in the United States (7.1 homicides per 100 000 residents) is the highest among high-income countries (4). Results from ecological studies suggest that state restrictions on firearm ownership are associated with decreases in firearm-related suicides and homicides (5).

Specific characteristics about storage and types of firearms seem to increase suicide risk. Firearms that are stored loaded or unlocked are more likely to be used than those that are unloaded or locked (6, 7), and adolescent suicide victims often use an unlocked firearm in the home (8). The apparent increased risk for suicide associated with firearms in the home is not unique to persons with a history of mental illness (7) and may be more of an indicator of the ease of impulsive suicide.

Impulsiveness may be a catalyst in using a firearm to commit suicide and may also play a role in firearm-related homicide. Researchers have estimated higher odds of homicide victimization among women than men (9, 10). Because most homicide victims know their perpetrators (9), this finding may indicate an impulsive reaction to domestic disputes.

To our knowledge, this is the first systematic review and meta-analysis to estimate the association between firearm accessibility and suicide or homicide victimization.

---

# Methods

We used Cochrane Collaboration methods (11) throughout the review process.

---

## Data Sources and Searches

We searched PubMed, EMBASE, the Cochrane Central Register of Controlled Trials, and Web of Science without date, geographic, or language limitations. We also examined bibliographies of included articles to identify additional references. In addition, we searched the gray literature for papers related to firearms and suicide or homicide. The Appendix and Appendix Table 1 (both available at www.annals.org) present details of our search strategy and screening process.

Appendix Table 1. Search Strategy

*Appendix Table 1.* Search Strategy

Core terms of PubMed search strategy, adapted as needed for use in other
databases; initial search on 22 May 2013
(home*[tiab] OR house*[tiab] OR household*[tiab]) AND (Firearms[mh]
OR Weapons[mh] OR Wounds, Gunshot[mh] OR firearm*[tiab] OR
gun*[tiab] OR handgun*[tiab] OR rifle*[tiab] OR shotgun*[tiab])
Individual database yields:
PubMed (n = 944)
EMBASE (n = 35)
Cochrane Central Register of Controlled Trials (n = 16)
Web of Science (n = 797)

Updated; additional search on 23 August 2013
(Accidents[mh] OR Homicide[mh] OR Suicide[mh] OR accident*[tiab] OR
homicide*[tiab] OR suicide*[tiab]) AND (Firearms[mh]    OR
Weapons[mh] OR Wounds, Gunshot[mh] OR firearm*[tiab] OR
gun*[tiab] OR handgun*[tiab] OR rifle*[tiab] OR shotgun*[tiab])

Terms of gray-literature search strategy
Gray literature search date: 25 August 2013
Publications, reports, and working papers from the following agencies and
institutes:
1) Small Arms Survey publications (www.smallarmssurvey.org)
2) Violence Policy Center (www.vpc.org)
3) University of Colorado-Boulder Center for the Study and Prevention
of Violence (www.colorado.edu/cspv)
4) Harvard Injury Control Research Center (www.hsph.harvard.edu/
hicrc)
5) Firearm and Injury Center at Penn (www.uphs.upenn.edu/ficap)
6) University of California, Davis, Violence Prevention Research
Program (www.ucdmc.ucdavis.edu/vprp)

Google searches of the following sites using these terms:
7) American Public Health Association (guns site:apha.org filetype:pdf)
8) American Psychological Association (guns site:apa.org filetype:pdf)
9) Centers for Disease Control and Prevention (guns site:cdc.gov
filetype:pdf)
10) National Institute of Justice (guns site:nij.gov filetype:pdf)

# Study Selection

## Study Design

Study designs eligible for inclusion in our review were randomized, controlled trials; nonrandomized, controlled trials; pre- or postintervention evaluations; and observational studies (for example, cohort or case–control studies) if a comparator was available. Because we were concerned with the individual effects of firearm accessibility, we included only studies with individual-level data and excluded those with population-level data (for example, ecological studies).

## Types of Participants

Participants were not restricted by age, sex, or country of residence.

## Types of Exposures

Studies needed to assess whether firearms were available for all participants. In addition, included studies needed to assess outcomes between participants with and without access to firearms. Specifically, studies needed to compare firearm ownership or availability (that is, accessibility) with no firearm ownership or availability (that is, no accessibility) or provide adequate data to estimate the effect that firearms had on selected harms outcomes. Firearm accessibility could be defined as self- or proxy-reported or assumed from other types of exposure data (for example, firearm purchase records).

## Types of Outcome Measures

The primary outcomes of interest were suicide or homicide victimization (that is, being a victim of homicide rather than a perpetrator).

## Data Extraction and Quality Assessment

Two authors independently extracted relevant data into a standardized, prepiloted data extraction form.

## Assessment of Risk of Bias

Two authors independently assessed the risk of bias for each study by using the Newcastle–Ottawa Scale (12, 13). We resolved disagreements by discussion or by involving the third author to adjudicate (Table 1 and Appendix Table 2).

Table 1. Summary of Critical Appraisal of Included Studies Using the Newcastle–Ottawa Scale for Assessing the Quality of Observational Studies*

*Table 1.* **Summary of Critical Appraisal of Included Studies Using the Newcastle–Ottawa Scale for Assessing the Quality of Observational Studies***

| Study, Year (Reference) | Stars, *n* | | |
|---|---|---|---|
| | Selection† | Comparability‡ | Exposure§ |
| **Suicide outcomes** | | | |
| Brent et al, 1988 (16) | 3 | 1 | 1 |
| Brent et al, 1991 (17) | 3 | 2 | 1 |
| Kellermann et al, 1992 (7) | 4 | 2 | 1 |
| Brent et al, 1993 (6) | 4 | 2 | 2 |
| Beautrais et al, 1996 (20) | 4 | 2 | 2 |
| Cummings et al, 1997 (22) | 3 | 1 | 3 |
| Shah et al, 2000 (8) | 4 | 2 | 1 |
| Conwell et al, 2002 (21) | 4 | 2 | 1 |
| Grassel et al, 2003 (24) | 4 | 1 | 3 |
| Kung et al, 2003 (18) | 4 | 2 | 1 |
| Wiebe, 2003 (10) | 4 | 1 | 1 |
| Mahon et al, 2005 (25) | 4 | 1 | 3 |
| Kung et al, 2005 (19) | 4 | 2 | 1 |
| **Homicide victimization outcomes** | | | |
| Kellermann et al, 1993 (9) | 4 | 2 | 2 |
| Cummings et al, 1997 (22) | 3 | 1 | 3 |
| Grassel et al, 2003 (24) | 4 | 1 | 3 |
| Wiebe, 2003 (10) | 4 | 1 | 1 |
| Branas et al, 2009 (48) | 4 | 2 | 3 |

* Reference 23 not shown because the scale is different for cohort studies.
† Maximum 4 stars.
‡ Maximum 2 stars.
§ Maximum 3 stars.

Appendix Table 2. Detailed Risk of Bias Results Using the Newcastle–Ottawa Scale for Assessing Quality for Observational Studies



# Data Synthesis and Analysis

When necessary, we calculated the odds ratio (OR) and 95% CI for dichotomous outcomes, although published adjusted estimates were preferentially used if provided in the report. We pooled data across studies and estimated summary effect sizes by using fixed- and random-effects models. The choice of model was determined by the significance of the maximum likelihood estimate of the heterogeneity parameter ($\tau^2$) (14).

If the estimate of $\tau^2$ did not significantly differ from 0, the fixed-effects model was used (14). We present 2 estimates of heterogeneity—the $I^2$ statistic and the $\tau$ coefficient. Estimates of the former are interpreted as the percentage of variability in effect estimates due to heterogeneity rather than chance, whereas the latter can be interpreted as the clinical heterogeneity as determined by the estimated SD of underlying effects across studies. Unlike the $I^2$ statistic, the $\tau$ coefficient does not change with the number of patients included in the studies in a meta-analysis (15). We used R, version 3.0.0 (R Foundation for Statistical Computing, Vienna, Austria), for statistical analyses. The $\tau$ coefficient was measured on the log OR scale.

This review is registered in PROSPERO (CRD42013004469).

# Results

## Search Results

The database searches yielded 6902 references (Figure 1). We removed 2929 duplicates and an additional 2881 clearly irrelevant references. We then identified 2382 records through gray-literature searches. We closely

reviewed 3474 titles and abstracts. After this screening, we selected 70 articles for full-text review. We identified an additional 4 studies by cross-referencing bibliographies (16–19). Overall, 16 observational studies met our inclusion criteria. The Appendix shows the disposition of studies excluded after full-text review.



**Figure 1. Summary of evidence search and selection.**

Download figure

Download PowerPoint

Fourteen of the included studies estimated the odds of suicide in the context of firearm accessibility (6–8, 10, 16–25), and 6 studies estimated the odds of homicide victimization in this context (9, 10, 22–24, 48). Four studies reported both outcomes (10, 22–24).

## Study Characteristics

## Demographic Characteristics

Persons who completed suicide (mean, 75% [range, 70% to 85%]) (6–8, 10, 16–21, 23) and homicide victims (mean, 79% [range, 63% to 92%]) (9, 10, 23, 48) were more commonly men. Most persons who completed suicide were white (range, 78% to 98%) (6, 8, 10, 16–19, 21, 23, 26), whereas most homicide victims were non-

Hispanic black or another race (range, 47% to 88%) (9, 10, 23, 48). Four (28.6%) of the 14 suicide studies were among adolescents only (6, 8, 16, 17), and 10 (71.4%) were among adults only (7, 10, 18–25). All studies of outcomes of homicide victimization were among adults only (9, 10, 22–24, 48).

## Firearm Access

Among 11 U.S. case–control studies using survey data, proportions of firearm access ranged from 62.7% to 75.4% among case patients and from 26.4% to 50.8% among controls participants. One non-U.S. study (20) used survey data to estimate the proportion of case patients (23.9%) and control participants (18.5%) with firearm access, and another non-U.S. study (25) assumed firearm access from military duty and estimated the proportion of case patients (41%) and control participants (17%) with access. Among U.S.-based studies with reported data, the proportion of completed suicides using a firearm ranged from 47% to 73% (6, 7, 10, 16, 17, 21–24); 3 studies did not report adequate data (8, 18, 19).

One non–U.S.-based study of civilians reported that 13% of suicides were completed using a firearm (20), whereas another non-U.S. study of military personnel reported that 52% of suicides were completed using a firearm (25). The proportion of homicides using a firearm ranged from 50% to 76% (13, 15, 27–29).

## Studies of Suicide

Eleven of 14 studies (78.6%) interviewed proxies to determine firearm accessibility among decedents or control participants (6–8, 10, 16–21, 23), whereas 3 studies (21.4%) used firearm purchase records or military duty to determine accessibility among decedents or control participants (22, 24, 25) (Table 2). Twelve studies (85.7%) defined suicide as self-inflicted, intentional death by any means (6, 7, 10, 16–23, 25), whereas 2 studies (14.3%) defined suicide as injury related only to firearms or firearm- or violence-related injury (8, 24). All suicides were reported consecutively or identified using death certificates. In case–control studies, various types of control participants were identified, such as inpatients who attempted suicide (14.3%) (16, 17), community or school control participants (42.9%) (6–8, 18, 20, 21), decedents from causes other than suicide (28.6%) (18, 19, 24, 25), participants in a national health survey (7.1%) (10), or living HMO-based control participants (7.1%) (22).

Table 2. Characteristics of Included Studies of Suicide and Homicide Victimization



Table 2. Characteristics of Included Studies of Suicide and Homicide Victimization

| Study, Year (Reference) | Population | Location | Firearm-Specific Outcomes | Type of Case Patients | Type of Control Participants | Gun Access, % Case Patients | Gun Access, % Control Participants |
|---|---|---|---|---|---|---|---|
| **Suicide outcomes** | | | | | | | |
| Brent et al, 1988 (16) | Adolescents | Pennsylvania | 55.6% of suicides | Consecutively reported* | Inpatient adolescents who attempted suicide† | 74.1 | 33.9 |
| Brent et al, 1991 (17) | Adolescents | Pennsylvania | 69% of suicides | Consecutively reported* | Inpatient adolescents who attempted suicide† | 72.3 | 37.0 |
| Kellermann et al, 1992 (7) | Adults | Tennessee, Washington, Ohio | 51%–73% of suicides | Consecutively reported within home* | Community control participants‡ | 65.0 | 41.0 |
| Brent et al, 1993 (6) | Adolescents | Pennsylvania | 70.2% of suicides | Consecutively reported* | Community control participants† | 75.4 | 50.8 |
| Beautrais et al, 1996 (20) | Adults | New Zealand | 13% of suicides | Consecutively reported* | Community control participants | 23.9 | 18.5 |
| Cummings et al, 1997 (22) | Adults | United States | 52% of suicides | HMO member cross-referenced with death certificates | HMO member | 24.6§ | 15.1§ |
| Shah et al, 2000 (8) | Adolescents | Colorado | Firearm-only cases | Death certificate* | Students at same school‖ | 72.0 | 50.0 |
| Conwell et al, 2002 (21) | Adults >50 y | New York | 47.7% of suicides | Consecutively reported* | Community control participants‡ | 62.7 | 41.3 |
| Grassel et al, 2003 (24) | Adults | California | 47.4% of suicides | Deaths from violence or firearm | Deaths from noninjury causes | 8.4§ | <1.0§ |
| Kung et al, 2003 (18) | Adults | United States | Deaths determined from death certificate to be suicide* | Deaths determined from death certificate to be natural‖ | Men: 69.5 Women: 56.0 | Men: 46.8 Women: 32.0 |
| Wiebe, 2003 (10) | Adults | United States | 63.5% of suicides | National Mortality Followback Survey data and death certificates* | National Health Interview Survey | 65.8 | 36.7 |
| Dahlberg et al, 2004 (23) | Adults | United States | 68% of suicides | Cohort defined using National Mortality Followback Survey data and death certificate¶ | Cohort defined using National Mortality Followback Survey data and death certificate¶ | 72.4 | 32.0 |
| Kung et al, 2005 (19) | Adults | California | Any means‖ | Deaths determined from death certificate to be suicide* | Deaths determined from death certificate to be natural‖ | 64.2 | 26.4 |
| Mahon et al, 2005 (25) | Adults | Ireland | 52% of suicides | Autopsy reports and death certificates | Deaths from all other causes** | 41.0†† | 17.0†† |
| **Homicide victimization outcomes** | | | | | | | |
| Kellermann et al, 1993 (9) | Adults | Tennessee, Washington, Ohio | 49.8% of homicides | Serially reported within home* | Community control participants** | 45.4 | 35.8 |
| Cummings et al, | Adults | United States | 56.4% of | HMO member cross- | HMO member | 21.4§ | 11.5§ |

| | | | | referenced with death certificates | | | |
|---|---|---|---|---|---|---|---|
| 1997 (22) | | | homicide cases | | | | |
| Grassel et al, 2003 (24) | Adults | California | 66.2% of homicide cases | Deaths from violence or firearm | Deaths from noninjury causes | 2.0§ | <1.0§ |
| Wiebe, 2003 (10) | Adults | United States | 76% of homicide cases | National Mortality Followback Survey data and death certificates¶ | National Health Interview Survey | 30.7 | 34.0 |
| Dahlberg et al, 2004 (23) | Adults | United States | 68% of homicide cases | Cohort defined using National Mortality Followback Survey and death certificates¶ | Cohort defined using National Mortality Followback Survey data and death certificates¶ | 41.9 | 32.0 |
| Branas et al, 2009 (48) | Adults | Pennsylvania | Firearm-only cases | Consecutively reported | Community control participants | 8.8 | 7.9 |

\* Proxy interviews.
† Parental figure interviews.
‡ Control participant proxy interviews.
§ Proportion of participants with firearm access determined by gun purchase data.
‖ Unreported percentage.
¶ Proxy interviews of decedents.
\*\* CV determined cases.
†† Proportion of participants with firearm access determined by military duty service time.

## Studies of Homicide Victimization

Three of 6 studies (50.0%) interviewed proxies to determine firearm accessibility in the home of decedents or control participants (Table 1) (9, 10, 23). Two studies (33.0%) used firearm purchase records to determine firearm accessibility of decedents or control participants (22, 24). In the 3 studies that used survey data, proportions of case patients with firearm access ranged from 30.7% to 45.4% and proportions of control participants ranged from 32.0% to 35.8%. Four studies (66.7%) defined homicide victimization as intentional death by any means, and 1 defined it as firearm- or violence-related injury (24). All homicides were reported consecutively or identified by using death certificates. In the 5 case–control studies with homicide outcomes, various types of control participants were identified, including community or school control participants (40.0%) (9, 48), nonhomicide decedents (40.0%) (10, 24), or living HMO-based control participants (20.0%) (22).

## Control Participant Selection

Three case–control studies had potential selection bias resulting from how control participants were selected (16, 17, 22). Cummings and colleagues (22) used an HMO population as the source of their control participants, whereas 2 other studies used inpatient hospital control participants (16, 17). Using HMO or inpatient hospital control participants can violate principles in control selection—namely, that firearm accessibility for control participants may not be the same as that in the study base (30). This bias may occur when patients use the HMO system or hospital to seek care for suicidal planning with firearms as the means. Two studies (16, 17) are especially prone to the Berkson bias—that is, firearm access is related to inpatient hospitalization due to suicidal planning (31).

## Comparability

Five studies of suicide had potential comparability bias resulting from a lack of adequate adjustment for major confounders (for example, history of mental illness) (10, 16, 22, 24, 25). Specifically, 1 study's authors describe significant differences between case patients and control participants with regard to some diagnoses of mental illness, although these are not adjusted for in the model with firearm accessibility (16). Four other studies did not report data on history of mental illness (10, 22, 24, 25). Similarly, 3 studies of homicide victimization had potential comparability bias resulting from a lack of adequate adjustment for major confounders (for example, arrest history of someone in the household) (10, 22, 24). In turn, it was not possible to discern whether domestic violence or arrest history differ between homicide case patients and control participants, which may have resulted in confounding.

## Exposure

Eleven of 14 studies of suicide and 2 of 6 studies of homicide had potential exposure bias due to unblinded interviews of proxies of case patients and control participants or differential nonresponse rates between case patients and control participants (6–10, 16–21, 23). Specifically, these studies used surveys to collect data on firearm accessibility; proxies for case patients and control participants knew their case patient or control participant status, thereby potentially biasing recall of firearm accessibility. Finally, although 7 case–control studies reported equal nonresponse rates between case patients and control participants (6, 9, 10, 20, 22, 24, 25), 7 others did not report this (7, 8, 16–19, 21), potentially leading to differential misclassification of firearm exposure.

## Meta-analysis of Effects of Guns in the Home

### Suicide Outcomes

We pooled data from 14 identified observational studies that assessed the odds of suicide (6–8, 10, 16–25) and, using a random-effects model, calculated a pooled OR of 3.24 (95% CI, 2.41 to 4.40) with substantial heterogeneity ($I^2 = 89\%$; $\tau = 0.45$) (Figure 2). All but 1 study (20) found significantly higher odds of suicide among participants who had firearm access than among those who did not, with ORs ranging from 1.38 to 10.38.



Figure 2. Odds of suicide and homicide in the context of firearm access.

Horizontal lines indicate 95% CIs, squares reflect point estimates, and the size of the squares is proportional to the study's weight. The diamonds reflect the pooled estimate across all studies, and the solid vertical lines reflect the null hypothesis.

Download figure

Download PowerPoint

## Homicide Outcomes

We also pooled data from 6 studies that assessed the odds of homicide (9, 10, 22–24, 48) and, using a random-effects model, estimated a pooled OR of 2.00 (CI, 1.56 to 3.02) with substantial heterogeneity ($I^2$ = 63%; $\tau$ = 0.22) (Figure 2). All studies found significantly higher odds of homicide victimization among participants who had access to a firearm than among those who did not, with ORs ranging from 1.41 to 3.54.

## Subgroup Analyses

To determine the effect that differences between subgroups had on pooled estimates, we stratified results by sex, age (adolescent or adult), year of publication (before 1997 or 1997 to 2013), location of death (in home only or not in home only), and risk of bias (high or moderate to low) (Figure 3). Most tests for interaction between subgroups were not statistically significant, although women had significantly higher odds of homicide victimization than men ($P$ < 0.001) and studies with moderate or low risk of bias yielded higher odds of homicide victimization than high-risk studies when firearm access was compared with no access ($P$ < 0.001).



Figure 3. Meta-analyses estimating the odds of suicide and homicide between subgroups.

Horizontal lines indicate 95% CIs, squares reflect point estimates, the diamonds reflect the pooled estimate across all studies, and the solid vertical lines reflect the null hypothesis. The $\tau$ estimate was not reported in fixed-effects models. NA = not applicable.

* The $\tau$ estimate is on the log odds ratio scale.

† Fixed-effects models.

‡ No meta-analysis was performed.

Download figure

Download PowerPoint

# Discussion

We performed a systematic review and meta-analysis of all studies that compared the odds of suicide or homicide victimization between persons with and without reported firearm access. All but 1 of the 16 studies identified in this review reported significantly increased odds of death associated with firearm access. We found strong evidence for increased odds of suicide among persons with access to firearms compared with those without access (OR, 3.24 [CI, 2.41 to 4.40]) and moderate evidence for an attenuated increased odds of homicide victimization when persons with and without access to firearms were compared (OR, 2.00 [CI, 1.56 to 3.02]).

Although our study attempts to quantify a person's risk for suicide and homicide in the context of firearm access, many studies have used population-level data to describe the public health risk in terms of aggregate firearm ownership (34–48). Reported proportions of U.S. households and persons with access to firearms are the highest in the world (3, 4), whereas rates of firearm-related deaths are among the highest among high-income countries (4).

It has been suggested that higher rates of suicide and homicide in areas with the highest rates of gun availability may indicate impulsivity and ease of locating firearms (37, 49). In addition, although a public health approach to prevention that entails restriction of access to firearms may lead to violent death by other means, the increased rates of violent death (suicide and homicide) in states with the highest rates of firearm access were attributable more to firearm violence than to nonfirearm violence (37).

Sex-specific subgroup analyses suggest that men with access to firearms have statistically nonsignificant higher odds for committing suicide than women (ORs, 3.71 and 3.56, respectively). Moreover, the nonsignificant pooled OR of suicide among women when firearm access was compared suggests that evidence of an increased risk for suicide among women may not be very strong when all of the available literature is considered. Recent research that found that women are less likely to achieve suicide completion by firearm or hanging and are nearly 4 times more likely to use poison than men (OR, 3.65 [CI, 1.87 to 7.09]) (50) seems to support these findings.

Although men with access to firearms may have higher odds of committing suicide than women, women have higher odds of homicide victimization. The tests for interaction between sex subgroups in our meta-analysis were significant in fixed-effects models ($P < 0.001$). Although men account for more than three quarters of all suicides and homicides, women with firearm access have a higher risk for homicide victimization, a finding that previous studies support (9, 10). Of note, in our review, homicide was the result of victimization rather than perpetration. Furthermore, empirical evidence suggests that most homicide victims know their assailant (10, 24),

which suggests an interpersonal dispute within the household or other domestic violence and not an unknown intruder.

Our results suggest that the pooled OR of suicide is similar between adults and adolescents (ORs, 3.34 and 2.56, respectively; *P* value for interaction = 0.31). To determine the extent to which data from firearm purchases or military duty contribute to the effects seen among adults, we performed a sensitivity analysis that excluded studies with those data; the pooled OR for suicide among adults was slightly decreased (3% reduction; pooled OR, 3.25) in this analysis. We performed an additional sensitivity analysis that excluded the remaining non-U.S. study, and the pooled OR increased slightly (9% increase; pooled OR, 3.64). Tests for interactions among age subgroups remained nonsignificant ($P = 0.170$), although estimates for adults were more than 40% higher than those for adolescents. Accessibility may explain part of the difference in risk between adults and adolescents; adults typically purchase and store the firearms, and improper storage practices pose a serious risk because they have been previously associated with adolescent suicide (51).

The availability of firearms in the home may not be the catalyst for suicidal ideation, but firearms may be a preferred method of suicide among those who have suicidal thoughts. Betz and colleagues (52) found that adolescents with firearm access were no more likely to have suicidal thoughts or a suicide plan in the past 12 months than those without firearm access. However, among adolescents with a suicide plan, those with a firearm in the home were more than 7 times more likely to have a plan involving firearms than those without a firearm in the home (OR, 7.39 [CI, 2.04 to 26.84]) (52).

Since 1996, federal law has prohibited U.S. Department of Health and Human Services agencies from using funds for research that could be interpreted as promoting or advocating for gun control (53). Although we anticipated a lower absolute number of studies since 1996, we found that 63% of all studies (*n* = 10) were published from 1997 to 2013 compared with 37% published before 1997. Similarly, a recent study of publication rates of studies of firearm-related death among youths found an increase in publications (54). The investigators found that, although the rates of publication increased, the relative increase was lower than among publications of other leading causes of death among youths, and models exploring the effects of the federal law passed in 1996 did not suggest a temporal pattern in publication (54).

We also stratified our pooled results by risk of bias and found no significant difference between studies with high risk and those with moderate or low risk (ORs, 3.43 and 3.23, respectively). To the extent that we measured bias in the studies of suicide, we were not able to detect any influence of these biases in the pooled results. Among studies with only moderate or low risk of bias that evaluated the effect of firearm ownership on homicide, the pooled OR was 2.36 (CI, 1.81 to 3.01), which is 18% higher than the pooled OR that included all studies, suggesting that the higher bias in homicide studies may trend estimates toward the null.

Our review has limitations. First, our conclusions are only as good as the data and studies that we identified. To minimize this limitation, we searched extensively by using standardized search strategies from the Cochrane Collaboration to identify all relevant studies. Studies of death commonly have a case–control design, although the cohort study included in our meta-analysis found results similar to those of the case–control studies. In addition, although we limited our analysis to individual-level data, we acknowledge that several available ecological studies have also explored the link between firearms and violent death (5, 55). Among other concerns, we decided not to include population-level data because we were concerned about ecological bias; for example, gun ownership data on a population level may not reflect the persons who actually commit suicide, so no true link between gun ownership and harms outcomes can be made. Despite their limitations, individual-level data, such as those we included in this study, are ideal because confounding and explanatory reasons for the relationship among firearms and suicide and homicide can be better explored.

Second, misclassification of firearm exposure and cause of death is a potential risk in included studies. Although all studies of homicide were among adults, causes of firearm-related deaths are inconsistently reported as homicide or accidental, particularly among children (56). In fact, in some cases, accidental firearm-related deaths among children may be classified as homicide due to an unsecured firearm or as a result of a medical examiner's decision that any death resulting from 1 person shooting another, regardless of intent, is a homicide (56). Further, to determine firearm availability, proxies were interviewed in 79% of studies evaluating

suicide outcomes and 50% evaluating homicide outcomes. However, evidence suggests apparent differences between sexes in describing firearm ownership or firearm storage within the same household (57, 58). In fact, husbands are most often acknowledged by both men and women to be the person responsible for firearm storage and ownership (58), a sex gap that may introduce selection bias in proxy interviews.

Third, we synthesized heterogeneous populations of varying risks to estimate pooled ORs of death. We analyzed our pooled data by using fixed- and random-effects models but note that fixed-effects models only marginally changed pooled effects in the suicide outcomes and all models retained statistical significance. Specifically, when fixed-effects models were used instead of random-effects models, the pooled ORs changed from 3.24 to 3.32 for suicide and from 1.94 to 1.65 for homicide. Moreover, for the 11 U.S. studies that used survey data to classify firearm exposure, proportions of case patients with gun access were closely related, ranging from 62.7% to 75.4%. The reported proportions of control participants with gun access varied more, from 26.4% to 50.8%. Perhaps as a reflection of different firearm ownership culture or restrictions, the only non-U.S. study in a civilian population used survey data and estimated the proportions of suicide case patients and control participants with firearm access to be considerably lower than those in U.S. studies (23.9% and 18.5%, respectively) (20).

Fourth, we considered studies of suicide and homicide victimization by any means, and firearm-specific outcomes may differ. In addition to the other differences between U.S. and non-U.S. studies, 47% to 73% of suicide cases in the United States were firearm-specific compared with only 13% of cases in the study of non-U.S. civilians (20). When considering suicides by nonfirearm methods in the identified literature, researchers have generally found reduced odds of suicide completion by any means other than a firearm, comparing firearm accessibility (OR range, 0.68 to 0.90) (7, 10, 22, 24). Among homicide victimization studies, none reported a significant finding for homicides that are not firearm-specific, although the proportion of homicides in which firearms was used ranged from 50% to 100% (9, 10, 22–24, 48).

Fifth, in studies with homicide outcomes, whether the presence of a firearm among case patients is the result of environmental characteristics or living conditions is unclear. For example, some persons may purchase a firearm for protection because of neighborhood crime, which then translates the risk from the ownership of a firearm to the neighborhood. Also, in homicides, the case patients are by definition deceased and injuries due to firearms may be more lethal than other means; thus, assault by other means would be less likely to be captured (59).

Finally, other sources of bias are an ever-present threat. Among them, using firearm purchase data or military duty as a proxy for firearm access or ownership may not accurately represent ownership. The pooled OR for suicide in our random-effects meta-analyses with data from firearm purchase or military duty was only 3.2% higher than the pooled OR without these studies (3.24 and 3.14, respectively). In contrast, the pooled OR for homicide in the random-effects meta-analyses with firearm purchase data was 29.9% higher than the pooled OR (fixed-effects) without these studies (2.00 and 1.54, respectively), although this is probably partly an artifact of model specification. Finally, although publication bias is a concern, the Egger regression tests for asymmetry of the funnel plot (27) for suicide studies were not significant ($P = 0.88$). However, we identified too few studies of homicide to reasonably assess publication bias.

In summary, we found the association between firearm availability and homicide to be more modest than that between firearm availability and completed suicide. Future studies of firearm access and homicide risk should focus on the role that social factors and surrounding living conditions play in homicide victimization. Furthermore, the National Research Council has acknowledged the difficulty in establishing firearm ownership in studies because of privacy and questionable legality concerns (28). As such, it recommended that researchers receive adequate access to data to trace firearms (28). Future studies of the effect of firearms used in violent injuries may, as a result, have a lower risk for misclassification of firearm ownership and yield more methodologically robust results. Nonetheless, the evidence that we synthesize here helps to elucidate the risks of having a firearm in the home; restricting that access may effectively prevent injury (29).

# Appendix: The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members

## Search Strategy

One investigator reviewed the titles and abstracts identified in the initial search to assess potential relevance to the topic. After removing irrelevant titles, 2 investigators independently read the titles, abstracts, and descriptor terms of the remaining citations to identify eligible reports. We obtained full-text articles for all citations identified as potentially eligible, and 2 investigators independently determined the relevance of the articles according to our inclusion criteria.

When there was uncertainty about a study's eligibility, we obtained the full-text article. The 2 investigators independently applied the inclusion criteria, and any differences were resolved by discussion with the third investigator. We reviewed studies for relevance based on design, types of participants, and outcome measures.

## Disposition of Excluded Studies After Full-Text Review

Of the full-text articles that we reviewed, 3 were excluded because the study populations were contained in previously published data included in this review (26, 32, 60), 16 were ecological studies comparing aggregate data between populations (34–47, 61, 62), 15 were only descriptive (2, 52, 63–76), 1 estimated only the victimization rates (nonfatal) of firearm owners (76), 3 were reviews (77–79), 7 did not evaluate our selected harms outcomes (80–86), 7 studied only unintentional firearm death (33, 87–92), 1 did not evaluate firearm access (93), and 4 were editorials (94–97). Overall, 16 observational studies met our inclusion criteria.

# Comments

## 3 Comments

SIGN IN TO SUBMIT A COMMENT

Andrew Anglemeyer, PhDUniversity of California, San Francisco20 February 2014

## Authors' Comment

In Dr Sklaroff's commentary, he refers to our systematic review and meta-analysis (1) as a "gun-control review" and suggests that the "preordained outcome" was due to "author-bias" (2). Clearly this is a contentious topic for many, but our scholarly endeavor was not clouded by any personal or political leaning. We are not "unabashedly campaigning to restrict the right to bear arms" (2), as Dr Sklaroff suggests--our review underscores the importance of firearm safety, particularly in high-risk situations (e.g., depressed family member or violent relationship).

Dr Sklaroff's suggestion that the exclusion of some studies and not others somehow creates "author bias" is incorrect. We correctly listed reference 26 (3) as an excluded study to avoid double counting

because its data were included in references 6 (4) and 16 (5), both of which were correctly included and correctly cited. References 32 (6) and 60 (7) were both excluded for similar reasons. All of the studies excluded because some or all of their data were previously published found higher odds of death among cases with firearm exposure. By excluding these data, we actually reduced the risk of artificially deflated variance in our pooled estimates (and subsequently the quality of evidence could have been stronger had we included them)--the opposite of "author-bias". In fact, had we incorrectly included these data, we would have obtained an estimate of suicide that was 5% greater with a margin of error 10% smaller than we obtained in our review. For the homicide outcome, we would have obtained an estimate 12% greater with a margin of error 9% smaller than we obtained in our review. Further, as we state in our response to the editorial (8), had we included population-level data, as opposed to only individual-level data, we would have likely found even stronger evidence. Lastly, the truncating of references in the print edition is a journal-specific issue, not an attempt to hide from the readership specific references. All 97 references are available in the online version of our review.

Respectfully,

Andrew Anglemyer, PhD
University of California, San Francisco
San Francisco, California

References

1. Anglemyer A, Horvath T, and Rutherford G. The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members. A Systematic Review and Meta-Analysis. Ann Intern Med 2014; 160: 101-10.
2. Sklaroff Robert (February 4, 2013). "Potential Politicization of Gun Control Controversy". In http://annals.org/article.aspx?articleid=1814426.
3. Brent DA, Baugher M, Bridge J, Chen T, Chiappetta L. Age- and sex- related risk factors for adolescent suicide. J Am Acad Child Adolesc Psychiatry. 1999;38:1497-505.
4. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide. A community case-control study. Am J Dis Child. 1993; 147:1066-71.
5. Brent DA, Perper JA, Goldstein CE, Kolko DJ, Allan MJ, Allman CJ, et al. Risk factors for adolescent suicide. A comparison of adolescent suicide victims with suicidal inpatients. Arch Gen Psychiatry. 1988;45:581-8.
6. Brent DA, Perper J, Moritz G, Baugher M, Allman C. Suicide in adoles- cents with no apparent psychopathology. J Am Acad Child Adolesc Psychiatry. 1993;32:494-500.
7. Bailey JE, Kellermann AL, Somes GW, Banton JG, Rivara FP, Rushforth NP. Risk factors for violent death of women in the home. Arch Intern Med. 1997;157:777-82.
8. Anglemyer A (January 28, 2013). "Comment". In http://annals.org/article.aspx?articleid=1814430.

Robert B. Sklaroff, M.D.Nazareth Hospital, Philadelphia, PA4 February 2014

## Potential Politicization of Gun Control Controversy

TO THE EDITOR:

Because Public Health research predictably guides generation of Public Policy, it is necessary to scrutinize the political science underlying the paired gun-control review (1) and editorial (2); challenges are detected to fundamental standards that may compromise an otherwise sound meta-analysis of available literature. The last sentences of each are revelatory, for the former finds "restricting [access to a firearm in the home] may effectively prevent injury" and the latter concludes "obtaining a firearm not only endangers those living in the home, but also imposes substantial costs on the community." Notwithstanding unaddressed Second Amendment constraints, the authors of both unabashedly campaign to restrict the right to bear arms, thereby ignoring—for example—the human compulsion to manifest reasonable self-defense.

The intuitive deduction, that availability of a firearm will increase the risk that momentary depression will yield suicide, is consistent with modern lay culture—recalling the 1945 movie "Spellbound"—and medical scholarship—recalling an essay published last year in this journal (3). Yet, it is undermined by the editorialist, who has argued that the widespread ownership of firearms in private hands in the U.S. promotes the spread of the "disease" of gun violence (4). He invoked a generalized reference to his book when claiming "There is no association between gun ownership levels and suicide by means other than guns. These studies have controlled for...depression [and] suicidal ideation." If true, this assertion would undermine efforts to include scrutiny of mental health data during any mandated background-checks; alas, it is untrue, for a profile has been generated of psychiatric patients at high risk for suicide (5).

This latter citation was among the articles cited in the review (#26), prompting confusion when noting it was among three articles cited in the online Appendix—which purports to show "the disposition of studies excluded after full-text review"—along with two others (#32 and #60) "because the study populations were contained in previously published data included in this review." Noting there are 59 published references and 97 online references, merely counting the number of citations associated with a particular reason for exclusion yields the observation that there is an admixture of articles that were included and articles that were excluded (i.e., some were among the first #1-59 and at least one was among the latter #60-97). The authors should have provided a cross-walk "pairing" of how one set of data was subsuming another set of myriad peer-reviewed studies, precluding concern that any undue selectivity existed.

Therefore, author-bias—seeking the ability to generate the above preordained outcome—could have clouded how subsidiary observations were drawn regarding, for example, the allegation of enhanced risk of being killed by a household member. And, overall, adopting a purely academic approach could have yielded insights, for example, as to the type of mental health diagnoses that might predispose to criminal gun-use; indeed, this entire body of work could then have been compared/contrasted with

lethal violence committed via non-household, unregistered firearms, yielding far more useful insights as to what societal interventions might be optimal.

References

1. Andrew Anglemyer, Tara Horvath, George Rutherford; The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members - A Systematic Review and Meta-analysis. Ann. Intern. Med. 2014 Jan;160(2):101-110.

2. David Hemenway; Guns, Suicide, and Homicide: Individual-Level Versus Population-Level Studies. Ann. Intern. Med. 2014 Jan;160(2):134-135.

3. Carl E. Fisher, Jeffrey A. Lieberman; Getting the Facts Straight About Gun Violence and Mental Illness: Putting Compassion Before Fear. Ann. Intern. Med. 2013 Sep;159(6):423-424.

4. Wheeler, Timothy J. (September 2005). "Private Guns, Public Health". The Freeman. In http://en.wikipedia.org/wiki/Private_Guns,_Public_Health#cite_ref-free_1-0.

5. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide. A community case-control study. Am J Dis Child. 1993; 147:1066-71.

Christopher Barsotti MD FAAEMDartmouth-Hitchcock Putnam Physicians, Southwestern Vermont Medical Center27 January 2014

## Firearm Screening and Individual Risk

The article by Anglemyer, et al., summarizes and affirms the association between elevated rates of homicide/suicide and the presence of firearms, but beyond estimating the role of impulsivity, more specific causalities of gun violent acts remain obscure. From other studies we recognize that certain populations are at greater risk: individuals with alcohol and other drug abuse (1), previous domestic violent conduct (2), etc.

Hemenway's editorial calling for individual-level studies of perpetrators would certainly move us towards a better understanding of firearm risk by those with access to guns. Indeed, firearm exposure is intrinsically relevant to the risk stratification of patients susceptible to perpetrating an act of self-directed or interpersonal violence. Patients' cognitions about firearms, as well as their behavior with them, have immediate clinical application. Firearm avoidance by patients presenting with suicidal ideation may indicate healthy insight by that individual regarding his/her impulsivity, and thus firearm avoidance may be evidence of good judgment. It is certainly plausible that such behavior may be perceived as protective. Conversely, whether and how a patient handles a firearm conveys essential information about the gravity of suicidal ideation: as in one recent case of mine, the patient unlocked and loaded only one of his two handguns – and subsequently consumed an excessive quantity of alcohol in order to impair further his impulse control.

Despite being the first medical professionals to assess acutely decompensated suicidal patients, the majority of emergency physicians do not screen for firearms (3). There are substantial barriers to firearm screening in clinical practice, as well as risks that might be encountered by physicians who attempt to use such information to reduce possible harm. Although firearm exposure may elevate the clinical estimation of risk for harm in certain presentations, physicians may not disclose such protected

health information unless a "serious and imminent" threat against an identifiable party is known (4). Additionally, outpatient management may be more problematic for patients whose firearm exposure cannot be managed.

We do need more research on individual-level perpetrators of gun violence, but what physicians also need right now are clear guidelines on how, when and to whom we should direct questions about firearm access. How should we interpret the information we receive? How and when is it appropriate to intervene? Without adequate legal support and professional guidelines, firearm screening will remain captive to the politics of gun control, and dangerous individuals will remain unrecognized, untreated and at high risk.

References:

1. Rivara F, Mueller B, Somes G, et al. Alcohol and illicit drug abuse and the risk of violent death in the home. JAMA. 1997;278:569-575.

2. Bailey J, Kellermann A, Somes G, et al. Risk factors for violent death of women in the home. Arch Intern Med. 1997;157:777-82

3. Betz M, Miller M, Barber C, et al. Lethal means restriction for suicide prevention: Beliefs and behaviors of emergency department providers. Depress Anxiety. 2013;30:1013-20.

4. HHS Regulations, Uses and Disclosures for Which an Authorization or Opportunity to Agree or Object is Not Required: Uses and Disclosures to Avert a Serious Threat to Health or Safety - § 164.512 (j)(i)(A).

---

SPECIAL ARTICLE

---

# Handgun Ownership and Suicide in California

David M. Studdert, LL.B., Sc.D., Yifan Zhang, Ph.D., Sonja A. Swanson, Sc.D.,
Lea Prince, Ph.D., Jonathan A. Rodden, Ph.D., Erin E. Holsinger, M.D.,
Matthew J. Spittal, Ph.D., Garen J. Wintemute, M.D., M.P.H.,
and Matthew Miller, M.D., Sc.D.

---

ABSTRACT

---

From the Stanford Law School (D.M.S.),
School of Medicine (D.M.S, Y.Z., L.P.,
E.E.H.), and Department of Political Sci-
ence (J.A.R.), Stanford University, Stan-
ford, and the School of Medicine, Univer-
sity of California at Davis, Sacramento
(G.J.W.) — all in California; the Depart-
ment of Epidemiology, Erasmus Medical
Center, Rotterdam, the Netherlands
(S.A.S.); the Melbourne School of Popu-
lation and Global Health, University of
Melbourne, Melbourne, VIC, Australia
(M.J.S.); and the Bouvé College of Health
Sciences, Northeastern University, Bos-
ton (M.M.). Address reprint requests to
Dr. Studdert at Stanford Health Policy,
615 Crothers Way, Stanford, CA 94305.

N Engl J Med 2020;382:2220-9.
DOI: 10.1056/NEJMsa1916744
Copyright © 2020 Massachusetts Medical Society.

**BACKGROUND**

Research has consistently identified firearm availability as a risk factor for suicide.
However, existing studies are relatively small in scale, estimates vary widely, and
no study appears to have tracked risks from commencement of firearm ownership.

**METHODS**

We identified handgun acquisitions and deaths in a cohort of 26.3 million male
and female residents of California, 21 years old or older, who had not previously
acquired handguns. Cohort members were followed for up to 12 years 2 months
(from October 18, 2004, to December 31, 2016). We used survival analysis to esti-
mate the relationship between handgun ownership and both all-cause mortality
and suicide (by firearm and by other methods) among men and women. The
analysis allowed the baseline hazard to vary according to neighborhood and was
adjusted for age, race and ethnic group, and ownership of long guns (i.e., rifles or
shotguns).

**RESULTS**

A total of 676,425 cohort members acquired one or more handguns, and 1,457,981
died; 17,894 died by suicide, of which 6691 were suicides by firearm. Rates of
suicide by any method were higher among handgun owners, with an adjusted
hazard ratio of 3.34 for all male owners as compared with male nonowners (95%
confidence interval [CI], 3.13 to 3.56) and 7.16 for female owners as compared
with female nonowners (95% CI, 6.22 to 8.24). These rates were driven by much
higher rates of suicide by firearm among both male and female handgun owners,
with a hazard ratio of 7.82 for men (95% CI, 7.26 to 8.43) and 35.15 for women
(95% CI, 29.56 to 41.79). Handgun owners did not have higher rates of suicide by
other methods or higher all-cause mortality. The risk of suicide by firearm among
handgun owners peaked immediately after the first acquisition, but 52% of all
suicides by firearm among handgun owners occurred more than 1 year after ac-
quisition.

**CONCLUSIONS**

Handgun ownership is associated with a greatly elevated and enduring risk of
suicide by firearm. (Funded by the Fund for a Safer Future and others.)

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

SUICIDE ATTEMPTS ARE OFTEN IMPULSIVE acts, driven by transient life crises.[1,2] Most attempts are not fatal, and most people who attempt suicide do not go on to die in a future suicide.[3,4] Whether a suicide attempt is fatal depends heavily on the lethality of the method used,[5-8] and firearms are extremely lethal.[6-8]

These facts focus attention on firearm access as a risk factor for suicide, especially in the United States, which has a higher prevalence of civilian-owned firearms than any other country[9] and one of the highest rates of suicide by firearm.[10] In 2018, 24,432 suicides by firearm occurred in the United States.[11] Handguns are used in approximately three quarters of suicides by firearm.[12-14]

Ecologic[15-17] and case–control[18-25] studies have consistently shown a positive association between firearm availability and suicide. Collectively, the evidence indicates that the risk of suicide is three times as high when there is firearm access as when there is not — an excess risk attributable to higher rates of suicide by firearm, not of suicide by other methods.[17,26-29] However, the evidence base has gaps and limitations. For example, the case–control studies are relatively small in scale and prone to mismeasurement of firearm availability and, with one apparent exception,[25] rely on data from the 1980s and 1990s.

We tracked firearm ownership and mortality over 12.2 years in a cohort of 26.3 million adult residents of California. Nearly 700,000 cohort members acquired their first handgun during the study period (October 18, 2004, through December 31, 2016). Our goal was to estimate the effect of handgun ownership on their risk of suicide.

## METHODS

### STUDY OVERSIGHT AND REPORTING

Our study was approved by the institutional review board at Stanford University, and the results are reported in accordance with the Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) guidelines.[30] A checklist of the items recommended in the STROBE guidelines is provided in Table S21 in the Supplementary Appendix, available with the full text of this article at NEJM.org.

### DATA

We formed the cohort by linking information on handgun transfers and all-cause mortality among adults in California to a series of historical extracts of the California Statewide Voter Registration Database (SVRD). The SVRD enumerates all registered voters in the state. The state must keep the SVRD up to date with new registrations and deregistrations (e.g., relocations and deaths). Thus, at the date of an extract, the SVRD consists of adults known to be alive and residing in California. We obtained 13 historical extracts of the SVRD spaced approximately 1 year apart and spanning our study period; the extracts included approximately 74% of residents of the state who were eligible to vote in California and 61% of all adult residents (Table S2).

Virtually all lawful transfers of firearms in California — including transfers between private parties, gifts, and loans — must be transacted through a licensed firearms dealer.[31] Dealers relay details of the transfers and transferees electronically to the California Department of Justice, where the information is archived in the Dealer Record of Sale (DROS) database. People who move to California with firearms are required to report or transfer their weapons within 60 days after arrival,[32] and these reports are also entered into the database. Although this regimen has governed handgun transfers for decades, transfers of long guns (rifles and shotguns) were not routinely archived until January 1, 2014.[33] We obtained records of the 9.1 million handgun and long-gun transfers archived in the DROS database over a 32-year period (from January 1, 1985, through December 31, 2016).

The California Death Statistical Master Files are the state's official mortality records. They contain detailed information on deaths of state residents, wherever the deaths occur. We obtained data on all deaths reported in the study period.

### DATA CLEANING AND LINKAGE

Data-cleaning processes are described in Parts B and C in the Supplementary Appendix. We linked firearm acquisition and mortality records to the SVRD extracts at the individual level; the linkage methods are described elsewhere.[34]

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

### KEY MEASURES

Causes of death were coded according to the *International Classification of Diseases, 10th Revision*, in which suicides are specified according to method (Sections X60–X84), including suicide by firearm (Sections X72–X74). DROS data indicated which cohort members acquired handguns and the dates of acquisition. The age and sex of cohort members were derived from the SVRD. Race and ethnic group and missing values for sex were imputed with use of validated methods[35,36] (see Sections XIII and XIV in the Supplementary Appendix). We geocoded residential addresses and then assigned them to census tracts — geographically contiguous areas designed to approximate small neighborhoods.[37]

Using DROS data, we constructed three additional variables. First, to identify cohort members who already owned a handgun, we linked data on handgun transfers in the 19.8 years leading up to the study period. Second, we created a time-varying variable that indicated the cumulative number of handguns owned (based on acquisitions and deacquisitions) and used it to identify "divestments" — transfers of the last known handgun a cohort member owned. Finally, we flagged cohort members who had acquired long guns with an indicator variable that switched on at the date of their first-known long-gun acquisition. (For additional details on all study variables, see Part B in the Supplementary Appendix.)

### DATA-SET STRUCTURE AND OBSERVATION AND EXPOSURE TIME

The final analytic data set was at the person–period level. It excluded cohort members who had acquired one or more handguns before coming under observation during the study period and cohort members with missing census tracts or birth dates (Fig. S1). We also excluded observation time from registrants younger than 21 years of age, the minimum age for lawful handgun acquisition in California.[38]

Cohort members entered the cohort on the date of the SVRD extract in which each first appeared as a registrant at the age of 21 years or older. Observation time ended on the day before the next extract in which they did not appear,[39] at the time of death, or at the end of the study period, whichever came first. We defined exposure as beginning on the date of first handgun acquisition, although acquirers were not eligible to take possession of the weapon until 10 days later, owing to California's mandatory waiting period.[40] Exposure time continued until observation time ended, except among divesters, for whom it ended on the date of divestment, at which time their nonexposure time recommenced.

### STATISTICAL ANALYSIS

We used Cox proportional-hazards models to calculate hazard ratios estimating the relationship between handgun ownership and mortality (all-cause mortality, suicide, suicide by firearm, and suicide by other methods). The predictor of interest was a binary variable distinguishing exposed person-time (periods of handgun ownership) from unexposed person-time (periods of nonownership). The models allowed the baseline hazard to vary according to census tract and was adjusted for age at baseline, sex, race and ethnic group, and long-gun ownership. We plotted survival curves using the Kaplan–Meier method and estimated adjusted survival curves using inverse probability weighting.[41]

We tested for unmeasured confounding in two ways. First, we conducted negative control outcome analyses.[42] In these analyses, we used the same modeling approach and exposure time used in our main analyses, but the outcomes were three causes of death (lung cancer, endocarditis, and alcoholic liver disease) that are more common among people who smoke, inject drugs, or have alcohol-use disorder, respectively — established risk factors for suicide[43-47] that could not be measured directly in our data. Thus, a finding of no association between handgun ownership and these three causes of death would suggest minimal bias from confounding by these unmeasured behaviors in our main analyses. Second, we conducted bias analyses to calculate how strong the associations would need to be between an unmeasured confounder and our exposure and outcome variables, respectively, to explain our main results. In these analyses, we used the E-value calculator developed by VanderWeele and colleagues.[48,49]

In addition, we probed the effect of having anchored the cohort to registered voters in California. Handgun acquirers in the cohort were

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

**Table 1.** Characteristics of the Study Sample According to Handgun-Ownership Status.*

| Characteristic | Owners (N = 676,425) | Nonowners (N = 25,637,011) |
|---|---|---|
| Sex — no. (%) | | |
| Male | 528,111 (78.1) | 11,324,350 (44.2) |
| Female | 147,250 (21.8) | 14,165,318 (55.3) |
| Missing | 1,064 (0.2) | 147,345 (0.6) |
| Age — yr† | | |
| Mean (median) | 41 (38) | 43 (40) |
| Range | 21–110 | 21–110 |
| Race or ethnic group — no. (%) | | |
| White | 505,539 (74.7) | 15,550,513 (60.7) |
| Hispanic | 107,731 (15.9) | 5,766,667 (22.5) |
| Asian | 28,033 (4.1) | 1,788,910 (7.0) |
| Black | 30,490 (4.5) | 2,239,863 (8.7) |
| Other | 1,091 (0.2) | 54,011 (0.2) |
| Missing | 3,541 (0.5) | 237,047 (0.9) |
| Residential location — no. (%)‡ | | |
| Urban | 560,399 (82.8) | 23,173,886 (90.4) |
| Suburban | 78,285 (11.6) | 1,716,930 (6.7) |
| Large rural town | 21,727 (3.2) | 443,986 (1.7) |
| Small rural town | 16,012 (2.4) | 302,048 (1.2) |
| Missing | 2 (<0.01) | 161 (<0.01) |

\* Handgun owners are defined as cohort members who acquired their first handgun on record (ever or since January 1, 1985) before coming under observation in the study period (October 18, 2004, through December 31, 2016). Nonowners are defined as cohort members for whom there was no recorded acquisition of a handgun between January 1, 1985, and the end of the study period. Percentages may not total 100 because of rounding.
† Values refer to cohort members' age on the first day they came under observation.
‡ Categories for residential locations are based on rural–urban commuting area (RUCA) codes (see Section III in the Supplementary Appendix). Values refer to cohort members' residential location on the day they entered the cohort. Missing values arise from census tracts that could not be mapped to RUCA codes from the 2010 Census.

weighted to represent all handgun acquirers in the state during the study period, not merely those who were registered voters, and nonacquirers were weighted to resemble all adult nonacquirers statewide. (For additional information about the generalizability and sensitivity analyses, see Sections VII and VIII in the Supplementary Appendix.)

Statistical analyses were performed with the use of R software, version 3.5.1 (R Foundation for Statistical Computing), and Stata software, version 14.1 (StataCorp). Confidence intervals for the hazard ratios were not adjusted for multiple comparisons. For additional details regarding the statistical analyses, see Section V in the Supplementary Appendix.

## RESULTS

### SAMPLE CHARACTERISTICS

The study sample comprised 26,313,436 people who were followed for an average of 6.9 years; 676,425 (2.6%) of them acquired one or more handguns during the study period. Handgun owners were younger than nonowners at baseline (mean age, 41 years vs. 43 years) and were more likely to be male (78.1% vs. 44.2%), white (74.7% vs. 60.7%), and residing outside an urban area (17.2% vs. 9.6%) (Table 1).

### FREQUENCY AND RATE OF DEATH AND SUICIDE

A total of 1,457,981 cohort members died during the study period (Table 2); 17,894 died by suicide,

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

**Table 2.** Counts, Crude Rates, and Adjusted Hazard Ratios for All-Cause Mortality and Suicide among Cohort Members, According to Handgun Ownership Status.

| Cause of Death | Owners | | Nonowners | | Adjusted Hazard Ratio (95% CI)‡ |
|---|---|---|---|---|---|
| | Deaths* | Crude Rate† | Deaths* | Crude Rate† | |
| All causes | 10,863 | 382.94 | 1,447,118 | 820.91 | 0.80 (0.79–0.82) |
| Male | 9,343 | 409.60 | 697,731 | 910.11 | 0.81 (0.79–0.83) |
| Female | 1,500 | 271.78 | 739,924 | 747.99 | 0.72 (0.68–0.76) |
| Suicide | 1,354 | 47.73 | 16,540 | 9.38 | 3.67 (3.46–3.89) |
| Male | 1,132 | 49.63 | 11,376 | 14.84 | 3.34 (3.13–3.56) |
| Female | 219 | 39.68 | 5,107 | 5.16 | 7.16 (6.22–8.24) |
| Suicide by firearm | 1,200 | 42.30 | 5,491 | 3.11 | 9.08 (8.48–9.73) |
| Male | 1,003 | 43.97 | 4,575 | 5.97 | 7.82 (7.26–8.43) |
| Female | 194 | 35.15 | 900 | 0.91 | 35.15 (29.56–41.79) |
| Suicide by other methods | 154 | 5.43 | 11,049 | 6.27 | 0.68 (0.58–0.80) |
| Male | 129 | 5.66 | 6,801 | 8.87 | 0.64 (0.55–0.76) |
| Female | 25 | 4.53 | 4,207 | 4.25 | 1.01 (0.68–1.50) |

* Death counts for handgun owners refer to deaths among cohort members during a period in which they owned one or more handguns. Death counts for nonowners refer to deaths among cohort members during a period in which they did not own a handgun. Sex-specific totals for all-cause mortality, suicide, and firearm suicide do not sum to the overall total because the overall total includes cohort members with missing values for sex.
† Rate denominators for handgun owners consist of the exposure time they contributed while owners. Rate denominators for nonowners consist of the sum of nonexposure time contributed by handgun owners in their nonownership periods and the nonexposure time contributed by nonowners throughout their observation period.
‡ Adjusted hazard ratios were estimated with the use of Cox proportional-hazards models in which baseline hazards were stratified according to census tract. The models were controlled for age at cohort entry, sex (overall models only), race and ethnic group, and ownership of rifles or shotguns. Complete estimates from the 12 models are shown in Tables S16–S19.

of which 6691 were suicides by firearm. Men accounted for 70% of the suicides and 83% of the suicides by firearm. A firearm was used in 89% of the suicides among handgun owners and 33% of those among nonowners.

Handgun owners had lower rates of all-cause mortality than nonowners but substantially higher rates of suicide (Table 2). The rate of suicide by any method among male handgun owners was three times as high as that among male nonowners (hazard ratio, 3.34; 95% confidence interval [CI], 3.13 to 3.56), and the corresponding rate among female handgun owners was seven times as high as that among female nonowners (hazard ratio, 7.16; 95% CI, 6.22 to 8.24). These elevated suicide rates among handgun owners were attributable to much higher rates of suicide by firearm. Men who owned handguns had a rate of suicide by firearm that was nearly eight times as high as that among male nonowners (hazard ratio, 7.82; 95% CI, 7.26 to 8.43) and a lower rate of suicide by other methods

(hazard ratio, 0.64; 95% CI, 0.55 to 0.76). The rate of suicide by firearm among female handgun owners was 35 times as high as the rate among women who did not own handguns (hazard ratio, 35.15; 95% CI, 29.56 to 41.79) and the rate of suicide by other methods was similar in the two groups of women (hazard ratio, 1.01; 95% CI, 0.68 to 1.50). (Complete estimates from these models are available in Tables S16 through S19.)

TEMPORALITY OF THE RISK OF SUICIDE BY FIREARM

Handgun owners had higher rates of suicide by firearm than nonowners throughout the study period, but the magnitude of this difference changed over time (Fig. 1 and Fig. S6). One suicide by firearm occurred among owners during the 10-day waiting period, followed by 9 on the day owners became eligible to take possession of their weapons and 102 in the first week thereafter. From the first day of eligibility through the 30th day after purchase, the rate of suicide by firearm among owners was 471 per 100,000

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.



**Figure 1. Adjusted Survival Curves for Suicide by Firearm among Handgun Owners and Nonowners.**

The survival curves show the probability of not dying by suicide by firearm among handgun owners and nonowners over the 146-month study period and are adjusted for sex, age, and race and ethnic group. The shading around the curves indicates 95% confidence intervals, but these intervals are imperceptibly small for the curves for nonowners of handguns. Nonownership time is measured from the first day of observation, and ownership time is measured from the day of the first handgun acquisition. To address competing mortality risks, the survival curves do not censor cohort members who died of causes other than suicide by firearm (for details of this approach, see Section V in the Supplementary Appendix).

2225

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

**Table 3.** Counts, Crude Rates, and Adjusted Hazard Ratios for Suicide by Firearm among Handgun Owners, According to Time Period after First Handgun Acquisition.*

| Suicides by Firearm | Period Since First Handgun Acquisition | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1–10 Days | 11–30 Days | 31–90 Days | 91–365 Days | 366 Days–3 Yr | 4–6 Yr | 7–12.2 Yr |
| Suicides — no./ total no. (%) | 1/1200 (0.08) | 172/1200 (14.33) | 154/1200 (12.83) | 251/1200 (20.92) | 309/1200 (25.75) | 194/1200 (16.17) | 119/1200 (9.92) |
| Crude rate per 100,000 person-years | 5.41 | 470.80 | 147.30 | 60.71 | 45.87 | 18.55 | 14.28 |
| Adjusted hazard ratio (95% CI) | 4.59 (0.82–25.52) | 100.10 (55.75–179.90) | 16.62 (12.98–21.29) | 12.40 (10.48–14.67) | 5.35 (4.64–6.17) | 1.58 (1.34–1.86) | 2.61 (2.14–3.19) |

* "Acquisition" refers to the time of the application to purchase. California requires a 10-day (240-hour) waiting period from the date and time of the application to purchase to the time at which the purchaser is permitted to take possession of the firearm.

person-years (hazard ratio, 100.10; 95% CI, 55.75 to 179.90), and these suicides accounted for 14% of all suicides by firearm among owners during the study period (Table 3). The rate of suicide by firearm among owners declined in subsequent periods but remained elevated over the long term, with 52% of all suicides by firearm among owners occurring after the first year of ownership.

**SENSITIVITY AND GENERALIZABILITY ANALYSES**

Handgun owners did not have higher rates of death from alcoholic liver disease than nonowners (hazard ratio, 0.83; 95% CI, 0.72 to 0.95), and owners 50 years of age or older did not have higher rates of death from lung cancer (hazard ratio, 0.86; 95% CI, 0.79 to 0.93); mortality from endocarditis was higher among owners than among nonowners, but the confidence interval included 1 (hazard ratio, 1.60; 95% CI, 0.93 to 2.76) (Table S20). The bias analyses showed that a putative confounder would need to be very large to nullify the positive association detected between ownership and suicide; for example, it would need to both increase the risk of suicide by a factor of six and be six times more common among handgun owners than nonowners (E values: overall, 6.80; men, 6.14; women, 13.80) (Table S5). Analyses weighted to make the cohort more closely resemble the total adult population of California (i.e., with inclusion of people who were not registered to vote) produced estimates of the association between handgun ownership and suicide risk that were very similar to those in our main results (Table S6).

## DISCUSSION

In this study of firearm ownership and mortality in a cohort of 26.3 million adult residents of California, we found an elevated risk of suicide among a large sample of first-time handgun owners. This risk was driven by a much higher rate of suicide by firearm — not by higher rates of suicide by other methods. Handgun owners' risk of suicide by firearm peaked in the period immediately after their first handgun acquisition but remained relatively high 12 years later, and the long-term risk accounted for a majority of the excess suicides by firearm among owners.

Nearly all previous studies of the relationship between firearm access and suicide have detected positive associations. These studies have limitations. In ecologic analyses, grouping people reduces information and may mask important individual-level differences between exposure and outcome.[50] Risk estimates from case–control studies range widely, in part because many have analyzed only a few hundred suicides.[18-20,22,25] Psychological autopsy, the standard method for determining gun access in case–control studies,[18,20-22,24] is vulnerable to recall bias, with proxies of recent victims of gunshot injuries plausibly more likely to report access than proxies of controls.[51] Some case–control studies have used dead controls[22,24] or drawn controls from a population other than that of the cases;[21,22,24,25] both approaches are potential sources of bias. Finally, case–control studies are ill-suited to measuring temporal changes in risk.

Cohort studies are well suited to measuring

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

temporal changes, but the absence of centralized information on gun ownership has long impeded their conduct in the United States. In one previous cohort study involving recent purchases of handguns,[52] the rates of suicide by firearm among male and female handgun purchasers exceeded those in the general population, including gun owners (age-standardized mortality ratios of 3.23 and 15.50, respectively); the study did not adjust for other characteristics.

Our study is many times larger than previous ones and is unusual in estimating risks among first-time gun owners, accounting for divestment, and separately analyzing risks of suicide by firearm in both men and women. Our risk estimates are larger than those reported in some previous studies. However, direct comparisons are limited by the facts that case–control studies produce different measures of risk and that most define exposure as a gun in the home rather than personal ownership.

Although women accounted for only 16% of all suicides by firearm and had substantially lower suicide rates than men, the risk of suicide by firearm among female handgun owners (as compared with female nonowners) was substantially greater than that among male handgun owners (as compared with male nonowners). Women attempt suicide more frequently than men but have fewer completed suicides, largely because the means they tend to use (e.g., poisons) are less lethal than those men tend to use (e.g., guns or hanging).[5,7,8] Handgun ownership may impose a particularly high relative risk of suicide for women because of the pairing of their higher propensity to attempt with ready access to and familiarity with an extremely lethal method.

The lower risk of all-cause mortality detected among handgun owners should not be interpreted as a protective effect because it stems largely from owners' lower rates of death from common chronic diseases (e.g., cancer or heart disease) that do not have a clear relationship to handgun ownership. Two other explanations are more plausible. First, handgun acquisition involves participation in commerce. In California, this includes personal appearance at a dealer, which necessitates a degree of physical mobility and well-being. Second, handguns are expensive. People who can afford to buy them are wealthier,[53] and wealth is positively associated with health.

Unmeasured confounding is a threat to causal inference in observational studies.[54] Our bias analyses indicate that to substantially attenuate or erase the elevated rates of suicide by firearm we observed among handgun owners, any confounding difference between owners and nonowners would need to be as strong a predictor of suicide as well-established risk factors (e.g., major depressive disorders) and nearly an order of magnitude more common among handgun owners than nonowners, even after adjustment for the covariates accounted for in our analyses. What trait could reach that mark? One possibility is suicidal intent — owners who acquired handguns for the purpose of ending their life. Suicidal intent probably explains at least part of the spike in suicides by firearm soon after acquisition. However, intent is less plausible as an explanation for the elevated risk of suicide by firearm among owners over the longer term, when most occurred.

More generally, we were not able to adjust for mental illness; although it is a major risk factor for suicide, it is unlikely to be a strong confounder. Several national studies[55-57] have found that gun owners (or people with access to guns) and nonowners have similar rates of depression, suicidal ideation, and suicide attempts (for a review of these studies, see Section VI in the Supplementary Appendix). Moreover, our negative control outcome analyses did not detect consistent evidence of residual confounding from this source.

Our study has other limitations. First, we will have misclassified some handgun owners as unexposed because, for example, they acquired their handguns unlawfully or before our data on acquisition histories began. Such misclassification should bias toward the null any differences in the risk of death detected between owners and nonowners. Second, we only partially accounted for long-gun ownership, although the implications of this are mitigated by the fact that approximately three quarters of suicides by firearm involve handguns[12-14] and less than 20% of firearm owners in California own only long guns.[53] Finally, generalizability outside California is unknown. California has stricter gun laws than many other states, including universal background checks, a waiting period, and various prohibitions on firearm purchasing by people with severe mental illness.[58] Our results may underestimate the association between handgun

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

ownership and suicide in states without such safeguards.

Fifty-nine people were killed in the mass shooting in Las Vegas in 2017, the deadliest in U.S. history. Approximately the same number die each day in the United States from suicide by firearm. Many of these deaths are preventable. Our study bolsters and extends the message from previous research: ready access to firearms, particularly handguns, is a major risk factor for suicide. Health care providers and policymakers should be aware of this risk. This information is also important for current and prospective firearm owners seeking to weigh the risks and perceived benefits of ownership.

Supported by the Fund for a Safer Future (grant no. GA004696), the Joyce Foundation (grant no. 17-37241), and internal funds from Stanford Law School and the Stanford University School of Medicine.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

A data sharing statement provided by the authors is available with the full text of this article at NEJM.org.

We thank Hitsch Daines, Anunay Kulshrestha, and Zach Templeton for research assistance; Stace Maples at Stanford Geospatial Center and Claudia Engel at the Stanford Libraries for assistance with geocoding; Michael Francis at the Office of the Secretary of State and Karin MacDonald at the California Statewide Database for assistance with voter registration data; the staff at the Bureau of Firearms, California Department of Justice, for assistance with Dealer Record of Sale data; Tianxi Cai, Lu Tian, and Lee-Jen Wei for advice on statistical analysis; and Jay Bhattacharya, Philip Cook, John Donohue, Jeremy Goldhaber-Fiebert, Daniel Ho, and Michelle Mello for helpful comments on an earlier draft of the manuscript.

### REFERENCES

**1.** Kessler RC, Borges G, Walters EE. Prevalence of and risk factors for lifetime suicide attempts in the National Comorbidity Survey. Arch Gen Psychiatry 1999; 56:617-26.

**2.** Rimkeviciene J, O'Gorman J, De Leo D. Impulsive suicide attempts: a systematic literature review of definitions, characteristics and risk factors. J Affect Disord 2015;171:93-104.

**3.** Owens D, Horrocks J, House A. Fatal and non-fatal repetition of self-harm: systematic review. Br J Psychiatry 2002;181: 193-9.

**4.** Nordentoft M, Mortensen PB, Pedersen CB. Absolute risk of suicide after first hospital contact in mental disorder. Arch Gen Psychiatry 2011;68:1058-64.

**5.** Spicer RS, Miller TR. Suicide acts in 8 states: incidence and case fatality rates by demographics and method. Am J Public Health 2000;90:1885-91.

**6.** Shenassa ED, Catlin SN, Buka SL. Lethality of firearms relative to other suicide methods: a population based study. J Epidemiol Community Health 2003;57: 120-4.

**7.** Miller M, Azrael D, Hemenway D. The epidemiology of case fatality rates for suicide in the northeast. Ann Emerg Med 2004;43:723-30.

**8.** Conner A, Azrael D, Miller M. Suicide case-fatality rates in the United States, 2007 to 2014: a nationwide population-based study. Ann Intern Med 2019 December 3 (Epub ahead of print).

**9.** Karp A. Estimating global civilian-held firearms numbers: briefing paper. Geneva: Small Arms Survey, 2018 (http://www.smallarmssurvey.org/weapons-and-markets/tools/global-firearms-holdings.html).

**10.** Global Burden of Disease 2016 Injury Collaborators. Global mortality from firearms, 1990-2016. JAMA 2018;320:792-814.

**11.** Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS) (www.cdc.gov/injury/wisqars).

**12.** California Department of Public Health. EpiCenter: California injury data online (http://epicenter.cdph.ca.gov).

**13.** Centers for Disease Control and Prevention. National Violent Death Reporting System (NVDRS) (https://www.cdc.gov/injury/wisqars/nvdrs.html).

**14.** Hanlon TJ, Barber C, Azrael D, Miller M. Type of firearm used in suicides: findings from 13 states in the National Violent Death Reporting System. J Adolesc Health 2019;65:366-70.

**15.** Miller M, Hemenway D. The relationship between firearms and suicide: a review of the literature. Aggress Violent Behav 1999;4:59-75.

**16.** Miller M, Lippmann SJ, Azrael D, Hemenway D. Household firearm ownership and rates of suicide across the 50 United States. J Trauma 2007;62:1029-34.

**17.** Miller M, Barber C, White RA, Azrael D. Firearms and suicide in the United States: is risk independent of underlying suicidal behavior? Am J Epidemiol 2013; 178:946-55.

**18.** Kellermann AL, Rivara FP, Somes G, et al. Suicide in the home in relation to gun ownership. N Engl J Med 1992;327: 467-72.

**19.** Cummings P, Koepsell TD, Grossman DC, Savarino J, Thompson RS. The association between the purchase of a handgun and homicide or suicide. Am J Public Health 1997;87:974-8.

**20.** Conwell Y, Duberstein PR, Connor K, Eberly S, Cox C, Caine ED. Access to firearms and risk for suicide in middle-aged and older adults. Am J Geriatr Psychiatry 2002;10:407-16.

**21.** Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case-control study. Ann Emerg Med 2003;41:771-82.

**22.** Kung HC, Pearson JL, Liu X. Risk factors for male and female suicide decedents ages 15-64 in the United States: results from the 1993 National Mortality Followback Survey. Soc Psychiatry Psychiatr Epidemiol 2003;38:419-26.

**23.** Grassel KM, Wintemute GJ, Wright MA, Romero MP. Association between handgun purchase and mortality from firearm injury. Inj Prev 2003;9:48-52.

**24.** Dahlberg LL, Ikeda RM, Kresnow MJ. Guns in the home and risk of a violent death in the home: findings from a national study. Am J Epidemiol 2004;160: 929-36.

**25.** Dempsey CL, Benedek DM, Zuromski KL, et al. Association of firearm sue, accessibility, and storage practices with suicide risk among US army soldiers. JAMA Netw Open 2019;2(6):e195383.

**26.** Stroebe W. Firearm possession and violent death: a critical review. Aggress Violent Behav 2013;18:709-21.

**27.** Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: a systematic review and meta-analysis. Ann Intern Med 2014; 160:101-10.

**28.** Miller M, Swanson SA, Azrael D. Are we missing something pertinent? A bias analysis of unmeasured confounding in the firearm-suicide literature. Epidemiol Rev 2016;38:62-9.

**29.** The relationship between firearm availability and suicide. Santa Monica, CA: RAND, March 2, 2018 (https://www.rand.org/research/gun-policy/analysis/essays/firearm-availability-suicide.html).

**30.** von Elm E, Altman DG, Egger M, Pocock SJ, Gøtzsche PC, Vandenbroucke JP. The Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement: guidelines for report-

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

ing observational studies. Lancet 2007;370: 1453-7.

**31.** California Penal Code §§26500, 27545.

**32.** California Penal Code §17000, 27560.

**33.** California Penal Code §§11106, 26905.

**34.** Zhang Y, Holsinger EE, Prince L, et al. Assembly of the LongSHOT cohort: public record linkage on a grand scale. Inj Prev 2020;26:153-8.

**35.** Imai K, Khanna K. Improving ecological inference by predicting individual ethnicity from voter registration records. Polit Anal 2016;24:263-72.

**36.** Mullen L, Blevins C, Schmidt B. Package 'gender': predict gender from names using historical data. November 9, 2019 (https://cran.r-project.org/web/packages/gender/gender.pdf).

**37.** United States Census Bureau. Geographic areas reference manual. November 2004 (https://www.census.gov/programs -surveys/geography/guidance/geographic -areas-reference-manual.html).

**38.** California Penal Code §27505.

**39.** Lesko CR, Edwards JK, Cole SR, Moore RD, Lau B. When to censor? Am J Epidemiol 2018;187:623-32.

**40.** California Penal Code §§26815, 27540.

**41.** Cole SR, Hernán MA. Adjusted survival curves with inverse probability weights. Comput Methods Programs Biomed 2004; 75:45-9.

**42.** Lipsitch M, Tchetgen Tchetgen E, Cohen T. Negative controls: a tool for detecting confounding and bias in observational studies. Epidemiology 2010;21:383-8.

**43.** Poorolajal J, Darvishi N. Smoking and suicide: a meta-analysis. PLoS One 2016; 11(7):e0156348.

**44.** Wilcox HC, Conner KR, Caine ED. Association of alcohol and drug use disorders and completed suicide: an empirical review of cohort studies. Drug Alcohol Depend 2004;76:Suppl:S11-S19.

**45.** Murphy GE. Psychiatric aspects of suicidal behavior. In: Hawton K, van Heeringen K, eds. The international handbook of suicide and attempted suicide. Chichester, United Kingdom: John Wiley, 2000:135-46.

**46.** Norström T, Rossow I. Alcohol consumption as a risk factor for suicidal behaviour: a systematic review of associations at the individual and at the population level. Arch Suicide Res 2016;20: 489-506.

**47.** Darvishi N, Farhadi M, Haghtalab T, Poorolajal J. Alcohol-related risk of suicidal ideation, suicide attempt, and completed suicide: a meta-analysis. PLoS One 2015;10(5):e0126870.

**48.** VanderWeele TJ, Ding P. Sensitivity analysis in observational research: introducing the E-value. Ann Intern Med 2017; 167:268-74.

**49.** Mathur MB, Ding P, Riddell CA, VanderWeele TJ. Website and R package for computing E-values. Epidemiology 2018;29(5):e45-e47.

**50.** Wakefield J. Ecologic studies revisited. Annu Rev Public Health 2008;29:75-90.

**51.** Pirkis J, Nicholas A, Gunnell D. The case for case-control studies in the field of suicide prevention. Epidemiol Psychiatr Sci 2019;29:e62.

**52.** Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. N Engl J Med 1999;341:1583-9.

**53.** Kravitz-Wirtz N, Pallin R, Miller M, Azrael D, Wintemute GJ. Firearm ownership and acquisition in California: findings from the 2018 California Safety and Well-being Survey. Inj Prev 2019 December 5 (Epub ahead of print).

**54.** Hernán MA, Robins JM. Causal inference. Boca Raton, FL: Chapman & Hall/ CRC, 2020.

**55.** Sorenson SB, Vittes KA. Mental health and firearms in community-based surveys: implications for suicide prevention. Eval Rev 2008;32:239-56.

**56.** Ilgen MA, Zivin K, McCammon RJ, Valenstein M. Mental illness, previous suicidality, and access to guns in the United States. Psychiatr Serv 2008;59:198-200.

**57.** Miller M, Barber C, Azrael D, Hemenway D, Molnar BE. Recent psychopathology, suicidal thoughts and suicide attempts in households with and without firearms: findings from the National Comorbidity Study Replication. Inj Prev 2009;15:183-7.

**58.** Giffords Law Center to Prevent Gun Violence. Annual gun law scorecard (http://gunlawscorecard.org/).

*Copyright © 2020 Massachusetts Medical Society.*

The New England Journal of Medicine
Downloaded from nejm.org on April 6, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.



# Guns in the Home

*By: Judy Schaechter, MD, MBA, FAAP*

Did you know that roughly a third of U.S. homes with children have guns? In fact, an estimated 4.6 million kids live with unlocked, loaded guns. That's a scary statistic when you think about the fact that even young toddlers are capable of finding unlocked guns in the home, and they are strong enough to pull the trigger.

As a parent, you may not realize what a serious risk a gun in the home is, especially for children. The reality is that having firearms in the home increases the risk of unintentional shootings, suicide, and homicide.

**Firearm Safety for Families**

 



Studies show children are naturally curious, even about a firearm they've been warned not to touch.

 **Kids are safer when:** Firearms are in a lockbox or safe, unloaded. Ammunition is locked away separately.

 **Kids are safest when:** firearms are stored outside the home.



## Unintentional Shootings

Unintentional shootings happen to children of all ages. In homes with guns, the likelihood of accidental death by shooting is four times higher.

In 2020, there were at least 369 unintended shootings by children in the United States. These shootings caused 142 deaths and 242 injuries. The COVID-19 pandemic hasn't helped either. From March to December 2020, unintended shooting deaths by kids went up more than 30% compared to the same time period in 2019.

## Suicide

Kids and adolescents are at an increased risk for suicide when there is a gun in the home too. Suicide rates in this population are four times higher than for kids who live in homes without guns. In the past decade, 40% of the suicides committed by kids and teens involved guns. Nine out of 10 of these suicides were with guns that the victims accessed at their own homes or from a relative's home.

## Homicide

The risk of homicide is three times higher when there are guns in the home. Not only that, but 58% of shooting deaths in children and teens are homicides.

# Keep the "safe" in fiream safety

Back to Top

Hiding a gun is not enough! Kids are curious, and studies show they usually know where a family keeps a gun.

## Gun safes can lower the risk a curious child will be hurt:



Safe or lockbox for handguns



Locked gun safe for rifles



Gun trigger locks— inexpensive and effective



Lock box for ammo





## The most effective way to keep kids safe

**The American Academy of Pediatrics (AAP) advises that the safest home for a child is one without guns.** The most effective way to prevent unintentional gun injuries, suicide and homicide to children and adolescents, research shows, is the absence of guns from homes and communities.

## What to do if you do keep a gun in your home

If you decide to keep guns in the home, be aware that many studies show that teaching kids about gun safety, or to not touch a firearm if they find one, is not enough. You can reduce the chances of children being injured, however, by following import ant safety rules:

- **Safe storage.** All guns in your home should be *locked and unloaded, with ammunition locked separately* (https://www.youtube.com/watch?v=J1bWyBZSPzU&feature=youtu.be). Make sure children and teens can't access the keys or combinations to lock boxes or gun safes. And remember not to keep loaded, unlocked guns in the car, or anywhere else on your property, either.

- **Safe use.** When using a gun for hunting or target practice, keep the safety catch in place until you are ready to fire it. Before setting the gun down, always unload it. As much as a child may want to take a turn shooting, this is not a good idea. No matter how much instruction you may give about how to safely shoot a gun, children are not capable or responsible enough to handle a potentially lethal weapon.

## Keep kids safe in *other* homes

More than a third of all unintentional shootings of children take place in the homes of their friends, neighbors, or relatives. That's why it is also important to make sure your kids are safe when they spend time where other people live.

Here's how to help ensure your children and their playmates do not come across an unsecured gun while they play:

Back to Top

(/English/news/Pages/Is-There-A-Gun-Where-Your-Child-Plays-Asking-Can-Save-Lives.aspx)

- **Add this question to your playdate checklist.** Even if you don't have guns in your own home, ask (/English/safety-prevention/at-play/Pages/Is-There-A-Gun-Where-Your-Child-Plays-Asking-Can-Save-Lives.aspx) about guns and safe storage at the other homes they visit. Just as you'd ask about pets, allergies, supervision and other safety issues before your child visits another home, add one more important question: "Is there an unlocked gun in your house?" If there is, reconsider allowing your child to play there or talk to them about keeping the guns unloaded and locked.

> Just as you'd ask about pets, allergies, supervision and other safety issues before your child visits another home, add one more important question:
>
> *"Is there an unlocked gun in your house?"*

- **Talk to your children.** Remind your kids that if they ever come across a gun, they must stay away from it and tell you immediately.

## Guns in the media

Make sure your children understand that gun violence they may see on TV, in movies, and in video games they play at home or friends' homes is not real. They need to be told—and probably reminded again and again—that in real life, children are killed and hurt badly by guns. Although the popular media (/English/news/Pages/Virtual-Violence-Impacts-Children-on-Multiple-Levels.aspx) often romanticize gun use, children need to learn that these weapons can be extremely dangerous.

## More information

- Is There an Unlocked Gun Where Your Child Plays? (/English/safety-prevention/at-play/Pages/Is-There-A-Gun-Where-Your-Child-Plays-Asking-Can-Save-Lives.aspx)
- Where We Stand: Gun Safety (/English/safety-prevention/all-around/Pages/Where-We-Stand-Gun-Safety.aspx)
- 10 Things Parents Can Do to Prevent Suicide (/English/health-issues/conditions/emotional-problems/Pages/Ten-Things-Parents-Can-Do-to-Prevent-Suicide.aspx)
- Firearm-Related Injuries Affecting the Pediatric Population (http://pediatrics.aappublications.org/cgi/doi/10.1542/peds.2012-2481) (AAP Policy Statement)

## About Dr. Schaechter:



Judy Schaechter, MD, MBA, FAAP, is a Professor of Public Health Sciences at the University of Miami Miller School of Medicine and past president of the national Injury Free Coalition for Kids. She is a past member of the American Academy of Pediatrics Council on Injury, Violence and Poison Prevention Executive Committee.

**Last Updated**  6/2/2021
**Source**  American Academy of Pediatrics Council on Injury, Violence and Poison Prevention (Copyright © 2021)

The information contained on this Web site should not be used as a substitute for the medical care and advice of your pediatrician. There may be variations in treatment that your pediatrician may recommend based on individual facts and circumstances.



Moms Demand Action                    Everytown Research & Policy

NEWS & PRESS

# New Analysis of One Year of Unintentional Child Gun Deaths in the U.S. Finds Nearly Two Children Killed Every Week, More Than 60 Percent Higher Than Federal Data Reflect

**June 25, 2014**

*More than 70 Percent of These Tragedies Preventable By Responsible Gun Storage*

*New Poll Finds Strong Majorities – Including Gun Owners – Agree That Guns Should Be Locked and Unloaded, Support Criminal Charges When Children Access Negligently Stored Guns;* *www.Everytown.org/ChildAccess/*

With kids out of school and playing at home over the coming summer months, Everytown for Gun Safety and Moms Demand Action for Gun Sense in America released a r̶e̶p̶ort today, "Innocents Lost: A Year of Unintentional Child Gun Deaths," a first-̶ analysis that found at least 100 children were killed over a 12-month period. ̶-̶ almost two each week —is 61 percent higher than federal data reflect. Nearly two-thirds of these unintended shooting deaths (65 percent) took place in a

4/6/22, 6:12 PM   New Analysis of One Year of Unintentional Child Gun Deaths in the U.S. Finds Nearly Two Children Killed Every Week, More Than…

Case 5:22-cv-00501-BLF  Document 36-8  Filed 04/08/22  Page 74 of 132

home or vehicle that belonged to the victim's family and more than two-thirds of the tragedies (70 percent) could have been avoided if gun owners stored their guns responsibly.

Everytown and Moms also released the findings of a new poll that found strong majorities of likely voters agree that kids and unsecured guns don't mix.

— 86 percent of Americans – and 77 percent of gun owners – agree that parents with guns in their homes should be required to keep them locked and unloaded.

— 73 percent of Americans – and 72 percent of gun owners – believe that doctors and teachers should be allowed to educate parents about responsible gun storage at home.

— 82 percent of Americans – and 81 percent of gun-owners – favor allowing law enforcement to charge adult gun owners with a crime when a minor gains access to a negligently stored gun and death or serious injury occur.

"This important study reveals the significant undercount of children who are unintentionally killed by guns – and that the majority of these tragedies could have been prevented by responsible firearm storage," said **Shannon Watts, founder of Moms Demand Action for Gun Sense in America, a part of Everytown for Gun Safety**. "When a child dies or is injured because a gun is left unsecured in a home, it's not an accident. Now that school's out for summer, more children will be playing at home throughout the next few months, making it even more important for gun owners to safely store their guns at home."

"Too often child gun deaths are reported as inevitable 'accidents', but our analysis found that more than two-thirds of these tragedies were entirely preventable – if only the firearm had been stored responsibly," said **John Feinblatt, president of Everytown for Gun Safety**. "Preventing doctors from talking to patients and parents about gun safety in the home – which the gun lobby has systematically tried to do in states across the country – puts our children's lives at risk. Sensible measures that will deter _____ble gun storage respect the rights of lawful gun owners while also protecting ___m danger."

Children's natural curiosity can turn an every day scenario into a deadly game of hide

4/6/22, 6:12 PM

Case 5:22-cv-00501-BLF Document 26-8 Filed 04/08/22 Page 75 of 132

New Analysis: One Year of Unintentional Child Gun Deaths in the U.S. Finds Nearly Two Children Killed Every Week, More Than…

Children's natural curiosity can turn an every day scenario into a deadly game of hide-and-seek — as highlighted in a recent video released by Everytown for Gun Safety. About a third of American children live in homes with firearms – and among them, 43 percent contain at least one unlocked firearm. In all, more than two million American children live in homes with unsecured guns, and 1.7 million live in homes with guns that are both loaded and unlocked. The census of unintentional child gun deaths over the course of a year also found that:

— Toddlers age 2-4 have the highest risk of unintentionally shooting themselves.

— Children age 12-14 have the highest risk of being unintentionally shot by a peer.

— Boys were killed in unintentional shootings more than three times as often as girls. And boys were more than 10 times likely to be the shooter in an unintentional shooting as girls.

— The overwhelming majority of shootings occurred in a place likely thought of as safe – 84 percent of deaths occurred in the home or car of the victim's family, or in the home of a friend or relative.

— Handguns were used in 57 percent of the shootings, more than twice as many incidents as those involving long guns.

— In 58 percent of cases, the victim was killed by someone else, and in 36 percent the victim shot him or herself.

— Of the 66 shootings in which the firearm's legal owner was reported, 76 percent involved a gun that belonged to a parent or other family member.

"As this report so tragically illustrates, access to guns in the home puts our children at risk of serious injury or death. Young children are naturally curious – expecting them to _____ ____llow safety rules as the only means to prevent gun injuries is a recipe for ____ ___at's why people who own guns have an absolute responsibility to store ____ _____aded and locked out of reach of children," said Thomas K. McInerny, MD, FAAP, immediate past president of the American Academy of Pediatrics. "The AAP

4/6/22, 6:12 PM
Case 5:22-cv-00501-BLF Document 26-8 Filed 04/08/22 Page 76 of 132
New Analysis of One Year of Unintentional Child Gun Deaths in the U.S. Finds Nearly Two Children Killed Every Week, More Than…

urges local, state and federal lawmakers to enact the strongest possible laws to prevent firearm injuries and deaths."

"My nephew was killed with a gun that should never have been in a child's hands," said Ava Frisinger, whose nephew was killed in an unintentional gun death. "More than two million children live in homes with unsecured [JAS1] guns, and sadly we see almost twice a week how dangerous the consequences can be. We need to do more to keep kids away from unsecured firearms."

The report also reviews existing state laws and found that twenty-eight states and the District of Columbia have some laws on the books that, to varying degrees, allow law enforcement to bring criminal charges against gun owners if children access their guns. An interactive map that reviews state child access prevention laws is also available here.

Based on the findings of Everytown and Moms' analysis and existing scientific research, the report presents several ways to reduce the number of children killed in unintentional gun shootings – including enhancing responsible firearm storage by educating gun owners; deterring irresponsible storage practices with child access prevention laws; and fostering new technologies like smart guns. Everytown and Moms propose several specific recommendations to address the issue of unintentional child gun deaths:

— States should adopt stronger laws to prevent children from accessing unsecured guns, by authorizing criminal charges if an adult gun owner stores a gun negligently, a child gains access to the firearm, and some harm results.

— Congress should appropriate funds for research to improve public health data collection regarding unintended child gun deaths and to develop effective educational materials for promoting responsible gun storage.

— Congress should earmark funding for the Consumer Product Safety Commission to [...]ate and set standards for emerging technologies that promote gun safety.

[...]rs should be allowed and encouraged to promote gun safety, and efforts to gag physicians should be opposed.

— Greater awareness of the issue should be promoted through a national public education campaign enlisting law enforcement, corporate, and non-profit partners.

Much like pool safety, there are simple, commonsense measures adults can take to save children's lives. In conjunction with the release of the report, Everytown and Moms also released today family-friendly tip sheets for safe firearm storage in the home. These tip sheets contain the simple steps responsible gun owners – and non-owners – can take to save children's lives.

---

**If you're a member of the media, please send inquiries to media@momsdemandaction.org**

---



4/6/22, 6:12 PM     New Analysis Of One Year Of Unintentional Child Gun Deaths in the U.S. Finds Nearly Two Children Killed Every Week, More Than…

Case 5:22-cv-00501-BLF   Document 26-8   Filed 04/08/22   Page 78 of 132

**Use Accessible Colors**



News & Press

Contact

Privacy Policy

Terms of Service

Volunteer Stories

**Julvonnia McDowell: 'I remain hopeful and resilient'**





**COVID-19 Information**

Public health information (CDC)

Research information (NIH)

SARS-CoV-2 data (NCBI)

Prevention and treatment information (HHS)

Español

FULL TEXT LINKS



> Soc Sci Med. 2007 Feb;64(3):656-64. doi: 10.1016/j.socscimed.2006.09.024. Epub 2006 Oct 27.

# State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003

Matthew Miller [1], David Hemenway, Deborah Azrael

Affiliations
PMID: 17070975     DOI: 10.1016/j.socscimed.2006.09.024

## Abstract

Two of every three American homicide victims are killed with firearms, yet little is known about the role played by household firearms in homicide victimization. The present study is the first to examine the cross sectional association between household firearm ownership and homicide victimization across the 50 US states, by age and gender, using nationally representative state-level survey-based estimates of household firearm ownership. Household firearm prevalence for each of the 50 states was obtained from the 2001 Behavioral Risk Factor Surveillance System. Homicide mortality data for each state were aggregated over the three-year study period, 2001-2003. Analyses controlled for state-level rates of aggravated assault, robbery, unemployment, urbanization, per capita alcohol consumption, and a resource deprivation index (a construct that includes median family income, the percentage of families living beneath the poverty line, the Gini index of family income inequality, the percentage of the population that is black and the percentage of families headed by a single female parent). Multivariate analyses found that states with higher rates of household firearm ownership had significantly higher homicide victimization rates of men, women and children. The association between firearm prevalence and homicide victimization in our study was driven by gun-related homicide victimization rates; non-gun-related victimization rates were not significantly associated with rates of firearm ownership. Although causal inference is not warranted on the basis of the present study alone, our findings suggest that the household may be an important source of firearms used to kill men, women and children in the United States.

## Related information

PubChem Compound
PubChem Substance

## LinkOut - more resources

Case 5:22-cv-00501-BLF   Document 36-8   Filed 04/08/22   Page 80 of 132

**Full Text Sources**

Elsevier Science

J Urban Health
https://doi.org/10.1007/s11524-018-0261-7



# Firearm Storage in Gun-Owning Households with Children: Results of a 2015 National Survey

**Deborah Azrael · Joanna Cohen · Carmel Salhi · Matthew Miller**

© The New York Academy of Medicine 2018

**Abstract** Data from a nationally representative probability-based online survey sample of US adults conducted in 2015 ($n = 3949$, response rate 55%) were used to assess self-reported gun storage practices among gun owners with children. The presence of firearms and children in the home, along with other household and individual level characteristics, was ascertained from all respondents. Questions pertaining to household firearms (how guns are stored, number, type, etc.) were asked only of those respondents who reported that they personally owned a gun. We found that approximately one in three US households contains at least one firearm, regardless of whether children lived in the home (0.34 [0.29–0.39]) or not (0.35 [0.32–0.38]). Among gun-owning households with children, approximately two in ten gun owners store at least one gun in the least safe manner, i.e., loaded and unlocked (0.21 [0.17–0.26]); three in ten store all guns in the safest manner, i.e., unloaded and locked (0.29, [0.24–0.34]; and the remaining half (0.50 [0.45–0.55]) store firearms in some other way. Although firearm storage practices do not appear to

vary across some demographic characteristics, including age, sex, and race, gun owners are more likely to store at least one gun loaded and unlocked if they are female (0.31 [0.23–0.41]) vs. male (0.17 [0.13–0.22]); own at least one handgun (0.27 [0.22–0.32] vs. no handguns (0.05 [0.02–0.15]); or own firearms for protection (0.29 [0.24–0.35]) vs. do not own for protection (0.03 [0.01–0.08]). Approximately 7% of US children (4.6 million) live in homes in which at least one firearm is stored loaded and unlocked, an estimate that is more than twice as high as estimates reported in 2002, the last time a nationally representative survey assessed this outcome. To the extent that the high prevalence of children exposed to unsafe storage that we observe reflects a secular change in public opinion towards the belief that having a gun in the home makes the home safer, rather than less safe, interventions that aim to make homes safer for children should address this misconception. Guidance alone, such as that offered by the American Academy of Pediatrics, has fallen short. Our findings underscore the need for more active and creative efforts to reduce children's exposure to unsafely stored firearms.

**Keywords** Firearms · Guns · Children · Storage · Suicide

D. Azrael (✉) · M. Miller
Harvard Injury Control Research Center, Harvard School of Public Health, 677 Huntington Ave., Kresge 310, Boston, MA 02115, USA
e-mail: azrael@hsph.harvard.edu

J. Cohen
Columbia University, New York, NY, USA

C. Salhi · M. Miller
Department of Health Sciences, Bouvé College of Health Sciences, Northeastern University, Boston, MA 02115, USA

## Introduction

In 2015, 1468 US children under the age of 18 died as the result of a gunshot wound and almost 7000 were non-fatally injured with a gun [1]. Of those children who died

Published online: 10 May 2018





D. Azrael et al.

by firearm, 40% died either by suicide or as the result of an unintentional firearm injury, most often inflicted by themselves or another child [2]. In contrast to firearm deaths among adults, most firearm deaths of children, especially younger children, occur in their own homes [3]. For suicides and unintentional deaths, the gun used in the death almost always comes from the child's home [4].

A large body of evidence has shown that the presence of guns in a child's home substantially increases the risk of suicide and unintentional firearm death [5–18], though recent data suggest that few gun owners appreciate this risk [19]. Moreover, the risk of unintentional and self-inflicted firearm injury is lower in homes that store firearms unloaded (compared with loaded) and locked (compared with unlocked) [20]. In keeping with this evidence, guidelines intended to reduce firearm injury to children, first issued by the American Academy of Pediatrics (AAP) in 1992 [21], assert that whereas the safest home for a child is one without firearms, risk can be reduced substantially, although not eliminated, by storing all household firearms locked, unloaded, and separate from ammunition [20].

Only three nationally representative studies, and none since the early 2000s, have estimated the proportion of children living in homes where firearms are stored in the least safe manner (i.e., unlocked and loaded). Two of these studies used survey data from 1994 (the National Health Interview Survey and the Injury Control and Risk Survey) [22, 23]; the other used data from 2002 (the Behavioral Risk Factor Surveillance Survey) [24]. All three studies found that approximately 10% of gun-owning households with children contained at least one loaded and unlocked firearm.

Although household gun ownership rates in the USA have remained relatively stable over the past two decades [25], patterns of and reasons for gun ownership have shifted since the early 2000s, possibly affecting firearm storage practices. Over this period, millions of guns, the large majority of which are handguns, have been added to the US gun stock [26]. Handguns are more often owned for personal or household protection, compared with long guns [26], and are far more likely to be stored loaded and unlocked [27, 28]. Consistent with the shift in the gun stock, public opinion regarding the risks and benefits of having a firearm in the home also appear to have changed. According to polling conducted by Gallup, in 2000, approximately 35% of US adults believed that "a gun in the home makes it a safer place to be," whereas by 2014, 63% did [29].

The current study provides the first contemporary estimate in over 15 years of the number of US children who live in households with guns and, within these households, how firearms are stored.

## Methods

### Design and Sampling

Data for this analysis came from a nationally representative Web-based survey (The National Firearms Survey) designed by the investigators (D.A. and M.M.) to describe firearm ownership, storage, and use in the USA. The survey was conducted by the firm Growth for Knowledge (GfK) in April 2015. Respondents were drawn from GfK's KnowledgePanel, an online panel comprised of approximately 55,000 US adults sampled on an ongoing basis. Invitations to participate were sent by e-mail; one reminder e-mail was sent to nonresponders 3 days later. All panel members, except those serving in the US Armed Forces at the time of the survey, were eligible to participate. To ensure reliable estimates, firearm owners and veterans were oversampled. Participants did not receive any specific incentive to complete the survey, although GfK has a point-based program through which participants accrue points for completing surveys and can redeem them later for cash, merchandise, or participation in sweepstakes. Additional details about the survey design and participants are available elsewhere [30].

Of the 7318 invited panel members who received the survey, 4165 began the survey and 3949 completed it (excluding 48 active-duty military personnel who began the survey but were ineligible to complete it). This yielded a survey completion proportion of 55% based on the formula recommended for calculating response proportions for Web panels [31]. Respondents were more likely than non-respondents to be younger, female, unmarried, less educated, and living in metropolitan areas. Respondents were about as likely as non-respondents to live in a firearm-owning house, but were more likely to personally own a firearm.

The study was approved by the Northeastern University Institutional Review Board.



Firearm Storage in Gun-Owning Households with Children: Results of a 2015 National Survey

Measures

*Gun Ownership Status*

The preamble to the survey read: "The next questions are about working firearms. Throughout this survey, we use the word *gun* to refer to any firearm, including pistols, revolvers, shotguns, and rifles, but not including air guns, bb guns, starter pistols, or paintball guns. By 'working guns', we mean guns that are in working order—that is capable of being fired." Immediately, following this preamble, respondents were asked "Do you or does anyone else you live with currently own any type of gun?" Those who responded affirmatively were asked a second question: "Do you personally own a gun?"

Only respondents who reported personally owning firearms were asked specific questions about household firearms, including the number and types of guns in the home, how guns were stored, and reasons for owning firearms. Specifically, respondents were asked: "Do you personally own any of the following types of guns? (handguns, long guns, other guns)," and then, for each firearm type owned by the respondent, "How many (handguns, long guns, other guns) do you own?" Thus, for each respondent, the total number of handguns, long guns, and "other" guns they owned could be tabulated.

*Gun Storage*

For each type of firearm (handgun, long gun, other), gun owners were asked to specify the number of guns they stored loaded and unlocked, loaded and locked, unloaded and unlocked, and unloaded and locked. Based on responses to these questions, for primary analyses, gun owners were sorted into one of three hierarchical, mutually exclusive, and collectively exhaustive categories: (1) those who stored at least one gun loaded and unlocked (the least safe storage method), (2) those who stored no guns loaded and unlocked but at least one gun loaded and locked, or unloaded and unlocked (the intermediate-risk category), and (3) those who stored all guns unloaded and locked (the safest storage method). The two types of storage in the intermediate-risk category were combined because the relative risk of a loaded and locked gun, compared with an unloaded and unlocked gun, was determined to be too context-specific to generalize about which is safer. Respondents ($n = 13$) who refused to answer any questions about how their guns were stored were excluded.

*Demographic, Socio-Economic, and Firearm-Related Variables*

Additional variables included in our analyses were age (18–29, 30–44, 45–59, $\geq 60$), respondent gender, race/ethnicity (non-Hispanic White, non-Hispanic Black, Hispanic, other), education (< high school, high school degree, some college, $\geq$ Bachelor's degree), household income (< $25,000, $25,000–$59,999, $60,000–$99,999, $\geq$ $100,000), US region of residence (Northeast, Midwest, South, West), and rurality of residence (urban, suburban, rural). Whether or not the respondent had children living with them is reported as a mutually exclusive hierarchical variable: any child under 6 years old (yes/no), any child 6–12 years old but no child under 6 (yes/no), and any child 13–17, but no child under 13 (yes/no). Respondent political ideology was reported as liberal, moderate, or conservative. The type of guns owned by respondents was categorized as own at least one handgun vs. own no handguns. Respondents were asked for each type of gun they owned, to indicate their main reasons for ownership (protection against strangers, protection against people they knew, protection against animals, hunting, other sporting use, or for a collection). For this analysis, we include a binary variable: owns any type of firearm for protection against people vs. all other reasons.

Analysis

Analyses used survey weights provided by GfK that combined pre-sample and study-specific post-stratification weights accounting for oversampling and nonresponse, to produce nationally representative estimates with 95% confidence intervals, following the STROBE (Strengthening the Reporting of Observational Studies in Epidemiology) guidelines for reporting [32]. All bivariate and multivariate logistic regression analyses were conducted with Stata Version 14 (StataCorp LP, College Station, TX) using the SVY suite of commands.

We estimated the prevalence of children living in homes where guns are stored loaded and unlocked by multiplying the percentage of all households with children (obtained from 2015 Census data) by our survey-derived estimates of (a) the distribution of children in homes with vs. without firearms and (b) storage practices in homes with children and firearms.



**Results**

We find that approximately one in three US households contains at least one gun, whether the household includes children under the age of 18 (0.34 [0.29–0.39]) or not (0.35 [0.32–0.38]) (not shown). Among households with children, approximately two in ten store at least one gun loaded and unlocked (0.21, 95% CI 0.17–0.26), half store no guns loaded and unlocked, but have at least one gun either loaded and locked, or unloaded and unlocked (0.50, 95% CI 0.45–0.55), and three in ten store all guns unloaded and locked (0.29, 95% CI 0.24–0.34).

Gun storage practices do not vary significantly across most demographic characteristics of gun owners (Table 1), except gender: female gun owners in homes with children are more likely than are male gun owners in homes with children to store at least one gun loaded and unlocked (0.31 [0.23–0.41] vs. 0.17 [0.13–0.22]). Gun storage practices in homes with children also vary by US region, and the age of the youngest child in the household, although these results did not reach statistical significance. Those with older children only were more likely to store at least one gun loaded and unlocked than those with younger children (any child under 6, 0.17 [0.12–0.23]; no children under 6 and at least one child under 13, 0.22 [0.16–0.31]; no child under 13, 0.27 [0.19–0.37]). Households in which any gun is owned for protection are significantly more likely to contain a loaded and unlocked gun than are homes in which no guns are owned for protection (0.29 [0.24–0.35] vs. 0.03 [0.01–0.08]), as are households with at least one handgun, compared to those with no handguns (0.27 [0.22–0.32] vs. 0.05 [0.02–0.15]).

A multiple logistic regression analysis (any gun loaded and unlocked vs. no gun loaded and unlocked) yielded consistent results. In a model adjusting for all of the respondent characteristics in Table 1, the adjusted odds for storing at least one household firearm loaded and unlocked was almost seven times higher for homes in which guns were owned for protection, compared with homes where guns were present but none were owned for protection (OR 6.94 [2.35–20.52]), more than four times higher in homes with handguns, compared to homes where all guns were long guns or other guns (OR 4.55 [1.44–14.39]), and almost twice as high for homes in which females owned firearms, compared to homes in which males owned firearms (OR 1.89 [1.04–3.43], Table 3 in Appendix).



Extrapolating from the reports of gun owners (i.e., that 21% of gun-owning households with children contain at least one gun that is both loaded and unlocked), we estimate that 7% of US households with children contain a loaded and unlocked gun (Table 2). Given that there were approximately 125 million US households in that year [33], 30% of which (37.5 million) included children under the age of 18, we estimate that about 13 million households with children (34%) contain at least one gun, and in approximately 2.7 million (21%) of these homes a gun is stored loaded and unlocked. Households with loaded and unlocked guns in our survey contained an average of 1.7 children, yielding an estimate of 4.6 million children (range 3.9–5.9 million) living in a household with a loaded and unlocked gun in 2015.

**Discussion**

Overall Firearm Storage Practices/Exposure

Consistent with prior national surveys, we find that approximately one-third of US households contain at least one gun, whether children live in the home or not [22, 26, 34]. Among gun-owning households, our finding that storage practices tend to be safer when children live in the home [23, 24, 27, 28, 34, 35], especially young children [22, 36], is also consistent with earlier work. By contrast, we find that nearly twice as many children live in homes where guns are stored loaded and unlocked, compared to the last nationally representative survey to assess this outcome (the 2002 BRFSS) [24]. For example, we find that approximately 21% of homes with children and guns store at least one gun loaded and unlocked, whereas the 2002 BRFSS estimates that approximately 8% of such homes had loaded and unlocked household firearms. Increases in the proportion of homes with children where firearms are stored loaded and unlocked, compounded by the growth of the US population of children since 2002, suggest that the number of children who live in homes with at least one loaded and unlocked firearm may have increased substantially over the past 15 years, from approximately 1.6 million to 4.6 million.

Three non-mutually exclusive reasons may contribute to the striking increase in the estimated number of children living in homes with guns stored unsafely: (1) growth in the US population; (2) a shift in the primary



Firearm Storage in Gun-Owning Households with Children: Results of a 2015 National Survey

**Table 1** Firearm storage among US adult firearm owners with children under 18 in household

| | No. (weighted %) | Unlocked/loaded | UU/LL | Locked/unloaded |
|---|---|---|---|---|
| | *452 (100)* | *0.21 [0.17–0.26]* | *0.50 [0.45–0.55]* | *0.29 [0.24–0.34]* |
| Age | | | | |
| 18–29 | 52 (17) | 0.24 [0.14–0.38] | 0.49 [0.35–0.63] | 0.27 [0.16–0.42] |
| 30–44 | 205 (51) | 0.18 [0.13–0.25] | 0.53 [0.46–0.61] | 0.28 [0.22–0.36] |
| 45–59 | 150 (26) | 0.25 [0.18–0.33] | 0.46 [0.37–0.55] | 0.29 [0.22–0.38] |
| 60+ | 45 (6) | 0.24 [0.13–0.40] | 0.44 [0.29–0.59] | 0.32 [0.20–0.48] |
| Gender | | | | |
| Male | 329 (73) | 0.17 [0.13–0.22] | 0.54 [0.48–0.60] | 0.29 [0.24–0.35] |
| Female* | 123 (27) | 0.31 [0.23–0.41] | 0.40 [0.31–0.50] | 0.28 [0.21–0.37] |
| Urbanicity | | | | |
| Urban | 62 (15) | 0.19 [0.10–0.31] | 0.53 [0.39–0.66] | 0.29 [0.18–0.42] |
| Suburban | 232 (51) | 0.19 [0.14–0.25] | 0.49 [0.42–0.57] | 0.32 [0.25–0.39] |
| Rural | 157 (34) | 0.26 [0.19–0.35] | 0.49 [0.41–0.58] | 0.25 [0.18–0.33] |
| Race | | | | |
| White | 375 (78) | 0.21 [0.17–0.26] | 0.49 [0.44–0.55] | 0.29 [0.25–0.34] |
| Black | 20 (5) | 0.22 [0.09–0.44] | 0.52 [0.33–0.73] | 0.26 [0.11–0.51] |
| Hispanic | 31 (12) | 0.18 [0.08–0.35] | 0.52 [0.33–0.70] | 0.30 [0.16–0.50] |
| Other | 26 (4) | 0.26 [0.08–0.59] | 0.57 [0.31–0.80] | 0.16 [0.07–0.34] |
| Region | | | | |
| Northeast | 54 (11) | 0.14 [0.07–0.27] | 0.54 [0.39–0.67] | 0.33 [0.21–0.46] |
| Midwest | 128 (26) | 0.18 [0.11–0.26] | 0.50 [0.41–0.60] | 0.32 [0.24–0.41] |
| South | 183 (42) | 0.30 [0.23–0.38] | 0.51 [0.43–0.59] | 0.19 [0.14–0.26] |
| West | 87 (21) | 0.13 [0.07–0.23] | 0.46 [0.34–0.58] | 0.42 [0.30–0.54] |
| Education | | | | |
| Less than high school | 30 (8) | 0.21 [0.09–0.40] | 0.39 [0.22–0.59] | 0.40 [0.23–0.61] |
| High school | 94 (26) | 0.22 [0.14–0.32] | 0.56 [0.45–0.67] | 0.22 [0.15–0.33] |
| Some college | 156 (34) | 0.25 [0.18–0.33] | 0.46 [0.38–0.55] | 0.29 [0.22–0.37] |
| Bachelor's degree or higher | 172 (32) | 0.17 [0.12–0.24] | 0.52[0.44–0.60] | 0.31 [0.24–0.39] |
| Income | | | | |
| <25,000 | 31 (6) | 0.31 [0.15–0.52] | 0.49 [0.30–0.69] | 0.20 [0.09–0.37] |
| 25,000–59,999 | 108 (24) | 0.27 [0.18–0.37] | 0.50 [0.39–0.60] | 0.24 [0.16–0.33] |
| 60,000–99,999 | 155 (37) | 0.17 [0.12–0.25] | 0.49 [0.41–0.58] | 0.33 [0.26–0.42] |
| 100,000+ | 158 (34) | 0.20 [0.14–0.28] | 0.51 [0.43–0.60] | 0.29 [0.21–0.37] |
| Age of children in home (hierarchy) | | | | |
| 0 to 5 | 177 (42) | 0.17 [0.12–0.23] | 0.53 [0.45–0.61] | 0.30 [0.24–0.38] |
| 6 to 12 | 143 (32) | 0.22 [0.16–0.31] | 0.53 [0.44–0.62] | 0.25 [0.18–0.34] |
| 13 to 17 | 132 (26) | 0.27 [0.19–0.37] | 0.42 [0.32–0.51] | 0.31 [0.23–0.41] |
| Political affiliation | | | | |
| Liberal | 59 (14) | 0.15 [0.08–0.28] | 0.54 [0.39–0.68] | 0.31 [0.20–0.46] |
| Moderate | 175 (41) | 0.20 [0.15–0.28] | 0.50 [0.42–0.59] | 0.30 [0.23–0.38] |
| Conservative | 212 (44) | 0.24 [0.18–0.31] | 0.48 [0.41–0.58] | 0.28 [0.22–0.34] |
| Reason for ownership | | | | |
| Any gun for protection*** | 307 (71) | 0.29 [0.24–0.35] | 0.51 [0.44–0.57] | 0.20 [0.16–0.26] |
| No gun for protection | 139 (29) | 0.03 [0.01–0.08] | 0.47 [0.38–0.57] | 0.50 [0.40–0.59] |
| Type of guns owned | | | | |
| Owns at least one handgun** | 337 (75) | 0.27 [0.22–0.32] | 0.48 [0.42–0.54] | 0.26 [0.21–0.31] |
| Owns no handguns | 115 (25) | 0.05 [0.02–0.15] | 0.57 [0.47–0.67] | 0.37 [0.28–0.48] |

*p<0.05, **p<0.01, ***p<0.001



**Table 2** Estimated number of US children exposed to firearms in the home

| Storage* | % storage in gun-owning households with children** | % US households with children*** | Mean number of children per household storage type | No. of US children < 18 exposed (millions) | |
|---|---|---|---|---|---|
| Loaded and unlocked | 0.21 | 0.07 | 1.7 | 4.54 | [3.7–5.6] |
| Loaded and locked or unloaded and unlocked | 0.50 | 0.17 | 1.8 | 11.44 | [10.3–12.6] |
| Unloaded and locked | 0.29 | 0.10 | 1.8 | 6.64 | [5.5–7.8] |

*Hierarchical variable (1) at least one gun loaded and unlocked; (2) no guns loaded and unlocked, at least one gun loaded and locked OR unloaded and unlocked; (3) all guns unloaded and locked

**Per the National Firearms Survey, 34% of US households with children have one or more guns

***Per the US Census there were 124.59 million households in the US in 2015. Of these, 30% included children < 18 years old, yielding an estimated 37.4 million households with children

reasons people with and without children own guns, away from hunting and towards personal and home protection; and (3) methodological differences in the way that we assessed storage practices, compared to the approach taken in the BRFSS and other national studies. The first two reasons help explain a credible increase in exposure to unlocked, loaded firearms in general; the third suggests that some of the measured difference may be an artifact of systematic undercounting in prior reports due to the decision to elicit storage practice information from any household member, including non-gun-owning respondents, rather than as in our study, restricting questions to gun-owning respondents only.

*Population Growth* A portion, but not all, of the nearly threefold increase in the number of children exposed to unsafely stored firearms we observe may be accounted for by US population growth since 2002. According to US Census figures, the US population grew by approximately 4.6 million households 2002–2015, approximately one third of which were gun-owning households. Assuming our survey-derived estimate of 1.7–1.8 children per gun-owning household has roughly obtained over the past 15 years, we estimate that an additional 600,000 children are living in a household with a loaded and unlocked gun due to population growth alone.

*Shifting Patterns of and Reasons for Gun Ownership* Since the early 2000s, the composition of the US gun stock has shifted towards handguns (and away from long guns), and, consistent with the reasons people tend to own handguns, towards personal or household protection, and away from hunting or sporting uses alone [26]. Both these trends would be expected to lead to shifts in storage practices towards less safe storage, and in particular, towards household guns being stored loaded and unlocked [27, 28]. Consistent with the observed shift in the gun stock, public opinion regarding the risks and benefits of having a firearm in the home also appear to have changed: according to polling conducted by Gallup, for example, whereas in 2002, approximately 35% of US adults believed that "a gun in the home makes it a safer place to be," by 2014, 63% did [29]. Because the 2002 BRFSS does not ascertain the types of guns people own, or reasons for gun ownership, quantitative assessment of the extent to which this secular shift contributes to the observed increase in children living in homes with guns is not possible.

*Survey Effects* It is also possible that reports of household firearm storage from the BRFSS may have yielded underestimates of unsafe storage practices because of the well-established discrepancy between gun stock and gun storage estimates based on reports of subgroups more likely to personally own firearms, but no more likely to live in homes with guns (e.g., estimates based on reports by married men, compared with estimates based on reports of married women). This discrepancy is commonly referred to as the "reporting gap." Historically, the reporting gap is substantial. For example, prior work has found that married men, compared with married women, are far more likely to report that there is *any* gun in their household and, conditional on reporting any gun, that there are *more* guns in their household [37]. Moreover,



among people in two adult households with children, proxy reporters (i.e., non-gun-owning respondents who report living in homes with firearms) are more likely to report that guns are stored securely, compared with reports by gun owners themselves [38]. As a result of the reporting gap, most major recent surveys that have sought to estimate the stock of guns in the USA, or other characteristics of gun ownership (types and number of guns, etc.), have based their estimates on data provided by those who personally own guns only. Discrepancies due to the "reporting gap" might be compounded, to an indeterminate extent, because of reporting differences related to survey administration modes (e.g., random digit dial telephone survey vs. in-person vs. online), or to secular changes in proxy respondents' knowledge about, and willingness to report, how firearms are actually stored in their homes. Although we know of no studies to date that have examined these issues quantitatively, it seems plausible that the shift towards owning household guns for protection may have increased the likelihood that non-gun-owning women in households with firearms are more knowledgeable about the presence of guns and how they are stored.

Factors Associated with Unsafe Firearm Storage

Our finding that female gun owners in households with children, compared with male gun owners in homes with children, are more likely to store at least one gun loaded and unlocked has not, as far as we can tell, been previously reported. Given the actuarial risk that loaded and unlocked firearms (as well as firearms in general) pose to children, additional research on this issue is warranted.

Our finding that storing at least one gun loaded and unlocked is more common in the South, and among those who own handguns and firearms for protection are consistent with work on firearm storage in general (i.e., in all households, or in sub-populations such as veterans) [27, 28, 35, 39, 40]; however, we are not aware of any prior work that presents data on firearm storage in households *with children* with respect to any of these characteristics.

As with findings from all self-report surveys, our study's results should be interpreted in light of potential inaccuracies due to social desirability, recall, and other biases [41]. And while the magnitude of bias may vary for these possible sources of distortion, the direction of bias would likely be to underestimate, not overestimate, the prevalence of unsafe storage. In this regard, it is worth noting that online panel surveys, such as used here, have been shown to reduce social desirability bias and yield more accurate estimates of respondent characteristics than telephone surveys [42, 43]. In addition, prior research has validated survey responses to firearm questions on random-digit dial surveys, with false denials of gun ownership limited to approximately 10% [44, 45]. Another advantage of online panels is high completion rates for those who begin the survey [31]. Among gun owners in households with children, for example, only 2.8% (*n* = 13) declined to answer our questions about firearm storage. Finally, our survey completion rate (54.6%) is higher than rates for typical nonprobability, opt-in, online surveys (2–16%) [43], higher than those of previous national injury surveys that included questions about firearm ownership [46], and similar to those from other surveys conducted by GfK. Nevertheless, panel members who chose not to participate in our survey may have differed in important ways compared with panel members who chose to participate.

Despite these limitations, our study suggests that more than 1 in 15 US children (7%) live in a household in which at least one firearm is stored loaded and unlocked, and that the number of children who are exposed to unsafely stored guns appears to have grown substantially over the past 15 years. To the extent that the high prevalence of children exposed to unsafe storage that we observe reflects a secular change in public opinion towards the belief that having a gun in the home makes the home safer, rather than less safe, interventions that aim to make homes safer for children should address this misconception. Guidance alone, such as that offered by the American Academy of Pediatrics, has fallen short. Our findings underscore the need for more active and creative efforts to reduce children's exposure to unsafely stored firearms.

**Acknowledgments**   New Venture Fund fund for a Safer Future GA004695. The authors would like to thank Joseph Wertz and Andrew Conner for their contributions to the authors' early thinking about this manuscript.



## Appendix 1

**Table 3**  Characteristics of gun owners with children who store firearms loaded and unlocked

|  | Any firearm loaded and unlocked (OR) | 95% CI |
|---|---|---|
| Age |  |  |
| 18–29 | Reference |  |
| 30–44 | 0.65 | 0.24–1.75 |
| 45–59 | 1.04 | 0.37–2.91 |
| 60+ | 0.97 | 0.26–3.68 |
| Gender |  |  |
| Male | Reference |  |
| Female* | 1.89 | 1.04–3.43 |
| Urbanicity |  |  |
| Urban | Reference |  |
| Suburban | 0.73 | 0.29–1.84 |
| Rural | 1.23 | 0.49–3.06 |
| Race |  |  |
| White | Reference |  |
| Black | 0.99 | 0.32–3.05 |
| Hispanic | 1.03 | 0.37–2.85 |
| Other | 1.09 | 0.29–4.20 |
| Region |  |  |
| Northeast | Reference |  |
| Midwest | 1.37 | 0.45–4.12 |
| South | 2.22 | 0.79–6.22 |
| West | 1.01 | 0.30–3.37 |
| Education |  |  |
| Less than high school | Reference |  |
| High school | 1.65 | 0.51–5.34 |
| Some college | 1.85 | 0.59–5.77 |
| Bachelor's degree or higher | 1.68 | 0.49–5.74 |
| Income |  |  |
| < 25,000 | Reference |  |
| 25,000–59,999 | 0.94 | 0.30–2.97 |
| 60,000–99,999 | 0.41 | 0.13–1.30 |
| 100,000+ | 0.72 | 0.21–2.39 |
| Age of children in home (hierarchy) |  |  |
| 0 to 5 | Reference |  |
| 6 to 12 | 1.57 | 0.76–3.25 |
| 13 to 17 | 1.52 | 0.66–3.46 |
| Political affiliation |  |  |
| Liberal | Reference |  |
| Moderate | 1.90 | 0.73–4.94 |
| Conservative | 2.04 | 0.77–5.40 |
| Reason for ownership |  |  |
| Any gun for protection* | 6.94 | 2.35–20.52 |
| No gun for protection | Reference |  |
| Type of guns owned |  |  |
| At least one handgun* | 4.55 | 1.44–14.39 |
| No handguns | Reference |  |



# References

1. Centers for Disease Control and Prevention, National Centers for Injury Prevention and Control. *Web-based Injury Statistics Query and Reporting System (WISQARS)* [online]. (2005) {cited 2018 Mar 15}. Available from: www.cdc.gov/injury/wisqars.

2. Hemenway D, Solnick SJ. Children and unintentional firearm death. *Inj Epidemiol*. 2015;2(1):26. https://doi.org/10.1186/s40621-015-0057-0.

3. Miller M, Azrael D, Hemenway D. Firearms and violent death in the United States. In: Webster DW, Vernick J, editors. *Reducing Gun Violence in America: informing Policy with Evidence and Analysis*. Baltimore, MD: John Hopkins University Press.

4. Grossman DC, Reay DT, Baker SA. Self-inflicted and unintentional firearm injuries among children and adolescents: the source of the firearm. *Arch Pediatr Adolesc Med*. 1999;153(8):875–8. https://doi.org/10.1001/archpedi.153.8.875.

5. Miller M, Hemenway D. The relationship between firearms and suicide: a review of the literature. *Aggress Violent Behav*. 1999;4(1):59–75. https://doi.org/10.1016/S1359-1789(97)00057-8.

6. Brent DA. Firearms and suicide. *Ann N Y Acad Sci*. 2001;932:225–40. https://doi.org/10.1111/j.1749-6632.2001.tb05808.x.

7. Anglemyer A, Horvath T, Rutherford G. The accessibility of firearms and risk for suicide and homicide victimization among household members: a systematic review and meta-analysis. *Ann Intern Med*. 2014;160(2):101-110. https://doi.org/10.7326/M13-1301.

8. Kellermann AL, Rivara FP, Somes G, Reay DT, Francisco J, Banton JG, et al. Suicide in the home in relation to gun ownership. *N Engl J Med*. 1992;327(7):467–72. https://doi.org/10.1056/NEJM199208133270705.

9. Brent DA, Perper J, Moritz G, Baugher M, Allman C. Suicide in adolescents with no apparent psychopathology. *J Am Acad Child Adolesc Psychiatry*. 1993;32(3):494–500. https://doi.org/10.1097/00004583-199305000-00002.

10. Brent DA, Perper JA, Allman CJ, Moritz GM, Wartella ME, Zelenak JP. The presence and accessibility of firearms in the homes of adolescent suicides. A case-control study. *JAMA*. 1991;266(21):2989–95. https://doi.org/10.1001/jama.1991.03470210057032.

11. Brent DA, Perper JA, Moritz G, Baugher M, Schweers J, Roth C. Firearms and adolescent suicide. A community case-control study. *Am J Dis Child*. 1993;147(10):1066–71. https://doi.org/10.1001/archpedi.1993.02160340052013.

12. Conwell Y, Duberstein PR, Connor K, Eberly S, Cox C, Caine ED. Access to firearms and risk for suicide in middle-aged and older adults. *Am J Geriatr Psychiatry*. 2002;10(4):407–16. https://doi.org/10.1097/00019442-200207000-00007.

13. Bailey JE, Kellermann AL, Somes GW, Banton JG, Rivara FP, Rushforth NP. Risk factors for violent death of women in the home. *Arch Intern Med*. 1997;157(7):777–82. https://doi.org/10.1001/archinte.157.7.777.

14. Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case-control study. *Ann Emerg Med*. 2003;41(6):771–82. https://doi.org/10.1067/mem.2003.187.

15. Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. *N Engl J Med*. 1999;341(21):1583–9. https://doi.org/10.1056/NEJM199911183412106.

16. Dahlberg LL, Ikeda RM, Kresnow M-J. Guns in the home and risk of a violent death in the home: findings from a national study. *Am J Epidemiol*. 2004;160(10):929–36. https://doi.org/10.1093/aje/kwh309.

17. Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. *J Trauma*. 2002;52(2):265–7. https://doi.org/10.1097/00005373-200202000-00011.

18. Miller M, Azrael D, Hemenway D, Vriniotis M. Firearm storage practices and rates of unintentional firearm deaths in the United States. *Accid Anal Prev*. 2005;37(4):661–7. https://doi.org/10.1016/j.aap.2005.02.003.

19. Conner A, Azrael D, Miller M. Public opinion about the relationship between firearm availability and suicide: results from a national survey. *Ann Intern Med*. 2018;168(2):153–5. https://doi.org/10.7326/M17-2348.

20. Grossman DC, Mueller BA, Riedy C, Dowd MD, Villaveces A, Prodzinski J, et al. Gun storage practices and risk of youth suicide and unintentional firearm injuries. *JAMA*. 2005;293(6):707–14. https://doi.org/10.1001/jama.293.6.707.

21. Dowd MD, Sege R, Council on Injury, Violence, and Poison Prevention Executive Committee; American Academy of Pediatrics. Firearm-related injuries affecting the pediatric population. *Pediatrics*. 2012;130(5):e1416–23. https://doi.org/10.1542/peds.2012-2481.

22. Schuster MA, Franke TM, Bastian AM, Sor S, Halfon N. Firearm storage patterns in US homes with children. *Am J Public Health*. 2000;90(4):588–94. https://doi.org/10.2105/AJPH.90.4.588.

23. Stennies G, Ikeda R, Leadbetter S, Houston B, Sacks J. Firearm storage practices and children in the home, United States, 1994. *Arch Pediatr Adolesc Med*. 1999;153(6):586–90. https://doi.org/10.1001/archpedi.153.6.586.

24. Okoro CA, Nelson DE, Mercy JA, Balluz LS, Crosby AE, Mokdad AH. Prevalence of household firearms and firearm-storage practices in the 50 states and the District of Columbia: findings from the Behavioral Risk Factor Surveillance System, 2002. *Pediatrics*. 2005;116(3):e370–6. https://doi.org/10.1542/peds.2005-0300.

25. Smith TW, Son J. *Trends in gun ownership, 1972–2014*. Chicago, IL; 2015. http://www.norc.org/PDFs/GSS Reports/GSS_TrendsinGunOwnership_US_1972–2014.pdf. Accessed 2 March 2018

26. Azrael D, Hepburn L, Hemenway D, Miller M. The stock and flow of US firearms: results from the 2015 National Firearms Survey. *RSF Russell Sage Found J Soc Sci*. 2017;3(5):38–57. https://doi.org/10.7758/rsf.2017.3.5.02.

27. Weil DS, Hemenway D. Loaded guns in the home. Analysis of a national random survey of gun owners. *JAMA*. 1992;267(22):3033–7. https://doi.org/10.1001/jama.267.22.3033.

28. Crifasi CK, Doucette ML, McGinty EE, Webster DW, Barry CL. Storage practices of US gun owners in 2016. *Am J*



*Public Health*. 2018;108(4):532–7. https://doi.org/10.2105/AJPH.2017.304262.

29. McCarthy J. More than six in 10 Americans say guns make homes safer. *Gallup*. http://news.gallup.com/poll/179213/six-americans-say-guns-homes-safer.aspx. Published 2014. Accessed March 15, 2018.

30. Miller M, Hepburn L, Azrael D. Firearm acquisition without background checks: results of a national survey. *Ann Intern Med*. 2017;166(4):233–9. https://doi.org/10.7326/M16-1590.

31. Callegaro M, Disogra C. Computing response metrics for online panels. *Public Opin Q*. 2008;72(5):1008–32. https://doi.org/10.1093/poq/nfn065.

32. von Elm E, Altman D, Egger M, Pocock S, Gotzche P, Vandenbroucke J, et al. The Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement: guidelines for reporting observational studies. *Ann Intern Med*. 2007;147:573–7. https://doi.org/10.7326/0003-4819-147-8-200710160-00010.

33. US Census. https://www.census.gov/data.html. Accessed March 15, 2018.

34. Johnson RM, Coyne-Beasley T, Runyan CW. Firearm ownership and storage practices, US households, 1992–2002. A systematic review. *Am J Prev Med*. 2004;27(2):173–82. https://doi.org/10.1016/j.amepre.2004.04.015.

35. Hemenway D, Solnick SJ, Azrael DR. Firearm training and storage. JAMA. 1995;273(1):46–50. https://doi.org/10.1001/jama.1995.03520250062035.

36. Johnson RM, Miller M, Vriniotis M, Azrael D, Hemenway D. Are household firearms stored less safely in homes with adolescents?: analysis of a national random sample of parents. *Arch Pediatr Adolesc Med*. 2006;160(8):788–92. https://doi.org/10.1001/archpedi.160.8.788.

37. Ludwig J, Cook PJ, Smith TW. The gender gap in reporting household gun ownership. *Am J Public Health*. 1998;88(11):1715–8. https://doi.org/10.2105/AJPH.88.11.1715.

38. Azrael D, Miller M, Hemenway D. Are household firearms stored safely? It depends on whom you ask. *Pediatrics*. 2000;106(3):E31. https://doi.org/10.1542/peds.106.3.e31.

39. Powell KE, Jacklin BC, Nelson DE, Bland S. State estimates of household exposure to firearms, loaded firearms, and handguns, 1991 through 1995. *Am J Public Health*. 1998;88(6):969–72. https://doi.org/10.2105/AJPH.88.6.969.

40. Simonetti J, Azrael D, Rowhani-Rahbar A, Miller M. Firearm storage practices and risk perceptions among a nationally representative of US Veterans with and without self harm risk factors. SLTB. 2018. https://doi.org/10.1111/sltb.12463https://doi.org/10.1111/sltb.12463

41. Marsden P, Wright J. In: 2nd, editor. *Handbook of survey research*. Bingley, UK: Emerald Group Publishing; 2010.

42. Kreuter F, Presser S, Tourangeau R. Social desirability bias in CATI, IVR, and Web Surveys: the effects of mode and question sensitivity. *Public Opin Q*. 2008;72(5):847–65. https://doi.org/10.1093/poq/nfn063.

43. Chang L, Krosnick J. National surveys via RDD telephone interviewing versus the internet: comparing sample representativeness and response quality. *Public Opin Q*. 2009;73(4):641–78. https://doi.org/10.1093/poq/nfp075.

44. Kellermann AL, Rivara FP, Banton J, Reay D, Fligner CL. Validating survey responses to questions about gun ownership among owners of registered handguns. *Am J Epidemiol*. 1990;131(6):1080–4. https://doi.org/10.1093/oxfordjournals.aje.a115600.

45. Rafferty AP, Thrush JC, Smith PK, McGee HB. Validity of a household gun question in a telephone survey. *Public Health Rep*. 1995;110(3):282–8.

46. Betz ME, Barber C, Miller M. Suicidal behavior and firearm access: results from the second injury control and risk survey. *Suicide Life Threat Behav*. 2011;41(4):384–91. https://doi.org/10.1111/j.1943-278X.2011.00036.x.





# Unintentional Shootings

"Unintentional" is the description used in public health for an injury or death that was not caused purposely (in contrast with suicide and homicide, in which there is an intent to cause harm). Unintentional shootings can be self-inflicted or inflicted by someone else and can happen to Americans of all ages. Unintentional injuries and deaths are often called "accidents," which can imply that nothing could be done to stop them from happening; we do not use "accident" terminology because gun violence is preventable. We must reduce unintentional gun deaths and injuries by, among other things, educating people about the risk that guns pose in the home, avoiding alcohol and gun use, training on proper firearm use, and advocating for safer storage.

## Quick Facts about Unintentional Shootings



Each year, nearly 500 people die from unintentional firearm injuries — more than one person every single day.

Unintentional firearm injuries account for 37% of nonfatal firearm injuries but less than 2% of all gun deaths.

Americans are four times more likely to die from an unintentional gun injury than people living in other high-income countries.

Unsafely stored firearms increase the risk of unintentional firearm deaths.



Citations: CDC WONDER Database; Gani, Sakran, & Canner (2017); Solnick & Hemenway (2019); Weibe (2003); Miller, Azrael, & Hemenway (2001); Miller, Azrael, & Hemenway (2005).

# UNINTENTIONAL SHOOTINGS, NOT ACCIDENTS

The public health approach is centered on the idea of prevention. As the Society for Public Health Education puts it, "Injuries are not accidents — they are not random incidents. Injuries have identified risk and protective factors making them preventable."[1]

Unintentional deaths and injuries are often called accidents, which can imply that nothing could be done to stop them from happening. For this reason, we do not use "accident" terminology because gun violence is preventable.

This framework applies to other injuries like car crashes, falls, and drownings. Words matter!

# BACKGROUND

In 2019, 486 Americans died from unintentional firearm injuries — about 1.2% of total gun deaths.[2]

Unintentional is the description used in public health for an injury or death that was not caused purposely (in contrast with suicide and homicide, in which there is an intent to cause harm). Unintentional shootings can be self-inflicted or inflicted by someone else. About half of all unintentional gun deaths are caused by another person pulling the trigger.[3] Each year, nearly 500 people die from unintentional firearm injuries — more than one person every single day.[4]

Much like other forms of gun violence, unintentional gun deaths are more likely to occur in the United States than in other high-income countries. Americans are four times more likely to die from an unintentional gun injury than those in comparable countries.[5]

## THE CDC PLAYS A VITAL ROLE IN PROVIDING PUBLIC HEALTH DATA TO RESEARCHERS

Researchers need robust and reliable data on unintentional gun injuries and fatalities to study and develop solutions to address the epidemic of gun violence in the United States. The Centers for Disease Control and Prevention (CDC) is the federal agency responsible for protecting the health of Americans by ensuring that data is properly collected to develop solutions to our nation's public health crises, including gun violence. The CDC's National Violent Death Reporting System (NVDRS) plays an instrumental role to gun violence prevention advocates and researchers. The NVDRS uses death

certificates, police reports, and hospital records to report information about the victim, the cause of death, and the circumstances surrounding their death.[6] The CDC makes this data publicly available and easily accessible through their Web-based Injury Statistics Query and Reporting System (WISQARS).

# MISCLASSIFICATION OF UNINTENTIONAL GUN INJURIES AND DEATHS

Although the CDC releases data on firearm injuries and deaths in the U.S., the data, especially related to firearm injuries, is not reliable. As a result of a lack of a robust and reliable data source, there are often misclassifications for firearm injuries and deaths. Due to these misclassifications and underreporting of gun injuries and deaths, we do not know the true burden of unintentional firearm injuries and deaths in the U.S.

According to a 2017 study, over half (50.2%) of all nonfatal gun injuries are assaults and over one-third (36.7%) are unintentional injuries. However, the unintentional category may be overreported because those with gun injuries may not admit that they were assaulted to either avoid law enforcement scrutiny or out of fear of retaliation.[7]

Data problems exist for fatal injuries, too. A 2011 study found that "As much as 38% of true cases of unintentional firearm deaths were missed, as were 42% of cases reported as false-positives."[8] The study authors write, "In answer to the question, 'Are there too many or too few unintentional firearm deaths in official mortality data?' the best answer is, 'Both.' Many true accidents are missed, while many suicides and homicides are mistakenly reported as accidents."

There is a critical need for accurate data on the burden of gun violence in the United States.

# CIRCUMSTANCES IN WHICH UNINTENTIONAL SHOOTINGS CAN HAPPEN

One study found that, across all ages, the most common circumstances in which an unintentional gun death occurs are:[9]

- Playing with a gun (28.3%),

- Believing that the gun was not loaded (17.2%), and

- Hunting (13.8%).

This study also found that nearly a quarter of those who died from an unintentional firearm injury — and nearly half of all 20-29-year-olds who died from unintentional shootings — had consumed alcohol.[10]

# GUN OWNERSHIP AND UNINTENTIONAL FIREARM DEATHS

Studies show that higher rates of household gun ownership and availability of guns are associated with higher rates of unintentional firearm deaths.[11,12,13] There is an association between unsafely stored firearms and unintentional gun deaths — one study found that states with higher rates of unsafely stored guns have higher rates of unintentional gun deaths.[14]

Children ages 5-14 were more likely to die from unintentional gun injuries if they lived in states where guns are more prevalent.[15,16] This trend holds for adults, too. A 2013 survey found that in New York, 10.3% of the adult population owns guns while 48.9% of Alabama's adult population owns guns.[17] Alabama's unintentional firearm death rate is 48 times that of New York.[18]

# PREVENTING UNINTENTIONAL SHOOTINGS

## SAFER STORAGE OF FIREARMS

Evidence shows that parents of adolescents — the most at-risk group in terms of unintentional firearm deaths — were more likely than parents of younger children to keep guns in the home stored unsafely (unlocked, loaded, or both).[19]

If a person chooses to store their firearm in the home, it is important to always practice safe firearm storage. For at-home firearm storage, it is widely recommended to store firearms locked and unloaded, store and lock ammunition separately from firearms, and ensure the key or lock combination is inaccessible to children or others who may be at risk for injury.

Safely storing and reducing access to firearms for the gun owner and other individuals, especially children, in the home is an unintentional injury prevention strategy supported by researchers, healthcare professionals, and gun owners alike. While there is no safer storage law at the federal level, various safer storage laws exist at the state level.[20]

Healthcare providers can also play a role in preventing unintentional firearm injuries by improving their patients' safer storage practices through lethal means safety counseling. Studies show that healthcare providers influencing patients' gun storage practices can substantially lower the risk of firearm-related injury.[21] For example, researchers found that for every five gun-owning parents whose child's pediatrician gave them lethal means safety counseling and free cable locks, two parents reported using

Case 5:22-cv-00501-BLF   Document 36-8   Filed 04/08/22   Page 95 of 132

the cable locks six months later.[22] In addition to parents, lethal means safety counseling should be given to individuals who have risk factors for unintentional firearm injury, including people with risky alcohol or substance use and individuals with dementia or conditions impairing cognition and judgment.

*To learn more, visit our page on* _lethal means safety counseling (https://efsgv.org/learn/policies/lethal-means-safety-counseling/)_.

# ALCOHOL AND UNINTENTIONAL SHOOTINGS

Guns should never be handled after consuming alcohol and other substances. Alcohol use is a risk factor for all forms of gun violence, including unintentional injuries and deaths.[23] Alcohol can impair judgment and lead to violent behavior. Adding firearms to this already dangerous situation can be deadly.

Indeed, evidence shows that alcohol use is common in unintentional firearm deaths. A 2019 study found that nearly a quarter of those who died from an unintentional firearm injury — and nearly half of all 20-29-year-olds who died from unintentional shootings — had consumed alcohol.[24] For the oldest age group in the study (adults aged 60 or older), alcohol was involved in 11.3% of unintentional gun deaths.

# DEMENTIA AND UNINTENTIONAL SHOOTINGS

Older adults living with dementia or conditions impairing cognition and judgment may be at an increased risk of firearm injury and death.[25] One-third of adults 65 and older own guns, and another 12% live in a household with a gun.[26] It is estimated that 60% of people living with dementia live in a household with a gun.[27]

People living with dementia who have a firearm in the home may pose a risk to themselves and others. Dementia may make a person unable to safely handle a firearm, and also may result in misperceptions of actual threats.[28] Further, dementia, and other diseases, could impair logical thinking and emotional control.[29]

Just as family members may consult with older relatives' physicians about concerns about their ability to drive or live alone, family members may also express concerns about their relatives' ability to use a firearm.[30] The Alzheimer's Association recommends removing firearms from the home of someone living with dementia to prevent unintentional shootings, recognizing that storing or locking up a firearm may not be enough.[31] Extreme risk laws may be an appropriate mechanism for removing firearms from an individual living with dementia. This tool has the potential to prevent all forms of gun violence, including unintentional shootings.

*To learn more, visit our page on* _extreme risk laws. (https://efsgv.org/learn/policies/extreme-risk-laws/)_

Case 5:22-cv-00501-BLF Document 36-8 Filed 04/08/23 Page 96 of 132

# UNINTENTIONAL GUN INJURIES IN THE UNITED STATES

Annually, more than 27,000 individuals are admitted to the emergency department for unintentional firearm injuries. The vast majority of these individuals, more than 26,000, do not succumb to their injuries and die. In fact, unintentional firearm injuries account for 37% of all nonfatal firearm injuries but less than 2% of all gun deaths.[32] The lethality of unintentional firearm injuries is far less than any other type of gun violence. According to Nationwide Emergency Department Sample (NEDS) and CDC data, two out of every 100 unintentional firearm injuries are fatal.[33] However, as previously mentioned, some nonfatal injuries classified as unintentional may actually be the result of an assault. Regardless, the vast majority of unintentional firearms injuries are not fatal.

# UNINTENTIONAL FIREARM DEATHS IN THE UNITED STATES

Although there are still far too many unintentional firearm deaths, the number of unintentional firearm deaths has decreased over the past two decades. In the first decade of the 21st century, there were 691 annual unintentional firearm deaths (all ages); in contrast, in the second decade (2010-2019), there were 512 annual unintentional firearm deaths (all ages), a 35% decrease. Similarly, the number of unintentional firearm deaths among children and teens (ages 0-19) dropped by 23%, from an average of 154 annually from 2000-2009 to 118 annually from 2010-2019.[34] The expansion of interventions to improve safer firearm storage and handling practices may contribute to further decreases in unintentional firearm deaths in the years to come.

### UNINTENTIONAL FIREARM DEATHS IN THE UNITED STATES, 2000-2019

Case 5:22-cv-00501-BLF   Document 36-8   Filed 04/08/23   Page 97 of 132



Source: CDC WONDER.

## UNINTENTIONAL FIREARM DEATH RATE IN THE UNITED STATES,
## 2000-2019



Source: CDC WONDER.

*All rates listed are age-adjusted in order to allow for accurate comparisons between populations with differing age distributions.*

# DISPARITIES ACROSS DEMOGRAPHICS

Across all ages, races, and ethnicities, males die from unintentional shootings more often than females. Among males, Black men ages 20-34 are at the highest risk of dying from an unintentional shooting. Among females, Black females ages 0-19 are at the highest risk of dying from an unintentional shooting.[35]

## BY SEX

The vast majority of victims of unintentional shootings are male. In 2019, 90% of unintentional gun death victims were male.[36] For both self-inflicted and other-inflicted unintentional gun deaths, the lowest percentage of male victims occurs in the youngest age group: those 0 to 9 years old.[37]

### UNINTENTIONAL FIREARM DEATHS BY SEX, 2019



**Male**
**90%**

**Female**
**10%**

Source: CDC WONDER.

## BY RACE, ETHNICITY, AND

Half (52%) of unintentional firearm deaths occur under the age of 35. Nearly one-quarter of all unintentional firearm decedents are 0-19 years old and 28% of all unintentional firearm decedents are 20-34 years old.[38]

One study found that victims were more likely to be unintentionally shot by someone else the younger they were. Over three quarters (78%) of unintentional firearm deaths for children 0-14 were caused by someone else while the majority of unintentional shootings among older Americans were self-inflicted.[39]

It is important to note that when looking at unintentional gun deaths for both males and females by age, race, and ethnicity, the subgroups have few deaths and as a result, much of the data is unreliable or suppressed. Black males ages 20-34 are at highest risk. For females, Black youth ages 0-19 are at highest risk, though the rates for all races and ethnicities for women are small. Rates of unintentional gun deaths for White women are similar across most of the lifespan.[40]



**FEMALE UNINTENTIONAL FIREARM DEATH RATES BY RACE, ETHNICITY, AND AGE, 2015-2019**

American Indian/Alaska Native | Asian/Pacific Islander | Black
White | Hispanic/Latino (any race)

Source: CDC WONDER.

Note: The CDC considers unintentional firearm death rates based on fewer than 20 deaths "statistically unreliable" and suppresses unintentional firearm death rates based on fewer than 10 deaths. Fewer than 20 unintentional firearm death rates were reported during this time period for the following races and Hispanic Origin category and therefore are omitted from the above chart: American Indian/ Alaska Native females all ages;  Asian/ Pacific Islander females all ages; Black females ages 20-34, 35-54, 55-74, 75+; White females ages 75+; and Hispanic/Latino females all ages.



Source: CDC WONDER.

Note: The CDC considers unintentional firearm death rates based on fewer than 20 deaths "statistically unreliable" and suppresses unintentional firearm death rates based on fewer than 10 deaths. Fewer than 20 unintentional firearm death rates were reported during this time

period for the following races and Hispanic Origin category and therefore are omitted from the above chart: American Indian/ Alaska Native males all ages;  Asian/ Pacific Islander males all ages; Black males ages 75+; and Hispanic/Latino males 55-74, 75+.

# GEOGRAPHICAL VARIATIONS

There is wide regional variation in where unintentional shootings occur. More than half of all individuals who die by unintentional gun injuries live in the South.[41] Individuals who live in the South are more than three times more likely to die by an unintentional shooting compared to those living in the Northeast.[42] In 2019, the five states with the highest rates of unintentional shooting deaths were all in the South. Alabama had the highest unintentional death rate, followed by Kentucky, North Carolina, Missouri, and Georgia. This regional variation may be linked to the strength of state gun violence prevention laws. For example, states in the Northeast region tend to have stronger gun laws than states in the South.[43] States with strong gun laws have been found to be associated with lower unintentional firearm injuries.[44]

# RECOMMENDATIONS

**Enact and implement programs and practices that promote safer firearm storage and handling.**

Easy access to firearms, particularly unsecured firearms and the presence of firearms in risky situations, increases risk of unintentional injury and death by firearm. Mitigating access with safer storage practices and through evidence-based policy prevents unintentional gun violence. Shifting behaviors related to firearm storage and handling practices may contribute to further decreases in unintentional firearm injuries and deaths in the years to come. We recommend:

- **Safer storage:** Safely storing and thereby reducing access to firearms is an unintentional injury prevention strategy supported by researchers, healthcare professionals, and gun owners alike. For at-home firearm storage, firearms should be stored locked and unloaded, ammunition should be stored and locked separately from firearms, and the key or lock combination should be inaccessible to children and adolescents or others at elevated risk of harm to self or others. Storing firearms outside of the home is the safest option.

- **Safety technologies:** Technological solutions have the potential to reduce firearm injury. We encourage the development and evaluation of technological solutions to improving the safety of firearms and storage devices.

Case 5:22-cv-00501-BLF   Document 36-8   Filed 04/08/22   Page 102 of 132

- **Lethal means safety counseling:** Lethal means safety counseling is an evidence-based healthcare intervention that is effective in preventing unintentional firearm injuries and deaths. Lethal means safety counseling helps providers work collaboratively with gun-owning patients and their families to reduce risk of injury by improving their patients' safer storage practices. Healthcare professionals should be trained on lethal means safety counseling as an unintentional injury prevention intervention. All patients and parents/guardians of pediatric patients should be asked about firearms access and provided safer storage information. Patients at elevated risk of unintentional injury, such as individuals with dementia or conditions impairing cognition and judgment, should receive more in-depth lethal means safety counseling. See Lethal Means Safety Counseling (https://efsgv.org/learn/policies/lethal-means-safety-counseling/) for more information.

- **Extreme risk laws:** Extreme risk laws empower law enforcement and the people closest to an individual at elevated risk of harm to self or others to intervene to help prevent gun tragedies before they occur. These state laws allow law enforcement, and in some states family and household members, among others, to petition a judge to temporarily limit an individual's access to firearms if they are at elevated risk of violence. Extreme risk laws may be an appropriate mechanism for removing firearms from an individual who is at high risk for unintentional injury, including individuals living with dementia or other conditions impairing cognition and judgment. Every state should have its own extreme risk law and continuously monitor and evaluate the law to ensure equitable implementation and ongoing effectiveness. See Extreme Risk Laws (https://efsgv.org/learn/policies/extreme-risk-laws/) for more information.

- **Avoid alcohol and other substances when accessing guns:** Just like driving a car, alcohol and other substances increase risk of violence and injury. Firearm access should be limited after consuming alcohol and other substances.

# RESOURCES

## EDUCATIONAL MATERIALS

- Firearm Child Access Prevention in Virginia (http://efsgv.org/wp-content/uploads/2019/06/Virginia-Child-Access-Prevention-June-2019.pdf)

## RESEARCH

- () Fowler KA, Dahlberg LL, Haileyesus T, & Annest JL. (2015). Firearm injuries in the United States. (https://www.ncbi.nlm.nih.gov/pubmed/26116133)*Preventive Medicine.*

- () Gani F, Sakran JV, & Canner JK. (2017). Emergency department visits for firearm-related injuries in the United States, 2006–14. (https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2017.0625)*Health Affairs. Appendix 13.*

- () Guetschow B, Lilienthal M, & Willey M. (2018). Unintentional firearm injuries remain prevalent over a 12 year experience at a rural midwestern level 1 trauma center. (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6047385/)*Iowa Orthopaedic Journal.*

- () Hemenway D, Barber C, & Miller M. (2010). Unintentional firearm deaths: a comparison of other-inflicted and self-inflicted shootings (https://www.ncbi.nlm.nih.gov/pubmed/20441829). *Accident Analysis and Prevention.*

- () Hemenway D & Solnick SJ. (2015). Children and unintentional firearm death. (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4602049/)*Injury Epidemiology.*

- () Miller M, Azrael D, & Hemenway D. (2001). Firearm availability and unintentional firearm deaths. (https://www.sciencedirect.com/science/article/abs/pii/S0001457500000610) *Accident Analysis and Prevention.*

- () Miller M, Azrael D, & Hemenway D. (2002). Firearm availability and unintentional firearm deaths, suicide, and homicide among 5-14 year olds. (https://www.ncbi.nlm.nih.gov/pubmed/11834986) *Journal of Trauma.*

- () Miller M, Azrael D, Hemenway D, & Vriniotis M. (2005). Firearm storage practices and rates of unintentional firearm deaths in the United States. (https://www.ncbi.nlm.nih.gov/pubmed/15949457) *Accident Analysis and Prevention.*

- () Solnick SJ & Hemenway D. (2019). Unintentional firearm deaths in the United States 2005–2015. (https://www.ncbi.nlm.nih.gov/pubmed/31637153) *Injury Epidemiology.*

- () Wiebe DJ. (2003). Firearms in US homes as a risk factor for unintentional gunshot fatality. (https://www.ncbi.nlm.nih.gov/pubmed/12850071) *Accident Analysis and Prevention.*

# ADDITIONAL RESOURCES

- () American Academy of Pediatrics's Gun Safety and Children (https://www.aap.org/en-us/about-the-aap/aap-press-room/campaigns/gun-safety/Pages/default.aspx)

- () Firearm Safety Among Children and Teens (FACTS) Consortium's "Safe Storage" video (https://youtu.be/tExYuQKaFec)

- () How Gun Policies Affect Unintentional Injuries and Deaths (https://www.rand.org/research/gun-policy/analysis/unintentional-injuries.html) from the RAND Corporation

- () Harvard Injury Control Research Center's (https://www.hsph.harvard.edu/hicrc/firearms-research/gun-threats-and-self-defense-gun-use/) information on "Accidents"

- () The National Crime Prevention Council and the Advertising Council's Lock It Up campaign (https://www.safefirearmsstorage.org/)

- () Safe States's Injury Prevention Inventory: Unintentional Firearm Injury (https://www.safestates.org/page/IPI_UninFirearm_pg15)

---

Last updated February 2021

---

1. Injury Prevention (https://www.sophe.org/focus-areas/injury-prevention/). Society for Public Health Education.

2. Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2019 (http://wonder.cdc.gov/ucd-icd10.html).

3. Hemenway D, Barber C, & Miller M. (2010). Unintentional firearm deaths: a comparison of other-inflicted and self-inflicted shootings (https://www.ncbi.nlm.nih.gov/pubmed/20441829). *Accident Analysis and Prevention*.

4. Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2018 (http://wonder.cdc.gov/ucd-icd10.html).

5. Solnick SJ & Hemenway D. (2019). Unintentional firearm deaths in the United States 2005–2015 (https://www.ncbi.nlm.nih.gov/pubmed/31637153). *Injury Epidemiology.*

6. National Violent Death Reporting System (NVDRS) (https://www.cdc.gov/violenceprevention/datasources/nvdrs/index.html). Centers for Disease Control and Prevention.

7. Gani F, Sakran JV, & Canner JK. (2017). Emergency department visits for firearm-related injuries in the United States, 2006–14 (https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2017.0625). *Health Affairs.* Appendix 13.

8. Barber C & Hemenway D. (2011). Too Many or Too Few Unintentional Firearm Deaths in Official U.S. Mortality Data? (https://www.ncbi.nlm.nih.gov/pubmed/21376860) *Accident Analysis and Prevention*.

9.  Solnick SJ & Hemenway D. (2019). Unintentional firearm deaths in the United States 2005–2015
    (https://www.ncbi.nlm.nih.gov/pubmed/31637153). *Injury Epidemiology.*

10. Solnick SJ & Hemenway D. (2019). Unintentional firearm deaths in the United States 2005–2015
    (https://www.ncbi.nlm.nih.gov/pubmed/31637153). *Injury Epidemiology.*

11. Wiebe DJ. (2003). Firearms in US homes as a risk factor for unintentional gunshot fatality
    (https://www.ncbi.nlm.nih.gov/pubmed/12850071). *Accident Analysis and Prevention.*

12. Miller M, Azrael D, & Hemenway D. (2001). Firearm availability and unintentional firearm deaths
    (https://www.sciencedirect.com/science/article/abs/pii/S0001457500000610). *Accident Analysis
    and Prevention*

13. Miller M, Azrael D, Hemenway D, & Vriniotis M. (2005). Firearm storage practices and rates of
    unintentional firearm deaths in the United States
    (https://www.ncbi.nlm.nih.gov/pubmed/15949457). *Accident Analysis and Prevention.*

14. Miller M, Azrael D, Hemenway D, & Vriniotis M. (2005). Firearm storage practices and rates of
    unintentional firearm deaths in the United States
    (https://www.ncbi.nlm.nih.gov/pubmed/15949457). *Accident Analysis and Prevention.*

15. Miller M, Azrael D, & Hemenway D. (2002). Firearm availability and unintentional firearm deaths,
    suicide, and homicide among 5-14 year olds. (https://www.ncbi.nlm.nih.gov/pubmed/11834986)
    *Journal of Trauma.*

16. Per the study authors, Gun availability was assessed using three measures: (1) Cook's Index,
    calculated using mortality statistics among the adult U.S. population, and defined as the average
    of two proportions: (1/2) (firearm suicides/all suicides) (firearm homicides/all homicides) (2) FS/S,
    the percentage of suicides among adults that are firearm suicides; and (3) the percentage of
    households that reported owning a firearm in the BRFSS survey of a nonrandom 21 states
    (Household gun).

17. Kalesan B, Villarreal MD, Keyes KM, & Galea S. (2016). Gun ownership and social gun culture
    (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4809774/). *Injury Prevention.*

18. Centers for Disease Control and Prevention, National Center for Health Statistics. About
    Underlying Cause of Death, 1999-2018 (http://wonder.cdc.gov/ucd-icd10.html). 5-year-average for
    2014-2018.

19. Johnson RM, Miller M, Vriniotis M, Azrael D, & Hemenway D. (2006). Are Household Firearms
    Stored Less Safely in Homes With Adolescents?: Analysis of a National Random Sample of
    Parents (https://www.ncbi.nlm.nih.gov/pubmed/16894076). *Archives of Pediatric & Adolescent
    Medicine.*

20. Giffords Law Center. Safe Storage (https://lawcenter.giffords.org/gun-laws/policy-areas/child-consumer-safety/safe-storage/).

21. Grossman DC, Mueller BA, Riedy C, Dowd MD, Villaveces A, Prodzinski J, et al. (2005). Gun storage practices and risk of youth suicide and unintentional firearm injuries (https://pubmed.ncbi.nlm.nih.gov/15701912/). *Journal of the American Medical Association*.

22. Barkin SL, Finch SA, Ip EH, Scheindlin B, Craig JA, Steffes J, & Wasserman RC. (2008). Is office-based counseling about media use, timeouts, and firearm storage effective? Results from a cluster-randomized, controlled trial (https://www.ncbi.nlm.nih.gov/pubmed/18595960). *Pediatrics.*

23. McGinty EE & Webster DW. (2017). The roles of alcohol and drugs in firearm violence (https://www.ncbi.nlm.nih.gov/pubmed/28055044). *JAMA Internal Medicine*.

24. Solnick SJ & Hemenway D. (2019). Unintentional firearm deaths in the United States 2005–2015 (https://www.ncbi.nlm.nih.gov/pubmed/31637153). *Injury Epidemiology.*

25. Galluzzi K & Warner-Maron I. (2018). Guns and older adults: The physicians role (https://jaoa.org/article.aspx?articleid=2716918). *The Journal of the American Osteopathic Association.*

26. Betz ME, McCourt AD, Vernick JS, Ranney ML, & Wintemute GJ. (2018). Firearms and dementia (https://www.ncbi.nlm.nih.gov/pubmed/30452572). *Annals of Internal Medicine*.

27. Betz ME, McCourt AD, Vernick JS, Ranney ML, & Wintemute GJ. (2018). Firearms and dementia (https://www.ncbi.nlm.nih.gov/pubmed/30452572). *Annals of Internal Medicine*.

28. Galluzzi K & Warner-Maron I. (2018). Guns and older adults: The physician's role (https://jaoa.org/article.aspx?articleid=2716918). *The Journal of the American Osteopathic Association.*

29. Galluzzi K & Warner-Maron I. (2018). Guns and Older Adults: The Physician's Role (https://jaoa.org/article.aspx?articleid=2716918). *The Journal of the American Osteopathic Association.*

30. Betz ME, McCourt AD, Vernick JS, Ranney ML, & Wintemute GJ. (2018). Firearms and dementia (https://www.ncbi.nlm.nih.gov/pubmed/30452572). *Annals of Internal Medicine*.

31. Alzheimer's Association. (2017). Firearm Safety (https://www.alz.org/national/documents/topicsheet_firearm_safety.pdf).

32. Gani F, Sakran JV, & Canner JK. (2017). Emergency department visits for firearm-related injuries in the United States, 2006–14 (https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2017.0625). *Health Affairs*. Appendix 13.

33.  Gani F, Sakran JV, & Canner JK. (2017). Emergency department visits for firearm-related injuries in the United States, 2006–14 (https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2017.0625). *Health Affairs.* Appendix 13.

34.  Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2019 (http://wonder.cdc.gov/ucd-icd10.html).

35.  Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2019 (http://wonder.cdc.gov/ucd-icd10.html).

36.  Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2019 (http://wonder.cdc.gov/ucd-icd10.html).

37.  Solnick S & Hemenway D. (2019). Unintentional firearm deaths in the United States 2005–2015 (https://www.ncbi.nlm.nih.gov/pubmed/31637153). Injury Epidemiology.

38.  Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2019 (http://wonder.cdc.gov/ucd-icd10.html).

39.  Hemenway D, Barber C, & Miller M. (2010). Unintentional firearm deaths: a comparison of other-inflicted and self-inflicted shootings (https://www.ncbi.nlm.nih.gov/pubmed/20441829). *Accident Analysis and Prevention*.

40.  Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2019 (http://wonder.cdc.gov/ucd-icd10.html).

41.  Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2019 (http://wonder.cdc.gov/ucd-icd10.html).

42.  Centers for Disease Control and Prevention, National Center for Health Statistics. About Underlying Cause of Death, 1999-2019 (http://wonder.cdc.gov/ucd-icd10.html).

43.  According to the U.S Census Bureau, (https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf) The South region consists of: TX OK AR LA MS AL TN KY WV VA DC MD DE NC SC GA FL. Most of these states have weak gun laws.

44.  Simonetti JA, Rowhani-Rahbar A, Mills B, Young B, & Rivara FP. (2015). State firearm legislation and nonfatal firearm injuries. (https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2015.302617)*American journal of public health.*

Case 5:22-cv-00501-BLF Document 36-8 Filed 04/08/22 Page 108 of 132

**805 15th Street NW | Washington, DC 20005 | (202) 408-7560
| efsgv@efsgv.org**

**© 2020 Educational Fund to Stop Gun Violence**

**Information on this website does not constitute legal or medical advice. Every factual situation is unique; if you want advice specific to your particular circumstances, you should consult knowledgeable counsel or medical personnel.**

# Sandy Hook Families Settle Lawsuits Against Lanza Estate For $1.5M

**By DAVE ALTIMARI**
AUG 06, 2015 AT 8:55 AM



The two lawsuits made similar claims -- that Nancy Lanza purchased a Bushmaster AR-15 and kept it in her Yogananda Street home where her son had access to it. (Stephen Dunn)

The families of 16 victims of the Sandy Hook school shooting will receive about $94,000 each to settle two lawsuits against the estate of the shooter's mother, Nancy Lanza.

Documents filed Monday in Probate Court show that the families have agreed to equally divide a $1.5 million homeowner's insurance policy that Lanza had on the Newtown home she shared with her son, Adam Lanza. Each family will get $93,750, records show. The lawsuits were filed by the families of 16 of those who died in the massacre and two who survived.

ADVERTISING

On Dec. 14, 2012 , Adam Lanza walked into Sandy Hook Elementary School and gunned down 26 people, including 20 first graders, using a Bushmaster AR-15 assault weapon that his mother had purchased legally. He had already killed his mother before going to the school – shooting her several times with a rifle as she slept in her bed at their Yogananda Street home.

The lawsuits made essentially the same claim — that Nancy Lanza purchased the Bushmaster and kept it in her home, where her 20-year-old son had access to it. State police reports said the Bushmaster was kept in a gun safe that was in a room adjacent to Adam Lanza's bedroom and that he had unlimited access to it.

[Related] Alex Jones appears for questioning in Connecticut for Sandy Hook lawsuit »

ADVERTISEMENT

The lawsuits allege that Nancy Lanza "knew or should have known that [Adam Lanza's] mental and emotional condition made him a danger to others."

The claims were made in two separate lawsuits filed against the estate of Nancy Lanza, which is still open in Probate Court. Stamford attorney Samuel Starks is the estate's administrator.

The lead plaintiffs in the lawsuits, were the parents of James Mattioli and the estate of Rachel D'Avino.

The settlements must be approved by Probate Judge Joseph Egan before they can be finalized in Superior Court, but lawyers familiar with the case said that should be completed by the end of this month. All the lawyers on the case worked pro bono so the families could get all the proceeds.

Two other lawsuits filed as a result of the shootings are still pending.

 **Five Things You Need To Know Newsletter**
Daily

We're providing the latest coronavirus coverage in Connecticut each weekday morning.

ENTER YOUR EMAIL ADDRESS

Many of the same families also are suing Remington Outdoor Co., the distributor of the Bushmaster, in federal court. That lawsuit claims that the Bushmaster, which can fire up to 30 rounds a minute and is capable of piercing body armor, shouldn't have been entrusted to the general public because it is a military assault weapon.

**LATEST CONNECTICUT**

Alex Jones appears for questioning in Connecticut for Sandy Hook lawsuit

New state grant to aid redevelopment near Hartford's Dunkin' Donuts Park, 11 other towns and cities

Racist graffiti repeatedly found in bathrooms at West Hartford high school

The other lawsuit is against the town of Newtown and alleges that the town did not take enough steps to secure the school. The lawsuit alleges that Lauren Rousseau, a substitute teacher killed, did not have a key to her room and was unable to lock the door before Lanza entered the classroom.

He killed 14 of the 15 people in that room. The rest were killed in an adjacent classroom. Lanza killed himself using one of the handguns that he had brought into the building. He fired 155 shots in less than five minutes.

The house on Yogananda Street where Nancy and Adam Lanza lived was torn down a few months ago. A bank purchased it for $1 from the estate and turned it over to the town.

*A previous version of this story indicated that two of the plaintiffs were teachers who survived the shooting. They withdrew their claims.*

3/21/22, 12:29 PM
Case 5:22-cv-00501-BLF Document 36-8 Filed 04/08/22 Page 113 of 132
Man who shot intruder in his home sued for wrongful death

    

# MEDICAL MALPRACTICE AND PERSONAL INJURY LAW BLOG

# MAN WHO SHOT INTRUDER IN HIS HOME SUED FOR WRONGFUL DEATH

Posted by Charles Gilman | Dec 15, 2020 | 0 Comments

A judge has decided that a man who shot and killed an intruder in his home, can be sued by the dead man's family.

The wrongful death lawsuit seeks $505,000 from the man who came home to find his front door kicked in and a nearly naked man in his living room. Police declined to prosecute the resident, but a judge, last month, said the civil case can move ahead.

In June 2012, an Oregon man returned to his home with his girlfriend after an evening out. They found his front door kicked in and a nearly naked intruder on the sofa. According to police reports, the 33-year-old intruder attacked the man and started strangling him. With his girlfriend's help, the man broke free and reached for a handgun he had hidden in the sofa. He shot the intruder once in the back at close range. All three were reportedly intoxicated at the time of the incident and the couple told police they did not know the intruder.

Last year, a lawsuit was filed against the resident on behalf of the parents and son of the intruder. The lawsuit alleges that the resident used reckless and excessive force against the intruder. The family's attorney suggested the resident provoked a confrontation by entering his own home after finding the door kicked in, instead of remaining outside and calling the police. However, the resident's attorney, arguing to throw out the case, said that Washington state law allows the use of defensive deadly force in such circumstances. In addition, his attorney argued, statutes defend against civil claims when the person who was harmed was committing a felony and that his conduct was "a substantial factor contributing to his death."

However, the judge sided with the family of the intruder, saying there was not definitive proof that the intruder attacked the couple before being shot.

In their bid for damages, the family cited loss of life and loss of "companionship and support" from the dead man. In a civil suit, there are two types of damages: compensatory (or actual damages) and punitive damages. Compensatory damages are money awarded to compensate for actual losses such as future earnings, medical bills, and funeral expenses. Punitive damages are considered punishment and awarded when the defendant's behavior is found to be especially harmful. The compensation in a wrongful death lawsuit is intended to cover the earnings of the deceased, as well as attempt to provide emotional comfort for loved ones and support the person for whom the earnings would have provided.

Earlier this year, a wrongful death lawsuit was filed against a Montana homeowner who shot and killed an intruder. The homeowner said the intruder was moving toward him and he feared for his life. The lawsuit claims the intruder was running away when he was shot.

In 2011, the family of a burglar who was shot and killed while breaking into a Colorado car lot was awarded almost $269,500 in their wrongful death lawsuit.

No matter the circumstances, if you have been injured or a loved one killed as a result of someone else's reckless behavior, you may be entitled to compensation. Call the offices of trial attorneys Charles Gilman and Briggs Bedigian at 1-800-529-6162 or [contact them online](#). The firm handles cases in Maryland, Pennsylvania, and Washington, D.C.

## SHARE



## ABOUT THE AUTHOR

### CHARLES GILMAN

As managing partner and co-founder of Gilman & Bedigian, it is my mission to help our clients recover and get their lives back on track. I strongly believe that every person who is injured by a wrongful act deserves compensation, and I will do my utmost to bring recompense to those who need and deserve it.

## COMMENTS

There are no comments for this post. Be the first and [Add your Comment](#) below.

## LEAVE A COMMENT

| Name * |
|---|

| Email * |
|---|

| Enter your comment...* |
|---|

☐ Save my name, email, and website in this browser for the next time I comment.

[POST COMMENT]

« Previous Post                                                                 Next Post »

## FREE CONSULTATION

Call 800-529-6162 or complete the form. Phones answered 24/7. Most form responses within 5 minutes during business hours, and 2 hours during evenings and weekends.

Name *

Phone *

Email

Injury Type

Injury Type

Injury Type

Comments/Questions *

MESSAGE OUR ATTORNEYS NOW >

100% Secure & Confidential

## LET US HELP

If someone you are close to has been seriously injured or worse, you are naturally devastated not only by what has happened, but by the effect that the injury or loss has had on you and your family. At a time when you're vulnerable, traumatized and emotionally exhausted, you need a team that will support you through the often complex process that lies ahead.

## OFFICE LOCATIONS

1954 Greenspring Drive
Suite 250
Timonium, MD 21093
(410) 560-4999
(410) 308-3116 (fax)

1515 Market St
Suite 1200
Philadelphia, PA 19102
(215) 561-4999

*Gilman & Bedigian handles birth injury cases nationwide in cooperation with local counsel.*

This website includes general information about legal issues and developments in the law. Such materials are for informational purposes only and may not reflect the most current legal developments. All material on this site is not intended, and must not be taken, as legal advice. Contact a licensed attorney in your jurisdiction for advice on specific legal issues or problems. Receipt of information from and use of this website to contact Gilman & Bedigian or one of its lawyers does not create an attorney-client relationship. Please do not send any confidential information until an attorney-client relationship has been established. Past results do not guarantee a similar outcome. Each case is different and past results are not a guarantee of reaching a favorable result in any future case.

## CONNECT





Terms of Use | Privacy Policy | Anti-spam

Copyright © 2022 Gilman & Bedigian, LLC

# Burglar sues Calif. homeowner, 90, who returned fire

BY BARRY LEIBOWITZ
OCTOBER 26, 2012 / 9:30 AM / CBS NEWS



Jay Leone

FACEBOOK VIA CBS SAN FRANCISCO

(CBS) GREENBRAE, Calif. - A Northern California homeowner who police say survived being shot in the jaw during a burglary is now getting a "punch in the gut": The burglary suspect is suing him for returning fire.

The Marin Independent Journal reported the suspect alleges that Jay Leone, who is 90-years-old, negligently shot the intruder.

According to CBS San Francisco, suspect Samuel Cutrufelli is charged with two counts of attempted murder after Leone was shot in the face on Jan. 3. Police said Cutrufelli was wounded when Leone returned fire.

Leone has vowed to countersue. In an exclusive January interview at his bedside at Marin General Hospital, Leone told CBS San Francisco he had to outwit the burglar who held him captive at gunpoint.

According to Leone, the incident began when Cutrufelli kicked in the door, of his Marin County home. Leone said he was ordered not to move as the house was scoured for valuables. But after awhile, Leone insisted that he had to use the bathroom, and convinced his captor to let him go, CBS San Francisco reported.

It was a ruse. Leone had a .357 revolver stashed in the bathroom. He grabbed it and ran back and pointed it at the burglar.

The burglar fired once, hitting Leone in the cheek.

"He opened up on me," said Leone. "He got me on the first shot."

Leone, a former Marin County Sheriff's deputy, paused before returning fire. The gunman begged for his life, but Leone emptied his weapon anyway.

"After he shot me, I looked him straight in the eye," said Leone. "He says, 'Don't kill me. Don't kill me... I've got a daughter!' I said, 'f- you ... pow, pow, pow, pow!'"

The ordeal wasn't over. Three of those shots hit their mark, but still the gunman rushed Leone and tried to shoot the 90-year-old with his own weapon.

"Sure enough, he wrestled me to the floor, put the gun to my head, pulled the trigger, and it went, 'click,'" Leone said. "And then he got all panicky. He ran out the door."

Cutrufelli called police claiming he had shot himself. They took him to a hostpial for treatment, but also arrested him on suspicion of burglary and attempted murder.

Now, he's suing the 90-year-old man he allegedly tried to kill.

RESEARCH | SOCIETY OF ACTUARIES | WEB EXCLUSIVES

# Firearm Risk: An Insurance Perspective

Actuaries can apply their skills to help quantify firearm-related risk

**KRISTEN MOORE AND CRAIG REYNOLDS**

JUNE/JULY 2018

---

Disclaimer: The Society of Actuaries makes no endorsement, representation or guarantee with regard to any content, and disclaims any liability in connection with the use or misuse of any information provided in this series of articles. Statements of fact and opinions expressed herein are solely those of the authors and are not those of the Society of Actuaries or the respective authors' employers.

---

In the 2017–2021 Society of Actuaries (SOA) Strategic Plan, the SOA promises its stakeholders that actuaries will "provide trusted and objective actuarial research, analysis and insight on important societal issues."[1] Firearm deaths and injuries are a significant problem in the United States and an important societal issue with actuarial and insurance aspects. Indeed, the American Medical Association recently called firearm violence "a public health crisis" and called for a comprehensive public health response and solution.[2]

Gun violence in America exacts a significant toll on our society in both human and economic terms. The economic cost of firearms directly affects the financial outcomes of insurers and taxpayers. Actuaries are well positioned to study the mortality and morbidity related to firearms, yet there is little on the topic in actuarial and insurance literature.

In this article, we provide a brief overview to introduce actuaries to the scope of firearm deaths and injuries, and we examine the extent to which actuaries and insurance professionals have studied or addressed the issue. We compare firearm risk to risks that are often considered in the underwriting process for life and homeowners insurance. We find that the death rate for firearms is material, largely not considered in insurance underwriting, and larger than at least one factor that is considered in insurance underwriting. We outline open research questions and encourage actuaries to apply their skills and talents to quantifying firearm-related risk.

We deliberately do not take a stand on policy issues related to firearms. Rather, we focus on the associated insurance risks, share known data and call for further research.

## GUN DEATHS AND INJURIES IN THE UNITED STATES: FREQUENCY AND COST

We summarize the frequency of fatal and nonfatal gunshot wounds in a series of tables and graphs. The data for Figures 1–4 were extracted from the Centers for Disease Control and Prevention (CDC) Web-based

Injury Statistics Query and Reporting System (WISQARS).[3] In Figure 1, we show the annual average number of fatal and nonfatal gunshot wounds (GSW) in the United States during the period 2010–2015. The graph in Figure 2 shows the year-by-year data. In both figures, we include the number of auto fatalities for comparison. Firearm fatalities are the third leading cause of injury-related death, just behind motor vehicle fatalities.[4] Indeed, in recent years, the difference between the two has been less than 0.5 percent, and firearm fatalities have now exceeded automobile fatalities in 21 states.[5,6]

| Figure 1: Annual Average Number of Fatal and Nonfatal Gunshot Wounds, 2010–2015 | | | |
|---|---|---|---|
| | | Gunshot Wounds (GSW) | |
| | Auto Fatalities | Fatal GSW | Nonfatal GSW | Total GSW |
| Annual Average 2010–2015 | 34,351 | 33,511 | 79,846 | 113,357 |

Source: Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS)

### Figure 2: Annual Number of Fatal and Nonfatal Gunshot Wounds, 2010–2015>

Hover Over Image for Specific Data



Source: Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS)

In Figures 3 and 4, we show fatal and nonfatal GSW by intent for 2015. We note that suicides account for 61 percent of fatal GSW. This is stable over the six-year period: 61 to 64 percent of fatal GSW were attributable to suicide. In both figures, legal intervention (deaths or injuries "inflicted by police or other law enforcement agents, including military on duty, in the course of arresting or attempting to arrest lawbreakers, suppressing disturbances, maintaining order and performing other legal actions") is grouped

with homicide or assault. Such incidents comprise only a small fraction, approximately 1 percent, of fatal and nonfatal GSW in 2015 (484 fatalities and 912 nonfatal GSW).

## Figure 3: Fatal Gunshot Wounds by Intent, 2015

Hover Over Image for Specific Data



Source: Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS)

## Figure 4: Nonfatal Gunshot Wounds by Intent, 2015

Hover Over Image for Specific Data



Source: Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS)

Estimates of the cost of gun violence vary. In recent studies, Spitzer et al. found that between 2006 and 2014, the average annual cost of initial inpatient hospitalizations for GSW was $734.6 million.[7] Gani et al.

estimated the average emergency department and inpatient charges for the same period at $2.8 billion per year.[8] The first figure is based on hospital costs while the second is based on charges; the cost-to-charge adjustment was not applied in Gani et al. For more data on cost, we refer the interested reader to Salemi et al.,[9] Lee et al.,[10] Livingston et al.,[11] Cook and Ludwig,[12] and Peek-Asa et al.[13] We emphasize that these studies capture only an initial snapshot of the cost of treating GSW; they exclude follow-up care such as procedures and treatments to address complications, rehabilitation, physical or occupational therapy, mental health care and so on. These snapshots fail to capture the potential "long-tailed" nature of claims related to GSW.

## ARE ACTUARIES AND INSURERS CONSIDERING FIREARM RISK?

In this section, we describe the extent to which actuaries and insurers are studying or quantifying firearm risk. We found only one article in an actuarial journal. However, there is evidence that some actuaries and insurance companies are recognizing firearm-related risk through their product offerings, pricing and underwriting decisions in at least a limited way. We have summarized these findings:

- Lemaire used multiple decrement techniques to compute the reduction in life expectancy and the increase in life insurance premiums in the United States due to firearm violence.[14] To the best of our knowledge, this is the only paper in the actuarial scholarly literature related to firearm risk.
- As states began passing laws to allow school staff members to carry firearms, some insurance companies responded by terminating liability or workers' compensation coverage, or by imposing premium increases per armed staff member.[15]
- At least three companies offer Workplace Violence Expense Insurance to cover expenses associated with incidents of workplace violence.[16,17,18] Moreover, Workplace Violence and Active Shooter Response are active areas of risk management.[19]
- Some companies offer gun liability insurance. Indeed, the National Rifle Association (NRA) endorses a line of personal firearms liability insurance as well as self-defense insurance, which provides coverage in the event that a policyholder uses his or her gun in an act of self-defense.[20,21]
- Bills were introduced in four states (Hawaii, New Hampshire, New York and California) to mandate liability insurance for gun owners.[22] On the other hand, a Florida law passed in 2014 prohibits insurance companies from using firearm ownership as a factor in insurance underwriting.[23] We did not find evidence that actuaries had analyzed or weighed in on these legislative measures.

## DO FIREARMS INTRODUCE RISK?

There is extensive literature on this topic, including individual-level studies, ecological studies, survey papers and meta-analyses. Multiple studies have concluded that a firearm in the home is a risk factor for suicide, domestic violence homicide and accidental shootings, and that higher levels of gun prevalence are positively associated with higher homicide rates. We refer readers to the papers by Hemenway,[24] Hepburn and Hemenway,[25] Miller et al.[26] and Stroebe;[27] the meta-analysis by Anglemeyer et al.,[28] and the references contained therein; as well as the recent article in *Scientific American*.[29]

Case 5:22-cv-00501-BLF   Document 36-8   Filed 04/08/22   Page 123 of 132

Again, there is an extensive body of literature that addresses this question, but one can visualize the association between the firearm death rate and gun prevalence in Figure 5, which is based on publicly available data.[30],[31] This relationship is approximate, as estimates and measures of gun ownership vary.

**Figure 5: Firearm Death Rate Versus Firearm Ownership Rate by State, 2013**

Sources: Xu, J., S. L. Murphy, K. D. Kochanek, and B. A. Bastian. 2016. "Deaths: Final Data for 2013." *National Vital Statistics Reports* 64 (2). *http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf* **PDF**.
Kalesan, B., M. D. Villarreal, K. M. Keyes, and S. Galea. 2016. "Gun Ownership and Social Gun Culture." *Injury Prevention* 22 (3): 216–220. *http://dx.doi.org/10.1136/injuryprev-2015-041586*.

We, along with the authors cited previously in this article, emphasize that none of the studies prove causation, but rather a statistical association. In their literature review on firearm availability and homicide, Hepburn and Hemenway wrote, "None of the studies prove causation, but the available evidence is consistent with the hypothesis that increased gun prevalence increases the gun death rate."[32]

# IS FIREARM RISK COMPARABLE TO OTHER INSURANCE UNDERWRITING FACTORS?

In this section, we compare firearm risk to other factors that are used in the underwriting of life insurance and homeowners insurance. We note that we are considering only risk and the financial impact of covered risks, not the social and political forces that influence the selection of underwriting criteria.

For life insurance, risky avocations such as private aviation, scuba diving and rock climbing might be considered in the underwriting process, though firearm ownership generally is not. Using publicly available data, Tavernier and Vadiveloo computed a death rate per million "participants" in various risky avocations and compared that to a death rate per gun owner.[33] The calculations are detailed in Tavernier and Vadiveloo's paper titled "Firearms as an Underwriting Characteristic;" however, since this source is an unpublished student thesis, we walk through some of the calculations and cite their original sources as well. The results are summarized in Figure 6.

| Figure 6: Fatality Rates for Firearms Versus Scuba Diving | | |
|---|---|---|
| **Risk** | **Deaths per Million Participants** | **Life Insurance Underwriting Factor** |
| **Scuba diving** | **164** | **Yes** |
| **Firearm in the home** | **240–450** | **No** |

Source: The authors' own calculations and data from Tavernier, R., and J. Vadiveloo. 2017. "Firearms as an Underwriting Characteristic." Undergraduate Student Thesis. Department of Mathematics, University of Connecticut.

For scuba diving, the estimated death rate is given as 16.4 per 100,000 scuba divers.[34]

For firearms, we estimate a death rate attributable to firearm ownership. More specifically, for the numerator, we must estimate the number of deaths that are attributable to firearm ownership. For the denominator, we must estimate the number of gun owners or gun-owning households.

Of course, not all gun deaths result from the fact that an individual chose to engage in the possibly-risky activity of firearm ownership. If a woman accidentally kills herself while cleaning her gun, one can argue that her death was attributable to her choice of risky avocation. However, if one is the victim of a random gun murder, his gun ownership status could be independent of his cause of death. Thus, the correct choice for the numerator is unclear. For that reason, we use a range of 18,000 to 33,000. At the maximum, our numerator includes all firearm deaths. At the minimum, we include only suicides.[35] However, since we are thinking specifically in the context of insurance, we reduce the number of suicides from 20,000 to 18,000 to reflect the fact that some suicides would occur during the suicide exclusion period. Based on Tables 1 and 3 of Tseng's study,[36] Tavernier and Vadiveloo proposed a reduction of 10 percent.[37] Of course, not all

firearm victims are insured—nor are all scuba participants. But this analysis is still useful as a measure of relative risk.

In addition to the variation in the numerator, there is considerable variation in the denominator, as estimates of the number of gun owners vary. The challenges of quantifying gun ownership, availability, prevalence and use are detailed in Hepburn and Hemenway's paper,[38] as well as Chapter 3 of the National Research Council's review.[39] We choose denominators ranging from 40 million to 75 million. At the low end, we use the General Social Survey's (GSS) estimate of a 32 percent gun ownership rate multiplied by the 126 million households in the United States.[40,41] At the high end, other sources suggest the total number of gun owners is as high as 75 million.[42]

This variability produces a wide range for our estimated death rate attributable to firearm ownership. If we include only the adjusted number of suicides (18,000) in the numerator, our estimate ranges from 240 to 450 gun deaths per million gun owners. If the numerator included accidental shootings and domestic violence homicide, for example, the estimated death rates would be higher. If we include all gun deaths (33,000) in the numerator, the range of estimates increases to 440 to 825 deaths per million gun owners. However, as we remarked previously, some gun deaths are completely independent of one's gun ownership status.

Despite the wide range in our estimated death rate attributable to gun ownership, it is worth noting that, even at the low end, the death rate attributable to firearms of 240 deaths per million gun owners is 46 percent higher than the death rate attributable to scuba diving. The latter is used in life insurance underwriting, while the former is not.

Furthermore, while using death rates "per participant" might be an appropriate measure for assigning an insurance rating class once participation has been confirmed, the overall death rate per million of a population might be more relevant when deciding which activities to ask about on an insurance application. Given that the scuba participation rate is much lower than the gun ownership rate, a decision to ask about scuba participation and not gun ownership seems difficult to justify.

For homeowners insurance, risky features in the home such as swimming pools, trampolines and aggressive breed dogs are generally considered in the underwriting process, while firearm ownership is not.[43,44] It is natural to ask whether the risk of a firearm in the home is comparable to the risk of these other household features.

Estimates of the number of trampoline-related injuries range from 100,000 per year[45] to 295,000 per year.[46] Some of these injuries might result in a homeowners claim. We did not find a reliable estimate of the number of household trampolines; thus, we did not calculate a loss rate.

*For life insurance, risky avocations such as private aviation, scuba diving and rock climbing might*

As we pointed out previously, there are about 113,000 fatal and nonfatal GSW per year. Not all firearm-related losses would result in a homeowners claim, as intentional and illegal acts would be excluded. However, some suicides, homicides, assaults, unintentional shootings and even mass shootings could result in a homeowners claim against the gun owner's policy. In addition, firearm theft could result in a homeowners claim. The Department of Justice (DOJ) estimates that approximately 232,000 guns were stolen per year during the six-year period from 2005–2010,[47] while Hemenway et al. estimate 250,000 gun theft incidents per year, with about 380,000 guns stolen.[48]

> *be considered in the underwriting process, though firearm ownership generally is not.*

In computing a homeowners loss rate due to firearms, the correct choice for the numerator is unclear. But beyond examining claim frequency for household risks, one should also examine claim severity. Homeowners claims related to firearms could include high-dollar liability settlements. For example, the mass shootings in Columbine, Colorado, and Newtown, Connecticut, resulted in homeowners settlements.[49,50] But even more "routine" gun accidents could lead to significant settlements.

In the next section under "Claims Analysis," we recommend a systematic study of the frequency and severity of firearm-related claims for homeowners and other lines of business.

## OPEN RESEARCH QUESTIONS

There is a clear need for unbiased and objective research on the economic impact of firearms. Webster et al. point out: "Gunfire from assaults, suicides and unintentional shootings exacts an enormous burden on public health globally. The available science, however, is limited to answer many important questions necessary for mounting successful efforts to reduce gun violence. Certain data are lacking, and there are numerous analytical challenges to deriving unbiased estimates of policy impacts. Significant investments in research over the long term are warranted to answer questions central to successful prevention of gun violence."[51] Similarly, in their 300-page critical review of the literature on firearms and violence, the National Research Council of the National Academy of Sciences observes, "One theme that runs throughout our report is the relative absence of credible data central to addressing even the most basic questions about firearms and violence."[52]

Actuaries can provide high-quality, objective, relevant, quantitative research that can be used by our stakeholders as input for recommendations and decisions on this key societal issue. Toward that end, we propose three important avenues for future research.

### Claims Analysis

The cost of gun violence directly affects the financial outcomes of life, health, disability, workers' compensation, commercial and personal liability, and homeowners insurers, as well as American

taxpayers. Actuaries should examine the frequency and severity of firearm-related claims across lines of insurance business in order to analyze insurers' exposure to firearm risk.

Data availability and coding of firearm-related claims present significant issues. Moreover, health claims related to nonfatal GSW might be long-tailed, and claims related to follow-up procedures and treatments might not be linked to the original treatment episode. The proposed analysis is challenging. However, the Insurance Information Institute has meticulously tracked the frequency and severity of dog bite liability claims over the last 12 years.[53] If insurers can track the data for dog bites, surely they can make progress on tracking firearm-related claims.

## Total Health Care Cost of Treating Gunshot Wounds

Earlier in this article, we presented several different estimates of, and references about, the costs of treating GSW. Many researchers have quantified the cost of treatment in the emergency department as well as the initial inpatient hospitalization, but, as researchers point out, these costs are just the tip of the iceberg.[54] The studies we cited exclude treatment costs such as physical and occupational therapy, follow-up treatment and procedures for complications, mental health care, nursing care and so on. Actuaries should follow the claims of gunshot survivors longitudinally to quantify the total health care cost of treating GSW.

## Mortality Study

Hepburn and Hemenway remark, "Most striking is the paucity of individual-level studies … For example, there are no studies that follow a large cohort of individuals with known characteristics, comparing homicide victimization rates of those with a gun in the home, and those without."[55]

Wintemute et al. published a related study using California handgun purchase data. In particular, they studied a cohort of 238,292 people who had purchased a handgun in California in 1991 and examined the mortality experience of the group through the end of 1996. They computed standardized mortality ratios and found that the purchase of a handgun was associated with a substantial increase in the risk of suicide by firearm, suicide by any method and female homicide.[56]

Actuaries should examine whether a mortality differential exists between members of gun-owning households and the general and insured population. More specifically, actuaries should examine cohorts of gun-owning households in select states, compute mortality rates by age and sex, and compare them to a standard table for the state or region.

*Actuaries can provide high-quality, objective, relevant, quantitative research that can be used by our stakeholders as input for recommendations and decisions on this key societal issue.*

## A CALL TO ACTION FOR ACTUARIES

Actuarial input on the public health crisis of gun violence is consistent with the history and mission of our profession. The Surgeon General's reports on smoking and health were controversial; however, this did not deter actuaries from studying the issue.[57] When the AIDS crisis arose in the 1980s, the SOA established a task force to study the impact of AIDS on the insurance industry. The task force produced a 300-page report.[58] Among the many recommendations in the report, the task force recommended that AIDS-related claims be tracked, just as we are recommending that firearm-related claims be tracked across lines of business. Additionally, actuaries are currently studying other important and timely issues such as obesity and climate change.[59,60]

Beginning with the Dickey Amendment of 1996, government entities have been restricted in their ability to fund research related to firearms. Stark and Shah explain, "Although the legislation does not ban gun-related research outright, it has been described as casting a pall over the research community." Indeed, researchers estimate that the field receives just 1.6 percent of the funding one would expect, given its impact on mortality.[61] This makes the contributions of actuaries more urgent.

Actuaries have unique skills in measuring and managing risk. We are experts in mortality analysis, skilled in data analytics and model building, and we can analyze the problem objectively. As a profession, we must employ our skills and talents to help address the economic, mortality and morbidity impact of gun violence.

> **Kristen Moore, ASA, Ph.D.,** is an associate professor of Mathematics at the University of Michigan.

> **Craig Reynolds, FSA, MAAA,** is a principal and consulting actuary with Milliman.

## REFERENCES:

1. Society of Actuaries. "The 2017–2021 Strategic Plan Development Process." 2017–2021 Strategic Plan. Accessed June 25, 2018. *https://www.soa.org/strategic-planning/default/*.

2. American Medical Association. 2016. "AMA Calls Gun Violence 'A Public Health Crisis.'" June 14. Accessed April 13, 2018. *https://www.ama-assn.org/ama-calls-gun-violence-public-health-crisis.*

3. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. 2018. "Welcome to WISQARS." Injury Prevention & Control. May 3. Accessed February 15, 2018. *www.cdc.gov/injury/wisqars.*

4. Xu, J., S. L. Murphy, K. D. Kochanek, and B. A. Bastian. 2016. "Deaths: Final Data for 2013." *National Vital Statistics Reports* 64 (2). *http://www.cdc.gov/nchs/data/nvsr/nvsr64/nvsr64_02.pdf*.

5. Supra note 3.

6. Stewart, M. 2016. "Gun Deaths Are Now Outpacing Traffic Deaths in 21 States, and Counting." *HuffPost.* January 15. *http://www.huffingtonpost.com/entry/guns-deaths-car-deaths_us_56991b31e4b0ce4964242c47.*

7. Spitzer, S. A., K. L. Staudenmayer, L. Tennakoon, D. A. Spain, and T. G. Weiser. 2017. "Costs and Financial Burden of Initial Hospitalizations for Firearm Injuries in the United States, 2006–2014." *American Journal of Public Health* 107 (5): 770–774. *https://ajph.aphapublications.org/doi/10.2105/AJPH.2017.303684*. ⤵

8. Gani, F., J. V. Sakran, and J. K. Canner. 2017. "Emergency Department Visits for Firearm-related Injuries in the United States, 2006–14." *Health Affairs* 36 (10): 1729–1738. *https://www.healthaffairs.org/doi/10.1377/hlthaff.2017.0625*. ⤵

9. Salemi, J. L., V. Jindal, R. E. Wilson, M. F. Mogos, M. H. Aliyu, and H. M. Salihu. 2015. "Hospitalizations and Healthcare Costs Associated With Serious, Non-lethal Firearm-related Violence and Injuries in the United States, 1998–2011." *Family Medicine and Community Health* 3 (2): 8–19. *http://www.ingentaconnect.com/content/cscript/fmch/2015/00000003/00000002/art00003*. ⤵

10. Lee, J., S. A. Quraishi, S. Bhatnagar, R. D. Zafonte, and P. T. Masiakos. "The Economic Cost of Firearm-related Injuries in the United States From 2006 to 2010." *Surgery* 155 (5): 894–898. *https://www.surgjournal.com/article/S0039-6060(14)00060-9/fulltext*. ⤵

11. Livingston, D. H., R. F. Lavery, M. C. Lopreiato, D. F. Lavery, and M. R. Passannante. 2014. "Unrelenting Violence: An Analysis of 6,322 Gunshot Wound Patients at a Level I Trauma Center." *The Journal of Trauma and Acute Care Surgery* 76 (1): 2–11. *https://journals.lww.com/jtrauma/pages/articleviewer.aspx?year=2014&issue=01000&article=00002&type=abstract*. ⤵

12. Cook, P.J., and J. Ludwig. 2006. "The Social Costs of Gun Ownership." *Journal of Public Economics* 90 (1): 379–391. *https://www.sciencedirect.com/science/article/abs/pii/S0047272705000411*. ⤵

13. Peek-Asa, C., B. Butcher, and J. E. Cavanaugh. 2017. "Cost of Hospitalization for Firearm Injuries by Firearm Type, Intent and Payer in the United States." *Injury Epidemiology* 4 (1). *https://injepijournal.springeropen.com/articles/10.1186/s40621-017-0120-0*. ⤵

14. Lemaire, J. 2005. "The Cost of Firearm Deaths in the United States: Reduced Life Expectancies and Increased Insurance Costs." *The Journal of Risk and Insurance* 72 (3): 359–374. *https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1539-6975.2005.00128.x*. ⤵

15. Frankel, T. C. 2018. "One Roadblock to Arming Teachers: Insurance Companies." *The Washington Post*. May 26. *https://www.washingtonpost.com/business/economy/one-roadblock-to-arming-teachers-insurance-companies/2018/05/26/59d6c704-5f7e-11e8-8c93-8cf33c21da8d_story.html?noredirect=on&utm_term=.ea0941514380*. ⤵

16. Chubb Group of Insurance Companies. 2013. "ForeFront Portfolio 3.0: Workplace Violence Expense Insurance." September. Accessed April 27, 2018. *http://www.chubb.com/businesses/csi/chubb13750.pdf* 📄. ⤵

17. XL Group. 2016. "XL Catlin Unveils Workplace Violence Insurance Coverage for U.S. Businesses." February 3. Accessed April 27, 2018. *http://xlgroup.com/press/xl-catlin-unveils-workplace-violence-insurance-coverage-for-us-businesses*. ⤵

18. Great American Insurance Group. 2013. "Workplace Violence Insurance: Serious Issues, Important Coverage." Accessed April 13, 2018. *https://www.greatamericaninsurancegroup.com/docs/default-source/executive-liability/usa/2352-eld-workplace-violence-insurance-sell-sheet.pdf?sfvrsn=4*. ⤵

19. Metzner, R. 2012. "Preventing Workplace Violence." *Risk Management Monitor*. November 30. *http://www.riskmanagementmonitor.com/2012-a-year-of-workplace-violence*. ⤵

Case 5:22-cv-00501-BLF    Document 36-8    Filed 04/08/22    Page 130 of 132

20. National Rifle Association. "Personal Firearms Liability Insurance." Accessed April 14, 2018. *https://mynrainsurance.com/insurance-products/liability-personal-firearms.* ↗

21. Lockton Affinity. NRA Carry Guard. Accessed April 14, 2018. *https://lockton.nracarryguard.com/.* ↗

22. Gore, L. 2016. "Mandatory Gun Insurance Before Lawmakers in 4 States." AL.com. February 9. *http://www.al.com/news/index.ssf/2016/02/mandatory_gun_insurance_before.html.* ↗

23. Vote Smart. "SB 424—Prohibits Insurance Increases for Gun Owners—Florida Key Vote." Accessed August 16, 2017. *http://votesmart.org/bill/17865/50390#.V7NTLj4rLEU.* ↗

24. Hemenway, D. 2011. "Risks and Benefits of a Gun in the Home." *American Journal of Lifestyle Medicine* 5 (6): 502–511. *http://journals.sagepub.com/doi/abs/10.1177/1559827610396294.* ↗

25. Hepburn, L. M., and D. Hemenway. 2004. "Firearm Availability and Homicide: A Review of the Literature." *Aggression and Violent Behavior* 9 (4): 417–440. *https://www.ncjrs.gov/App/publications/Abstract.aspx?id=206421.* ↗

26. Miller, M., D. Hemenway, and D. Azrael. 2007. "State-level Homicide Victimization Rates in the U.S. in Relation to Survey Measures of Household Firearm Ownership, 2001–2003." *Social Science & Medicine* 64 (3): 656–664. *https://www.sciencedirect.com/science/article/pii/S0277953606004898?via%3Dihub.* ↗

27. Stroebe, W. 2013. "Firearm Possession and Violent Death: A Critical Review." *Aggression and Violent Behavior* 18 (6): 709–721. *https://www.sciencedirect.com/science/article/pii/S1359178913000797.* ↗

28. Anglemyer, A., T. Horvath, and G. Rutherford. 2014. "The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members: A Systematic Review and Meta-analysis." *Annals of Internal Medicine* 160 (2): 101–110. *http://annals.org/aim/fullarticle/1814426/accessibility-firearms-risk-suicide-homicide-victimization-among-household-members-systematic.* ↗

29. Moyer, M. W. 2017. "More Guns Do Not Stop More Crimes, Evidence Shows." *Scientific American*. October 1. *https://www.scientificamerican.com/article/more-guns-do-not-stop-more-crimes-evidence-shows/.* ↗

30. Supra note 4    PDF ↗

31. Kalesan, B., M. D. Villarreal, K. M. Keyes, and S. Galea. 2016. "Gun Ownership and Social Gun Culture." *Injury Prevention* 22 (3): 216–220. *http://dx.doi.org/10.1136/injuryprev-2015-041586.* ↗

32. Supra note 25. ↗

33. Tavernier, R., and J. Vadiveloo. 2017. "Firearms as an Underwriting Characteristic." Undergraduate Student Thesis. Department of Mathematics, University of Connecticut. ↗

34. Vann, R.D., and Lang, M.A. (eds). 2011. *Recreational Diving Fatalities*. Proceedings of the Divers Alert Network 2010 April 8–10 Workshop. Durham, N.C.: Divers Alert Network. *https://www.diversalertnetwork.org/files/Fatalities_Proceedings.pdf* PDF . ↗

35. Supra note 3. ↗

36. Tseng, S. H. 2004. "The Effect of Life Insurance Policy Provisions on Suicide Rates." December 15. Accessed April 28, 2018. *emptormaven.com/img/lifetseng.pdf* PDF . ↗

37. Supra note 33. ↗

38. Supra note 25. ↗

39. National Research Council. 2005. *Firearms and Violence: A Critical Review*. Washington, D. C.: The National Academies Press. *https://doi.org/10.17226/10881*.

40. Smith, T. W., and J. Son. 2015. "Trends in Gun Ownership in the United States, 1972–2014." NORC at the University of Chicago. March. Accessed April 13, 2018. *http://www.norc.org/PDFs/GSS%20Reports/GSS_Trends%20in%20Gun%20Ownership_US_1972-2014.pdf*.

41. United States Census Bureau. 2017. "America's Families and Living Arrangements: 2017." Accessed April 13, 2018. *https://www.census.gov/data/tables/2017/demo/families/cps-2017.html*.

42. Beckett, L. 2016. "Gun Inequality: U.S. Study Charts Rise of Hardcore Super Owners." *The Guardian*. September 19. *https://www.theguardian.com/us-news/2016/sep/19/us-gun-ownership-survey*.

43. Hill, Catey. 2012. "11 Riskiest Dog Breeds for Homeowners and Renters." *Forbes*. May 30. *https://www.forbes.com/sites/cateyhill/2012/05/30/11-riskiest-dog-breeds-for-homeowners-and-renters/#2df04abb36d9*.

44. Esurance. "Trampolines and Homeowners Insurance: Are You Covered?" Accessed June 8, 2018. *https://www.esurance.com/info/homeowners/trampolines-and-homeowners-insurance*.

45. Loder, R. T., W. Schultz, and M. Sabatino. 2014. "Fractures From Trampolines: Results From a National Database, 2002 to 2011." *Journal of Pediatric Orthopaedics* 34 (7): 683–690. *https://insights.ovid.com/crossref?an=01241398-201410000-00005*.

46. American Academy of Orthopaedic Surgeons. 2017. "Orthopaedic Surgeons Warn Parents and Young Children About the Dangers of Trampolines." July 19. Accessed April 13, 2018. *http://newsroom.aaos.org/patient-resources/prevent-injuries-america/trampoline-safety.htm*.

47. Bureau of Justice Statistics. 2012. "About 1.4 Million Guns Stolen During Household Burglaries and Other Property Crimes From 2005 Through 2010." Office of Justice Programs. November 8. Accessed April 13, 2018. *https://www.bjs.gov/content/pub/press/fshbopc0510pr.cfm*.

48. Hemenway, D., D. Azrael, and M. Miller. 2017. "Whose Guns Are Stolen? The Epidemiology of Gun Theft Victims." *Injury Epidemiology* 4 (1). *https://injepijournal.springeropen.com/articles/10.1186/s40621-017-0109-8*.

49. Mitchell, R. W. 2001. "Columbine Settlement Rattles Insurer Groups." *National Underwriter* 105 (19): 18.

50. Altimari, D. 2015. "Sandy Hook Families Settle Lawsuits Against Lanza Estate for $1.5M." *Hartford Courant*. August 6. Accessed April 13, 2018. *http://www.courant.com/news/connecticut/hc-sandy-hook-lawsuit-settled-20150803-story.html*.

51. Webster, D. W., M. Cerdá, G. J. Wintemute, and P. J. Cook. 2016. "Epidemiologic Evidence to Guide the Understanding and Prevention of Gun Violence." *Epidemiologic Reviews* 38 (1): 1–4. *https://academic.oup.com/epirev/article/38/1/1/2754874*.

52. Supra note 39.

53. Insurance Information Institute. 2017. "Spotlight on: Dog Bite Liability." April 3. *https://www.iii.org/issue-update/dog-bite-liability*.

54. Bansal, D. G. 2017. "Initial Hospital Costs for Gunshot Wounds Just 'Tip of the Iceberg.'" Stanford Medicine News Center. March 21. Accessed April 14, 2018. *http://med.stanford.edu/news/all-news/2017/03/initial-hospital-costs-from-gunshot-wounds-total-6-billion-over-nine-years.html*. ↵

55. Supra note 25. ↵

56. Wintemute, G. J., C. A. Parham, J. J. Beaumont, M. Wright, and C. Drake. 1999. "Mortality Among Recent Purchasers of Handguns." *The New England Journal of Medicine* 341 (21): 1583–1589. *https://www.nejm.org/doi/full/10.1056/NEJM199911183412106*. ↵

57. Cowell, M. J., and B. L. Hirst. 1980. "Mortality Differences Between Smokers and Nonsmokers." *Transactions of the Society of Actuaries* 32: 185–213. *https://www.soa.org/Library/Research/Transactions-Of-Society-Of-Actuaries/1980/January/tsa80v328.aspx*. ↵

58. Society of Actuaries AIDS Task Force. 1988. "The Impact of AIDS on Life and Health Insurance Companies: A Guide for Practicing Actuaries." *Transactions of the Society of Actuaries* 40 (2): 839–1159. *https://www.soa.org/library/tsa/1980-89/TSA88V40PT25.pdf* [PDF]. ↵

59. Behan, D. F., and S.H. Cox. 2010. "Obesity and Its Relation to Mortality and Morbidity Costs." Society of Actuaries. December. Accessed April 14, 2018. *https://www.soa.org/research-reports/2011/research-obesity-relation-mortality/*. ↵

60. Actuaries Climate Index. Accessed April 14, 2018. *http://actuariesclimateindex.org/home/*. ↵

61. Stark, D. E., and N. H. Shah. 2017. "Funding and Publication of Research on Gun Violence and Other Leading Causes of Death." *Journal of the American Medical Association* 317 (1): 84–85. *https://jamanetwork.com/journals/jama/fullarticle/2595514*. ↵