# Exhibit 8

COUNCIL AGENDA: 01/25/2022

FILE: 22-045

ITEM: 4.1



CITY OF
SAN JOSE
CAPITAL OF SILICON VALLEY

*Memorandum*

**TO:**  HONORABLE CITY COUNCIL          **FROM:**  Mayor Sam Liccardo

**SUBJECT:  GUN HARM REDUCTION ORDINANCE**          **DATE:**  January 24, 2022

Approved _/s/ Sam Liccardo_          Date:  January 24, 2022

---

<u>**REPLACEMENT/ SUPPLEMENTAL MEMORANDUM**</u>

<u>**Recommendation:**</u>

Adopt the recommendations and findings contained in the (a) January 21, 2022 Memorandum of Councilmembers Carrasco, Cohen, Peralez, Vice Mayor Jones, and myself, (b) January 21, 2022 Memorandum of Councilmember Peralez, and (c) the following recommendations from Councilmember Dev Davis' January 21, 2022 Memorandum, as modified below:

1. (#2a)  Return in the Spring with a presentation to the Council about the extent to which SJPD and partners at the District Attorney's Office are fully enforcing existing firearm-related laws, and specifically:
   a.  Identify what resource, legal, or other constraints inhibit full enforcement, if any; including the use of the Armed Prohibited Persons (APPS) database for Penal Code Section 12021 arrests,
   b.  Identify any proposed solutions to those constraints.
2. (#2b) Return in March a ghost gun ban that closes existing loopholes in the California Unsafe Handgun Act, as previously directed by Council on June 29, 2021.
3. (#3) Continue the direction from the Council's June 29, 2021 direction to build on partnerships with law enforcement that better inform our community about Gun Violence Restraining Orders and how community members can avail themselves of them.  Return to council in the Spring with specific recommendations for public information and outreach about safe storage laws, GVRO's, and this Gun Harm Reduction ordinance.

4. (#5) Respond to Council's June 29, 2021 direction to strengthen partnerships to enable more frequent gun buy-back programs, such as the event scheduled this Spring at the County Government Center.
5. (#6) Identify and apply for grants to support gun safety education and buyback programs

**Discussion:**

I appreciate Councilmember Davis' expression of concern for addressing the impacts of gun violence throughout our community with ideas other than that which the Council has an opportunity to vote for on January 25th.   Many of those ideas have already been vetted and approved by the Council through its vote and direction from June 29, 2021.  However, several assertions made within the memorandum appear to be based on inaccurate assumptions, and lead to misleading conclusions.

I typically would not take the time to provide a written rebuttal to a colleague's memo, but this policy is one for which we have been repeatedly threatened with litigation, rendering the factual accuracy of the written record of great importance. Given the substantial public interest in this matter, moreover, it seems imperative to ensure that we're all debating the same, accurate set of facts.  To be fair, Councilmember Davis' memo was issued before the memorandum signed by four colleagues and myself provided further refinement of the initiative, and in some cases, she may not have had all the information prior to the issuance of her own statement.

- **Police Workload**

For example, she writes that this proposal "adds an already overtaxed police department with yet another layer of bureaucracy and paperwork." In fact, there is no paperwork for any officer to complete, no files to manage, and no bureaucracy to navigate. The police only become involved if they see a gun or have other reason to believe a person has a gun, such as because of the statements of a witness. At that time, the office may ask the individual if they have proof of insurance, and of having paid a fee. If an attestation document is presented, the interaction will conclude. If the individual fails to present a document, then the officer issues a citation. Doing so involves little more labor or paperwork than the issuance of a parking ticket.

- **Insurance**

Next, Councilmember Davis asserts that "requiring a fee…given to a non-profit that may or may not be legally able to certify insurance coverage for a resident is not the way to reduce gun harm."   Councilmember Davis again appears to be confused about the proposal. If this ordinance required the designated nonprofit organization to "certify insurance coverage," she'd be right—but it doesn't. The non-profit organization has no role in certifying anyone's insurance coverage, nor in anything else having to do with liability insurance. Every gun owner completes an attestation of coverage, and is required to keep their self-attestation form with the gun. This argument lacks merit.

Councilmember Davis next asserts that the "insurance that may or may not be available to everyone," but our team's outreach to more than fifteen insurance companies offering rental and homeowner insurance revealed that every policy included liability coverage for firearm possession.   Most did so at no additional cost. Those who cannot afford any insurance for financial reasons can complete a waiver that enables their exemption under the ordinance.

- **A "Revival" of the Mayor's Gang Prevention Task Force**

Next, Councilmember Davis writes that she:

"recommend[s] reinstating/reviving the Mayor's Gang Prevention Task Force, to at least facilitate interagency connections and information sharing. In the past, illegal gun use was addressed during multi-agency meetings of the Mayor's Gang Prevention Task Force. What has happened to that once very successful group? The last gang hotspot map on our city's website is from April 2015. The last workplan listed online is for 2015-2017."

Councilmember Davis' claim of the demise of the Mayor's Gang Prevention Task Force, in the words of Mark Twain, appears greatly exaggerated. We will have a meeting of the MGPTF policy team this Thursday, January 27th, and I invite Councilmember Davis to attend, as other councilmembers routinely do so. She can find the agenda and zoom here: https://sanjose.legistar.com/MeetingDetail.aspx?ID=924922&GUID=69D8BAE3-F54A-4E57-A826-5CF2B065E8FE&Options=info%7C&Search=&Refresh=1. While the Policy Team meets only quarterly–the last meeting was in the Fall, but she can review the video of that meeting through the City website—the MGPTF Technical Team continues to meet monthly, and it is the forum that provides for the most direct and substantive interagency collaboration. Contrary to the suggestion that there is no updated "Hot Spot" map, the latest "Hot Spot" map for 2022 can be found on the PRNS website here:  https://www.sanjoseca.gov/your-government/departments/parks-recreation-neighborhood-services/gang-intervention. The update to the MGPTF's Strategic Workplan—which can be found on the PRNS website—will be completed this summer.

- **Oakland's Ceasefire and Community-Based Violence-Reduction Measures**

Councilmember Davis also points out that "[a] similar program in Oakland was shown in a quasi-experimental study to be effective in reducing total shootings and gang involved shootings and is rated as an effective solution to crime by the US Department of Justice."  The program to which she refers, Ceasefire, will sound familiar to many who have been involved with our own Mayor's Gang Prevention Task Force since its launch in San Jose in the 1990's: a collaboration of law enforcement, community-based organizations, social service agencies, the courts (and in San Jose's case, schools), working together on multidisciplinary prevention and intervention initiatives to reduce violence. A dramatic point of difference, however is funding; Oakland's Ceasefire relies upon a steady source of government funding from two consecutive tax measures, Measure Y and Measure Z, the latter of which supplanted the former in 2014. While the Ceasefire model is hardly new to us, San Jose lacks any independent resource to fully fund many effective community-based violence prevention programs, but instead draws from the

General Fund and occasional grants to do so. Obviously, the passage of an ordinance that generated fees to help fund community-based based violence-reduction programs would help enormously—which is precisely the point of the proposed measure.

Moreover, it bears noting that although the grass seems greener elsewhere; it's often not; last year, Oakland had 134 homicides, while San Jose had 31 homicides in a city that has more than twice Oakland's population. In other words, Oakland's homicide rate appears approximately nine (9) times higher than San Jose's.

- **Gun Violence Restraining Orders**

Councilmember Davis next urges that "We do have laws in place that address gun harm that are unevenly enforced. Let's work on using and enforcing those laws. Gun Violence Restraining Orders (GVRO) are law in California..." I appreciate Councilmember Davis' attention to GVRO's, which were already the extensive subject of our Council-approved proposal last June, and I expect the City Manager and SJPD to inform us about our progress in moving forward with several of the recommendations. The implication of Councilmember Davis' statement, however—that little has been done to actually implement GVRO's—is mistaken. Due to the good work led by District Attorney Jeff Rosen and Supervising Deputy DA Marisa McKeown, Santa Clara County has the second-highest number of GVRO's issued of any county in California.

Our efforts to reinforce that work through the Council's June action has begun to bear fruit; the DA's office has conducted trainings for all of our BEST non-profit providers participating in the (still active) Mayor's Gang Prevention Task Force. The DA has also trained more than 1,000 police officers countywide, the greatest number being members of SJPD. We will participate in more collaborations to get the word out about GVRO's, and I look forward to hearing more through the City Manager's update.

- **Ghost Guns**

Councilmember Davis urges that "[w]e should be pursuing prosecution and jail time for anyone in possession of ghost guns that circumvent regulation." I completely agree, which is why we already obtained Council approval for a ghost gun ban last June, and we hope that an ordinance will be brought back to Council as soon as possible in the weeks ahead. Our City Attorney assured me that her team is working on getting the final ordinance on ghost guns to the Council soon.

- **Lack of Incarceration of Arrestees at the Jail**

Councilmember Davis recites a concern that I also share, which is that "We should listen to our public safety officers out on the streets who feel defeated when a suspect is released from custody sooner than the arresting officer has time to finish the initial arrest report." I welcome any participation from Councilmember Davis or other colleagues on my repeated efforts to address the public safety impacts of lack of use of the County jail for post-arrest detention, and of zero-bail-release policies of judges.   I have publicly criticized judges who have released defendants charged with homicide and child molestation without bail, and I have had no fewer

than a half-dozen private conversations with the Presiding Judge and other key judges in Santa Clara County on the subject. My recent conversation with Judge Daniel Nishigaya has made it apparent that there will be reforms in processes to ensure a single judge will handle bail hearings, to employ a more consistent approach.

I have also raised this issue with senior county officials, particularly with regard to release of methamphetamine-addicted arrestees back to the streets after the commission of felony crimes, and will continue to urge the use of the jail for appropriate and constitutional pretrial detention, particularly in light of the County's inability to provide sufficient inpatient, detoxification beds to address the very real methamphetamine crisis that afflicts our community. I welcome Councilmember Davis and any colleagues to join me in these advocacy efforts, but none of those issues—involving the County Pretrial Services and Behavioral Health policy, Judges, the DA, and others—preclude us from doing something about elements of the problem over which the City actually has some control.

- **Unresolved "Details" or "Structure"**

Finally, Councilmember Davis opines that the "Mayor and City Attorney are asking us to pass an ordinance where all the details and structure are to be 'worked out later.'" In fact, the shape of proposal has been largely resolved after two years of extensive consultation and research with the assistance of numerous legal experts, public health practitioners, gun violence organizations, and many members of the community. Councilmember Davis does not identify which "details or structure" she finds missing, and from the erroneous assumptions elsewhere in her memorandum, it's quite possible there are additional misunderstandings on her part. Nonetheless, any remaining minor details of implementation can be resolved through the City Manager's regulatory authority, as is routine with the approval of any new policy, in the six months prior to implementation of the ordinance.