HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

DAVID A. WARRINGTON*
dwarrington@dhillonlaw.com
CURTIS M. SCHUBE*
cschube@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314
Telephone: (571) 400-2121

*Admission *Pro Hac Vice*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a nonprofit corporation, and **MARK SIKES,** an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF SAN JOSE, a public entity, JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL,**<br><br>Defendants. | Case Number: 5:22-cv-00501-BLF<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Hearing Date: August 4, 2022<br>Hearing Time: 9:00 a.m.<br>Location: Zoom Webinar<br><br>Judge: Honorable Beth Labson Freeman |



1

**TABLE OF CONTENTS**

STATEMENT OF THE ISSUES TO BE DECIDED.......................................................1

INTRODUCTION .......................................................................................................1

FACTUAL BACKGROUND........................................................................................2

ARGUMENT ..............................................................................................................9

I.      This Matter is Ripe for Review. ....................................................9

II.     The Ordinance is Preempted by State Law.....................................11

III.    The Ordinance Burdens Core Second Amendment Rights. .............12

        i.      There is no reasonable fit between the Ordinance and
                its stated objective.............................................................13

        ii.     This does not fit within the Ninth Circuit's Cox/Murdock
                fee jurisprudence ..............................................................16

IV.     The First Amendment Prevents the City from Forcing Gun
        Owners to Fund a Private Nonprofit's Speech and Activities.........16

V.      The Ordinance is an Unlawful Tax.................................................17

VI.     The Ordinance Violates the City Charter. ......................................19

VII.    Plaintiffs Properly Request Declaratory Relief ..............................21

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Plaintiffs' Response to Defendants' Motion to Dismiss                    Case No.22-cv-00501-BLF
Plaintiffs' First Amended Complaint

# TABLE OF AUTHORITIES

## CASES

*Abood v. Detroit Bd. of Ed.*,
   431 U.S. 209 (1977)......................................................................................16

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979)........................................................................................9

*Bauer v. Becerra*,
   858 F.3d 1216 (9th Cir. 2017) ..................................................................13, 16

*Bishop v. City of San Jose*,
   1 Cal.3d 56 (1969) ......................................................................................11

*Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)......................................................................................18

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
   598 F.3d 1115 (9th Cir. 2010) ..................................................................10

*Chicago Teacher's Union, Local No. 1 v. Hudson*,
   475 U.S. 292 (1986)......................................................................................17

*Colorado Outfitters Ass'n v. Hickenlooper*,
   823 F.3d 537 (10th Cir. 2016) ......................................................................9

*County of Santa Clara v. Trump*,
   267 F.Supp.3d 1201 (N.D. Cal. 2017) ..........................................................21

*Cox v. New Hampshire*,
   312 U.S. 569 (1941)......................................................................................16

*Cramer v. Brown*,
   2012 WL 13059699 (C.D. Cal. 2012) ..........................................................10

*Fid. & Cas. Co. v. Reserve Ins. Co.*,
   596 F.2d 914 (9th Cir. 1979) ........................................................................21

*Fiscal v. City and County of San Francisco*,



Plaintiffs' Response to Defendants' Motion to Dismiss                    Case No.22-cv-00501-BLF
Plaintiffs' First Amended Complaint

1  |  158 Cal.App.4th 895 (Ct. App. 2008)................................................................................11

2  |  *Great Western Shows, Inc. v. County of Los Angeles*,

3  |  27 Cal.4th 853 (2002) ........................................................................................................12

4  |  *Heller II*,

5  |  670 F.3d at 1273 ................................................................................................................13

6  |  *Heller v. District of Columbia*,

7  |  801 F.3d 264 (D.C. Cir. 2015).........................................................................................13

8  |  *Jackson v. City and County of San Francisco*,

9  |  746 F.3d at 969 ..................................................................................................................16

10 |  *Janus v. AFSCME, Council 31*,

11 |  138 S.Ct. 2448 (2018)........................................................................................................16

12 |  *Knox v. Service Employees Intern. Union, Local 1000*,

13 |  567 U.S. 298 (2012)...........................................................................................................17

14 |  *Kwong v. Bloomberg*,

15 |  723 F.3d 160 (2d. Cir. 2013) ....................................................................................13, 16

16 |  *Libertarian Party of L.A. Cnty. v. Bowen*,

17 |  709 F.3d 867 (9th Cir. 2013) .............................................................................................9

18 |  *Mendoza v. Fonseca McElroy Grinding Co., Inc.*,

19 |  11 Cal.5th 1118 (2021) ......................................................................................................11

20 |  *Nat'l Park Hosp. Assn. v. Dep't of Interior*,

21 |  538 U.S. 803 (2003)...........................................................................................................10

22 |  *Nichols v. Brown*,

23 |  859 F.Supp.2d 1118 (C.D. Cal. 2012) ..............................................................................9

24 |  *Schmeer v. County of Los Angeles*,

25 |  213 Cal.App.4th 1310 (Ct. App. 2013)...........................................................................18

26 |  *Sippel v. Nelder*,

27 |  24 Cal.App.3d 173 (1972) ................................................................................................11

28 |



Plaintiffs' Response to Defendants' Motion to Dismiss       Case No.22-cv-00501-BLF
Plaintiffs' First Amended Complaint

*Sunset Amusement Co. v. Bd. of Police Comm'rs*,

   7 Cal.3d 64 (1972) ...........................................................................................11

*Thomas v. Anchorage Equal Rights Comm'n*,

   220 F.3d 1134 (9th Cir. 2000) ...........................................................................9

*United States v. Chovan*,

   735 F.3d 1127, 1138 (9th Cir. 2013) ...............................................................12

*United States v. Power Co., Inc.*,

   2008 WL 2626989 (D. Nev. 2008) ....................................................................10

*Vieux v. East Bay Reg'l Park Dist.*,

   906 F.2d 1330 (9th Cir. 1990) ...........................................................................10

*Washington State Grange v. Washington State Republican Party*,

   552 U.S. 442 (2008) ...........................................................................................11

**STATUTES**

Cal. Penal Code § 12026...........................................................................................11

Chapter § 10.32.210, Title 10, San Jose Municipal Code Ordinance...........................4

Ordinance § 10.32.200.A. ..................................................................................4, 6, 7

Ordinance § 10.32.200.B.4 ........................................................................................4

Ordinance, §10.32.200.B.8. ....................................................................................14

Ordinance, §10.32.200.B.9 .....................................................................................14

Ordinance § 10.32.200.B.12 .....................................................................................5

Ordinance § 10.32.210.A ...........................................................................................6

Ordinance § 10.32.215...............................................................................................6

Ordinance §10.32.220...............................................................................................16

Ordinance §10.32.225.................................................................................................4

Ordinance §10.32.235.A...........................................................................................21

Ordinance § 10.32.240...............................................................................................6

Ordinance § 10.32.245..........................................................................................4, 6



Ordinance § 10.32.250 ........................................................................................................8

**OTHER AUTHORITIES**

San Jose City Charter § 701(d) ........................................................................................20

Mary Harris, *San Jose's New Gun Law Is the First of Its Kind*, Slate.com (Feb. 3, 2022),

   https://slate.com/news-and-politics/2022/02/san-jose-gun-law-mayor-sam-liccardo.html

   ................................................................................................................................7

**CONSTITUTIONAL PROVISIONS**

California Constitution...................................................................................................18

U.S. CONST. amend. XIV, §2..................................................................................13, 14



1

**STATEMENT OF THE ISSUES TO BE DECIDED**

2       Whether Plaintiffs stated claims for violations of the First and Second Amendments to the

3   U.S. Constitution, the California Constitution, and/or the San Jose City Charter as a result of the City

4   of San Jose's Ordinance conditioning the constitutional right of gun ownership on (1) paying an

5   annual City "Fee" directly to a nonprofit (*i.e.*, a donation) to fund private speech and activities

6   related to gun use, and (2) purchasing an insurance policy. Additionally, whether the City's leaving

7   the cost of insurance premiums up to private insurers or the City's failure to codify the annual fee

8   amount or identify the nonprofit who will receive the City's fee, renders this lawsuit unripe for

9   review.

10

**INTRODUCTION**

11       The City of San Jose (the "City") proclaims that San Jose citizens must let a law *go into effect*

12   in order to find out what is in it and begin to suffer any violations of their rights, before they can file

13   suit to protect those rights. As of the date of this filing, the City has not informed its residents how

14   much they will be paying in fees or to whom they will be paying the fees, and there is no way to

15   know how much the insurance premium will cost.

16       However, what Defendants fail to account for is that this Ordinance is unconstitutional

17   regardless of the cost to gun owners or which nonprofit they eventually identify, and citizens do not

18   need to suffer an imminent violation of their rights before they can seek the courts' protection. Any

19   non-administrative compelled fee is unconstitutional under the First and Second Amendments. The

20   fee and insurance requirements are not a "fit" to any stated government objective. The field of

21   regulating gun ownership at home is already occupied by, and therefore preempted by, state law. The

22   fee and insurance mandates are taxes, no matter the amount. And, this ordinance violates the City's

23   Charter by diverting the receipt and spending of a City fee to a nonprofit outside of the City's

24   accounts and beyond its direct control. All of this is true no matter how the City chooses to fill in the

25   blanks. Plaintiffs do not need to wait and all material facts needed to determine that the Ordinance is

26   unlawful are already known.

27       The City of San Jose boasted to national media about its ingenuity in enacting the first-of-its-

28   kind Ordinance.  Yet before this Court the City seeks refuge in the argument that the Ordinance is

nothing special, just a routine exercise of the City's powers that is just like ordinances previously found constitutionally permissible.

Further, the City offers a contradictory description as to what exactly the Ordinance compels. The City claims it creates a City "fee," but all "fee" revenues go to an independent nonprofit, and the City is prohibited from directing how the nonprofit will spend the "fees." Yet, the City claims that the City Manager maintains control over the nonprofit. Cutting through the City's argument whiplash, either the City (a) has no idea what its Ordinance does, or (b) knows exactly what it does, but cannot admit it to this Court because it is blatantly unconstitutional. As Plaintiffs have shown, the answer is the latter.

The Ordinance violates basic rules of government that were designed to protect Americans, Californians, and the City's citizens from government overreach and abuse of their rights. If Second Amendment rights can be burdened by a municipality compelling donations to fund nonprofit speech, any core right could be at risk. There would be nothing preventing the city from charging a voting "fee" to be paid to a local nonprofit educating voters on government's preferred methods of civic participation. Putting aside the issue of gun rights/control, the operation of the Ordinance violates essential controls on government power that protect everyone.

Accordingly, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss.

## FACTUAL BACKGROUND

On June 29, 2021, the City Council directed San Jose City Attorney Nora Frimann "to return to Council with an ordinance for Council consideration that would require every gun owner residing in the City of San José, with certain exceptions, to obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage." Frimann Mem. re Gun Harm Reduction Ord., Jan. 14, 2022, ("City Attorney Mem.") (MTD FAC Ex. 1) (reattached hereto as Exhibit A). Plaintiff National Association for Gun Rights immediately sent the City a cease-and-desist letter warning that the proposed ordinance was unconstitutional. *See* Ltr. From D. Warrington and H. Dhillon to San Jose City Council, July 14, 2021 (FAC, Ex. C) (reattached hereto as Exhibit B).

On January 14, 2022, in advance of the City Council's January 25 meeting, the San Jose City Attorney issued a memorandum in compliance with the City Council's directions that recommended the Council "[c]onsider approving an ordinance amending Title 10 of the San José Municipal Code to add Part 6 to Chapter 10.32 to reduce gun harm by: (a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs." City Attorney Mem. at 1(FAC Ex. B) (reattached as Exhibit C). Under a section addressing penalties for noncompliance, the City Attorney stated that "[f]ailure to comply shall constitute a civil violation subjecting the owner to the temporary or permanent seizure of the gun, and under specified circumstances, a fine." *Id*. at 2.

The Mayor's Memorandum also noted that "Members of the California legislature are exploring bills to have law enforcement agencies *seize guns as a sanction for violations of local gun regulations*, with subsequent restoration of ownership as required by constitutional due process." Mayor's Mem. to City Council, Jan. 21, 2022, 2 (FAC Ex. E) (reattached as Exhibit D)(emphasis added).

Following the City Council's January 25, 2022, meeting, the Mayor immediately issued a press release the night of the vote, in which he boasted that "Tonight San José became the *first city* in the United States to enact an ordinance to require gun owners to purchase liability insurance, and to invest funds generated from fees paid by gun owners into evidence-based initiatives to reduce gun violence and gun harm." Liccardo Press Release, Jan. 25, 2022 (emphasis added) (FAC Ex. H) (reattached as Exhibit E). The San Jose City Council overwhelmingly approved the measure despite opposition from some gun owners who said it would violate their 2nd Amendment rights. FAC ¶ 24.

### The Ordinance

The Ordinance will take effect on August 7, 2022, one hundred eighty days from the date of its adoption on February 8, 2022, Ord., Sec. 2, and will be codified as Chapter 10.32 of Title 10 of the San Jose Municipal Code, Ordinance section 1-2 (the "Ordinance"). (FAC Ex. K) (reattached as Exhibit F). It will require 50,000-55,000 San Jose residents, minus a few exceptions, to keep proof with their guns that they have an insurance policy for gun accident liability and have paid an annual Gun Harm Reduction Fee to a nonprofit chosen by the City Manager. *Id.*, §§ 10.32.210,



10.32.215, 10.32.250; Liccardo Mem. Re Gun Harm Reduction Ord., Jan. 19, 2022 (FAC Ex. L)(reattached as Exhibit G). The penalties for noncompliance include "impoundment" (seizure) of a person's guns and the payment of fines. Ordinance §§ 10.32.240, 10.32.245.

This Ordinance targets gun ownership in the home because it does not apply to those who have a license to carry a concealed weapon. Ordinance §10.32.225. (Without a concealed carry permit, there is virtually no other way San Jose residents can exercise their Second Amendment rights outside of the home. *See* CAL. PENAL CODE §§ 25850, 26150, 26155, 26350, 26400.)

### The Purpose and Justifications of the Ordinance

The City's vague purpose for the Ordinance is "to reduce gun harm." Ordinance § 10.32.200.A. The Ordinance cites overall state and national injury data for homicide, suicide, and accidents, and statistics on the total number of youth injured in California in certain years. Ordinance § 10.32.200.B.2. As to "gun harm" in San Jose, specifically, the Ordinance notes that in *Santa Clara County*, in which San Jose is located, "sixteen percent (16%) of hospitalizations from firearms injuries were due to unintentional shootings." Ordinance § 10.32.200.B.4. The nonprofit organization helping the City enact and justify the Ordinance, Pacific Institute for Research and Evaluation (PIRE), concluded in its own analysis that an average of "206 people suffer death or serious bodily injury from gunshots each year" in San Jose, though the Ordinance does not specify how many were typically due to accidents or suicide, or intentional violence. *See* Ordinance § 10.32.200.B.7.

The Ordinance contains an estimation that "San Jose taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household, to respond to gun violence with such public services as emergency police and medical response, victim assistance, incident investigation, acute and long-term care, and perpetrator adjudication and judicial sanctioning." Ordinance § 10.32.200.B.8. This estimation also does not differentiate between the costs arising due to intentional violence, suicide, and accidents.

The Ordinance boldly claims that "including private costs to individuals and families…San Jose residents incur an annual financial burden of $442 million per year." *Id*., § 10.32.200.B.9. However, more than $328,355,500 or 74% of these alleged costs are for the impact of guns on

DLG
DHILLON LAW GROUP INC.

"quality of life," which includes the "value of pain, suffering, and lost quality of life." Liccardo Jan. 19, 2022, Memo., 4 (Ex. G). The next highest figure within the asserted $442 million calculation is "lost work," accounting for $78,272,000 or nearly 18% of the total. *Id*. In other words, 92% of the $442 million in "costs" claimed in the Ordinance comprises artificially calculated "quality of life" and "lost work" due to all causes of firearm deaths and injuries.

Accordingly, the costs used to calculate the total financial burden on San Jose, which the Ordinance aims to fully or partially recoup from all gun owners, does not correct for the overwhelming costs imposed by the perpetrators of violent criminal conduct that the Ordinance does not target, and 92% of the highest dollar figure the Ordinance cites for support does not comprise actual expenses incurred by the City. And yet, the Ordinance uses these sham figures to justify:

> (A) imposing a collective financial burden on all gun owners (except those with a permit to carry their guns) through the Gun Harm Reduction Fee;
> (B) compelling gun owners to pay the Gun Harm Reduction Fee directly to a City-chosen nonprofit, a forced donation, allegedly for programs to re-educate gun owners about the dangers of guns *and other purposes*; and
> (C) requiring all gun owners to buy insurance to cover the costs to victims of the accidental use of guns (but not all crime victims).

As to compelling purchase of insurance, the Ordinance provides no studies or statistics establishing that gun liability insurance will reduce gun violence. Instead, the Ordinance includes only the conclusory statement that "Liability insurance can reduce the number of gun incidents by encouraging safer behavior…." Ordinance § 10.32.200.B.12.

Thus, every citizen of San Jose will be forced to pay a fee and buy insurance to exercise their fundamental Constitutional right to home and self-defense by owning a gun based on the direct and societal costs primarily caused by criminals using guns illegally. Liccardo Jan. 19, 2022, Memo. 1 (Ex. G) (noting that "Assaults and homicides are most common" and "Unintentional gunshot wounds tend to be less serious."). Specifically, according to PIRE, the alleged costs to the City of homicide and assault are $7,067,303 out of $7,940,358 (or 89%) of the total costs, *id*. at 2, and PIRE



also attributed the majority of its artificially calculated societal costs of guns to "Homicide/Assault/ Legal Intervention." *Id.* at 5 ($253,828,000 out of $441,699,000).

### a. The Insurance Mandate

The insurance mandate requires that "[a] person who resides in the City of San Jose and owns or possesses a Firearm in the City shall obtain and continuously maintain in full force and effect a homeowner's, renter's or gun liability insurance policy…specifically covering losses or damages resulting from any accidental use of the Firearm, including but not limited to, death, injury, or property damage." Ordinance § 10.32.210.A. The Ordinance does not include any information about minimum insurance coverage thresholds or premiums. *See generally* Ordinance. Thus, the insurance requirement lacks certainty as to the cost of insurance, what has to be covered, and minimum coverage thresholds. This guesswork will allow private for-profit corporations to dictate the government-mandated cost of owning a gun. Additionally, based on the insurance companies' economic interests, they may choose not to insure a person who nonetheless has a Constitutional right to keep and bear arms.

To comply with the Ordinance, gun owners must present a "City-designated attestation form" signed under penalty of perjury identifying their insurance policy to any police officer who "knows or *has reason to believe"* they possess a firearm. Ordinance § 10.32.230.A (emphasis added). Failure to comply with the Ordinance authorizes seizure ("impoundment") of the person's gun and fines. Ordinance §§ 10.32.240; 10.32.245.

### b. Gun Harm Reduction Fee

The first of two fees the Ordinance imposes requires that "A person who resides in the City and owns or possesses a Firearm in the City shall pay an Annual Gun Harm Reduction Fee to the Designated Nonprofit Organization each year." Ordinance § 10.32.215. The fee amount is not specified in the Ordinance, which neither contains any criteria to determine what the fee will be nor any limits on how high it can be set. *See id*. Rather, the City Council reserved the right for itself to determine this amount at an unspecified later date. *Id*.

The Ordinance requires gun owners to pay this fee directly to a nonprofit chosen by the City Manager, Defendant Jennifer Maguire ("Maguire"). *Id*., §§ 10.32.205; 10.32.220. No part of the

City's fee actually goes to the City. Further, "all monies…shall be expended by the Designated Nonprofit Organization." *Id*., § 10.32.220.A. Additionally, once the money is in the nonprofit's coffers, "the City shall not specifically direct how the monies from the Gun Harm Reduction Fee are expended." *Id*., §10.32.220.C. Accordingly, without City oversight or even knowledge of the fees being paid to the nonprofit, and with the City prohibiting itself from controlling how the funds are being spent, the potential for waste, fraud, and abuse is staggering. As discussed below, it is also illegal.

The Ordinance provides scant information about the Designated Nonprofit Organization, other than the fact that it will have a contract with the City. In recent public comments, Mayor Liccardo has claimed that, in addition to funding this nonprofit, the City will also be creating it and choosing its members—but this is not stated anywhere in the Ordinance. Mary Harris, *San Jose's New Gun Law Is the First of Its Kind*, Slate.com (Feb. 3, 2022), https://slate.com/news-and-politics/2022/02/san-jose-gun-law-mayor-sam-liccardo-interview.html (Pls. MPI Ex. J)(reattached as Exhibit H)("We're forming a 501(c)(3) foundation, which is going to receive the dollars, and the board, which will be comprised of a host of folks, . . .").

The only criteria for the City's contract with the nonprofit as to how the funds are ultimately spent is that the nonprofit's services are to "include, but are not necessarily limited to" suicide prevention services or programs, violence reduction or domestic violence services or programs, addiction intervention and substance abuse treatment, mental health services related to gun violence, and firearms safety education or training. *Id*., § 10.32.220.A. "All monies from the Gun Harm Reduction Fee shall be expended by the Designated Nonprofit Organization" to provide the services and programs listed above exclusively to "residents of the city that own or possess a Firearm in the City, to members of their household, or to those with whom they have a close familial or intimate relationship." *Id.*

The fee thus functions as a way to compel gun owners to give their money to a government-approved nonprofit, that will inevitably hold the City's anti-gun biases, to spend on unspecified programs targeting gun owners at the nonprofit's sole discretion with little to no City oversight. The program forces gun owners to subsidize an organization that is hostile to gun ownership, to be used



for their own re-education. But although the Gun Harm Reduction Fee must be exclusively spent on programs to re-educate gun owners, members of their household, or to those with whom they have a close familial or intimate relationship, *id.*, the Ordinance in fact does not include *any* requirement for gun owners or anyone else to attend the nonprofit's programs.

Despite justifying the Ordinance on the grounds that gun injuries are allegedly costing the City hundreds of millions of dollars, the Gun Harm Reduction Fee does not compensate the City for any of those alleged losses. The Ordinance authorizes the City Manager to collect *another* undetermined fee to administer the Ordinance, that is, to "charge and collect any and all cost recovery fees associated with fulfilling the policies of this Part relating to the reduction of gun harm, including any associated third-party costs." Ordinance § 10.32.250.

Any gun owner who does not pay the Gun Harm Reduction Fee could be issued an as yet undetermined fine, Ordinance § 10.32.240 (it "shall be set forth in the schedule of fines established by resolution of the City Council") and may have their gun "impounded." *Id.* at §10.32.245. In a recent interview, the Mayor disclosed how the Ordinance could allow the police new opportunities to confiscate guns.

> Encountering people with guns, out on the street, in bars and nightclubs—you can imagine a host of different venues where a police officer would really like to have the ability to remove a gun from a potentially combustible situation. For example, there's a bar brawl and they're patting down everybody and someone's got a gun. "Have you paid your fee? You have insurance?" "No." OK, well, there's an opportunity for us to remove the gun.

*San Jose's New Gun Law Is the First of Its Kind*, *supra*. (Ex. H).

\*   \*   \*   \*

The insurance requirement and both of the fees in the Ordinance are unknown costs imposed on gun owners that are designed to deter gun ownership. These unknown costs are subject to the whims of the City Council and insurance companies and bear a significant risk of making gun ownership cost prohibitive. The unknown extent of the costs, whatever they may be now or in the future, further chills the exercise of Second Amendment rights.

1   Plaintiffs therefore seek preliminary injunctive and/or declaratory relief to prevent the City

2   from enforcing the Ordinance, which it will do should this Court not take action prior to August 7,

3   2022.

4                                            **ARGUMENT**

5   **I.      This Matter is Ripe for Review.**

6          The Constitution does not require citizens to wait for the government to violate their rights,

7   and suffer consequential injuries, before they can sue. Temporary restraining orders, preliminary

8   injunctions, and declaratory judgments are routine mechanisms by which citizens appeal to the

9   judicial branch to *prevent* government from violating rights before the violations occur. "When the

10  plaintiff has alleged an intention to engage in a course of conduct arguably affected with a

11  constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution

12  thereunder, he should not be required to await and undergo…prosecution as a sole means of seeking

13  relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  Such is the posture

14  here.

15         In the First Amendment context, for example, a plaintiff may make a pre-enforcement claim

16  when there is "an actual and well-founded fear that the challenged statute will be enforced."

17  *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). For the Second

18  Amendment, a "credible threat of prosecution test" is used. *See e.g. Colorado Outfitters Ass'n v.*

19  *Hickenlooper*, 823 F.3d 537, 550-51 (10th Cir. 2016). Plaintiffs are "not required to violate [a gun

20  law] and subject [themselves] to prosecution to establish an injury-in-fact." *Nichols v. Brown*, 859

21  F.Supp.2d 1118, 1128 (C.D. Cal. 2012) (citing *Babbitt*, 442 U.S. at 298; *Thomas v. Anchorage*

22  *Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)).

23         Defendants attempt to insulate the Ordinance from any pre-enforcement challenge "because

24  key aspects of the ordinance that Plaintiffs challenge have not yet been established." MTD FAC 8.

25  Defendants argue that the undetermined fee amount, and the yet-to-be-identified nonprofit, make

26  the matter not "clean-cut and concrete" for this Court's review. *Id*. (quotation omitted). Yet, it is

27  certain that, when the ordinance takes effect on August 7: (1) the Ordinance will condition lawful

28  gun ownership on the making of a financial donation to a nonprofit that the Ordinance characterizes

as a city "Fee"; (2) none of that fee will pay for administrative costs imposed on the City by gun owners, but is exclusively to fund the nonprofit's programs; (3) the City will have no control over use of the fee; (4) the Ordinance will condition lawful gun ownership on the purchase of insurance that will not compensate the City for any costs it incurs arising from gun use; and (5) the Ordinance was not approved by the voters. Ordinance §§ 10.32.210; 10.32.215, 10.32.250, Section 2; MTD FAC 3-5. Plaintiffs or their members, will be subject to the ordinance, FAC ¶13-14, and there is nothing to suggest that the City will refrain from enforcing the Ordinance. Regardless of the amount of the fee, and regardless of the identity of the nonprofit, Plaintiffs' claims will not change.

Many of Defendants' authorities are not supportive of their position that a pre-enforcement challenge is not ripe if the ordinance's application needs further rule promulgation. MTD FAC 7-8 (citing *Nat'l Park Hosp. Assn. v. Dep't of Interior*, 538 U.S. 803, 808 (2003), (an administrative regulation was not ripe because the agency had "no delegated rulemaking authority."); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1117 (9th Cir. 2010), (the issues revolved around reimbursement for an insurance policy, which were issues that truly required *factual* development specific to the parties); *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1344 (9th Cir. 1990) (dispute over the title to land, where the Defendant did not yet have title to the land); *United States v. Power Co., Inc.*, 2008 WL 2626989, *4 (D. Nev. 2008) (challenge revolving around an expiration of a license prior to the license's expiration)). The only case cited by the Defendants that is relevant to pre-enforcement challenges, *Cramer v. Brown*, 2012 WL 13059699, *3 (C.D. Cal. 2012), is actually *supportive* of ripeness. There, the Court held that a pre-enforcement challenge filed prior to a new law's effective date was ripe because the state had no authority to amend the statute, just as is the case here. *Id*. The City Council no longer has the ability to amend the Ordinance because the ordinance has already passed. FAC 26-27. Any possible application of the Ordinance, as written and passed, will violate the United States and California constitutions and the City's Charter. The matter is ripe.

Similarly, the City also contends a facial challenge is impossible because it speculates that (after it is implemented and violating citizens' rights) there may be unspecified circumstances where the Ordinance is *not* unconstitutional. Opp. at 5-6. There is only one circumstance the

1    Ordinance, in application, would survive: if the City does not require gun owners to comply with

2    the Ordinance. Just as the City quotes, when "no set of circumstances exists when [the law] would

3    be valid…the law is unconstitutional in all of its applications." MTD FAC 9-10 (quoting

4    *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).

## II.    The Ordinance is Preempted by State Law.

6        Defendants acknowledge that field preemption applies "if it is the intent and purpose of such

7    general [state] laws to occupy the field to the exclusion of municipal regulation." MTD FAC 18

8    (quoting *Bishop v. City of San Jose*, 1 Cal.3d 56, 60-61 (1969) (overruled by *Mendoza v. Fonseca*

9    *McElroy Grinding Co., Inc.*, 11 Cal.5th 1118 (2021)). It tries to distract this court from controlling

10   authority by stating, citing a case about a roller-skating rink, that ordinances are to be upheld if they

11   are reasonably related to the health, safety, comfort, and welfare of the public. *Id*. at 17 (quoting

12   *Sunset Amusement Co. v. Bd. of Police Comm'rs*, 7 Cal.3d 64, 72 (1972)). That may be true, but the

13   issue of residential handgun possession has already been determined to be preempted by state law.

14   *Fiscal v. City and County of San Francisco*, 158 Cal.App.4th 895, 903 (Ct. App. 2008). Tellingly,

15   Defendants fail to account for, or even acknowledge, *Fiscal. See* MTD FAC 17-19.

16        *Fiscal*, dealing with a law practically banning handgun possession, acknowledged that state

17   law already prevents public entities from "adopting impediments on legally qualified citizens to

18   'purchase, own, possess, keep, or carry' a concealable firearm in their homes or businesses." 158

19   Cal.App.4th at 906 (citing Cal. Penal Code § 12026). This same statutory text now exists as

20   California Penal Code Section 25605. *Fiscal* read this language to mean that local entities are

21   deprived of "*any* power to regulate handgun possession on private property" and the legislature

22   "intended to occupy the field of residential handgun possession." *Id*. at 908 (emphasis added).

23   Section 12026 "was intended to occupy the *field of residential firearm possession*." *Id*. (emphasis

24   added). If this case is deemed to be about non-residential firearm possession, it is still preempted. In

25   *Fiscal*, the Court noted that permit requirement has been "easily struck down," previously. *Id*. at

26   907 (citing *Sippel v. Nelder*, 24 Cal.App.3d 173 (1972)). So too should this Ordinance be, as

27   requiring gun owners to have proof of insurance and proof of paying two separate fees is akin to a

28   permit or license.

DLG
DHILLON LAW GROUP INC.

Defendants' primary authority, *Great Western Shows, Inc. v. County of Los Angeles*, 27 Cal.4th 853 (2002), which *Fiscal* accounted for and distinguished, was about the sale of guns on county property. MTD FAC 18. *Fiscal* noted that *Great Western* was "palpably distinguishable" because its preemption analysis was specific to "state law authorizing gun shows." *Fiscal*, 158 Cal.App.4th at 917.

This lawsuit is not about the City's ability to regulate firearm sales on City property. It is for this reason that each of Defendants' authorities are not applicable to this Ordinance. Indeed, each of the preemption cases cited by Defendants are distinguishable because none focus on residential firearm ownership. This Ordinance is specific to gun possession in the home, which was the focus of *Fiscal*—and the Ordinance. Accordingly, *Fiscal,* rather than *Great Western,* is analogous and controls in this matter.

### III.     The Ordinance Burdens Core Second Amendment Rights.

The Second Amendment confers "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)("Heller I"). This guarantee is "among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010). Moreover, "the core of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (quoting *Heller*, 554 U.S. at 635). Strict scrutiny applies if a challenged law implicates a core Second Amendment right. *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014).

"[J]ust as in the First Amendment context, the level of scrutiny in the Second Amendment context should depend on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Chovan*, 735 F.3d at 1138 (citation and quotation omitted). Here, the Ordinance strikes directly at what the Ninth Circuit held is the "core of the Second Amendment," that is, the right of law-abiding citizens to use guns to defend themselves and their homes. It does so by conditioning the lawful possession of guns in the home on the making of annual donations to fund the speech and activities of the City's preferred nonprofit and the mandatory purchase of private insurance, threatening to fine gun owners and confiscate guns to

compel compliance. Defendants' authorities for intermediate scrutiny are not nearly as intrusive, as none of them regulated guns in the home. MTD FAC 12. *Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) had to do with gun *sale* fees, not regulation of home use. Defendants' other two examples had to do with administrative fees, which are permissible under the *Cox/Murdock* administrative fee jurisprudence, not substantial burden analysis. MTD FAC 12 (citing *Heller v. District of Columbia*, 801 F.3d 264, 278 (D.C. Cir. 2015)("*Heller II*"); *Kwong v. Bloomberg*, 723 F.3d 160, 161 (2d. Cir. 2013)). Accordingly, strict scrutiny is appropriate because the Ordinance regulates core Second Amendment rights.

Further, as Justice Roberts stated previously, repeated by Justice Kavanaugh, the Constitution does not prescribe an interests balancing test for the Second Amendment. *Heller II*, 670 F.3d at 1273 (Kavanaugh, B., dissenting) (quoting Tr. Of Oral Arg. At 44, *Heller I*, 554 U.S. 570 (No. 07-290)). These tests are mere "baggage" and should no longer be used. *Id*. The Ordinance is therefore unconstitutional by virtue of it burdening Plaintiffs' right to own guns. Indeed, the Second Amendment is unqualified, stating that the right to bear arms "shall not be infringed." U.S. CONST. amend. XIV, §2.

Defendants' argument demonstrates the importance of avoiding an interest balancing test. They argue that the Ordinance "merely requires gunowners [sic] to obtain insurance and pay a reasonable annual Fee" and thus is a minimal burden. MTD FAC 11. However, such an argument creates a slippery slope. If a $25 annual fee is reasonable, why then wouldn't a $50 fee be reasonable as well? If a $50 fee is "minimal," why not then $100? The fee, which the Ordinance does not restrict, could continue to be raised annually at the discretion of Defendant City Council. Should the Plaintiffs be required to rush back to court with each fee increase? The same applies to the insurance mandate, where the premiums will be controlled by for-profit insurance companies and will likely increase with time. A balancing test would be inefficient and runs contrary to the plain language of the Second Amendment.

Yet even under the lower intermediate scrutiny standard Defendants seek, the Ordinance fails.

       i.     *There is no reasonable fit between the Ordinance and its stated objective*



Under intermediate scrutiny, the City must establish that 1) the stated objective is significant, substantial, or important, and 2) a reasonable fit between the challenged regulation and the asserted objective. *Chovan*, 735 F.3d at 1139. The Ninth Circuit acknowledges that reducing gun violence is important, meaning here the test turns solely on whether there is a reasonable fit between the Ordinance and its claimed objectives. *Id.*

Defendants, however, misconstrue the "reasonable fit" requirement, conflating it with, and subsuming it within, the requirement that a law's goals must be significant, substantial, or important, and further contending that courts must defer to legislative judgments on fit. MTD FAC 13. The result is a vision of constitutional rights jurisprudence that would collapse intermediate scrutiny into a deferential one-prong test asking whether a legislature's stated goal for a law impacting a constitutional right is well-intentioned. Indeed, this is not the test.

Yet even if Defendants' reading of the reasonable fit requirement was correct, the City relies on irrelevant information as the basis for the Ordinance's reasonableness. The Ordinance cites misleading statistics, "finding[]" that "San Jose taxpayers annually spend approximately $39.7 million, or approximately $151 per firearm-owning household." Ordinance, §10.32.200.B.8. But they fail to acknowledge that $34.1 million of that is due to crime, regardless of its connection to firearms. Doc 25-3, Ex. I, p. 5. The Ordinance "find[s]" that San Jose residents incur an annual financial burden of $442 million per year…." Ordinance, §10.32.200.B.9. But it fails to mention that, even using their figures, only $35 million of that is a "direct" burden, the rest is entirely speculative for "pain, suffering, and lost quality of life" which the Defendants' study says is the "largest share" of that figure. Doc 25-3, Ex. I, p. 4. Thus, the Defendants' findings artificially inflate the costs to justify making non-criminal citizens pay for speculative costs caused primarily by criminals. (Defendants cite a handful of studies in their Motion to Dismiss, pages 13-14, but neither supporting Declaration states that these studies were relied upon in forming the Ordinance.)

Regarding insurance, Defendants' only justification is that "requiring gun liability insurance *might be effective* in reducing harm, since this has occurred over a long period of time in the context of automobile liability insurance." MTD FAC 14 (emphasis added). But the *only* studies Defendants cite are for automobile insurance. The activity of driving a car—routinely, daily, and

with significantly more public interaction than is usually found in the average home—is entirely different than merely owning a gun and keeping it in one's home. It is an apples-to-oranges comparison, and a "guess" that cannot justify burdening a core constitutional right.

Between the bait-and-switch use of crime statistics for an ordinance that does not target criminals, and the wild guess about the relevance of auto insurance, Defendants' self-serving statements about the Ordinance's "fit" with its purpose cannot be given deference. The authorities cited by Defendants also do not support the wholesale deference Defendants demand. In *Chovan* the important government interest at issue was an interest in "preventing domestic gun violence" and the law under examination prohibited "domestic violence misdemeanants" from possessing guns. *Chovan*, 735 F.3d at 1140. The court in *Chovan* meticulously examined the evidence the law fit its purpose, finding that the law was focused on violent people not prohibited from possessing guns by other laws, that domestic violence misdemeanants were likely to be repeat offenders, that they use guns, and that their gun use would increase the likelihood their victims would die. *Id.* This evidence satisfied intermediate scrutiny.

The contrast with the Defendants' Ordinance is stark. The Ordinance is justified by two main purposes: (a) deterring, preventing, and reducing injuries and damages caused by guns; and (b) reducing social and financial costs caused by the use of guns. MTD FAC 13. But the Ordinance's Gun Harm Reduction Fee does *nothing* to target criminals who use guns, the primary source—by a large margin—of the injuries and damages the Defendants use to justify the Ordinance. (Ex. G, p. 5). Rather, the Ordinance compels *every* gun owner to make an annual donation to the City's chosen nonprofit. Defendants also concede that the "'primary costs' of gun violence" that they cited to support enactment of the Ordinance are in fact "associated with City response costs" that the Ordinance does not seek to recover. *Id.*

The Defendants' response to this mismatch between the Ordinance's goals and its actual operation is to fall back on the worthiness of its goals in general and that the City also made findings that there were other costs "related to suicide and self-inflicted harm." MTD FAC 13. But this misses the point. A "reasonable fit" analysis does not measure whether the Defendants' stated goals were worthy, but whether a law "targets only" the objective which it seeks to address to

1  "achieve its goal." *Jackson*, 746 F.3d at 969. Here, they do not.

2      Defendants' citations to cases permitting reimbursement for administrative costs do not

3  help. (Opp. at 9) (citing *Bauer*, 858 F.3d at 1225 (fees charged to implement and enforce

4  background checks) and *Kwong v. Bloomberg*, 723 F.3d 160, 167 (2nd Cir. 2013) (fee imposed to

5  enforce and implement a licensing scheme)). There is no reimbursement here, and Defendant cites

6  no authority approving making citizens shoulder a society's at-large financial burden for the

7  criminal conduct of others as a condition of exercising a core constitutional right. (Indeed, if the

8  Defendants are claiming the Ordinance is a licensing scheme, more legal problems ensue, such as

9  state preemption, discussed above.) Defendants do not, and cannot, cite any case validating a law

10  forcing gun owners to donate directly to a private third-party organization as a condition of

11  exercising their Second Amendment right of home and self-defense.

12          *ii.*    *This does not fit within the Ninth Circuit's Cox/Murdock fee jurisprudence.*

13      The *Cox/Murdock* fee-jurisprudence, adopted by the Ninth Circuit, only permits fees to

14  defray administrative and enforcement costs. *Kwong*, 723 F.3d at 165; *Bauer*, 858 F.3d at 1226.

15  Defendants simply misunderstand these authorities. The City wishes to place fees into a level of

16  burden analysis, citing the fact that $19 and $340 fees were not found to be unduly burdensome.

17  MTD 15-16. However, before the Court can get to a burden analysis, there must be a showing that

18  the fees "meet the expense incident to the administration of the act." *Bauer*, 858 F.3d at 1225

19  (quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)). Unlike the fees in *Bauer* and *Kwong*,

20  the Ordinance's fee does not defray the City's administrative costs in any way as the money goes

21  directly to the nonprofit. Ordinance §10.32.220.

22        **IV.**    **The First Amendment Prevents the City from Forcing Gun Owners to Fund**

23            **a Private Nonprofit's Speech and Activities.**

24      Defendants fundamentally misunderstands the significance and holding of *Janus v.*

25  *AFSCME, Council 31*, 138 S.Ct. 2448 (2018). *Janus* was not, as Defendants suggest, just about

26  "lobbying, advertising, litigation, and social and recreational activities, and other activities." MTD

27  FAC 16. Unions were already prevented from using mandated fair share fees to support political

28  activity prior to *Janus*, and in fact had been since 1977. *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209,

235-36 (1977) (holding that a union cannot constitutionally compel dues and use them to "spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes…."); *Chicago Teacher's Union, Local No. 1 v. Hudson*, 475 U.S. 292 (1986) (requiring fee payers be allowed to opt out of paying funds for political activity); *Knox v. Service Employees Intern. Union, Local 1000*, 567 U.S. 298 (2012) (requiring the ability to opt out of payment even for speech related to union contracts).

*Janus* prevented forced subsidization of unions, regardless of whether the speech for which non-members were paying was political or not, finding it was unconstitutional to "force[]" public employees "to subsidize a union, even if they choose not to join and strongly object to the positions the union takes in collective bargaining and related activities." *Janus*, 128 S.Ct. 2459-60. Any such payment to a private organization, the Court stated, requires consent to pay, and extracting fees without consent "violates the First Amendment and cannot continue." *Id*. Here, a nonconsenting gun owner, such as Plaintiff Mark Sikes who objects by virtue of the filing of this lawsuit, has no option to waive the payment of this annual fee/donation subsidizing the City-chosen nonprofit. He is forced to support the speech of the nonprofit, in violation of the First Amendment.

Defendant complains of *Janus* being "deeply rooted in the union context." MTD FAC 16. But, one would be hard pressed to find examples of government creating law that *requires* a citizen to subsidize a nonprofit entity. Unions are a rare example of a government forcing a citizen to pay another private entity directly and are a logical place to look. And, even if the Ordinance had been passed in a pre-*Janus* regime, forced subsidization of a non-profit that advocates for proscribed actions addressing suicide, violence, mental health, firearms safety, and addiction is inherently political or speaks a message. Additionally, whether it be in the context of a union, bar dues, or funding a non-profit, the First Amendment exists to protect from government compulsion of forced speech and association in all circumstances. The First Amendment does not apply exclusively to unions.

### V.      The Ordinance is an Unlawful Tax.

Defendants' authority for the argument that the Gun Harm Reduction Fee is not a tax, *Schmeer v. County of Los Angeles*, 213 Cal.App.4th 1310 (Ct. App. 2013), runs against the plain

language of the California Constitution and is otherwise clearly distinguishable from the instant case. First, a "tax," which must be approved by the voters, "means any levy, charge, or exaction of any kind imposed by a local government…." Article XIII C.1(e). (A "'General tax' means any such tax imposed for general governmental purposes." Article XIII C.1(a).)

A "levy" is "the imposition or collection of an 'assessment'," which is defined as "an amount that a person is officially required to pay." *Assessment*, *Merriam-Webster Dictionary* (2022), https://www.merriam-webster.com/dictionary/assessment. A "charge" is simply "the price demanded for something." *Charge*, *Merriam-Webster Dictionary* (2022), https://www.merriam-webster.com/dictionary/charge. An "exaction" is defined as "something exacted," to especially include *"a fee, reward, or contribution demanded or levied with severity or injustice." Exaction*, *Merriam-Webster Dictionary* (2022), https://www.merriam-webster.com/dictionary/exaction.

First, there is no question that the Gun Harm Reduction fee is a levy, charge, or exaction, and that it will be imposed by the City of San Jose. The California Constitution does not limit its definition of a tax based on whether a municipality deposits the tax revenue into a city account or if it diverts the tax payment directly to another person. It would be a curious interpretation of the California Constitution and a profound loophole to hold that a city could evade the constitutional requirement of voter approval for taxes by just ordering the public to directly pay third parties.

Second, the Gun Harm Reduction Fee and the insurance requirement (backed by the threat of a fine payable to the City) are levies, charges or exactions imposed by the City of San Jose and thus each constitutes a "tax" within the meaning of the California Constitution. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-566 (2012) (a law describing a payment as a "penalty" for not complying with an insurance requirement does not determine whether the payment is a tax for constitutional purposes).

Third, *Schmeer's* actual holding was that the language "any levy, charge, or exaction of any kind imposed by a local government" in the first paragraph of article XIII C, section 1, subdivision (e) is limited to charges payable to, *or for the benefit of, a local government.*" *Schmeer*, 213 Cal. App. 4th at 1328–29 (italics added). While Defendants focus exclusively on the fact that the Fee is not payable to the City, *Schmeer* also treated charges "for the benefit of" the government as taxes. If, as Defendants

have argued elsewhere, the Ordinance benefits San Jose, article XIII C applies.

Fourth, *Schmeer* is also distinguishable. The grocery stores in *Schmeer* were to use the 10-cent fee *to compensate themselves* for complying with a City requirement imposed on them – a prohibition against plastic bags that was only imposed on persons who used their bags. Here, the Ordinance *neither* requires the fee to compensate the nonprofit for the costs of its compliance with a City regulation nor is imposes it on just those persons who obtain something from the nonprofit.

## VI.    The Ordinance Violates the City Charter.

Defendants' proposed interpretation of the City's Charter, MTD FAC 21-23, is based on a selective, self-serving reading of its plain terms. City officials' compliance with the City Charter is neither aspirational nor a mere technicality. A charter city's charter has the force of law, Cal. Const. Art. XI, Sec. 3(a). In its entirety, Section 1211 states:

> All monies paid into the City Treasury shall be credited to and kept in separate funds in accordance with provisions of this Charter or ordinance. A fund, to be known as the "General Fund," is hereby created as a medium of control and accounting for all City activities excepting activities for which special funds are established and maintained. All revenues and receipts which are not required by this Charter, State law or ordinances to be placed in special funds shall be credited to the General Fund.

Read together, the Charter could not be plainer: (1) City revenues must be placed in either the General Fund or special funds; (2) the General Fund serves "as a medium of control and accounting for all City activities," except for those activities for which the City creates a special fund; and (3) if the law does not require city revenues and receipts to be placed in special funds, they must go to the General Fund. Here, neither the Ordinance nor any other law requires the City to place the Gun Harm Reduction Fee into a special fund. Accordingly, pursuant to section 1211's third sentence, the fee's revenues must be placed into the City's General Fund.

Defendants instead argue that the reference in the first sentence of section 1211 to "monies paid into the City's Treasury" bars the application of section 1211 to the Ordinance because it requires the fee to be paid to the City's designated nonprofit. MTD FAC 21. But this violates the very maxim Defendants cite: "The language of the Charter and the Ordinance must be read in the context of the respective statutes as a whole. . . the court must 'avoid a construction that would lead to impractical or unworkable results.'" *Id*. (Citations omitted). Defendants' interpretation would create an

exception that swallows the rule. To allow city fees to bypass the General Fund, diverted into city officials' favored nonprofit beyond the City's control and accounting, would turn section 1211 on its head. It would subvert this fundamental control on the City government's ability to hide, or avoid oversight of, how City fee revenues are spent.

The City's interpretation, if accepted, contradicts treatment of the Ordinance's Gun Harm Reduction Fee as a City fee in the first instance, corroborating the tax analysis above (for an exaction to qualify as a city fee, it must pay for city services). Combined with the Defendants' further argument that the fee is not subject to the City's budgetary or appropriations authority, MTD FAC 21-22, the Defendants further distinguish the Gun Harm Reduction Fee and the activities of the designated nonprofit from government functions. Specifically, Defendants acknowledge:

> The nonprofit is not a City department, office, or agency. Indeed, "[n]o City official or employee shall sit on the board of directors of the Designated Nonprofit Organization", and the City "shall not specifically direct how the monies from the [Fee] are expended"

> The Ordinance does not provide for or contemplate using the Fee for the operation of City departments. Rather, the Ordinance requires the designated nonprofit to "spend every dollar generated from the [Fee]" on programs and initiatives within a particular category – none of which include the operation of offices, departments, or agencies of the City.

*Id.* (citations omitted).

Thus, to the diversion of the Fee to a third party nonprofit instead of the City's General Fund, the City further acknowledges the fee will not fund a city department, city officials are prohibited from serving on the nonprofit's board, and "the City 'shall not specifically direct how the monies from the [Fee] are expended.'" MTD FAC 22. But this collides with the Charter's delegation to the City Manager of responsibility "for the faithful execution of all laws, provisions of [the] Charter, and acts of the Council which are subject to enforcement by the City Manager or by officers who are under the City Manager's direction and supervision." *Id.* (quoting Charter § 701(d)). Reversing themselves, the Defendants immediately pivot to asserting the City Manager indeed *will* "'implement the requirements and fulfill the policies of [the Ordinance] relating to the reduction of gun harm,' including by designating the nonprofit receiving the Fee and setting forth 'processes and procedures relating to the payment of the fee, and **any additional guidelines or auditing of the use of**



**the monies from the fee.**'" *Id.* (quoting 10.32.235.A, *et seq.*) (emphasis in original). In sum, Defendants state "San Jose maintains authority over how the designated nonprofit expends the fee through the administrative oversight of the City Manager." *Id.*

Accordingly, Defendants claim the City is simultaneously prohibited from directing how the nonprofit will spend the City's fee, which is not deposited into city accounts, and yet the City maintains authority over how the nonprofit spends the City's fee. The fee is also simultaneously not paying for City operations, and yet City's chief administrative officer "maintains authority" over the nonprofit's spending.

Returning to the Defendants' proposed interpretation of Charter section 1211: the Defendants' conflicting arguments either mean that: (A) the City Charter is not violated by City fee revenues funding activities under the City Manager's control but kept outside City accounts ('off the books'); or (B) the City Charter is not violated by a City fee being diverted to an entity over which the City has no immediate control. This are impractical and unworkable results, indicating the Defendants' interpretations are wrong.

### VII.   Plaintiffs Properly Request Declaratory Relief.

Defendants object that declaratory relief is "duplicative." MTD FAC 23. However, Plaintiffs' request for relief is requested "to the extent that each of the claims above have not already established a remedy." FAC 148. For declaratory relief to be "duplicative," Defendants would have to concede that Plaintiffs have already "established a remedy." Defendants make no such concession, so declaratory relief cannot be "duplicative" at this stage. So long as Plaintiffs establish federal subject-matter jurisdiction and standing, which they have, declaratory relief is a remedy available to them. *County of Santa Clara v. Trump*, 267 F.Supp.3d 1201, 1216 (N.D. Cal. 2017) (citing *Fid. & Cas. Co. v. Reserve Ins. Co.*, 596 F.2d 914, 916 (9th Cir. 1979)).

Respectfully submitted,

Date: April 23, 2022                    DHILLON LAW GROUP INC.

By:   /s/ Harmeet K. Dhillon
            Harmeet K. Dhillon



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Michael A. Columbo
Mark P. Meuser
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
(415) 433-1700

David A. Warrington*
Curtis M. Schube*
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314
(571) 400-2121

*Admitted *pro hac vice*.

Attorneys for Plaintiffs



Plaintiffs' Response to Defendants' Motion to Dismiss
Plaintiffs' First Amended Complaint

Case No.22-cv-00501-BLF