GRETCHEN HOFF VARNER (Bar No. 284980)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: ghoffvarner@cov.com

Attorney for Amicus Curiae

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.**, a nonprofit corporation, and **MARK SIKES**, an individual,<br><br>     Plaintiffs,<br><br>     v.<br><br>**CITY OF SAN JOSE**, a public entity, **JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL**,<br><br>     Defendants. | Civil Case Number: 5:22-cv-00501-BLF<br><br>**BRIEF OF BRADY AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Hearing Date on Motion for Preliminary Injunction: July 14, 2022<br>Hearing Time: 9:00 a.m.<br>Location: Zoom Webinar<br><br>Hearing Date on Motion to Dismiss: August 4, 2022<br>Hearing Time: 9:00 a.m.<br>Location: Zoom Webinar<br><br><br>Judge: Honorable Beth Labson Freeman |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Table of Contents**

I.      Interests of Amicus Curiae ................................................................................... 1

II.     Introduction ......................................................................................................... 1

III.    The Ordinance Does Not Implicate Second Amendment Conduct and Imposes at Most a Minor Financial Burden on Gun Ownership. ...................................................... 2

        A.      The Ordinance Does Not Implicate the Second Amendment. ............................. 3

                1.      The Insurance Requirement Does Not Implicate the Second Amendment. 3

                2.      The Fee Requirement Does Not Implicate the Second Amendment. ......... 5

        B.      Even If the Ordinance Implicates the Second Amendment, the Financial Requirements Are Constitutional Because They Are Consistent with Historical Regulations. ................................................................................................ 6

                1.      The Insurance and Fee Requirements Are Consistent with the Long History of Gun-Related Economic Requirements. .................................... 6

                2.      The Insurance Requirement Is Consistent with—and Even an Improvement Upon—the Long History of Governments Allocating the Costs of Gun Accidents ............................................................... 8

                3.      Mandatory Liability Insurance Has Long Been Held Constitutional ....... 10

                4.      The Ordinance's Liability Insurance Requirement Is a Proven Solution to the Difficult Societal Problem of Firearm Accidents. ............................. 11

                5.      The Vast Majority of San Jose Gun Owners Are Already in Compliance with the Ordinance's Insurance Requirement. ......................................... 15

# Table of Authorities

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Barnett,*
2010 WL 3619778 (N.D. Cal. Sept. 9, 2010) ...................................................................13

*Bauer v. Becerra,*
858 F.3d 1216 (9th Cir. 2017) ...........................................................................1, 5, 7

*Cole v. Fisher,*
11 Mass. 137 (1814) ...........................................................................................9

*District of Columbia v. Heller,*
554 U.S. 570 (2008).........................................................................................1, 3

*Ex parte Poresky,*
290 U.S. 30 (1933) ...........................................................................................14

*Kanter v. Barr,*
919 F.3d 437 (7th Cir. 2019) ................................................................................5

*Kwong v. Bloomberg,*
723 F.3d 160 (2d Cir. 2013)...............................................................................6, 7

*Fla. ex rel. McCollum v. U.S. Dep't of Health & Hum. Servs.,*
716 F. Supp. 2d 1120 (N.D. Fla. 2010)....................................................................11

*Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.,*
648 F.3d 1235 (11th Cir. 2011) ...........................................................................11

*McCoy v. Commonwealth of Pennsylvania,*
37 Pa. Cmwlth 530 (1978) ................................................................................11

*Meier v. Anderson,*
692 F. Supp. 546 (E.D. Pa. 1988) .........................................................................11

*Moody v. Ward,*
13 Mass. 299 (1816) ..........................................................................................9

*Morgan v. Cox,*
22 Mo. 373 (1856) ...........................................................................................10

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012)....................................................................................4, 8, 11

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
No. 20-843, 2022 WL 2251305, 597 U.S. __ (2022) ................................................. *passim*

*State Farm Mut. Auto. Ins. Co. v. Partridge*,
514 P.2d 123 (Cal. 1973) (en banc) ..................................................................13, 16

**Statutes**

1851 R.I. Pub. Laws 9 § 2 (1851) ..........................................................................7

1856–1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt.
4 (1856–1857) ..........................................................................................7

1870 La. Acts 127, Persons, Trades, Professions and Occupations Subject to Taxation, §
3, pt. 6 (1870) ..........................................................................................5

Act of Feb. 20, 1792, ch. 7 §§ 9, 10 Stat. 232, 235 (1972) ..............................................7

An Act to Amend and Reduce into one the several Acts in Relation to the Revenue of this
State, and for other purposes § 1 (1844) ..................................................................7

An Act Authorizing the Corporate Authorities of the Town of Dangerfield, Fairfield and
Springfield, to tax ten pin alleys, billiard tables and pistol galleries § 1 (1860) ...................5

Ordinances of the City of Galveston, Taxes – License Tax and Ad-Valorem Tax (1873),
Art. 418, § 26 (1873)....................................................................................6

Ordinances and Joint Resolutions of the City of San Francisco § 13 (1854) ..............................7

**Other Authorities**

Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L.
Rev. 573 (2005) ..........................................................................................10

Tom Baker & Charles Silver, *How Liability Insurers Protect Patients and Improve
Safety*, 68 DePaul L. Rev. 211 (2019) ....................................................................14

Tom Baker & Thomas O. Farish, *Liability Insurance and the Regulation of Firearms*, in Suing the Gun
Industry, (Timothy D. Lytton ed., 2005) ..................................................................14

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past
Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Con. L. Quarterly
145 (2022)...............................................................................................5

James Fleming, Jr., *Accident Liability: Some Wartime Developments*, 55 Y.L.J. 365
(1946)................................................................................................10, 11

Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners:
Design Choices and Second Amendment Limits*, 14 Engage 21 (2013) ........................................5

Homeowners 3-Special Form (HO 00 03 05 11) (2010)  ......................................................16

Brief of Brady as Amicus Curiae in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction and
in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint
Case Number: 5:22-cv-00501-BLF                                                                      iv

Fred E. Inbau, *Firearms and Legal Doctrine*,
7 Tul. L. Rev. 529 (1932–33) ...................................................................................9

*Incidence and Cost of Firearm Injuries in San Jose*, *CA*,
Pacific Institute for Research and Evaluation 1 (Jan. 19, 2022) ...........................13

Peter Kochenburger, *Liability Insurance and Gun Violence*,
46 Conn. L. Rev. 1265 (2014) ............................................................................13, 16

David B. Kopel, *The First Century of Right to Arms Litigation*,
14 Geo. J.L. Pub. Pol. 127(2016).............................................................................6

Wex S. Malone, *Ruminations on the Role of Fault in the History of the Common Law of Torts*, 31 La. L. Rev. 1 (1970) .............................................................................9

Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Y.L.J.F. 121 (2015) ..................7

Jennifer B. Wriggins, *Mandates, Markets, and Risk*,
19.2 Conn. Ins. L. J. 275 (2013) ..............................................................................14

1

## I.      Interests of Amicus Curiae

2

Brady is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing

3

gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring

4

that the Constitution is construed to protect Americans' fundamental right to live. Brady also has a

5

substantial interest in protecting the authority of democratically elected officials to address the nation's

6

gun violence epidemic. Brady has filed amicus briefs in many cases involving the regulation of firearms,

7

including *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, No. 20-843, 2022 WL 2251305, 597 U.S.

8

__ (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bauer v. Becerra*, 858 F.3d 1216,

9

1219 (9th Cir. 2017).[1]

10

## II.     Introduction

11

The Supreme Court has decided that law-abiding, responsible citizens have a right to guns, but it

12

is beyond dispute that the right carries inherent, deadly risk. Every year, dozens of San Jose residents are

13

killed or injured in gun accidents—tragedies that, in addition to their human toll, cost the City and its

14

residents millions of dollars. By requiring that anyone who lives in San Jose and owns or possesses a gun

15

(1) carry a homeowners, renters or gun liability insurance policy that covers losses or damages resulting

16

from any accidental use of the firearm, and (2) pay a Gun Harm Reduction Fee to a nonprofit organization

17

that will offer education programs and safety training, the City aims to reduce the risk and subsequent cost

18

and hardships of gun accidents. The Ordinance achieves these goals and reallocates costs without

19

compromising any Second Amendment rights. Sworn law enforcement officers, holders of a concealed

20

carry weapon permit, and certain low-income individuals are exempt from the Ordinance's requirements.

21

The Ordinance's fee and insurance requirements do not implicate the Second Amendment because

22

they do not regulate, limit, or control the manner or method in which people may keep or bear arms.

23

Instead, they simply require that gun owners have liability insurance and pay a nominal fee. These are

24

merely economic requirements that provide financial incentives for responsible arms carrying. Ample

25

26

----

27

[1] No counsel for a party authored this brief in whole or in part, and no person other than Brady or

28

its counsel made any monetary contributions intended to fund the preparation or submission of this brief.

historical precedent, recognized most recently by the United States Supreme Court, indicates that such financial requirements do not directly restrict the right to own or carry firearms and thus fall entirely outside the scope of the Second Amendment.

Moreover, even if the Court were to find that the Ordinance implicates the Second Amendment, the evidence shows that it is consistent with the Nation's historical tradition of firearm regulation. Because its requirements are merely financial, at most the Ordinance imposes financial incentives for responsible arms carrying; it does not condition or restrict the manner of keeping or bearing arms.

Further, through private liability insurance, the City has harnessed a proven mechanism for facilitating and spreading the cost of potentially dangerous activities, one that governments have long used to manage societal risks. Likewise, the Ordinance's Gun Harm Reduction Fee is designed to reduce the incidence of firearm-related accidents, and is consistent with governments' long-standing practice of charging fees for myriad activities, including those that are constitutionally protected.

Because the Ordinance does not implicate the Second Amendment—and also is consistent with historical traditions of firearms regulation, including imposing financial incentives and allocating related costs and risks—the Ordinance is constitutional and should stand.  Accordingly, Plaintiffs' Motion for Preliminary Injunction is unlikely to succeed on the merits and should be denied, and Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint should be granted.

## III.   The Ordinance Does Not Implicate Second Amendment Conduct and Imposes at Most a Minor Financial Burden on Gun Ownership.

The City's sensible solution to the problem of gun accidents is constitutional. First, the Ordinance's fee and liability insurance requirements do not implicate the Second Amendment at all, because they have no bearing on whether a person can "keep and bear arms." Second, even if they did, the Ordinance is still plainly constitutional because it is consistent with the Nation's historical tradition of firearm regulation, including economic requirements that impose, at most, financial incentives for responsible arms carrying. Liability insurance is an economic requirement that governments have long relied upon to compensate accident victims and spread societal costs, and which courts have consistently upheld for as long as liability insurance has existed, nearly 100 years. So too are fees, which governments have used for firearms-related activities since the founding. Accordingly, the Ordinance is constitutional.

## A.     The Ordinance Does Not Implicate the Second Amendment.

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court held that the Second Amendment protects conduct that falls within the Amendment's "plain text." 2022 WL 2251305, at *8, *11. Determining the scope of the Amendment's plain text requires looking to "the Second Amendment's text, as informed by history." *Id.* at *9. It is only if the text and history confirm that the regulated conduct falls within the Second Amendment's original scope that the government must "then" show that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at *11.

### 1.     The Insurance Requirement Does Not Implicate the Second Amendment.

The Ordinance requires that gun owners carry liability insurance for firearm accidents. The conduct implicated by that requirement is entirely outside of the original scope of protected Second Amendment activity. This is confirmed by both the Second Amendment's text and its history.

Beginning with the constitutional text, the Second Amendment addresses the right to "keep and bear arms." In *District of Columbia v. Heller*, the Supreme Court determined that this text "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. Accordingly, conduct exercising this right falls within the Second Amendment's protections—for example, keeping an operable handgun in the home for self-defense, as was at issue in *Heller*, or carrying arms in public, as addressed in *Bruen*. By contrast, the conduct of insuring liability that might arise from a firearm-related accident is an entirely different kind of activity: a financial exercise that does not alter whether someone may keep or bear arms. Individuals purchase liability insurance through a transaction with an insurance company that is unconnected to their purchase of a firearm; insurance does not restrict firearm possession or use; and if a claim is made under the policy, it would only be after a firearm accident occurs, to compensate the injured party financially and protect the gun owner's financial assets. None of these activities have any effect on Second Amendment activity.

Further, the Ordinance does not condition firearm ownership on the procurement of insurance. As enacted, the Ordinance's enforcement provisions only authorize an administrative citation and fine for violation. Ord. 10.32.240. Plaintiffs' fear that residents who do not comply with the insurance requirement "may have their gun 'impounded'" is unfounded. Pls.' Resp. Defs.' Mot. Dismiss at 8. No penalties or impoundment can be imposed without due process (§§ 10.32.240-10.32.245), and moreover,

"impoundment" is only permitted "to the extent allowed by law"—which California law does not allow. Opp. Mot. Prelim. Inj. at 3. Thus, neither enforcement provision would affect San Jose citizens' ability to "keep" arms by forcing them to obtain insurance before purchasing a gun, or by forcing them to relinquish their guns for non-compliance without due process.

Liability insurance that covers firearm accidents may be *related to* firearms. But by its text—"keep and bear"—the Second Amendment only concerns a defined body of conduct, not the entire universe of gun-related activities. And although the Second Amendment may extend to some peripheral conduct that is necessary to the keeping and bearing of arms, its text does not reasonably encompass the entirely separate transaction of obtaining liability insurance. Simply put, obtaining insurance related to an activity is not the same thing as engaging in the activity itself.

Several examples illustrate this point. In the familiar example of health insurance, the Supreme Court explained in *National Federation of Independent Business. v. Sebelius* that the purchase of insurance—there, "health insurance"—is "not the same thing" as the insured conduct itself—there, "health care consumption"—"[n]o matter how 'inherently integrated'" the two may be. 567 U.S. 519, 558 (2012). The Court reasoned that the two "involve different transactions, entered into at different times, with different providers." *Id.* Similarly, an individual obtaining liability insurance by entering into a contract with an insurance company is simply "not the same thing" as purchasing a gun from a firearms dealer, or owning and using the gun.

Other government insurance mandates also raise no serious constitutional concerns even though they make insurance a prerequisite for engaging in constitutionally protected activity. For example, California requires businesses to carry workers' compensation insurance covering liability for workplace injuries, and this law applies to all types of businesses, including those engaged in Second Amendment activity, such as gun ranges. Yet no one could credibly argue that the workers' compensation insurance requirement implicates Second Amendment rights merely because it is related to Second Amendment activity.

Nor does the conduct of carrying liability insurance possibly fall within the scope of historically protected Second Amendment activity. There is no support for any historical understanding of gun rights including a right to *not carry* liability insurance. Indeed, there has never been a "general constitutional

rule that citizens must be exempted from the obligation to internalize the costs of exercising their constitutional rights." Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14 Engage 21 (2013). The insurance conduct at issue here is constitutionally sound because it does not bear on whether someone can purchase, keep, or use a firearm, and thus, "the challenged law regulates activity falling outside the scope of the right as originally understood." *Bruen*, 2022 WL 2251305 at *8 (*citing Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)).

### 2.   The Fee Requirement Does Not Implicate the Second Amendment.

The Constitution's text and history also demonstrate that the fee requirement does not implicate the Second Amendment. As with the insurance requirement, the Gun Harm Reduction Fee—which only requires that gun owners contribute to a designated nonprofit organization—does not infringe residents' ability to keep or bear arms.

The text is confirmed by constitutional history, which also makes clear that mere economic requirements do not burden Second Amendment rights. Early American governments required many different kinds of financial payments associated with gun ownership and use. But these economic requirements "posed no constitutional issues for Americans in the pre-Civil War era," and only "intensified" in the period following the Civil War. Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Con. L. Quarterly 145, 154 (2022) (citing historical sources). For example, some of the same 19th-century laws that required "rifle" and "pistol galleries" to pay annual sums applied equally to "bowling alleys," demonstrating that early Americans did not understand the Second Amendment to create any special constitutional protection from payments related to gun use. *See* Laws of the State of Texas, An Act Authorizing the Corporate Authorities of the Town of Dangerfield, Fairfield and Springfield, to tax ten pin alleys, billiard tables and pistol galleries § 1 (1860); 1870 La. Acts 127, Persons, Trades, Professions and Occupations Subject to Taxation, § 3, pt. 6 (1870).

Modern courts have suggested that gun-related fees do not implicate the Second Amendment while upholding such fees in any event. *See Bauer*, 858 F.3d at 1227 (stating "we need not—and do not—decide whether [a firearm sale] fee implicates the Second Amendment" because it would survive under either

level of scrutiny, while applying the pre-*Bruen* two-part test); *see also Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) (declining to "definitively decide" which scrutiny standard applied, because the fee was constitutional regardless). Indeed, the exercise of this right entails financial costs: there is cost to purchasing a firearm, cost to store one safely, cost to obtain training to use it.

In sum, the Ordinance does not condition or restrict the manner of keeping or bearing arms and thus does not regulate conduct protected by the Second Amendment. Because it does not, the City does not need to make any additional showing for this Court to find the Ordinance constitutional.

> **B.    Even If the Ordinance Implicates the Second Amendment, the Financial Requirements Are Constitutional Because They Are Consistent with Historical Regulations.**

Even if this Court finds the Ordinance does burden Second Amendment rights in some minimal way, it is fully "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 2022 WL 2251305, at *8, *15. Both the Ordinance's fee and insurance requirements are consistent with historical gun-related economic requirements, and the insurance requirement in particular is consistent with the government's historical role in allocating the costs of gun accidents.

> **1.    The Insurance and Fee Requirements Are Consistent with the Long History of Gun-Related Economic Requirements.**

To the extent that the Ordinance does implicate the Second Amendment by imposing a minimal *economic* burden, it is consistent with many other gun-related economic requirements throughout American history.

In *Bruen*, the Court considered the "surety statutes" that nine jurisdictions enacted in the roughly 20 years leading up to and shortly after the ratification of the Fourteenth Amendment and rejected any notion that such financial requirements were "a severe constraint" on Second Amendment conduct. 2022 WL 2251305, at *27. These surety statutes required individuals to post, or have a third party post, a bond before they could carry a firearm. *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Y.L.J.F. 121, 131 (2015); David B. Kopel, *The First Century of Right to Arms Litigation*, 14 Geo. J.L. Pub. Pol. 127, 131 fn. 14 (2016). The *Bruen* Court observed that "[T]he surety laws did not *prohibit* public carry in locations frequented by the general community," WL 2251305, at *26–27, and that "[T]he burden these surety statutes may have had on the

right to public carry was likely too insignificant to shed light on" the regulation at issue. *Id*. at *27. At the same time, the Court recognized that the minimal economic burden that these statutes imposed promoted public interests, including the "prevention" of gun harms, and "provid[ing] financial incentives for responsible arms carrying." *Id*. at *28. Similarly, the Ordinance's insurance and fee requirements pose only a minimal economic burden in order to prevent gun harms and incentivize responsible gun use. Like surety statutes, such minimal burdens are "insignificant" for Second Amendment purposes.

Beyond the surety bonds considered in *Bruen*, American history is full of government-imposed economic burdens associated with gun ownership and use. *See, e.g.*, An Act to Amend and Reduce into one the several Acts in Relation to the Revenue of this State, and for other purposes § 1 (1844) (Mississippi law requiring "two dollars on each dueling or pocket pistol"); 1851 R.I. Pub. Laws 9 § 2 (1851) ("[T]wo hundred dollars per annum on any person who shall own or keep a pistol gallery [or] rifle gallery."); Ordinances and Joint Resolutions of the City of San Francisco § 13 (1854) (San Francisco ordinance requiring "ten dollars per quarter" required from "[e]very person, house, or firm engaged in keeping a pistol or rifle shooting gallery"); 1856–1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4. (1856–1857) ("On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents . . . ."). Similar economic burdens have endured to the present day, and modern courts have not hesitated to uphold gun-related fees and costs as constitutional. *See, e.g.*, *Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) (upholding "fee on firearms transfers"); *Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) (upholding "residential handgun licensing fee"). Such fees have long been accepted as consistent with the Second Amendment.

The upholding of fee requirements naturally aligns with the long history of federal, state, and local governments in America assessing fees since the Nation's founding. For instance, the Post Office has charged fees for mailing letters from its inception in 1792. Act of Feb. 20, 1792, ch. 7 §§ 9, 10 Stat. 232, 235 (establishing the Post-Office and Post Roads within the United States), https://bit.ly/3utzSCQ (last visited July 11, 2022) (setting fees to mail letters depending on distance). Fees remain a common method for governments to efficiently target costs for services to individuals who use them the most or who create negative externalities. For example, in California, the Transportation Improvement Fee, collected when Californians register their vehicles, funds the Road Maintenance and Rehabilitation Program; the

Childhood Lead Poisoning Prevention Fee, collected from those involved in the stream of commerce of lead, or products containing lead, funds health care referrals, environmental assessments, and educational activities; and the Emergency Telephone Users Surcharge, typically charged as part of users' monthly telephone bills, funds the installation, administration, and supply of communication services for the 911 system. *California Begins Collecting Transportation Improvement Fee*, ForConstructionPros.com (Jan. 2, 2018) https://bit.ly/3RhC7Tg (last visited July 11, 2022); California Department of Tax and Fee Administration, *Childhood Lead Poisoning Prevention Fee*, https://bit.ly/3ORDR44 (last visited July 11, 2022); California Department of Tax and Fee Administration, *Emergency Telephone Users Surcharge – Frequently Asked Questions*, https://bit.ly/3yMLDXB (last visited July 11, 2022). Like these fees, San Jose's Gun Harm Reduction Fee is an efficient method for San Jose to allocate the costs of firearm harms.

Further, any argument that the cost of compliance makes gun ownership prohibitively expensive is premature at best, because such costs have not yet been determined. In addition, any serious concerns about cost are mooted by the Ordinance's hardship exception, which exempts "[t]hose persons for which compliance with this Part would create a financial hardship" from the insurance and fee provisions. Ord. § 10.32.225 (Exceptions). Under this exception, even those who cannot afford to comply can still own and use firearms, with *no* financial burden at all.

### 2. The Insurance Requirement Is Consistent with—and Even an Improvement Upon—the Long History of Governments Allocating the Costs of Gun Accidents.

For as long as there have been guns, there have been gun accidents. In response, American governments have imposed systems for allocating the costs of those accidents since the Nation's founding. San Jose's insurance requirement is entirely consistent with the way governments have historically allocated the inevitable costs of gun-related accidents. In fact, the insurance requirement allocates gun accident costs in a way that is much *less* burdensome on gun owners than the system in place at the founding.

Early American governments had a simple and harsh way of allocating gun accident costs: through courts that imposed strict liability on gun owners. American courts inherited this strict-liability approach from the English common law, where the rule had been that "where one shoots at [a mark] and wounds a man, although it be against his will, yet he shall be called a trespasser against his will." *See* Wex S. Malone,

*Ruminations on the Role of Fault in the History of the Common Law of Torts*, 31 La. L. Rev. 1, 13 (1970) (quoting *Tithe*, Y.B. 21 Hen. 7, f. 27, pl. 5). Strict liability continued to be the rule in both England and the United States throughout the founding era; indeed, an American commentator writing as late as the 1930s noted that cases involving gun accidents "all indicate the strict accountability to which a person has been held for injury caused to another in the vicinity by a discharge incident to the handling of a firearm." Fred E. Inbau, *Firearms and Legal Doctrine*, 7 Tul. L. Rev. 529, 549-50 (1932–33). For example, in *Moody v. Ward*, 13 Mass. 299 (1816), Massachusetts' highest court stated that militia commanders who allowed their troops to engage in "[t]he mischievous and disgraceful practice of firing guns in and near the highways" would be held "legally responsible for all damage sustained by a citizen in consequence of such neglect." *Id.* at 301. Likewise, in *Cole v. Fisher*, 11 Mass. 137 (1814), the court considered a case in which the defendant had fired his gun at the door of his shop after cleaning it, frightening a nearby horse and causing damage to the carriage the horse was carrying. After taking the "occasion to observe upon the dangers to which travellers and passengers on foot and in carriages are exposed by discharges of guns in or near the highways," the court stated the strict liability principle that "[t]he party injured, either in his person or property, by the discharge of a gun, even when the act is lawful . . . is entitled to redress in a civil action." *Id.* at 139.

American tort law eventually changed, and in the mid-1800s, courts began applying a negligence standard to gun accidents and other torts. By holding an individual liable only if the plaintiff could prove that the defendant had breached a duty, the new negligence standard was much more forgiving for gun owners than the strict liability standard had been. Comparing the old and new standards in an 1856 case involving an accidental shooting, a Missouri court noted that "the old system of actions" was "much stricter," because "it was no defence, in such cases, that the act occurred by misadventure, and without the wrong-doer's intending it." *Morgan v. Cox*, 22 Mo. 373, 376–77 (1856).

As the new negligence standard transformed the way that the government assigned liability through the courts, new private liability insurance sprung up "to insure against the consequences of negligence." Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573, 576 (2005); *id.* at 573 (describing the "symbiotic relationship between tort liability and insurance"). In time, tort law and liability insurance proved to be a powerful combination that was

capable of compensating victims, spreading the costs of accidents, and even reducing risk altogether in ways that were impossible under the old system of strict liability. *See id.*; *see also* Fleming James, Jr., *Accident Liability: Some Wartime Developments*, 55 Y.L.J. 365, 365 (1946) (mid-20th century commentator discussing the recently discovered benefits of this system). As discussed in greater detail below, American governments learned that they could make even better use of this public-private system by requiring liability insurance, and did so in areas such as workers' compensation, auto insurance, and medical malpractice insurance.

### 3. Mandatory Liability Insurance Has Long Been Held Constitutional.

Since ancient times, people have sought a way to protect themselves from the adverse consequences of their risky behaviors through what we now call insurance. *See Historical Development of Insurance*, Britannica, https://bit.ly/2Dd5yRy (last visited July 11, 2022). Governments have required liability insurance in several different areas, and have done so for many years. Some of these requirements have implicated constitutionally protected rights and faced constitutional challenges. However, courts have had no difficulty in affirming mandatory liability insurance as clearly constitutional.

Nearly 100 years ago, in *Ex parte Poresky*, the Supreme Court considered a suit involving a Fourteenth Amendment challenge to Massachusetts' "compulsory automobile liability insurance" law. 290 U.S. 30, 31 (1933). The Court swiftly denied the claim at issue, citing the other "decisions of this Court bearing upon the constitutional authority of the state, acting in the interest of public safety, to enact the statute assailed." *Id.* at 32. Auto insurance has not faced serious constitutional challenge since, and today, nearly every state requires it.[2]

Similarly, both state and federal courts have upheld medical malpractice insurance requirements against constitutional challenge. For example, in *McCoy v. Commonwealth of Pennsylvania*, a state court

---

[2] Any argument that driving a car is a privilege not a right is specious. The right to move freely, to use public rights of way, to travel across state lines, and drive in pursuit of a livelihood, though not expressly enumerated in the first eight amendments, are rights nonetheless, protected under the Fifth, Ninth, and Fourteenth Amendments.

considered "the constitutionality of the mandatory insurance provisions" of a state medical malpractice insurance act under a Fourteenth Amendment challenge. 37 Pa. Cmwlth 530, 533 (1978). The act required doctors to "either purchase insurance or develop a plan of self-insurance," and required the state licensure board "to suspend or revoke the license of a health care provider upon a failure to comply with the mandatory insurance provisions." *Id.* at 535. Upholding the statute, the court held that the state had the authority "to recognize the problem of malpractice insurance availability and to deal with it." *Id.* at 538. Likewise, in *Meier v. Anderson*, when doctors challenged a related provision of the same law, a federal court held that the state's actions in "controlling the medical malpractice insurance market" were within its constitutional authority. 692 F. Supp. 546, 552–53 (E.D. Pa. 1988), *aff'd*, 869 F.2d 590 (3d Cir. 1989) (internal quotation marks omitted).

Moving outside of the context of liability insurance to perhaps the most well-known insurance requirement of all—the individual mandate under the Affordable Care Act—constitutional challenges based in individual constitutional rights never even got off the ground. In the district court litigation that led to the Supreme Court's decision upholding the individual mandate in *National Federation of Independent Businesses v. Sebelius*, the plaintiffs had argued that the "mandate violate[d] their rights to substantive due process under the Fifth Amendment." *Fla. ex rel. McCollum v. U.S. Dep't of Health & Hum. Servs.*, 716 F. Supp. 2d 1120, 1161 (N.D. Fla. 2010). The district court "flatly rejected" this argument, and the litigants "expressly disclaimed" it on appeal. *Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.*, 648 F.3d 1235, 1361 (11th Cir. 2011) (Marcus, J., concurring); *see also Sebelius*, 567 U.S. at 613 (Ginsburg, J., concurring) ("Plaintiffs have abandoned any argument pinned to substantive due process, however, and now concede that the provisions here at issue do not offend the Due Process Clause.") (citations omitted).

In sum, none of these well-established insurance requirements have created serious constitutional issues. The Ordinance's liability insurance requirement does not, either.

### 4. The Ordinance's Liability Insurance Requirement Is a Proven Solution to the Difficult Societal Problem of Firearm Accidents.

Finally—and specifically concerning the liability insurance requirement—mandatory liability insurance is a particularly suitable solution to the problems posed by gun accidents.

Firearm ownership unavoidably creates the risk of accidents. Faced with the challenges of such accidents, San Jose, like many other governments have done in other contexts, turned to liability insurance. Governments have regularly created public-private liability insurance systems, rather than direct regulation, to address problems posed by other risky activities, influence consumer behavior, and encourage safer practices. This has been done successfully, for decades, in the context of automobile safety (auto insurance), workplace safety (workers' compensation insurance), and medical and other professional errors (malpractice insurance), among others. San Jose should be permitted to do the same here, harnessing the power of liability insurance to compensate victims, protect gun-owning policyholders' assets, allocate the risk of accidents, and promote public safety, all while imposing no restrictions or conditions on ownership, possession, or use of firearms.

### a. Firearms Create Risks and Costs That Are Not Intrinsically Well Allocated.

Firearm ownership is inherently *risky*. For example, even a responsible gun owner's firearm may go off accidentally, injuring people or property. These firearm accidents occur regularly in San Jose, where an average of 86 people are killed or injured each year by firearm incidents deemed "unintentional" or "undetermined"—that is, accidents. *Incidence and Cost of Firearm Injuries in San Jose*, *CA*, Pacific Institute for Research and Evaluation 1 (Jan. 19, 2022).

Firearm accidents are also ***costly***. Police and fire response alone for accidental shootings costs the City an average of $233,699 annually. *Id.* at 2. When considering other related costs, such as medical and mental health care, lost work, and lost quality of life, accidental shootings have a total societal cost to the City of nearly $25 million dollars every year, or $290,000 per person shot. *Id.* at 4–5. Although Plaintiffs may quibble over the exact dollar amount, these costs are massive by any measure.

Further, the costs of firearm-related accidents are distributed ***unpredictably and unfairly***. Taxpayers are forced to fund over $1 million of the $25 million annual cost of accidents, through public services such as emergency response and victim assistance. *Id.* at 5. The remaining millions of dollars in costs fall on victims, family members, and gun owners themselves. Without any system of allocating these costs, it is nearly impossible to know who will be financially responsible when a random accident strikes.

### b. Liability Insurance Excels at Reallocating Risks.

When the unintended consequences of an individual's actions harm another person or another person's property, that injured person or property owner may recover damages. However, issues arise—both for the victim and the person responsible for the harm—when the amount of these damages is beyond what the responsible individual can pay. This is the problem liability insurance was designed to solve.

Through liability insurance policies, insurers agree to cover, among other things, claims that third parties bring against the policyholder for accidental injuries the policyholder caused. Through insurance, the cost of such claims is transferred to insurance companies, which in turn spread that cost to their customers through risk-based premiums, instead of being borne out-of-pocket by the person who caused the accident, the victim, or public or private services. *See, e.g.*, Peter Kochenburger, *Liability Insurance and Gun Violence*, 46 Conn. L. Rev. 1265, 1271 (2014). Some familiar examples of liability insurance include homeowners insurance, renters insurance, automobile insurance, and commercial general liability insurance. Many existing liability insurance policies provide coverage for firearm-related injuries, including, for example, for injuries resulting from an accidental discharge, and for legal defense costs where the policyholder purposefully fired his weapon, but unintentionally shot someone. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Partridge*, 514 P.2d 123, 129 (Cal. 1973) (en banc) (noting that "any resultant damage" from the accidental firing of a gun "would clearly be covered" by the homeowners policy at issue); *Allstate Ins. Co. v. Barnett*, No. C-10-0077 EMC, 2010 WL 3619778, at *7 (N.D. Cal. Sept. 9, 2010) (finding a duty to defend when insured claimed he did not intend to shoot victim).

One of the reasons government-required liability insurance has been so successful is that the cost-sharing aspects of liability insurance are particularly effective when implemented at a community scale. If only the lowest-risk individuals purchase insurance, and the riskiest individuals go uncovered, many of the benefits of liability insurance are reduced: victims' ability to recover compensation for their injuries will depend on whether the gun owner has sufficient funds, and uninsured gun owners may bear astronomical medical or legal costs of an accidental shooting. Conversely, if only the highest-risk individuals purchase insurance, because they know they are the most likely to make a claim, insurance companies may charge inflated premiums. Thus, "rates go up . . . , and the victims of many accidents go uncompensated, which spreads the costs throughout society." Jennifer B. Wriggins, *Mandates, Markets,*

*and Risk*, 19.2 Conn. Ins. L. J. 275, 291 (2013). But, by including as many of the individuals in a community as possible that are participating in a risk in the risk pool, "insurance markets can work better for the benefit of consumers." *Id.* at 288. By requiring that most participants in a risky activity obtain insurance, governments make sure that the costs of the risk are distributed optimally among them.

### c.    Liability Insurance Provides Financial Incentives for Responsible Ownership and Risk Reduction.

Insurance companies also have a demonstrated ability to influence individual behavior by providing financial incentives to responsible policyholders. According to insurance scholars, "Once an insurance institution assumes responsibility for the financial consequences of a given harm, it has an incentive to prevent that harm." Tom Baker & Thomas O. Farish, *Liability Insurance and the Regulation of Firearms*, in Suing the Gun Industry, at 5 (Timothy D. Lytton ed., 2005). Such incentives tend to reduce accidents, as demonstrated in the areas of auto insurance, workers' compensation, and malpractice insurance.

For example, in workers' compensation, insurance companies offer better rates to businesses that make their workplaces safer. Occupational Safety and Health Administration, *Business Case for Safety and Health*, https://www.osha.gov/businesscase/benefits (last visited July 11, 2022) (noting multiple studies that find safer workplaces result in lower workers' compensation costs). Similarly, medical malpractice insurance identifies risky providers, encourages safer practices, and collects data that pinpoints the causes of medical errors. Tom Baker & Charles Silver, *How Liability Insurers Protect Patients and Improve Safety*, 68 DePaul L. Rev. 211, 226 (2019) ("Liability insurers and their industry groups have facilitated and supplemented the work of physicians and their professional societies by sharing closed claim data, providing analyses, and developing treatment guidelines of their own."). Car insurance also offers lower premiums for certain vehicle safety measures and rewards safe drivers. *See, e.g.*, Allstate, 7 Easy Ways to Help Lower Your Car Insurance Premium, https://al.st/3Plq99o, (last visited July 11, 2022); State Farm*, Be Rewarded With Drive Safe & Save Discounts*, https://bit.ly/3nR1eir (last visited July 11, 2022); Allstate, Safe Driving Bonus, https://al.st/3OXrX99 (last visited July 11, 2022).

Here, the Ordinance guarantees that San Jose gun owners will comprise a sizable segment of the local liability insurance market. With this large population of customers, insurance companies will have

a financial interest in limiting their payouts for gun-related accident claims. Just as they have done for other risks that they insure, insurance companies will likely try to reduce their payouts for gun accidents by incentivizing safe practices that reduce risk. For example, much as liability insurance providers have incentivized safer driving and safer workplaces, discussed above, insurance companies can offer premium discounts to incentivize safe gun practices. As noted in the City's findings, these incentives might encourage firearm owners to "take safety classes, use gun safes, install trigger locks, or utilize chamber-load indicators." Ord. No. 30716 at 4.

Plaintiffs' argument that this risk cannot be assessed is unavailing. Insurers have priced risk for generations, including for things much more obscure than firearm risks. For example, life insurance companies price the risk of scuba diving, an activity with a relatively low estimated death rate of 164 people per million participants. Kristen Moore & Craig Reynolds, *Firearm Risk: An Insurance Perspective*, The Actuary (June/July 2018) https://bit.ly/3IvWXdL (last visited July 11, 2022). By comparison, as many as double that number or more die from firearms in the home. *Id.* Given a financial incentive to price the risk of gun accidents, as the City-wide insurance requirement does, insurers will find a way to do so.

### 5.    The Vast Majority of San Jose Gun Owners Are Already in Compliance with the Ordinance's Insurance Requirement.

The Ordinance's insurance requirement requires no significant change to the status quo because most people already own qualifying insurance, or can easily obtain it. Homeowners and renters insurance policies already cover liability for accidental harms, including from firearms. *See supra* at 2; Kochenburger at 1275 (surveying policies); *see, e.g.*, ISO, Homeowners 3-Special Form (HO 00 03 05 11) (2010) (standard homeowners policy form, which includes "accident[s]" resulting in both "Bodily injury" and "Property damage" under its definition of a covered "Occurrence," and does not exclude firearms). Further, in an *en banc* decision, the California Supreme Court has confirmed that a claim for damage where a "gun had accidentally fired" would "clearly be covered" under a typical homeowners policy that provides coverage for accidents and does not exclude firearms. *Partridge*, 10 Cal. 3d at 103.

Many people already carry such coverage, including **93 percent** of homeowners. *See* Insurance Information Institute, 2021 Insurance Fact Book 90. Although the number of insured renters is smaller,[3] City residents who do not currently carry homeowners or renters insurance can easily obtain it with an off-the-shelf policy sold by any number of insurance companies authorized to do business in California.

Here, the insurance requirement is entirely of a piece with the traditional governmental role of allocating gun accident costs, as well as the historical progression toward using liability insurance to do so. It in no way oversteps the historical bounds of Second Amendment regulation. If anything, it is *less* burdensome on gun owners than the cost-allocation system that governments imposed during the founding era.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Defendants' briefings, Plaintiffs' Motion for Preliminary Injunction should be denied and Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint should be granted.

Dated: July 11, 2022                        Respectfully Submitted,

                                            **COVINGTON & BURLING LLP**

                                            /s/  Gretchen Hoff Varner
                                            GRETCHEN HOFF VARNER (Bar No. 284980)
                                            Salesforce Tower
                                            415 Mission Street, Suite 5400
                                            San Francisco, California 94105-2533
                                            Telephone: (415) 591-6000
                                            Facsimile: (415) 591-6091
                                            Email: ghoffvarner@cov.com
                                            *Attorney for Amicus Curiae*

---

[3] *See Number of Renters Is on the Rise—But Few of Them Have Insurance*, Insurance Information Institute (Sept. 22, 2014), https://bit.ly/3NXlxW7.

OF COUNSEL

**COVINGTON & BURLING LLP**
SUZAN CHARLTON*
JAMES FITCH*
ALLISON HAWKINS*
ELIZABETH UPTON*
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Email: scharlton@cov.com
jhfitch@cov.com
ahawkins@cov.com
eupton@cov.com

**BRADY**
JONATHAN LOWY*
SHIRA FELDMAN*
840 First Street, NE
Suite 400
Washington, DC 20002
Telephone: (202) 370-8100
Email: jlowy@bradyunited.org
sfeldman@bradyunited.org

*Attorneys for Amicus Curiae*
*\* Not admitted in this Court*