HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MICHAEL A. COLUMBO (SBN: 271283)
mcolumbo@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700

DAVID A. WARRINGTON*
dwarrington@dhillonlaw.com
CURTIS M. SCHUBE*
cschube@dhillonlaw.com
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 402
Alexandria, VA 22314
Telephone: (571) 400-2121

*Admitted *Pro Hac Vice*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a non-profit corporation, and **MARK SIKES,** an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF SAN JOSE, a public entity, JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL,**<br><br>Defendants. | Case No. **5:22-cv-00501-BLF**<br><br>**PLAINTIFFS' RESPONSE TO BRIEF OF BRADY AS AMICUS CURAIE**<br><br>Motion:        Mot. Preliminary Injunction |



**PLAINTIFFS' RESPONSE TO BRIEF OF BRADY AS AMICUS CURIAE**

**I.      Introduction**

The City of San Jose (the "City") instituted a first-of-its-kind law compelling gun owners to make a donation to a City-chosen non-profit and to purchase insurance. These requirements implicate the Second Amendment because they only apply to gun owners, only because they are gun owners, and force them to choose between either making the mandated payments, paying fines for violating the Ordinance, or forgoing the right to own a gun.

The Ordinance fails the Second Amendment analysis in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111 (2022). In *Bruen*, the Supreme Court held that a court must consider whether a regulation has historical analogs close in time to the ratification of the Second Amendment in 1791 showing that it is consistent with the Founders' understanding of the Second Amendment. The Court also held that when the issue the regulation seeks to address existed at the Founding, the Founders' solution to that issue, if any, will be informative.  Brady not only fails to identify comparable historical gun regulations, it acknowledges that the same harms the Ordinance addresses also existed at the Founding and that the Founders chose to address them by vastly different means. The City's unprecedented Ordinance therefore violates the Second and Fourteenth Amendments.

**II.      The Ordinance Implicates the Second Amendment Because It Regulates the Way People Can Exercise Their Second Amendment Rights.**

Brady claims that neither the Ordinance's "fee" requirement nor its insurance requirement, which are solely target gun owners, require a Second Amendment analysis. Brady Brf. 2-6. Brady claims the Ordinance has "no bearing on whether a person can 'keep and bear arms.'" Brf. 2:21. Brady's contentions are contrary to *Bruen* and Ninth Circuit authority.

The Supreme Court's analysis in *Bruen* asks first whether "the Second Amendment's plain text covers an individual's conduct[.]" *Bruen*, 142 S.Ct. at 2126. If so, "the Constitution presumptively protects that conduct" and the burden shifts to the government to justify its regulation. *Id.* "If the government can prove that the regulated conduct falls beyond the Amendment's original scope, 'then the analysis can stop there.'" *Id.* (quoting *United States v. Greeno*, 679 F.3d 510, 518 (2012)).

Here, the regulated conduct that triggers the application of the Ordinance's requirements is the mere ownership of a gun, which is squarely protected by the Second Amendment. "[T]he 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'" *Bruen* at 2134 (quoting Heller, 554 U.S. at 592).

By contrast, an example of a case falling outside the scope of the Second Amendment altogether is a law regulating the possession of a gun while committing a drug trafficking offense. *U.S. v. Greeno*, 679 F.3d 510 (6th Cir. 2012). Possessing a weapon to commit a crime is not within the original intention of the Second Amendment's scope. *Id*. The *Bruen* Court also noted that, in more borderline and "inconclusive" cases where the "regulated activity is not categorically unprotected," courts generally continue with the Second Amendment analysis. *Bruen*, 142 S.Ct. at 2126.

The Ninth Circuit similarly applies a Second Amendment analysis to laws burdening Second Amendment rights.  In *Jones v. Bonta*, the 9th Circuit concluded that the district court abused its discretion when it found a gun law imposed no burden on Second Amendment rights. *Jones v. Bonta*, 34 F.4th 704, 715 (9th Cir. 2022). The Court explained that laws may be found constitutional (using the more deferential and now obsolete *pre-Bruen* intermediate scrutiny analysis) because their burdens are slight—but this does not mean that there is no need for a Second Amendment analysis. *Id*. at 723. Consistent with the Supreme Court's analysis, a Second Amendment analysis can only be avoided where a law does not regulate activity protected by the Second Amendment.  *Id*.

The Second Amendment thus governed laws "that regulate either the way people can obtain or use firearms, or auxiliary features of those firearms." *Id*. at 725.  Specific examples include, among other things, "*using firearm purchase fees to fund law enforcement programs*". *Jones v. Bonta*, 34 F.4th 704, 725 (9th Cir. May 11, 2022). (citing *Bauer v. Becerra*, 858 F.3d 1216, 1221-22 (9th Cir. 2017)) (emphasis added). Such laws implicated the Second Amendment "because they regulate *the way people can exercise* their Second Amendment rights." *Id*. (emphasis added). In *Heller v. District of Columbia*, 801 F.3d 264, 273-74 (D.C. Cir. 2015) ("Heller III"), the D.C. Circuit also found that "additional registration requirements" including, among other things, fees and a requirement that one undergo a firearms safety course, in fact burdened Second Amendment rights. *Id*. at 270.

Like the Ordinance's "fee," its mandatory insurance requirement burdens conduct protected by the Second Amendment – indeed, its very purpose is to manipulate how people exercise their Second Amendment rights.  As the Ordinance itself points out, insurance works with "risk-adjusted premiums to reward good driving and incentivize use of [measures the insurance company deems to be safety measures]." Ordinance §10.32.200.11. As the City puts it, "Liability insurance can reduce the number of gun incidents by encouraging safer behavior…." Ordinance §10.32.200.12. Brady endorses this notion: its heading for section III.B.4.c states "Liability insurance provides financial incentives for responsible ownership and risk allocation." Brady Brf. 14:5-6. Put simply, the conduct of gun owners has a direct correlation with how much money the owner has to pay for insurance and the insurance requirement is designed to change how gun owners use their guns.  Under Ninth Circuit precedent, the "way people can…use firearms" implicates the Second Amendment. *Bonta*, 34 F.4th at 725.

Further, both the "fee" and the insurance requirement are enforced by citations and fines for non-compliance, as Brady acknowledges. Brady Brf. at 3:25-26. Brady argues that because the Ordinance's impoundment provision is illegal under California law, the Ordinance does not "condition firearm ownership on the procurement of insurance." Brady Brf. 3:24. Nevertheless, gun owners must either 1) give up their right to possess a gun; 2) pay the "fee" and for insurance; or 3) pay a fine. Either way, because of the Ordinance, gun owners must choose between exercising their constitutional rights and paying money. It cannot be said that such a choice does not implicate the Second Amendment. The Second Amendment is not a second-class right: Substitute gun ownership for political speech, praying, or voting, and it is plain that the Ordinance's conditions and threat of penalties for non-compliance at least requires a Second Amendment analysis.

Brady cites to *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 558 (2012) to argue that insurance is not the same as engaging in the protected activity. Brady Brf. 4:11-18. In *Sebelius*, however, the Court examined an extraordinary assertion of government power, not the extent of a protected right, much less the Second Amendment. Specifically, the Court rejected the argument that because the federal government has the constitutional Commerce Clause power to regulate the commercial transaction of obtaining health care, it also had the derivative power to compel every person to perpetually buy insurance to ensure they could pay for a future health care need. Here, by

Plaintiffs' Res. Brf. Brady Amicus                                                    5:22-cv-00501-BLF

contrast, San Jose does not have some other greater power to regulate gun ownership from which it derives a power to compel gun insurance. As in the cited portion of *Sebelius*, the court must enforce the Constitution's limits on government power. The first question for the Court is whether the Ordinance, by targeting gun owners for special requirements relating to their ownership of guns, regulates activity within the scope of the Second Amendment. *Bruen*, 142 S.Ct. at 2126; *Bonta*, 34 F.4th at 725.

In sum, San Jose's Ordinance imposes a nonprofit donation requirement and an insurance requirement, under threat of penalties, on everyone who possesses a gun, and only people who possess a gun, merely because they possess a gun. As a threshold matter, a Second Amendment analysis must be applied, consistent with *Bruen* and Bonta, because gun ownership is indisputably protected by the Second Amendment right to keep and bear arms.

### III.     Brady Failed to Find Adequate Historical Comparisons to the Ordinance.

The historical inquiry in *Bruen* begins with the "perceived societal problem," *Bruen*, 142 S.Ct. at 2131 (citing *Heller*, 554 U.S. at 628), and the means by which it has been addressed. Claimed historical analogs to modern regulations would need to be "relevantly similar." *Bruen*, 142 S.Ct. at 2132. "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id*. at 2133 (quote omitted).  The "government [is to] identify a <u>well-established</u> and <u>representative</u> historical *analogue*, not a historical *twin*." *Id*. (Italic in *Bruen,* underline added). "[I]f earlier generations addressed the societal problem, but did so through materially different means, that…could be evidence that a modern regulation is unconstitutional." *Id.* at 2131.

In *Heller*, the societal problem was firearm violence in densely populated areas. *Id.*  The Court found no analogous historical bans on firearms in the home; therefore, the challenged law's ban was unconstitutional. *Id.*  Similarly, in *Bruen*, the Court did not find historical comparisons to New York's proper-cause requirement for carrying a gun, therefore, it was unconstitutional. *Id*. at 2156.

Here, the government seeks to address the societal problems of firearm deaths, with an emphasis on deaths due to suicide or unsafe firearm use. *See* Ordinance, §10.32.200. These societal

4

harms are not unique to modern times. Rather, firearm deaths due to suicide and accidental discharge existed during the founding era. *See, e.g., Appeal of Cressman*, 42 Pa. 147, 148 (Pa. 1862) (decedent died due to accidental discharge of gun); *Scott County v. Fluke*, 34 Iowa 317 (1872) (person took own life with a firearm). Brady both acknowledges that this problem existed at the Founding and, further, concedes that the law at the time provided a solution for both deterrence and compensation for injuries. Brady Brf. 9:1-23. The Ordinance, by seeking to solve the same issue through an unprecedented compulsory nonprofit donation and universal insurance mandate, is not supported by this historical approach to firearm regulation at the time of the Second Amendment's adoption.

### A. Brady Does Not Identify Historically Established Analogous Fees on Guns.

Brady first argues that a "minimal economic burden" on guns is consistent with American history. In *Bruen*, at note 9, the Court addressed the potential for unconstitutionally high fees, though that issue was not before the Court, 142 S.Ct. at 2138, n.9, much less a compulsory donation masquerading as a city fee. It is well-settled that the government can impose a feel to reimburse itself for its actual administrative expenses. *See Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). However, the "fee" in the Ordinance, a mandatory nonprofit donation, does not reimburse San Jose for any service the City provides. Accordingly, this authority does not save the Ordinance.

Brady also cites four historical statutes which, it says, are analogs to San Jose's Ordinance. Brady Brf. 7:7-20. However, among those statutes, two (Rhode Island and San Francisco) applied to "galleries," not citizens. *Id.* As for the other two, the Mississippi statute does not state whether the "two dollars on each dueling or pocket pistol" is a tax, fee, or a fine or to whom the statute applied. There is not enough context to determine what the law accomplished. Finally, with regard to the North Carolina statute, the statute read in full:

> On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.[1]

---

[1] 1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 3, §23, pt. 4, available at https://firearmslaw.duke.edu/search-results/?_sfm_law_year=1856+1856&_sft_jurisdictions=north-carolina#2050

It is not clear that the North Carolina statute, insofar as it directly taxes the carrying and any use of a gun, is constitutional. In any event, these irrelevant examples do not demonstrate that a "fee" comprising a mandatory donation to a non-profit imposed on all gun owners was "well-established" or "representative" in historical law near the time of the Second Amendment's adoption. *Bruen*, 142 S.Ct. at 2133. Even if these laws were similar to the Ordinance, the fact that only one or two states had such laws is not sufficient to inform the nation's understanding of the Second Amendment; outliers are insufficient under *Bruen*. *Id*. ("courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." (citing *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021)).

Brady cites other fees imposed on citizens, such as mail, automobiles, lead products, telephones, etc. Brady Brf. 7:21. These are unrelated to guns, the ownership of which is expressly protected by a Constitutional right, and cannot be considered historical comparisons. For example, while the Fifth Amendment has been interpreted to include a right to travel, it does not guarantee the right to travel by car, whereas the Second Amendment guarantees the right to keep and bear arms.

### B. Brady's Historical Examples of Insurance Are Not Examples of Insurance Mandates On the Exercise of a Constitutional Right.

Brady argues that the surety statutes referenced in *Bruen* provide historical support for the Ordinance. Brady Brf. 6:19-7:6. In the mid-19[th] century, many jurisdictions required individuals to post bond before carrying weapons in public. *Bruen,* 142 S.Ct. at 2148.  However, those surety laws "typically targeted only those threatening to do harm." *Id*. They required bond for those who were "likely to 'breach the peace.'" *Id*. (quoting Mass. Rev. Stat., ch. 134, §16(1836)). These surety laws demonstrate that, historically, a government's default position was not to burden all citizens' right to carry a firearm. Rather, the government only imposed that burden once cause has been shown *specific to the individual*. Here, the City essentially presumes that every gun owner is dangerous, making *all* owners pay a "fee" to a nonprofit organization. Not only is there no showing that a gun owner is a danger, there is no requirement that the gun owner receive any services from the nonprofit.

Brady makes four further arguments, none of which address the questions this Court is supposed to analyze.

Plaintiffs' Res. Brf. Brady Amicus                                                    5:22-cv-00501-BLF

1

*1.   Historical Strict Liability Laws Are Not Mandatory Insurance Laws.*

2

First, Brady argues that the insurance requirement is an "improvement upon" the history of

3

allocating the costs of gun accidents. Brady Brf. 8:17. However, an "improvement upon" a past

4

practice suggests the new law is different than the past practice. Brady's history of gun accident

5

liability, Brady Brf. 9:1-23, demonstrates that at the time of the Founders there was a wholly different

6

legal mechanism, presumably consistent with the Second Amendment, that addressed the same exact

7

issue to which the Ordinance is addressed. The founders' solution was individual responsibility by the

8

party that actually caused an accident, adjudicated in court, rather than preemptively imposing

9

financial responsibility on the unoffending class of all gun owners. "[I]f earlier generations addressed

10

the societal problem, but did so through materially different means, that…could be evidence that a

11

modern regulation is unconstitutional." *Bruen*, 142 S.Ct. at 2131.

12

Brady makes the claim that insurance emerged in the time of negligence torts. Brady Brf. 9:24-

13

10:4. However, between the two law review articles it cites, only one references a gun, which was a

14

1944 example of a child being furnished with a BB gun. Fleming James, Jr., *Accident Liability: Some*

15

*Wartime Developments*, 55 Y.L.J. 365, n. 88 (1946); *see also* Kenneth S. Abraham, *Liability*

16

*Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573 (2005). The

17

emergence of insurance as a concept hardly establishes a historical practice at the time of the Second

18

Amendment's adoption of mandatory insurance for firearms that covers accidental and suicide deaths.

19

To the contrary, historically, insurance companies would often not pay for suicide by firearm. *Phillips*

20

*v. Louisiana Equitable Life Ins. Co.*, 26 La.Ann. 404 (La. 1987); *Shank v. The United Brethren*

21

*Mutual Aid Soc.*, 84 Pa. 385 (1877).

22

*2.   Mandatory Insurance in Other Contexts Does Not Provide Historical Examples of*
*Mandatory Gun Insurance.*

23

24

Brady provides examples of mandatory automobile insurance, mandatory medical malpractice

25

insurance, and mandatory health insurance as examples of historical insurance mandates being upheld

26

by the courts. Brady Brf. 10-11. However, analogues must be "relevantly similar,"142 S.Ct. at 2132,

27

and none of these are analogous to mandatory insurance for gun ownership.  They also began

28

Plaintiffs' Res. Brf. Brady Amicus                                                                5:22-cv-00501-BLF

"[n]early 100 years ago," or 1933, not at the time of the founders, Brady Brf. 10:15, and therefore do not illuminate the understanding of the Second Amendment in 1791.

Brady also argues that liability insurance is a "proven solution." However, this analysis is only relevant to the obsolete intermediate scrutiny analysis, specifically whether a regulation is "substantially related to the achievement of an important governmental interest." *Bruen*, 142 S.Ct. at 2126 (quotation omitted). However, the Supreme Court eliminated this second step as "one step too many." *Id*. at 2127. Therefore, whether liability insurance will achieve the government's identified objective is irrelevant. This Court should not entertain this red herring because a first-of-its kind regulation cannot be a "proven solution."

Finally, Brady asserts that the majority of San Jose gun owners are already in compliance with the Ordinance through home or renter's insurance. But not every gun owner has a home with an insurance policy that satisfies the Ordinance, not all renters have renter's insurance, and the degree of anticipated compliance (or non-compliance) is not the test for constitutionality.

### Conclusion

The Ordinance is a "first of its kind" law requiring citizens exercising their Second Amendment rights to donate a "fee" to a non-profit and purchase insurance, imposing burdens without a historical analogue. The Ordinance is therefore unconstitutional and should be enjoined.

Dated: July 28, 2022                    By:  _/s/ David Warrington_____
                                             Harmeet K. Dhillon
                                             Michael A. Columbo
                                             Mark P. Meuser
                                             DHILLON LAW GROUP INC.
                                             177 Post Street, Suite 700
                                             San Francisco, California 94108
                                             (415) 433-1700

                                             David A. Warrington (*pro hac vice*)
                                             Curtis M. Schube (*pro hac vice*)
                                             DHILLON LAW GROUP INC.
                                             2121 Eisenhower Avenue, Suite 402
                                             Alexandria, VA 22314
                                             (571) 400-2121

                                             *Attorneys for Plaintiffs*