**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., et al., | Case No.  22-cv-00501-BLF |
| Plaintiffs, | |
| v. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| CITY OF SAN JOSE, et al., | [Re:  ECF No. 25] |
| Defendants. | |

The City of San Jose passed the Reduction of Gun Harm – Liability Insurance Requirement and Gun Harm Reduction Fee ordinance on January 25, 2022.[1]  In the preamble, the City determined that the Ordinance was an exercise of its police powers "for the protection of the welfare, peace and comfort of the residents of the City of San Jose."  This suit was filed the same day.

Plaintiffs National Association for Gun Rights, Inc. ("NAGR") and Mark Sikes (collectively "Plaintiffs") bring suit against Defendants City of San Jose (the "City"), the City Manager Jennifer Maguire, and City of San Jose City Council (collectively "Defendants") to challenge Part 6 of Chapter 10.32 of Title 10 (§§ 10.32.200- 10.32.250) of the City of San Jose's local ordinances (the "Ordinance").  *See* First Amended Complaint ("FAC"), ECF No. 19.  The Ordinance at issue purports "to reduce gun harm by: (a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs."  *Id.* ¶ 19.  Plaintiffs assert that the Ordinance violates their Second Amendment and First Amendment rights (First and Second Claims), the California Constitution (Third and Fourth

---

[1] The Ordinance's second reading and enactment occurred on February 8, 2022.

Claims), and the City of San Jose's City Charter (Fifth Claim). *Id.* ¶¶ 82-146.

Shortly after commencing suit, Plaintiffs filed the present Motion for Preliminary Injunction ("Motion") to enjoin enforcement of the Ordinance, which was initially scheduled to go into effect on August 8, 2022 but the implementation of which has since been delayed past December 2022. Pls.' Mot. Prelim. Inj. 9, ECF No. 25; Defs.' Suppl. Br. 7, ECF No. 64. On June 23, 2022—after the Motion was briefed but before the hearing—the Supreme Court of the United States issued its opinion in *New York State Rifle & Pistol Ass'n., Inc. v. Bruen*, 142 S. Ct. 2111 (2022), altering the framework under which both parties briefed the Motion. This Court subsequently ordered the parties to file supplemental briefs addressing *Bruen* and the proper legal standard for evaluating the Second Amendment issues in the Motion. ECF No. 62. The Court has considered the parties' initial and supplemental briefing, the *amicus curiae* brief and response, and the oral arguments presented on July 14, 2022. For the reasons discussed below, Plaintiffs' Motion is DENIED.

## I.   BACKGROUND

On June 29, 2021, the San Jose City Council directed City Attorney Nora Frimann to return to Council with an ordinance requiring San Jose gun owners to "obtain and maintain a City-issued document evincing payment of an annual fee, and attestation of insurance coverage for unintentional firearm-related death, injury, or property damage." FAC ¶ 18. On January 14, 2022, the City Attorney returned with a recommendation for an ordinance "(a) requiring gun owners to obtain and maintain liability insurance; and (b) authorizing a fee to apply to gun harm reduction programs." *Id.* ¶ 19. On January 25, 2022, the City Council initially approved the Ordinance, and, on February 8, 2022, the Council voted to finally approve Ordinance No. 30716. *Id.* ¶ 26.

Plaintiff NAGR describes itself as a nonprofit grassroots organization dedicated to defending the Second Amendment right to keep and bear arms. *Id.* ¶ 13. Its members include San Jose residents who would be subject to the Ordinance. Plaintiff Sikes is a San Jose resident, who legally owns a gun and would be subject to the Ordinance if it were to go into effect. *Id.* ¶ 14.

### A.   The Ordinance

Ordinance No. 30716 is comprised of four sections, with the first section containing the

United States District Court
Northern District of California

operative provisions of Part 6 to Title 10 of the San Jose Municipal Code.  *See* FAC, Ex. K.  Part 6 contains sections §§ 10.32.200-10.32.250 and is titled, "Reduction of Gun Harm – Liability Insurance Requirement and Gun Harm Reduction Fee" (the "Ordinance").  *Id.* at 5-12. The second, third, and fourth sections establish the Ordinance's effective date, its severability, and the bases for the City Council's action in passing the Ordinance, respectively.

### i.   Insurance Requirement

The Ordinance itself begins with a recitation of the City's authority to adopt the Ordinance, its purpose, and specific factual findings propelling the City's action.  Ordinance § 10.32.200. The first operative provision requires San Jose residents who own or possess a firearm to obtain a homeowner's, renter's, or gun liability insurance policy "covering losses or damages resulting from any accidental use of the Firearm."  *Id.* § 10.32.210 (the "Insurance Requirement").

### ii.   Gun Harm Reduction Fee

The second main provision is the requirement for San Jose gun owners to pay an Annual Gun Harm Reduction Fee (the "Fee") to a Designated Nonprofit Organization (the "Nonprofit"), selected by the City Manager.  *Id.* § 10.32.215, 10.32.235.  The Fee amount will be established by City Council, and every dollar generated must be used by the Nonprofit to provide "services to residents of the City that own or possess a [f]irearm in the City, to members of their household, or to those with whom they have a close familial or intimate relationship."  *Id.* § 10.32.220(A).  The Ordinance instructs the Nonprofit to spend the funds generated from the Fee exclusively for programs and initiatives designed to "(a) reduce the risk or likelihood of harm from the use of firearms in the City of San Jose, and (b) mitigate the risk of physical harm or financial, civil, or criminal liability that a San Jose firearm owner or her family will incur through her possession of firearms."  *Id.* § 10.32.220(C).  The Ordinance also provides a non-exhaustive list of services the Nonprofit may provide, which include suicide prevention, violence reduction, addiction intervention, substance abuse, mental health services relating to gun violence, and firearms safety education.  *Id.* § 10.32.220(A)(1)-(5).  Proceeds generated by the Fee may not be used for litigation, political advocacy, or lobbying activities nor may the City "specifically direct how the monies from the Gun Harm Reduction Fee are expended."  *Id.* §§ 10.32.220(B)-(C).

### iii.   Compliance and Implementation

San Jose residents who are required to obtain and maintain insurance must maintain a City-designated attestation form, to which they must also affix proof of payment of the Fee.  Ordinance § 10.32.230.  The Ordinance exempts peace officers, persons with concealed carry licenses, and persons for whom compliance would create a "financial hardship" from complying with its provisions.  *Id.* § 10.32.225.

Any violation of the Ordinance is punishable by an administrative citation with fines to be established by City Council.  *Id.* § 10.32.240.  Additionally, the Ordinance prospectively would permit the impoundment of any non-compliant person's firearm, subject to a due process hearing and to the extent allowed by law.  *Id.* § 10.32.245.  That said, the City confirmed in its briefing and in oral arguments that there is currently no federal or state law authorizing the City to impound firearms under the Ordinance, and therefore, the impoundment provision is inoperable absent some future change in the applicable law.  *See* Defs.' Opp. Mot. Prelim. Inj. ("Opp."), at 3.

The Ordinance authorizes the City Manager to promulgate all regulations necessary to implement the requirements and fulfill the policies of the Ordinance, including designating the Nonprofit, providing guidelines on and auditing the use of the Fee, and establishing the criteria for the "financial hardship" exemption.  *Id.* § 10.32.235.  The Ordinance also authorizes the City Manager to collect any cost recovery fees associated with fulfilling the policies of the Ordinance. *Id.* § 10.32.250.

To date, the City Council and City Manager have not yet established the amount of the Fee, the amount of any administrative citation fines, or the identity of the Nonprofit.  Opp. 3-4.

### B.   Procedural History

On January 25, 2022, the same day as the City Council's meeting to consider approving the Ordinance, Plaintiffs filed the original Complaint, seeking declaratory and injunctive relief from the Ordinance.  *See* Compl. ¶ 16, ECF No. 1.

The First Amended Complaint asserts six claims for relief, including a claim under the Declaratory Judgment Act.  First, Plaintiffs allege that the Ordinance violates their Second Amendment rights by requiring gun owners to purchase insurance and pay annual fees (First

United States District Court  
Northern District of California

Claim).  FAC ¶¶ 82-105.  Plaintiffs also claim the Fee constitutes a compelled subsidy in violation of their First Amendment freedoms of speech and association (Second Claim).  *Id.* ¶¶ 106-115. The FAC asserts violations of the California Constitution, specifically that the State of California has occupied the field of residential handgun possession to the exclusion of local governments (Third Claim) and the Ordinance imposes fees that are in fact taxes subject to voter approval (Fourth Claim).  *Id.* ¶¶ 116-133.  Finally, Plaintiffs allege that the Ordinance violates the San Jose City Charter's budgeting and appropriation provisions, the delegation of executive functions, and the requirement that all City revenues and receipts be deposited in the City's accounts (Fifth Claim).  *Id.* ¶¶134-146; *see also* FAC, Ex. A ("City Charter").

On March 8, 2022, Plaintiffs moved to enjoin the enforcement of the Ordinance, currently scheduled to go into effect on August 8, 2022, though later postponed.  Mot. 4; Defs.' Suppl. Br. 7.  The City opposed, asserting ripeness objections in addition to substantive arguments.  Opp. 4-6.  The Motion was fully briefed by March 29, 2022, with a hearing scheduled for July 14, 2022. ECF Nos. 32 ("Reply"), 60.

On June 23, 2022, the Supreme Court of the United States issued its opinion in *New York State Rifle & Pistol Ass'n., Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which struck down New York State's "may-issue" licensing regime and altered the Ninth Circuit's Second Amendment framework.  *See, e.g.*, *Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021), abrogated by *Bruen*, 142 S. Ct. 2111.

On June 27, 2022, this Court ordered the parties to file supplemental briefs, addressing *Bruen* and the proper legal standard for Plaintiffs' Second Amendment challenge.  ECF No. 62. On July 11, 2022, the Court received a request to file an *amicus* brief from Brady, a nonprofit organization dedicated to reducing gun violence, which the Court granted.  ECF No. 66, 69.

## II.   LEGAL STANDARD

### A.   Ripeness

"Ripeness is an Article III doctrine designed to ensure that courts adjudicate live cases or controversies and do not issue advisory opinions or declare rights in hypothetical cases."  *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) (internal quotation marks and

United States District Court
Northern District of California

5

brackets omitted).  As an Article III doctrine of justiciability, ripeness must be established separately for each claim of relief sought.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352-53 (2006); *cf. City of Rialto v. W. Coast Loading Corp.*, 581 F.3d 865, 875 n.8 (9th Cir. 2009) ("[I]t is beyond question that every claim before us must meet minimum constitutional requirements for jurisdiction, such as ripeness.").  The ripeness inquiry contains both a constitutional and a prudential component.  *See Bishop Paiute*, 863 F.3d at 1153.  Constitutional ripeness is analyzed "under the rubric of standing because ripeness coincides squarely with standing's injury in fact prong," while prudential ripeness considers two overarching factors: "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration."  *Id.* 1153-54.

"A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final."  *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (quoting *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999).  In considering the hardship to the parties, courts consider whether "withholding review would result in direct and immediate hardship and would entail more than possible financial loss," as well as "whether the regulation requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance."  *Wolfson*, 616 F.3d at 1060 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)).

### B.   Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A plaintiff seeking a preliminary injunction must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Id.* at 20.  Alternatively, an injunction may issue where "the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor," provided that the plaintiff can also demonstrate the other two *Winter* factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (citation and internal quotation marks omitted).

United States District Court
Northern District of California

A preliminary injunction should not be granted, "unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (italics in original). That said, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). In cases where the government bears the burden as to the ultimate question of the challenged law's constitutionality, the moving party must "mak[e] a colorable claim that its [constitutional] rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022).

## III.    DISCUSSION

Because the City's ripeness challenges directly bear upon the Court's jurisdiction and ability to reach the merits in this case, the Court first addresses the City's ripeness arguments.

### A.    Ripeness

The City's ripeness argument, although broadly asserted against the entire lawsuit, appears to focus only on the First and Second Amendment challenges to the Fee. The City asserts that Plaintiffs' First Amendment challenge to the Fee is not ripe because Plaintiffs assume that the yet-to-be-designated Nonprofit's activities will inevitably violate the First Amendment. Opp. 4-5. The City also argues that, because the City Council has not established the Fee amount yet, the Fee's burden on Plaintiffs' Second Amendment rights is uncertain, and thereby their Second Amendment challenge is also unripe. *Id.* at 6. The City does not argue that Plaintiffs' challenges to the Insurance Requirement are unripe, nor does the City dispute constitutional ripeness, *i.e.*, the existence of an injury-in-fact. Rather, the City primarily argues the lack of prudential ripeness by disputing the fitness of the Fee for judicial determination at this time. *Id.* at 5.

Plaintiffs respond that pre-enforcement challenges to an ordinance are ripe where there is an "actual and well-founded fear that the challenged statute will be enforced." Reply 3 (quoting *Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013)). They argue that there is nothing to suggest that the City will not enforce the Ordinance, and it is sufficient that the Ordinance would condition lawful gun ownership on making a financial donation and

acquiring liability insurance.  *Id.*

### i.    Ripeness of First Amendment Claim

Plaintiffs' Complaint asserts that the mandatory Fee would infringe their First Amendment rights to free speech and free association.  FAC ¶ 62.  Because gunowners must pay the Fee regardless of whether they want to associate with or donate to the Nonprofit, the required Fee would be "[c]ompelling [them] to subsidize the speech of other private speakers."  Mot. 15 (quoting *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018)).  Plaintiffs compare the mandatory Fee to the mandatory union agency fees struck down in *Janus*, which were imposed on all relevant employees regardless of whether they were union members or agreed with the union's tactics.  138 S. Ct. at 2460.

The City responds that, as a threshold matter, Plaintiffs' challenges are unripe.  The Nonprofit, the City argues, has not yet been designated nor have its activities been confirmed, so Plaintiffs are merely speculating that the Nonprofit will "inevitably hold the City's anti-gun biases" and be "hostile to gun ownership."  Opp. 5, 16 (quoting Mot. 5, 8, 17).

In assessing whether this question is fit for judicial decision, the Court begins with the observation that the First Amendment freedom of association is closely, if not inextricably, tied to speech and expression.  *See, e.g.*, *Janus*, 138 S. Ct. at 2463 ("The right to eschew *association for expressive purposes* is likewise protected.") (emphasis added); *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012) ("[T]he ability of like-minded individuals to *associate for the purpose of expressing* commonly held views may not be curtailed.") (emphasis added); *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) ("It is beyond debate that freedom to engage in *association for the advancement of beliefs and ideas* is an inseparable aspect of the . . . freedom of speech.") (emphasis added).

The Supreme Court further defined the relationship between speech and association in *Keller v. State Bar of California*, which involved a state bar's mandatory membership dues.  496 U.S. 1 (1990).  There, the Supreme Court held that the compelled fee was justified by the State's interest in regulating the legal profession and, therefore, the state bar may use proceeds from the mandatory dues to constitutionally fund "activities germane to those goals" or "expenditures . . .

United States District Court
Northern District of California

1  necessarily or reasonably incurred" for those goals.  *Id.* at 14.  However, *Keller* held that the state

2  bar could not use the mandatory dues to fund "activities of an ideological nature," drawing a

3  distinction between activities that implicated speech and those that were "germane" to the

4  association's legitimate functions.  *Id.*

5       Turning to the Nonprofit at issue, as yet, the Ordinance does not specify what the

6  Nonprofit's activities will be.  Although the Ordinance lists five possible services that the

7  Nonprofit may fund, that list is neither mandatory nor exhaustive.  Ordinance § 10.32.220(A)

8  ("Such expenditures may include, but are not necessarily limited to the following. . . .").  The only

9  other indication of the Nonprofit's activities is the Ordinance's directive that the Nonprofit's

10  programs and initiatives be designed to "(a) reduce the risk or likelihood of harm from the use of

11  firearms in the City of San Jose, and (b) mitigate the risk of physical harm or financial, civil, or

12  criminal liability that a San Jose firearm owner or her family will incur through her possession of

13  firearms."  Ordinance § 10.32.220(C).  However, this broad mission statement does not inform the

14  Court as to whether the Nonprofit's activities will be permissibly "germane" to a justifiable state

15  interest or impermissibly "ideological" in nature.  *Keller*, 496 U.S. at 13-14.

16       It is also unclear whether the Fee would fund *any* kind of speech or expressive activities,

17  much less anti-gun sentiments.  *See* Ordinance § 10.32.220(A)-(C) (mentioning "services,"

18  "programs," and "initiatives").  For instance, one can readily envision a regulatory scheme in

19  which the Nonprofit adopts a program that violates the First (and Second) Amendment, perhaps by

20  undertaking a public service advertising campaign to reduce gun ownership.  *Cf. United States v.*

21  *United Foods, Inc.*, 533 U.S. 405 (2001) (holding that compelled subsidies used to fund industry

22  advertisements unconstitutional under the First Amendment); *but cf. Glickman v. Wileman Bros.*

23  *& Elliott*, 521 U.S. 457, 472–73 (1997) ("[O]ur cases provide affirmative support for the

24  proposition that assessments to fund a lawful collective program may sometimes be used to pay

25  for speech over the objection of some members of the group.").  However, one can also just as

26  readily conceive of a program that may reduce gun harm without involving speech or other

27  expressive activity, such as offering optional firearm safety training to first-time gun owners.  *Cf.*

28  *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) (finding no First Amendment violation

where closure sanction of a bookstore was targeting non-expressive activity). Absent speculation on the Nonprofit's activities, Plaintiffs' First Amendment claim "rests upon contingent future events that may not occur as anticipated." *Texas v. U.S.*, 523 U.S. 296, 300 (1998). Because "further factual development would significantly advance [the Court's] ability to deal with the legal issues presented," the Court cannot say that the First Amendment claim is fit for judicial decision. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (internal quotation marks omitted).

Plaintiffs' arguments to the contrary are mostly inapposite. To start, although the City argues that Plaintiffs' Fee challenges are *prudentially* unripe, Plaintiffs' response and cited authorities only bear upon *constitutional* ripeness, with one case only summarily addressing prudential ripeness in a footnote and another finding the case to be prudentially unripe. *Compare* Opp. 4-5 *with* Reply 3; *see also Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 872 n.5 (9th Cir. 2013); *Nichols v. Brown*, 859 F. Supp. 2d 1118, 1135 (C.D. Cal. 2012) ("Furthermore, this case is not ripe for review for prudential reasons as well."). As a result, the generally undisputed allegation that the City intends to enforce the Ordinance does not rebut or respond to the City's prudential ripeness argument where the Court does not know what the City will be enforcing.

Plaintiffs also submit that the Nonprofit will "inevitably hold the City's anti-gun biases," will be "hostile to gun ownership," and will be "inherently political." Mot. 8; Reply 10. Such viewpoints, however, are not apparent from the face of the Ordinance. True, the Ordinance proposes five non-exhaustive examples of services the Nonprofit *may* (but not shall) provide. Ordinance § 10.32.220(A)(1)-(5). However, Plaintiffs do not explain how suicide prevention, violence reduction, addiction intervention, mental health services, or firearm safety training necessarily evidence viewpoints that are "hostile" to gun ownership or are "inherently political." And, as noted above, these programs may or may not even involve any speech or expressive activities in the first instance. Without a concrete idea of the Nonprofit's actual programs and activities, the Court is left "entangling [itself] in abstract disagreements." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).

With respect to the "hardship to the parties of withholding court consideration," the Fee does not require an "immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Wolfson*, 616 F.3d at 1060.  Here, the only change in Plaintiffs' conduct would be the preparation (if any) to potentially pay a fee, an obligation that arises only if they do not qualify for the "financial hardship" exemption and is only punishable by an administrative citation.  Ordinance §§ 10.32.225, 10.32.240.  Furthermore, the City does not expect to finalize its contract with any non-profit before December 2022, Defs.' Suppl. Br. 7, and even so, there has been no indication as to the City Manager's regulations establishing the "date by which payment shall be made annually."  Ordinance § 10.32.215.  Given that the Ordinance's Fee provision would not force an immediate change to Plaintiffs' current conduct, the Court does not find any hardship for withholding court consideration on Plaintiffs' First Amendment challenge to the Fee.

Because the Nonprofit has not yet been identified nor have its activities been determined, the Court finds that Plaintiffs' First Amendment challenge to the Fee is prudentially unripe.[2]

### ii.    Ripeness of Second Amendment Claim

In response to Plaintiffs' Second Amendment challenge to the Fee, the City argues that, because the Fee's amount has not yet been determined, whether the Fee would infringe upon Plaintiffs' Second Amendment rights beyond a *de minimis* burden is not fit for judicial determination.  Opp. 6.  Plaintiffs respond that it is sufficient that "the Ordinance will condition lawful gun ownership on the making of a financial donation to a nonprofit that the Ordinance characterizes as a city 'fee.'"  Reply 3.

Whether an annual mandatory fee on gun owners violates the right to "keep and bear Arms" will turn on the Fee amount and the City's criteria for determining "financial hardship."

---

[2] Notwithstanding its assessment of the claim's ripeness, the Court notes that the substance of Plaintiffs' First Amendment argument contains compelling points, especially regarding the Supreme Court's holding in *Janus*, 138 S. Ct. 2448.  As the City Manager develops the regulations applicable to the Fee, close attention to Plaintiffs' arguments may be wise.

United States District Court
Northern District of California

Ordinance §§ 10.32.215, 10.32.225.  In and of itself, a fee that is merely associated with owning a firearm—and for which the failure to pay does not result in that ownership being revoked, Opp. 3—would not necessarily be inconsistent with the "historical tradition of firearm regulation." Indeed, the Supreme Court in *Bruen* expressly contemplated regulations that may permissibly include fee payments, so long as the fees were not so "exorbitant [so as to] deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9.  Here, the Court cannot assess whether such a Fee would be so "exorbitant" as to infringe upon Plaintiffs' rights without additional information on the Fee amount or the as-yet-to-be-determined "criteria by which a person can claim a financial hardship exemption." Ordinance § 10.32.235(A)(4).  Absent the promulgation of regulations on these two points, the Court would be left to issue an impermissible advisory opinion on the Ordinance's constitutionality under the Second Amendment.

The hardships of withholding judicial consideration of Plaintiffs' Second Amendment challenge to the Fee are identical to those arising from withholding consideration of Plaintiffs' First Amendment challenge. *See supra* Section III(A)(i).  Plaintiffs are not threatened by "serious penalties attached to noncompliance" that would force them to make "an immediate and significant change" to their regular conduct. *Wolfson*, 616 F.3d at 1060.  Even if the preparation to pay a fee could be considered significant, the obligation would certainly not be immediate, as the City has postponed the implementation and designation of the Nonprofit to at least December 2022.  Defs.' Suppl. Br. 7.  As a result, the Court's decision to withhold judicial consideration would not impose any immediate or significant hardships to the parties.

Accordingly, both Plaintiffs' First and Second Amendment challenges to the Fee provision are prudentially unripe, and the Court does not proceed to address those claims in its preliminary injunction analysis.  Plaintiffs' other challenges to the Fee provision—*i.e.*, that the Fee infringes upon a preempted field, violates the California voter approval tax requirement, and violates the City Charter—will be analyzed on their merits, as the City does not specifically dispute the ripeness of those claims.  Opp. 4-6.  Plaintiffs' challenges to the Insurance Requirement will likewise also be considered.

The Court DENIES as unripe Plaintiff's motion for preliminary injunction to the extent it

1    seeks to enjoin the Fee provision on First and Second Amendment grounds.

2        **B.    Likelihood of Success**

3        Having addressed the threshold ripeness issues, the Court proceeds to whether Plaintiffs

4    have shown that they are likely to succeed on the merits of their remaining claims.  *See Winter*,

5    555 U.S. at 20.

6            **i.    Second Amendment**

7        Plaintiffs challenge both the Fee and Insurance Requirement under the Second Amendment

8    (Claim 1), though only the Insurance Requirement is ripe for review.  After the FAC was filed, the

9    U.S. Supreme Court issued its opinion in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,

10   holding that New York State's "may-issue" licensing regime—*i.e.*, where officials have discretion

11   and *may issue*, rather than *shall issue*, concealed-carry licenses upon proof of proper cause—was

12   unconstitutional.  142 S. Ct. 2111 (2022).  In striking down the New York statute, the Supreme

13   Court acknowledged and expressly rejected the "two-step" means-end scrutiny framework that

14   Circuit Courts of Appeals (and the parties) have used to analyze Second Amendment challenges.

15   *See id.* at 2127.  In its place, *Bruen* pronounced a constitutional test adhering to the principles in

16   *D.C. v. Heller*, that is, "a test rooted in the Second Amendment's text, as informed by history."  *Id.*

17   at 2127 (citing *D.C. v. Heller*, 554 U.S. 570, 576-77 (2008)).  This motion for preliminary

18   injunction is considered under the *Bruen* standard.

19           a.   The *Bruen* Framework

20       *Bruen* articulates the Second Amendment constitutional standard as follows: "When the

21   Second Amendment's plain text covers an individual's conduct, the Constitution presumptively

22   protects that conduct.  The government must then justify its regulation by demonstrating that it is

23   consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2129–30.  The

24   Supreme Court further emphasized that "[t]o justify its regulation, the government may not simply

25   posit that the regulation promotes an important interest."  *Id.* at 2126.

26       To determine whether the Second Amendment's plain text covers an individual's conduct,

27   courts must first identify and delineate the specific course of conduct at issue, which in *Bruen* was

28   "carrying handguns publicly for self-defense."  *Id.* at 2134.  *Bruen* conducted a textual analysis of

United States District Court
Northern District of California

United States District Court
Northern District of California

the words "bear" and "keep" to determine whether the conduct of publicly carrying a firearm fell within the language of the Second Amendment. *Id.* at 2134-35.

If the conduct at issue is covered by the text of the Second Amendment, the burden then shifts to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation, specifically the periods closest to the adoption of the Second Amendment (1791) and the Fourteenth Amendment (1868). *Id.* at 2135-36. Courts need not themselves engage in "searching historical surveys" for potential regulatory analogues—they are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. If the parties are able to identify instances of historical firearm regulations, courts must reason by analogy to determine whether the two regulations are "relevantly similar." *Id.* at 2132 (quoting Cass R. Sunstein, *On Analogical Reasoning Commentary*, 106 Harv. L. Rev. 741, 773 (1993)). Two relevant metrics for this comparison are "how and why the regulations burden a law-abiding citizen's right to armed self-defense"; in other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33.

With this updated framework in mind to evaluate the Insurance Requirement's constitutionality under the Second Amendment, the Court turns to the parties' arguments.

   b. Plain Text

The Court must first identify Plaintiffs' "proposed course of conduct" and assess whether that conduct is covered by the Second Amendment's plain text.[3] *Bruen*, 142 S. Ct. at 2134.

_____

[3] As an initial note, Plaintiffs rely on the City's prior concession that "[f]or the purposes of opposing the Motion, [the City] concede that the Ordinance imposes some minimal or slight burden." Opp. 7. The City has since withdrawn that concession as not "constitutionally relevant" and argues that the Ordinance does not infringe upon conduct protected by the Second Amendment's text. Defs.' Suppl. Br. 3 n.1. The Court recognizes that both parties' Second Amendment analysis likely changed in the wake of *Bruen* and will consider the City's arguments, notwithstanding their prior concession made under a now-obsolete legal framework.

1    Neither Plaintiffs' nor the City's supplemental briefing specifies a course of conduct for

2    the Court to analyze. *See* Pls.' Suppl. Br. 3, ECF No. 65; Defs.' Suppl. Br. 3-4. When prompted

3    at oral arguments, Plaintiffs initially articulated the relevant conduct as requiring citizens to

4    purchase insurance to avoid a penalty, but they later argue that the conduct is "the mere ownership

5    of a gun." Pls.' Resp. Br. Brady Amicus Curiae 2, ECF No. 70. On the other hand, *amicus curiae*

6    defined the conduct as "insuring liability that might arise from a firearm-related accident." Br.

7    Brady Amicus Curiae ("Brady Br.") 3-4, ECF No. 66-1.

8    The Supreme Court provided limited guidance on how to define the proposed course of

9    conduct—*Bruen* simply stated the conduct at issue with New York's "may-issue" permitting

10   scheme as "carrying handguns publicly for self-defense." *Bruen*, 142 S. Ct at 2134. Extrapolating

11   from the Supreme Court's example and for purposes of evaluating this motion only, the Court

12   defines the conduct at issue here as "owning or possessing a firearm without firearm liability

13   insurance."[4] This definition closely tracks Plaintiffs' initial articulation of the conduct in question.

14   The Court recognizes that, because the impoundment provision is not operable under

15   current law, the Insurance Requirement would not imperil the ownership or possession of

16   anyone's firearms. *See* Defs.' Suppl. Br. 3-4; Brady Br. 3-4. However, even if ownership or

17   possession is not threatened by impoundment, the requirement to obtain insurance is nonetheless

18   triggered by the conduct of "own[ing] or possess[ing] a Firearm in the City." Ordinance §

19   10.32.210(A). Under the "plain text" prong of the *Bruen* analysis, the Court only reviews

20   Plaintiffs' proposed conduct and the plain text of the Second Amendment. *Bruen*, 142 S. Ct at

21   2134. To the extent *Bruen* accounts for the degree to which Plaintiffs' Second Amendment rights

22   have been burdened, that analysis would occur under the "historical tradition" prong of the *Bruen*

23   framework. *Id.* at 2149 (evaluating "the burden these surety statutes may have had on the right to

24   _____

25   [4] On a more developed record, the Court may reevaluate this description of the proposed conduct

26   for purposes of the *Bruen* analysis. The Court also notes the strong arguments offered by *amicus*

27   that the Second Amendment is not implicated by the Insurance Requirement or Fee provisions.

28   Brady Br. 3-6. The Court will revisit this issue as the case proceeds.

United States District Court
Northern District of California

1   public carry" and determining that the burden was "likely too insignificant to shed light on New

2   York's proper-cause standard").

3        Having defined the conduct at issue as "owning or possessing a firearm without firearm

4   liability insurance," the Court finds that Plaintiffs are likely to prevail on a finding that this

5   conduct is covered by the plain text of the Second Amendment.  And, as *Bruen* teaches, the

6   Constitution thus "presumptively protects that conduct."  142 S. Ct. at 2130.

7          c.  Historical Tradition

8        Because Plaintiffs' proposed conduct is likely covered by the Second Amendment's plain

9   text, the burden shifts to the City to "demonstrate[e] that [the Insurance Requirement] is consistent

10   with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct at 2130; *see also*

11   *Gonzales*, 546 U.S. at 429 ("[T]he burdens at the preliminary injunction stage track the burdens at

12   trial.").  The Court finds that the City has presented a sufficiently "relevantly similar" historical

13   regulation to defeat Plaintiffs' likelihood of success on *Bruen*'s historical tradition prong.

14        *Bruen* described the analogical reasoning of the historical tradition prong as "neither a

15   regulatory straightjacket nor a regulatory blank check. . . . [C]ourts should not 'uphold every

16   modern law that remotely resembles a historical analogue' [but] analogical reasoning requires only

17   that the government identify a well-established and representative historical *analogue*, not a

18   historical *twin*."  *Bruen*, 142 S. Ct. at 2133 (emphasis in original).  "[E]ven if a modern-day

19   regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass

20   constitutional muster."  *Id.*  As one example, *Bruen* noted that "[a]lthough the historical record

21   yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether

22   prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no

23   disputes regarding the lawfulness of such prohibitions.  We therefore can assume it settled that

24   these locations were 'sensitive places' where arms carrying could be prohibited consistent with the

25   Second Amendment."  *Id.* (internal citation omitted).

26        Here, the City has cited several potential historical analogues with varying degrees of

27   similarity to the Insurance Requirement.  *See* Defs.' Suppl. Br. 6-7 (citing 18th and 19th century

28   laws regarding safe gunpowder storage, requiring loyalty oaths as conditions of gun ownership,

United States District Court
Northern District of California

United States District Court
Northern District of California

prohibiting firing guns in certain circumstances, imposing surety bonds, and taxing dangerous animals).  Several of these are readily distinguishable.  For instance, "dangerous animal" laws address a different societal problem than the Insurance Requirement, one that was not subject to constitutional protection.  *See Mitchell v. Williams*, 27 Ind. 62, 62 (1866) (reviewing "an act to discourage the keeping of useless and sheep-killing dogs").  Eighteenth century loyalty oaths are similarly distinguishable, as the purpose behind those was to "deal with the potential threat coming from armed citizens who remained loyal to Great Britain."  Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 74 Fordham L.R. 487, 506 (2004).  Gunpowder storage laws had a somewhat analogous purpose to the Ordinance's, in that they were intended to protect communities from accidental fire and explosion.  *Id.* at 512.  However, the regulations themselves were often specific to gunpowder and not easily translatable to firearm regulations.  *See id.* at 511 (citing regulations that powder must be kept in the "highest story of the house" or in "four stone jugs or tin cannisters").

However, the Court finds that the mid-19th century surety statutes, cited by the City and discussed at length in *Bruen*, bear striking analogical resemblances to the Insurance Requirement. 142 S. Ct. at 2148; *see* Defs.' Suppl. Br. 6.  These statutes typically required certain individuals to post bond before carrying weapons in public if there was "reasonable cause" to fear these individuals would cause injury or breach of the peace, with the bond forfeited if the wielder did in fact injure another or breach the peace.  *Bruen*, 142 S. Ct. at 2148.

As an initial point, the Court notes that the history of reallocating costs of firearm-related accidents—from which the Insurance Requirement descends—can be traced back to the early American practice of imposing strict liability for such accidents.  *See* Brady Br. 8-10.  As early as 1814, the Supreme Judicial Court of Massachusetts noted that "[i]t is immaterial . . . whether the act of the defendant [causing a firearm injury] was by his intention and purpose injurious to the plaintiff, or the mischief which ensued was accidental," a legal principle that had "never been questioned" at the time.  *Cole v. Fisher*, 11 Mass. (1 Tyng) 137, 138 (1814); *see also Moody v. Ward*, 13 Mass. (1 Tyng) 299, 301 (1816) (noting that militia commanders whose soldiers fire "guns in and near the highways on days of military musters . . . are legally responsible for all

United States District Court
Northern District of California

damage sustained by a citizen in consequence of such neglect.").  Strict liability for gun accidents eventually transitioned to a negligence standard in the mid-1800s, which in turn gave rise to liability insurance to "insure against the consequences of negligence."  Brady Br. 9-10 (citing *Morgan v. Cox*, 22 Mo. 373, 376-77 (1856) (commenting on the transition of firearm strict liability to negligence)).  However, whether the standard was strict liability or negligence, the Nation nonetheless maintained a "historical tradition" of shifting the costs of firearm accidents from the victims to the owners of the implicated firearms.

With this historical backdrop in mind, the Court considers whether 19th century surety statutes are sufficiently analogous to the Insurance Requirement.  Both regulations share similar, albeit not identical, deterrent purposes: surety laws were "intended merely for prevention" of future harm, *Bruen*, 142 S. Ct. at 2149, while the Insurance Requirement is intended to "reduce the number of gun incidents by encouraging safer behavior."  Ordinance § 10.32.200(B)(12).  Both schemes also achieve their purposes through similar means, namely the threat of financial consequences (either through a peace bond or higher premiums) for individuals deemed to be high-risk (either by a judge or an underwriter).  *See Bruen*, 142 S. Ct. at 2151 ("[A]lthough surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying.").  The Supreme Court also highlighted the fact that surety laws were not complete bans on public carry, much like the Insurance Requirement.  *Id.* 2148 (noting that surety laws were "not *bans* on public carry") (italics in original).  Accordingly, the Court finds that surety laws and the Insurance Requirement share substantial overlap as to the "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Bruen*, 142 S. Ct. at 2133.

Plaintiffs argue that surety laws are distinguishable because these laws imposed a financial burden only *after* "cause has been shown *specific to the individual*."  Pls.' Suppl. Br. 4 (emphasis in original).  The Insurance Requirement, they argue, would assume "every person is a danger" and apply to all San Jose gun owners, regardless of whether they have shown themselves to be high-risk.  Pls.' Suppl. Br. 4-5.  This is certainly a fair distinction between surety laws and the Insurance Requirement but ultimately one that does not bear upon the metrics identified in *Bruen*. 142 S. Ct at 2133 ("how and why the regulations burden a law-abiding citizen's right to armed

self-defense"). First, although the Insurance Requirement applies to all gun owners, the actual amount of the financial burden (*i.e.*, insurance premiums) involves a risk evaluation that *is* tailored to the individual and analogous to "reasonable cause" determinations under surety statutes. *See* Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14 Engage 18 (2013) ("Competitive pressures would lead insurance carriers to keep the premiums for low-risk gun owners low, while charging higher premiums to those who are more likely to cause injuries to other people."). Second, at this stage in both the litigation and the Ordinance's implementation, there is no evidence on how low gun liability insurance premiums may be for low-risk gun owners.[5] *But see id.* at 22 n.34 (estimating a baseline premium of about $20 per year for an average firearm owner). A *de minimis* low-risk premium could retain analogical resemblance to the *de minimis* (but nonetheless discernible) burdens that surety laws imposed on low-risk gun owners in the 19th century. *Cf. Bruen*, 142 S. Ct. at 2149 (acknowledging that "the hypothetical possibility of posting a bond" may be a burden but "the burden these surety statutes may have had on the right to public carry was likely too insignificant"). *Bruen* does not demand a "historical twin," and neither will this Court.

The Court also notes the *Bruen* Court's general approval of the regulations attendant to "shall-issue" regimes. *Id.* at 2138 n.9 (noting with approval that "shall-issue" regimes often require licensing applicants to "undergo a background check or pass a firearms safety course"); *see also id.* at 2162 (Kavanaugh, J., concurring) (noting additional "shall issue" requirements such as fingerprinting, mental health records checks, and training in laws regarding the use of force).

Plaintiffs' proposed conduct can be interpreted to be covered by the Second Amendment's plain text, but the City has sufficiently demonstrated at this preliminary stage that the Insurance Requirement is likely to be consistent with the Nation's historical traditions. Although the Insurance Regulation is not a "dead ringer" for 19th century surety laws, the other similarities

---

[5] The Insurance Requirement may not even impose any financial burden, as Plaintiffs have not produced any evidence that ordinary homeowners' and renters' insurance would not already satisfy the Requirement. *See* Brady Br. 15-16.

19

1    between the two laws would render the Ordinance "analogous enough to pass constitutional

2    muster."[6] *Id.* at 2133.

3        Accordingly, the Court finds that Plaintiffs have not shown a likelihood of success as to

4    their Second Amendment challenge to the Ordinance's Insurance Requirement.  Furthermore, as

5    discussed at Section III(A)(ii), Plaintiffs' Second Amendment challenge to the Ordinance's Fee

6    provision is not presently ripe for review, and the Court issues no opinion as to the Fee's

7    constitutionality under the Second Amendment.

8            **ii.    First Amendment**

9        The FAC's Second Claim for Relief for violations of the First and Fourteenth Amendments

10   is limited to contesting the Ordinance's Fee provision and, thus, is not ripe for review.  FAC ¶¶

11   106-115; *see also supra* Section III(A)(i).

12           **iii.    California State Preemption**

13       In addition to their allegations that the Ordinance violates the U.S. Constitution, Plaintiffs

14   also assert that the Ordinance is preempted by California general law (Claim 3).

15       Pursuant to article XI, Section 7 of the California Constitution, the City of San Jose may

16   "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations

17   *not in conflict with general laws*."  Cal. Const. art. XI, § 7 (emphasis added).  The Supreme Court

18   of California considers a local ordinance to be "in conflict" if it "duplicates, contradicts, or *enters*

19   *an area fully occupied by general law*, either expressly or by legislative implication."  *O'Connell*

20   *v. City of Stockton*, 41 Cal. 4th 1061, 1067, 162 P.3d 583, 587 (2007) (emphasis added).  "The

21   party claiming that general state law preempts a local ordinance has the burden of demonstrating

22   preemption."  *Big Creek Lumber Co. v. Cnty. of Santa Cruz*, 38 Cal. 4th 1139, 1149 (2006), as

23   _____

24   [6] The Court briefly addresses the public comments made by San José Mayor Sam Liccardo

25   regarding the Ordinance as the first of its kind.  *See, e.g.*, FAC ¶ 23; *see also* Mot. 3.  To the extent

26   the mayor's comments characterize the Ordinance as something different from what the parties

27   have briefed in this case, the Court accords no weight to those comments.  The Court is charged

28   with reviewing the constitutionality of the Ordinance as drafted, not as described by the mayor.

United States District Court
Northern District of California

1    modified (Aug. 30, 2006).

2            Plaintiffs only argue that the Ordinance violates the California Constitution by entering an

3    "area fully occupied by general law," rather than duplicating or contradicting state law.  Mot. 18.

4    Because the State of California has already enacted legislation on several topics relating to firearm

5    regulations—*see* Mot. 18 (citing Cal. Pen. Code sections on firearm safety, appearance, storage,

6    carrying and possession, sale and transfers, registration, background checks, equipment, etc.)—the

7    City of San Jose, Plaintiffs argue, is preempted from regulating the field of "residential handgun

8    possession."  Mot. 18 (citing *Fiscal v. City & Cnty. of San Francisco*, 158 Cal. App. 4th 895, 909

9    (2008)).  Here, Plaintiffs have largely focused on Cal. Pen. Code § 25605 and Cal. Gov. Code §

10   53071 as evidence of the California Legislature's intent, as well as *Fiscal*, 158 Cal. App. 4th 895.

11           The City acknowledges that the State of California has occupied some areas of gun

12   regulation but disputes that the entire field of gun regulation has been preempted.  Opp. 17-18

13   (citing *Great W. Shows, Inc. v. Cnty. of Los Angeles*, 27 Cal. 4th 853, 861 (2002) ("A review of

14   the gun law preemption cases indicates that the Legislature has preempted discrete areas of gun

15   regulation rather than the entire field of gun control.")).  The City also argues that *Fiscal*'s remark

16   that California has preempted the entire field of "residential handgun possession" is non-

17   controlling dicta, as the San Francisco ordinance in *Fiscal* involved a near total handgun ban.

18   Opp. 18-19 (citing *Fiscal*, 158 Cal. App. 4th at 915, 919).  Finally, the City argues that the specific

19   language of the allegedly preempting California statutes' only extends to permitting and

20   registration requirements.  Opp. 19 (citing Cal. Pen. Code § 25605; Cal. Gov. Code § 53071).[7]

21           The Court first considers whether Plaintiffs' cited statutes evidence an "express

22   manifest[ation]" of the California Legislature's intent to occupy the field to the exclusion of the

23   City's Ordinance.  Here, Penal Code § 25605 does not purport to advance legislative intent of any

24   _____

25   [7] The City does not raise (nor can it) any ripeness challenge specific to Plaintiffs' preemption

26   claim, as the key preemption issue is "primarily legal and does not require substantial further

27   factual development," such as the subsequent promulgation of the City Manager's regulations.

28   *Wolfson*, 616 F.3d at 1060.

United States District Court
Northern District of California

kind, a conclusion *Fiscal* implicitly acknowledged. 158 Cal. App. 4th at 908 ("[W]e *infer* from [Section 25605] that the Legislature intended to occupy the field of residential handgun possession.") (emphasis added). The Government Code § 53071, on the other hand, does contain an express manifestation of intent; however, its language is explicitly limited to "the intention of the Legislature to occupy the whole field of *regulation of the registration or licensing* of commercially manufactured firearms." Cal. Gov. Code § 53071 (emphasis added). Although these statutes may manifest an intent to occupy the field of firearm permitting and registration, neither can be fairly read to contain a legislative intent to occupy the *entire* field of gun regulation. Nor can the Ordinance's insurance and fee regulations be transmuted into a permitting scheme to fall within this intent, as violations do not imperil one's possession of a firearm. Ordinance § 10.32.240; *see also* Opp. 3.

Having determined that Plaintiffs' cited statutes do not expressly preempt the Ordinance, the Court proceeds to the issue of whether the California Legislature has nonetheless *implicitly* occupied the field. In *Great Western Shows*, the California Supreme Court surveyed the body of California gun law preemption cases and concluded that "the Legislature has chosen not to broadly preempt local control of firearms but has targeted certain specific areas for preemption." 27 Cal. 4th at 861-64; *see also Am. Fin. Servs. Assn. v. City of Oakland*, 34 Cal. 4th 1239, 1255 (2005) (remarking that "rather than intending to deprive municipalities of their police power to regulate handgun sales, [the Legislature] has been cautious about depriving local municipalities of aspects of their constitutional police power to deal with local conditions.'"); *Calguns Found., Inc. v. Cnty. of San Mateo*, 218 Cal. App. 4th 661, 676 (2013) ("[T]he cases uniformly construe state regulation of firearms narrowly, finding no preemption of areas not specifically addressed by state law.").

Plaintiffs' reliance on *Fiscal* to establish preemption is misplaced for multiple reasons. Where the California Supreme Court has not squarely addressed an issue of California law, this Court must predict how the state high court would decide the issue using, *inter alia*, intermediate appellate court decisions. *See All. for Prop. Rts. & Fiscal Resp. v. City of Idaho Falls*, 742 F.3d 1100, 1102 (9th Cir. 2013) ("When the state's highest court has not squarely addressed an issue, we must predict how the highest state court would decide the issue using intermediate appellate

United States District Court
Northern District of California

court decisions. . .").  Here, not only has it not squarely addressed the issue of *Fiscal*'s scope of California gun law preemption, the California Supreme Court had remarked in *Great Western Shows* that the "Legislature has chosen not to broadly preempt local control of firearms but has targeted certain specific areas for preemption."  27 Cal. 4th at 864.  Furthermore, another Court of Appeal had addressed *Fiscal* at length and expressly declined to construe Government Code § 53071 as a broad "expression of intent to occupy the whole field of firearm regulation."  *Calguns*, 218 Cal. App. 4th at 673-74, 677 (limiting *Fiscal* to its facts and the "extreme breadth of the ordinance being challenged [in *Fiscal*]").  Given the absence of the final word from the state high court and the lack of uniformity among the intermediate state appellate courts on the scope of preemption Plaintiffs advance, this Court is not persuaded that the California Supreme Court would interpret Penal Code § 25605 and Government Code § 53071 to occupy the entire field of "residential handgun possession."

Furthermore, even if the Court were to adopt *Fiscal*'s implied preemptive scope of all "residential handgun possession," Plaintiffs have not established that the Ordinance's provisions would fall within that field of preemption, *i.e.*, that the Insurance and Fee provisions necessarily implicate handgun possession.  In *Fiscal*, the challenged ordinance purported to (1) prohibit the sale and transfers of all firearms without exception and (2) limit handgun possession to governmental and professional purposes with an option for residents to surrender their handguns to law enforcement.  *Fiscal*, 158 Cal. App. 4th at 901.  Accordingly, the ordinance in *Fiscal*, by its own language, directly implicated the possession of handguns.[8]  *Id.* ("Section 3 is entitled 'Limiting Handgun Possession in the City and County of San Francisco.'").  By contrast, there is no operation of San Jose's Ordinance that would result in a firearm being removed from its

_____

[8] At the hearing, Plaintiffs argued that *Fiscal* should be interpreted to preempt any ordinance that merely *impacts* residents possessing guns.  However, this unrestricted interpretation would in effect preempt *all* local gun regulation, a result expressly rejected by *Fiscal* itself.  158 Cal. App. 4th at 905 ("[T]he Legislature has never expressed an intent to preempt the entire field of firearm regulation to the exclusion of local control.").

1   owner's possession.  Opp. 3.  Without a means by which possession could be revoked, the Court

2   does not consider the Ordinance to be entering the field of residential handgun *possession*.

3          Given the state high court's interpretation on state gun law preemption, the Court holds

4   that Plaintiffs are not likely to succeed on their claim that the California Legislature has impliedly

5   preempted the Ordinance's Insurance and Fee Provisions.

6          **iv.    California Tax Requirement**

7          Plaintiffs also argue that, under the California Constitution, the Ordinance's provisions are

8   treated as taxes (Claim 4) and, therefore, should have been submitted to the voters for approval.

9          Specifically, the California Constitution article XIII C prohibits local governments from

10  imposing, extending, or increasing any general tax unless that tax is approved by a majority vote

11  to the electorate.  Cal. Const. art. XIII C, § 2(b).  A "tax" is defined as "any levy, charge, or

12  exaction of any kind imposed by a local government," subject to certain exceptions for charges

13  that do not exceed the "reasonable costs to the local government" of providing a service or benefit.

14  Cal. Const. art. XIII C, § 1(e).  Notably, article XIII C "does not expressly require that any levy,

15  charge or exaction must be payable to a local government" to qualify as a tax.  *Schmeer v. Cnty. of*

16  *Los Angeles*, 213 Cal. App. 4th 1310, 1326 (2013), as modified (Mar. 11, 2013) (internal

17  quotation marks omitted).

18         Plaintiffs argue that both the Insurance Requirement and the Fee are taxes that were not

19  "submitted to the electorate and approved by a majority vote," as required by the California

20  Constitution.  Mot. 19 (quoting Cal. Const. art. XIII C, § 2(b)).  The required insurance and Fee,

21  Plaintiffs assert, do not fall under any exception to the definition of a "tax" because none of the

22  charges purport to pay for government activities and, therefore, by definition "exceed the

23  reasonable costs to the local government."  Mot. 19-20; *see also* Cal. Const., art. XIII C, § 1(e).

24         The City responds that neither the required insurance nor the Fee can qualify as a tax,

25  because California courts have interpreted the California Constitution's voter approval

26  requirement to apply to a fee only if the resulting proceeds would pass into government hands.

27  Opp. 19-20 (citing *Schmeer*, 213 Cal. App. 4th at 1326-29).  The City also argues that,

28  alternatively, both the required insurance and the Fee would qualify for an exception to the voter

1   approval requirement because they confer a "specific benefit" directly to the payor and not

2   conferred on those not charged.  Opp. 20 (citing Cal. Const., art. XIII C, § 1).

3          Because the question of whether fees not payable to the government are considered taxes is

4   a legal question of state constitutional interpretation and does not rely on further factual

5   development, it would be ripe for review.  *See Wolfson*, 616 F.3d at 1060.  On this particular

6   question of state law, *Schmeer* is the only California appellate court opinion on point.  In *Schmeer*,

7   a Los Angeles ordinance required that all retail stores provide only recyclable or reusable bags for

8   their customers' use, and all retail customers must pay 10 cents to the retail store for each

9   recyclable bag used.  *Schmeer*, 213 Cal. App. 4th at 1314.  The collected proceeds were retained

10  by the store and could only be used for the store's costs of compliance, the recyclable bags, and

11  any educational materials promoting the use of reusable bags.  *Id.*  After conducting a lengthy

12  interpretative analysis on whether a government-imposed fee that was not payable or remitted to

13  the government would qualify as a "tax," the *Schmeer* court concluded that the California

14  Constitution's voter approval requirements were "limited to charges payable to, or for the benefit

15  of, a local government."  *Schmeer*, 213 Cal. App. 4th at 1326-31 (emphasis added); *see also*

16  *Howard Jarvis Taxpayers Ass'n v. Bay Area Toll Auth.*, 51 Cal. App. 5th 435, 453 (2020)

17  (distinguishing *Schmeer* on the basis that the toll increases at issue were remitted to a

18  governmental entity), reh'g denied (July 13, 2020).

19         Although the Ordinance's Insurance Requirement and Fee are imposed by the City in an

20  admittedly different context from a retail bag fee, *Schmeer*'s analysis nonetheless provides useful

21  guidance for this Court to predict how the California Supreme Court may consider the issue.  For

22  instance, *Schmeer* found that "[t]axes ordinarily are imposed to raise revenue for the government."

23  *Schmeer*, 213 Cal. App. 4th at 1326 (citing *California Farm v. State Water Res. Control Bd.*, 51

24  Cal. 4th 421, 437 (2011), as modified (Apr. 20, 2011); *Sinclair Paint Co. v. State Bd. of*

25  *Equalization*, 15 Cal. 4th 866, 874 (1997)).  Here, no provision of the Ordinance would generate

26  revenue for the City, as insurance premiums are paid to insurance companies and the Fee is paid

27

28

directly to the Nonprofit.[9]  The *Schmeer* opinion also independently addressed Plaintiffs' argument that—because the City would not be engaged in any activity under the Ordinance—the Ordinance's charges would necessarily exceed "reasonable costs of the government activity". Mot. 19 (quoting Cal. Const., art. XIII C, § 1).  However, rather than adopting a tautological interpretation of article XIII C's exceptions, *Schmeer* considered the exceptions' reference to costs of *government activity* as support that the exceptions "do not contemplate the situation where a charge is paid to an entity or person other than a local government or where such an entity or person incurs reasonable costs."  *Schmeer*, 213 Cal. App. 4th at 1327.  This analysis, though applied in the context of a retail bag fee, nonetheless translates effectively to assist the Court's present analysis of the California Constitution.

In any event, Plaintiffs do not offer a conflicting or alternative interpretation of article XIII C other than noting the California Constitution does not define a "tax" by where the funds are deposited.  Reply 11.  This response, however, simply disagrees with *Schmeer*'s interpretation and holding without providing supporting authority to the contrary.  Plaintiffs' citation to *Nat'l Fed'n of Indep. Bus. v. Sebelius* is inapposite, as article XIII C in the California Constitution bears no similarity to and need not be interpreted consistently with the Taxing Clause in the U.S. Constitution.  *See* Mot. 19; Reply 11 (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-66 (2012)).

Plaintiffs also note that *Schmeer* held that article XIII C's voter approval requirements apply to "charges payable to, *or for the benefit of, a local government*."  Reply 11 (emphasis in original) (quoting *Schmeer*, 213 Cal. App. 4th at 1328-29).  Accordingly, "[i]f, as Defendants have argued elsewhere, the Ordinance benefits San Jose, article XIII C applies."  Reply 11.  This interpretation, however, conflates a benefit to the local government with a benefit to the public at large.  There is little dispute that the Ordinance is intended to provide a benefit to the *public*—

---

[9] Section 10.32.250 of the Ordinance does permit the City Manager to charge and collect "cost recovery fees associated with fulfilling" the Ordinance directives, but Plaintiffs do not challenge this portion of the Ordinance.

indeed, one would hope and expect that everything the City of San Jose enacts (tax or no tax) is for the public benefit of its citizenry. Ordinance § 10.32.200. However, *Schmeer*'s "for the benefit of" language only contemplated benefits inuring to the *local government* itself, such as a "charge payable to a third party creditor to extinguish a debt owed by a local government." *Schmeer*, 213 Cal. App. 4th at 1329 n.7. Additionally, given that the Los Angeles bag fee was almost certainly a charge intended to provide public environmental benefits, *Schmeer* could not have intended that article XIII C's voter approval requirement applied to every charge for the *public*'s benefit. *See id.* at 1314.

Because the Ordinance's Insurance Requirement and Fee are not payable to the City and do not provide a specific benefit to the City itself, the Court is persuaded by *Schmeer*'s interpretation that such charges are not a "tax" requiring voter approval and, therefore, does not reach the City's alternate argument invoking the "specific benefits" exception to article XIII C. Opp. 20. Accordingly, Plaintiffs have not shown that they are likely to succeed on their claim that the Ordinance violates article XIII C of the California Constitution.

### v. San Jose City Charter

Finally, Plaintiffs argue that the Ordinance's Fee provisions violate San Jose's City Charter (Claim 5). Mot. 20-21. They argue that, because the Fee is paid directly to the Nonprofit, the Ordinance violates the City Charter's requirement for all "revenues and receipts" to be placed in a special fund or the General Fund. *Id.* at 21 (citing City Charter § 1211). The Ordinance also allegedly violates the delegation of budgeting and appropriation powers to the City Council by prohibiting City Council from directing how the Fee proceeds are expended. *Id.* (citing City Charter §§ 1204, 1206-07). The same prohibition, Plaintiffs argue, violates the delegation of executive functions to the City Manager. *Id.* at 20-21 (citing City Charter §§ 502, 701).

The City responds that most of the cited City Charter provisions do not apply to the Fee because it is not "paid into the City Treasury" and does not pay for any City operations. Opp. 21-22 (citing City Charter §§ 1204, 1206, 1207, 1211). Additionally, the City asserts that the Ordinance properly confers on the City Manager administrative oversight and audit authority over how the Nonprofit expends the Fee's proceeds. Opp. 22 (citing Ordinance § 10.32.235).

United States District Court
Northern District of California

1     As an initial point, although Plaintiffs' claims relating to the City Charter's "revenues and

2   receipts," budgeting, and appropriation sections primarily present legal and interpretative

3   questions and are likely ripe, Plaintiffs' claim regarding the City Manager's executive and

4   administrative functions would likely "require further factual development." *See* Ordinance §

5   10.32.235(A); *see also Wolfson*, 616 F.3d at 1060.  At this stage of the proceedings, the Court will

6   review Plaintiffs' City Charter challenges to the extent they do not rely on subsequent regulations

7   and yet-to-be-determined facts—however, the Court's discussion is correspondingly and

8   necessarily limited to the Ordinance's broad outline of the Fee structure and implementation.

9     The Court first addresses Plaintiffs' argument that payment of the Fee to the Nonprofit

10   violates § 1211 of the City Charter, which reads in its entirety:

11     All monies paid into the City Treasury shall be credited to and kept in separate
       funds in accordance with provisions of this Charter or ordinance.  A fund, to be
12     known as the "General Fund," is hereby created as a medium of control and
       accounting for all City activities excepting activities for which special funds are
13     established and maintained.  All revenues and receipts which are not required by
       this Charter, State law or ordinances to be placed in special funds shall be credited
14     to the General Fund.

15   City Charter § 1211.  This section addresses two potentially overlapping categories of funds: "All

16   monies paid into the City Treasury" and "All revenues and receipts."  The Ordinance, however,

17   directs "every dollar generated" from the Fee to be spent by the Nonprofit and used exclusively for

18   the Nonprofit's programs and initiatives.  Ordinance § 10.32.220(C).  Accordingly, because the

19   Fee is neither "paid into the City Treasury" nor is it received by the City as revenue, Plaintiffs

20   have not shown likelihood of success in proving that the Fee's proceeds would fall under § 1211

21   of the City Charter.  *See also supra* Section III(B)(iv).

22     Plaintiffs' claims that the Ordinance violates the City Charter's budgeting and

23   appropriations provisions rely on a similarly faulty premise, namely that the Nonprofit's

24   operations are City activities.  Mot. 20.  Plaintiffs are correct that the City Council retains the

25   power to adopt a budget, *see* City Charter § 1206; however, the City Charter defines the budget as

26   "a complete financial plan of *all City funds and activities*."  *Id.* § 1205 (emphasis added).  Because

27   the Fee's proceeds are not "revenues or receipts" and the Nonprofit is not a City department or

28   entity, the Nonprofit's funds and operations would not fall under the City's budgeting obligations.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    For the same reason, Plaintiffs have not shown likelihood of success in proving that the

2    Nonprofit's expenditures are subject to the City Charter's appropriations section, which delegates

3    to the City Council the authority to "appropriate monies for the operation of *each of the offices,*

4    *departments and agencies of the City*." *Id.* § 1207 (emphasis added).  Especially as Plaintiffs

5    themselves have asserted the Fee does not pay for government activity, *see* Mot. 19, the

6    Nonprofit's operations and expenditures cannot be reasonably interpreted to violate the City

7    Charter's budgeting and appropriation sections.

8         Finally, Plaintiffs argue that, by permitting the City to direct fees to a non-governmental

9    entity whose expenditures are expressly insulated from City control, the Ordinance undermines the

10   City Manager's responsibility for the "faithful execution of all laws," as well as the purpose of the

11   General Fund as a medium of control on "the City government's ability to hide, or avoid oversight

12   of, how City fee revenues are spent."  Reply 12-13 (citing City Charter §§ 701(d), 1211).

13   However, the Ordinance authorizes the City Manager to "promulgate all regulations necessary to

14   implement" the Ordinance, including any guidelines for and auditing how the Nonprofit expends

15   its funds.  Ordinance § 10.32.235.  As a result, the fact that the City may not specifically direct the

16   Nonprofit's activities does not *necessarily* violate the City Charter § 701 or abdicate the City

17   Manager's executive and administrative functions.  That said, as the Court noted, the City's

18   involvement with the Fee is difficult to assess in the abstract.  Plaintiffs may revisit this issue once

19   the City Manager promulgates the relevant implementing regulations, but for purposes of this

20   motion, Plaintiffs have not met their burden.

21        In summary, Plaintiffs' City Charter claims rely on the mistaken premises that the Fee is

22   characterized as City revenue and the Nonprofit is included in the City budget, neither of which is

23   supported by the City Charter's text or the Ordinance's language.  *See* Reply 11-12 (referring to

24   the Fee as "revenue").  Furthermore, Plaintiffs' claim regarding the City Manager's authority and

25   oversight over the Nonprofit would turn on the actual regulations promulgated by the City

26   Manager.  Accordingly, the Court finds that Plaintiffs have not shown that they are likely to

27   succeed on the merits of their City Charter challenges.

28        Because the Court finds that Plaintiffs have not established that they are likely to succeed

on the merits on their Second Amendment, California Constitution, and City Charter claims, it does not reach the remaining *Winter* factors.  *See* 555 U.S. at 20.

**IV.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' motion for a preliminary injunction to restrain and enjoin Defendants from enforcing any provision of the Ordinance is DENIED.


Dated: August 3, 2022

BETH LABSON FREEMAN
United States District Judge