GRETCHEN HOFF VARNER (Bar No. 284980)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: ghoffvarner@cov.com

Attorney for Amicus Curiae

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,** a nonprofit corporation, and **MARK SIKES**, an individual,<br><br>And<br><br>**HOWARD JARVIS TAXPAYERS ASSN.,** a nonprofit corporation, **SILICON VALLEY TAXPAYERS ASSN.,** a nonprofit corporation, **SILICON VALLEY PUBLIC ACCOUNTABILITY FOUNDATION**, a nonprofit corporation, **JIM BARRY**, an individual, and **GEORGE ARRINGTON**, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF SAN JOSE**, a public entity, **JENNIFER MAGUIRE**, in her official capacity as City Manager of the City of San Jose, and the **CITY OF SAN JOSE CITY COUNCIL** in the matter of San Jose Ordinance No. 30716, establishing an Annual Gun Harm Reduction Fee,<br><br>Defendants. | Civil Case Number: 5:22-cv-00501-BLF<br><br>**BRIEF OF BRADY AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED SECOND AMENDED COMPLAINT**<br><br>Date: June 15, 2023<br>Time: 9:00 a.m.<br>Judge: Honorable Beth Labson Freeman<br>Dept.: San Jose Courthouse, Courtroom 3 (5th Floor) |

## TABLE OF CONTENTS

Page

I.    Interests of Amicus Curiae.................................................................................1

II.   Introduction.......................................................................................................1

III.  The Ordinance's Financial Requirements Are Proven, Effective, and Constitutional
      Methods of Allocating Costs Associated with Risks.........................................3

      A.   American Liability Insurance Developed in Response to New Legal Systems for
           Imposing Liability........................................................................................5

      B.   American Governments Have Long Required Liability Insurance for Risky
           Activities.....................................................................................................8

IV.   Courts Have Consistently Found that Government-Mandated Liability Insurance and
      Fees Are Constitutional...................................................................................10

      A.   The Ordinance Does Not Implicate Second Amendment Conduct. ................10

           1.   The Insurance Requirement Does Not Implicate the Second Amendment. ..........11

           2.   The Fee Requirement Does Not Implicate the Second Amendment. ...................12

      B.   The Insurance and Fee Requirements Are Consistent with the Long History of
           Gun-Related Economic Requirements.............................................................13

           1.   The Supreme Court Found Surety Statutes, an Early American Historical
                Analogue, to Pose an "Insignificant" Burden on the Second Amendment............14

           2.   The San Jose Ordinance Is Consistent with Other Government Insurance
                Mandates that Courts Have Found Constitutional. .................................14

           3.   The San Jose Ordinance Is Consistent with Other Financial Requirements
                that Courts Have Found Constitutional...............................................15

           4.   The Ordinance's Liability Insurance Requirement Is a Sensible Solution to
                the Difficult Societal Problem of Firearm Accidents, Which Imposes Little
                or No Additional Cost on San Jose Gun Owners...................................16

V.    Conclusion ......................................................................................................18

Brief of Brady as Amicus Curiae in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Second Amended
Complaint
Case Number: 5:22-cv-00501-BLF                                                                    i

# TABLE OF AUTHORITIES

**CASES**                                                                    Page(s)

*Bauer v. Becerra*,
   858 F.3d 1216 (9th Cir. 2017) ...........................................................................1, 12, 16

*Cole v. Fisher*,
   11 Mass. 137 (1814) ........................................................................................................6

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................................................................1

*Ex parte Poresky*,
   290 U.S. 30 (1933) .........................................................................................................14

*Kwong v. Bloomberg*,
   723 F.3d 160 (2d Cir. 2013) ....................................................................................13, 15

*McDonald v. City of Chicago*,
   561 U.S. 742 (Stevens, J., dissenting) ...........................................................................1

*McCoy v. Commonwealth of Pennsylvania*,
   391 A.2d 723 (Pa. Commw. Ct. 1978) ........................................................................15

*Meier v. Anderson*,
   692 F. Supp. 546 (E.D. Pa. 1988), *aff'd*, 869 F.2d 590 (3d Cir. 1989)........................15

*Moody v. Ward*,
   13 Mass. 299 (1816) ........................................................................................................6

*Morgan v. Cox*,
   22 Mo. 373 (1856) ...........................................................................................................6

*N.Y. Cent. R.R. Co. v. White*,
   243 U.S. 188 (1917) ......................................................................................................10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) (Ginsburg, J., concurring) .........................................................15

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022)........................................................................................ *passim*

*Phoenix Ins. Co. v. Erie & W. Transp. Co.*,
   117 U.S. 312 (1886).........................................................................................................7

*State Farm Mut. Auto. Ins. Co. v. Partridge*,
   514 P.2d 123 (Cal. 1973) (en banc) .............................................................................18

*U.S. v. Hayes*,
    555 U.S. 415 (2009) ................................................................................................1

**STATUTES**

Act of Feb. 20, 1792, ch. 7 §§ 9, 10 Stat. 232, 235 (establishing the Post-Office and Post
    Roads within the United States), https://bit.ly/3utzSCQ .....................................16

Laws of the State of Texas, An Act Authorizing the Corporate Authorities of the Town of
    Dangerfield, Fairfield and Springfield, to tax ten pin alleys, billiard tables and pistol
    galleries § 1 (1860) ...............................................................................................12

San Jose Mun. Code § 10.32.225 ...........................................................................................18

San Jose Ord. No. 30716 .........................................................................................................17

1870 La. Acts 127, Persons, Trades, Professions and Occupations Subject to Taxation,
    § 3, pt. 6 (1870) ...................................................................................................12

**OTHER AUTHORITIES**

*Accident Insurance*, 4 Am. L. Rev. 585, 585 (1873) ..............................................................7

Allstate, *7 Easy Ways to Help Lower Your Car Insurance Premium*,
    https://www.allstate.com/resources/car-insurance/how-to-lower-car-insurance-
    premiums; ...........................................................................................................10

Allstate, *Safe Driving Bonus*, https://www.allstate.com/auto-insurance/safe-driver-
    savings ................................................................................................................10

Cal. Dep't of Tax and Fee Administration, *Childhood Lead Poisoning Prevention Fee*,
    https://bit.ly/3ORDR44 ......................................................................................16

Cal. Dep't of Tax and Fee Administration, *Emergency Telephone Users Surcharge –
    Frequently Asked Questions*, https://bit.ly/3yMLDXB ....................................16

*California Begins Collecting Transportation Improvement Fee*, ForConstructionPros.com
    (Jan. 2, 2018) https://bit.ly/3RhC7Tg; ...............................................................16

Cornelius J. Peck, *Negligence and Liability Without Fault in Tort Law*, 46 Wash. L. Rev.
    225 (1971) ........................................................................................................5, 6

David B. Kopel, *The First Century of Right to Arms Litigation,* 14 Geo. J.L. Pub. Pol.
    127, 131 n.14 (2016) ...........................................................................................14

Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing
    Southern Antebellum Case Law in Context*, 125 Yale L.J.F. 121 (2015) ...........14

Fleming James, Jr., *Accident Liability: Some Wartime Developments*, 55 Yale L.J. 365
    (1946) ...............................................................................................................7, 9

Brief of Brady as Amicus Curiae in Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Second Amended
Complaint
Case Number: 5:22-cv-00501-BLF                                                        iii

Fred E. Inbau, *Firearms and Legal Doctrine*, 7 Tul. L. Rev. 529 (1932–33) ...........................................6

Hannah Farber, *Underwriters of the United States: How Insurance Shaped the American Founding* (2021) ...........................................................................................................5

*Historical Development of Insurance*, Britannica, https://www.britannica.com/topic/insurance/Historical-development-of-insurance ...........................5

*History*, The Philadelphia Contributorship, https://1752.com/about-us/history/ .......................................5

*Incidence and Cost of Firearm Injuries in San Jose, CA*, Pacific Institute for Research and Evaluation 1 (Jan. 19, 2022) ...........................................................................................4

Insurance Information Institute, *2021 Insurance Fact Book* ......................................................................17

Insurance Information Institute, *Number of Renters Is on the Rise—But Few of Them Have Insurance*, (Sept. 22, 2014), https://bit.ly/3NXlxW7 .........................................................17

ISO, Homeowners 3-Special Form (HO 00 03 05 11) (2010) ..................................................................17

Jennifer B. Wriggins, *Mandates, Markets, and Risk*, 19.2 Conn. Ins. L. J. 275, 291 (2013) .....................9

John Fabian Witt, *Toward a New History of American Accident Law*, 114 Harv. L. Rev. 690 (2001) ...............................................................................................................6

Kara McGinley & Stephanie Nieves, *Minimum car insurance requirements by state*, Policygenius (Apr. 21, 2021), https://www.policygenius.com/auto-insurance/car-insurance-required-in-every-state/ ...........................................................................14

Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L. Rev. 573 (2005) ......................................................................................7, 8, 9

Occupational Safety and Health Administration, *Business Case for Safety and Health*, https://www.osha.gov/businesscase/benefits ....................................................................9

Peter Kochenburger, Liability Insurance and Gun Violence, 46 Conn. L. Rev. 1265 (2014)...........................................................................................................5, 9, 17

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Con. L. Quarterly 145 (2022)...........................................................................................................12

State Farm, *Be Rewarded With Drive Safe & Save Discounts*, https://www.statefarm.com/insurance/auto/discounts/drive-safe-save...........................10

Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14 Engage 21 (2013) ............................12

Tom Baker & Charles Silver, *How Liability Insurers Protect Patients and Improve Safety*, 68 DePaul L. Rev. 211 (2019) ...........................................................................10

Tom Baker & Thomas O. Farrish, *Liability Insurance and the Regulation of Firearms, in Suing the Gun Industry* (Timothy D. Lytton ed., 2005)...................................................................4, 9

Wex S. Malone, *Ruminations on the Role of Fault in the History of the Common Law of Torts*, 31 La. L. Rev. 1 (1970) ...........................................................................................................6

## I.      Interests of Amicus Curiae

Brady is the Nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Brady has a substantial interest in ensuring that the Constitution is construed to protect Americans' fundamental right to live.  Brady also has a substantial interest in protecting the authority of democratically elected officials to address the Nation's gun violence epidemic, including the City of San Jose's interest in addressing the risks and societal costs of gun-related accidents.  Brady has filed amicus briefs in many cases involving the regulation of firearms, including *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *District of Columbia v. Heller*, 554 U.S. 570 (2008); and *Bauer v. Becerra*, 858 F.3d 1216, 1219 (9th Cir. 2017).  Multiple decisions have cited Brady's research and expertise on these issues.  *See, e.g.*, *U.S. v. Hayes*, 555 U.S. 415 (2009); *McDonald v. City of Chicago*, 561 U.S. 742, 858 (Stevens, J., dissenting).[1]

## II.     Introduction

The Supreme Court has decided that law-abiding, responsible citizens have a right to guns for self-defense, but it is beyond dispute that the right is not unlimited and carries inherent, deadly risk.  Every year, dozens of San Jose residents are killed or injured in gun accidents—tragedies that, in addition to their human toll, cost the City and its residents millions of dollars.  Beyond the human toll, these accidents result in substantial costs—for example, from personal injuries, property damage, or emergency services, as well as follow-on costs from lost wages, hospital expenses, or lawsuits.  Tragically, these costs are often distributed as randomly and unfairly as the gun accidents that cause them.  San Jose has responded by requiring that anyone who lives in San Jose and owns or possesses a gun (1) carry a homeowners', renters', or gun liability insurance policy that covers injuries and damages resulting from any accidental use of the firearm, and (2) pay a Gun Harm Reduction Fee to a nonprofit organization that will offer education programs and safety training, in an effort to reduce the risk and subsequent cost and hardships of gun accidents.  The Ordinance achieves these goals and reallocates costs without compromising any Second

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than Brady or its counsel made any monetary contributions intended to fund the preparation or submission of this brief.

Amendment rights.  Sworn law enforcement officers, holders of a concealed carry weapon permit, and certain low-income individuals are exempt from the Ordinance's requirements.

Through a nominal fee and private liability insurance, the City has harnessed proven mechanisms for facilitating and spreading the costs of potentially dangerous activities.  For nearly a century, governments have used liability insurance to allocate the costs of the risks that are inherent in a range of activities, and courts have also long recognized liability-insurance mandates as constitutional.  Even before the advent of liability insurance, governments imposed other rules, policies, and fees to address such societal costs.  Likewise, the Ordinance's Gun Harm Reduction Fee is designed to reduce the incidence of firearm-related accidents and is consistent with governments' long-standing practice of charging fees for myriad activities, including those that are constitutionally protected.

The City's efforts are constitutional.  The Supreme Court has recognized that the Second Amendment must apply in contexts not present or contemplated at America's founding.  Specifically, the Court stated in *Bruen* that the Second Amendment was "intended to endure for ages to come," and thus "can, and must, apply to circumstances beyond those the Founders specifically anticipated."  142 S. Ct. at 2132 (quoting *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819)).  Further, as *Bruen* directed, cases such as this that involve significant changes to the circumstances existing at the founding require a "more nuanced approach."  *Id*.

Here, that nuanced approach requires courts to consider the historical development of not just how modern guns and modern cities have evolved, but of American tort law and concepts of risk and cost allocation.  Insurance as we know it was in its infancy when the Second Amendment was ratified, and thus the founders could not have "specifically anticipated" insurance requirements related to the carrying of firearms.  But liability insurance grew up in tandem with the development of American tort law, and today it forms an integral part of our systems for spreading—and even reducing—the costs associated with many kinds of risks.

Because the Ordinance's fee and insurance requirements do not regulate, limit, or control the manner or method in which people may keep or bear arms, the Ordinance does not implicate the Second Amendment.  At most, the Ordinance imposes financial incentives for responsible arms ownership; it does not condition or restrict the manner of keeping or bearing arms.  But even if the Court were to find that

the Ordinance implicates the Second Amendment, the evidence shows that these regulations are consistent with the Nation's historical tradition of firearm regulation.  Thus, regardless of whether early Americans could have foreseen such a public-private mechanism to address financial risks, San Jose's insurance requirement certainly achieves cost-allocating ends that they would have supported.

According to *Bruen*, courts must focus their inquiry on "two metrics"—the "how" and the "why" underpinning the regulations—to determine whether the regulation is justified when compared with founding-era restrictions.  *Id.* at 2133.  San Jose's Ordinance is consistent with the "how" and "why" of historical firearm regulations.  It achieves the same "why" of historical regulations that also allocated the costs of firearm accidents through a nuanced "how" that takes modern societal concerns and solutions into account.  San Jose's insurance requirement will protect gun owners and gun-accident victims in the event of an accident.  And it should also lead to broader adoption of safe gun practices, as has occurred as a result of other insurance regimes.

Because the Ordinance does not implicate the Second Amendment and moreover is consistent with historical traditions of firearm regulation—including imposing financial incentives and allocating related costs and risks—the Ordinance is constitutional and should stand.  Accordingly, Defendants' Motion to Dismiss Plaintiffs' Consolidated Second Amended Complaint should be granted.

## III.   The Ordinance's Financial Requirements Are Proven, Effective, and Constitutional Methods of Allocating Costs Associated with Risks.

For as long as there have been humans, there have been accidents.  Because of this, modern life entails physical risks given our relatively crowded living conditions, rapid pace, and extensive use of large and complex machinery and equipment.  Many daily activities we take for granted are some of the most risky, such as driving a car.  This everyday activity opens drivers up to the risk of getting into an accident that does damage to their car or someone else's, causes injuries or deaths, results in lost work, or even leads to a lawsuit.  As this example demonstrates, risks of bodily or property harm create financial costs.  Such financial costs include property repairs or replacement, doctor or hospital bills, lost wages, and legal fees.

Firearm ownership in particular is inherently risky.  For example, even a responsible gun owner's firearm may go off accidentally, injuring people or property.  Firearm accidents occur regularly in San

Jose, where an average of 86 people are killed or injured each year by firearm incidents deemed "unintentional" or "undetermined"—that is, accidents. *Incidence and Cost of Firearm Injuries in San Jose, CA*, Pacific Institute for Research and Evaluation 1 (Jan. 19, 2022). Firearm accidents are also costly. Police and fire response alone for accidental shootings costs the City an average of $233,699 annually. *Id*. at 2. When considering other related costs, such as medical and mental health care, lost work, and lost quality of life, accidental shootings have a total societal cost to the City of nearly $25 million dollars every year, or $290,000 per person shot. *Id*. at 4–5.

In many instances, the costs of firearm-related accidents are distributed unpredictably and unfairly. If one person involved in an accident cannot or will not pay, another person might end up bearing a disproportionate portion of the costs. *See, e.g.*, Tom Baker & Thomas O. Farrish, *Liability Insurance and the Regulation of Firearms,* in *Suing the Gun Industry*, at 3 (Timothy D. Lytton ed., 2005) (describing the "financial ruin" that can befall those left paying for risks in the absence of insurance). In San Jose, taxpayers are forced to fund over $1 million of the $25 million annual cost of accidents through public services such as emergency response and victim assistance. *Incidence and Cost of Firearm Injuries in San Jose*, CA, Pacific Institute for Research and Evaluation at 5. The remaining millions of dollars in costs fall on victims, family members, and gun owners themselves. Without any system of allocating these costs, it is nearly impossible to know who will be financially responsible when a random accident strikes.

Requiring that firearm users carry liability insurance means that these costs are not borne by victims or their families, by taxpayers, or solely by unlucky gun owners whose firearms are involved in accidents, but are instead fairly allocated among those who choose to engage in the risky activity—owning or possessing a firearm—and shared with insurers who underwrite the risk. Through liability insurance, insurers agree to cover, among other things, the risk of a third party making a claim against the policyholder for accidental injuries the policyholder caused. The cost of those claims is transferred to insurance companies, which in turn spread that cost to their customers through risk-based premiums. *See, e.g.,* Baker & Farrish, at 3 ("loss spreading is the main attraction of liability insurance"); Peter Kochenburger, *Liability Insurance and Gun Violence*, 46 Conn. L. Rev. 1265, 1270–71 (2014) (describing

how insurers adjust premiums based on risk). Thus, the costs associated with risks can be distributed among those who engage in (and insure) the risk-carrying activity.

These insurance systems are vital to Americans' ability to carry on daily life without fear of crushing, unexpected costs. But the environment that enabled these insurance-based solutions to thrive did not spring up overnight. Rather, American liability insurance—and ultimately, government-mandated liability insurance—developed in step with other legal and societal changes over our Nation's history. This section provides a brief overview of this development.

### A. American Liability Insurance Developed in Response to New Legal Systems for Imposing Liability.

In a broad sense, people have used what we now call "insurance" to spread the costs associated with risks since ancient times. *See Historical Development of Insurance*, Britannica, https://www.britannica.com/topic/insurance/Historical-development-of-insurance. Certain forms of insurance—for example, insuring against fires or marine risks—were prevalent in England in the 17th and 18th centuries, and likewise took root in early America. *See id.*; *see also* Hannah Farber, *Underwriters of the United States: How Insurance Shaped the American Founding* (2021). Indeed, Benjamin Franklin was one of the first proponents of insurance in the American colonies, and founded an early fire-insurance company in 1752. *See History*, The Philadelphia Contributorship, https://1752.com/about-us/history/.

Our current system for *insuring against* liability sprang up in response to new and changing laws for *imposing* liability. Early American governments had a simple and harsh way of allocating gun accident costs: through courts that imposed strict liability on gun owners. This is consistent with early English and American common law, in which individuals who caused accidents were often held strictly liable. *See, e.g.*, Cornelius J. Peck, *Negligence and Liability Without Fault in Tort Law*, 46 Wash. L. Rev. 225, 226 (1971) ("[A] rule of strict liability prevailed at the early stages of development of the common law, usually rendering an actor liable if he in fact caused injury to another."). American courts inherited this strict-liability approach from the English common law, where the rule had been that "where one shoots at [a mark] and wounds a man, although it be against his will, yet he shall be called a trespasser against his will." *See* Wex S. Malone, *Ruminations on the Role of Fault in the History of the Common Law of Torts*, 31 La. L. Rev. 1, 13 (1970) (quoting *Tithe*, Y.B. 21 Hen. 7, f. 27, pl. 5).

Strict liability continued to be the rule in both England and the United States throughout the founding era; indeed, an American commentator writing as late as the 1930s noted that cases involving gun accidents "all indicate the strict accountability to which a person has been held for injury caused to another in the vicinity by a discharge incident to the handling of a firearm."  Fred E. Inbau, *Firearms and Legal Doctrine*, 7 Tul. L. Rev. 529, 549–50 (1932–33).  For example, in *Moody v. Ward*, 13 Mass. 299 (1816), Massachusetts' highest court stated that militia commanders who allowed their troops to engage in "[t]he mischievous and disgraceful practice of firing guns in and near the highways" would be held "legally responsible for all damage sustained by a citizen in consequence of such neglect."  *Id.* at 301. Likewise, in *Cole v. Fisher*, 11 Mass. 137 (1814), the defendant had fired his gun at the door of his shop after cleaning it, frightening a nearby horse and causing damage to the carriage the horse was pulling. After taking the "occasion to observe upon the dangers to which travelers and passengers on foot and in carriages are exposed by discharges of guns in or near the highways," the court stated the strict liability principle that "[t]he party injured, either in his person or property, by the discharge of a gun, even when the act is lawful . . . is entitled to redress in a civil action."  *Id.* at 139.

For a number of reasons—among them, the massive increase in accidents giving rise to liabilities due to industrialization, modern warfare, and other societal changes—American courts in the mid-1800s developed a negligence standard, under which liability would be imposed only if "the actor were guilty of some fault or neglect."  Peck, at 227; *see also* John Fabian Witt, *Toward a New History of American Accident Law*, 114 Harv. L. Rev. 690, 694 (2001) (describing the "accident crisis" during the 19th century, which gave rise to changes in the tort system, as well as insurance-related innovations).  By holding an individual liable only if the plaintiff could prove in court that the defendant had breached a duty, the new negligence standard was much more forgiving for gun owners than the strict liability standard had been. Comparing the standards in an 1856 accidental shooting case, a Missouri court noted that "the old system of actions" was "much stricter," because "it was no defence, in such cases, that the act occurred by misadventure, and without the wrong-doer's intending it."  *Morgan v. Cox*, 22 Mo. 373, 376–77 (1856).

As the new negligence standard transformed the way the government assigned liability through the courts, new private liability insurance sprung up "to insure against the consequences of negligence." Kenneth S. Abraham, *Liability Insurance and Accident Prevention: The Evolution of an Idea*, 64 Md. L.

Rev. 573, 576 (2005); *see also id.* at 573 (describing the "symbiotic relationship between tort liability and insurance during this entire period" of "the middle of the nineteenth century to the present").   The precursors of modern liability insurance were first sold in the United States in the second half of the 19th century.   *See, e.g., id.* at 580 ("Liability insurance was first marketed in the United States in the 1880s, having been imported from Great Britain, where it was also a very recent invention."); *Accident Insurance*, 4 Am. L. Rev. 585, 585 (1873) (late-19th century commentator stating that "[a]ccident insurance is of modern origin"; "the first American company is only ten years old").

As described above, liability insurance policyholders pay risk-based premiums in return for payment of costs by the insurance provider in the event of a claim.   Thus, the costs associated with risks can be distributed among those who engage in and purchase insurance for the risk-carrying activity, rather than being borne out-of-pocket by an unlucky few (*e.g.*, accident victims), or covered directly or indirectly by others who may have no relationship at all to the activity (*e.g.*, taxpayers).   These principles of risk and risk management through modern insurance practices certainly apply to the activity of gun ownership and use, given the substantial possibility of a truly catastrophic injury or death when accidents with firearms do occur.

In time, tort law and liability insurance proved to be a powerful combination capable of compensating victims, spreading the costs of accidents, and even reducing risk altogether in ways that were impossible under the old system of strict liability.   *See* Abraham, at 573; *see also* Fleming James, Jr., *Accident Liability: Some Wartime Developments*, 55 Yale L.J. 365, 365 (1946) (mid-20th century commentator discussing the recently discovered benefits of this system).   The Supreme Court was quick to recognize this benefit as well.   In 1886, the Court recognized that "[b]y obtaining insurance," the insured "increases his means of meeting th[e] responsibility" to compensate the victims of his negligence.   *Phoenix Ins. Co. v. Erie & W. Transp. Co.*, 117 U.S. 312, 324 (1886).   As discussed in greater detail below, American governments learned that they could make even better use of this public-private system by requiring liability insurance, and did so in areas such as workers' compensation, auto insurance, and medical malpractice insurance.

Thus, although insurance as we now know it did not exist in the United States at the time of the founding, modern liability insurance has developed in step with the evolution of accident risk, costs, and

the legal systems for assigning those costs over our Nation's history.  By requiring liability insurance that covers the costs of firearm accidents, San Jose is merely continuing this traditional government role of assigning responsibility and allocating these costs.  The difference between then and now is that, compared to the strict-liability standard that founding-era American governments applied against gun owners, San Jose's insurance requirement employs a much less burdensome and more effective "how," to achieve the "why" of allocating responsibility and costs.

## B.   American Governments Have Long Required Liability Insurance for Risky Activities.

Given the symbiotic benefits involving American tort law and liability insurance, it did not take long for governments to begin *requiring* liability insurance as a way to ensure payment of accident costs.  Around the turn of the 20th century, states began enacting workers' compensation laws to address the skyrocketing costs of industrial accidents.  *See* Abraham, at 585.  A few years after that, states applied the same principle to car accident liability through mandatory auto insurance.  *See id.* at 594.  As government-required liability insurance created large risk pools, liability insurance came to be understood as not merely a way for the insured to "meet its responsibility" to pay for the costs of accidents—as the Supreme Court recognized in the late 1800s—but also as a powerful mechanism for "spreading the risk of loss."  *Id.* at 606.

Indeed, the cost-sharing aspects of liability insurance are particularly effective when implemented at a community scale, which can often be achieved only through insurance mandates.  If only the lowest-risk individuals purchase insurance, and the riskiest individuals go uncovered, many of the benefits of liability insurance are reduced: victims' ability to recover compensation for their injuries will depend on whether the gun owner has sufficient funds, and uninsured gun owners may bear astronomical medical or legal costs of an accidental shooting.  Conversely, if only the highest-risk individuals purchase insurance, because they know they are the most likely to make a claim, insurance companies will charge higher rates.  Thus, "rates go up . . . , and the victims of many accidents go uncompensated, which spreads the costs throughout society."  Jennifer B. Wriggins, *Mandates, Markets, and Risk*, 19.2 Conn. Ins. L. J. 275, 291 (2013).  But, by including as many of the individuals in a community as possible who are participating in a risk in the risk pool, "insurance markets can work better for the benefit of consumers."  *Id.* at 288.  As a

result, insurance mandates require that participants in an activity carrying some level of risk obtain insurance to help ensure that the costs of the risk are distributed optimally.

As the positive results of such cost-sharing became evident, Americans came to see that the powerful combination of tort-law reform and liability insurance was capable of allocating the costs of accident risks in ways that the old system never could have.  As one commentator writing in the mid-20th century put it, "[t]here is a growing belief that in this mechanical age the victims of accidents can, as a class, ill afford to bear their loss; that the social consequences of uncompensated loss are dire and far exceed the amount of the loss itself; and that more good will come from *distributing these losses among all the beneficiaries of mechanical progress than by letting compensation turn upon an inquiry into fault*," as it had under the early American tort system. James, Jr., at 365 (emphasis added).

By the 1960s and 1970s, Americans began considering not only the victim-compensation and cost-spreading benefits of the tort-liability-insurance system, but also "the relation between liability insurance and accident *prevention*."  Abraham, at 610 (emphasis added).  Insurance companies have a financial interest in gathering detailed actuarial information that will help them price risks.  *See* Baker & Farrish, at 5 ("Once an insurance institution assumes responsibility for the financial consequences of a given harm, it has an incentive to prevent that harm.").  Insurance companies can use that information to incentivize behaviors that they determine reduce risks.  *See, e.g.*, Kochenburger, at 1270–71 ("There is a long and often favorable story to tell of how insurance has enhanced public safety.").  The benefit for the insurance companies is reduced payouts and the benefit for society is risk prevention.

For example, in workers' compensation—mandated in California and most other states—insurance companies offer better rates to businesses that make their workplaces safer.  *See* Occupational Safety and Health Administration, *Business Case for Safety and Health*, https://www.osha.gov/businesscase/benefits (noting multiple studies that find safer workplaces result in lower workers' compensation costs).  Similarly, medical malpractice insurance identifies risky providers, encourages safer practices, and collects data that pinpoint the causes of medical errors.  Tom Baker & Charles Silver, *How Liability Insurers Protect Patients and Improve Safety*, 68 DePaul L. Rev. 211, 226 (2019) ("Liability insurers and their industry groups have facilitated and supplemented the work of physicians and their professional societies by sharing closed claim data, providing analyses, and

developing treatment guidelines of their own.").  Car insurance also offers lower premiums for certain vehicle safety measures and rewards safe drivers.  *See, e.g.*, Allstate, *7 Easy Ways to Help Lower Your Car Insurance Premium*, https://www.allstate.com/resources/car-insurance/how-to-lower-car-insurance-premiums; State Farm, *Be Rewarded With Drive Safe & Save Discounts*, https://www.statefarm.com/insurance/auto/discounts/drive-safe-save; Allstate, *Safe Driving Bonus*, https://www.allstate.com/auto-insurance/safe-driver-savings.

As these histories demonstrate, San Jose's requirements are not so different from early government attempts to allocate responsibility for accidents, and are achieved through a public-private partnership. Moreover, they are squarely consistent with the Constitution.

## IV.   Courts Have Consistently Found that Government-Mandated Liability Insurance and Fees Are Constitutional.

When government mandates for liability insurance were first implemented, they faced legal challenges similar to the one Plaintiffs bring here.  Some of these insurance requirements have implicated constitutionally protected rights and faced constitutional challenges.  But courts have had no difficulty in affirming mandatory liability insurance as clearly constitutional.  *See, e.g.*, *N.Y. Cent. R.R. Co. v. White*, 243 U.S. 188 (1917) (upholding early workers' compensation scheme).

### A.   The Ordinance Does Not Implicate Second Amendment Conduct.

The City's sensible solution to the problem of gun accidents is constitutional because the Ordinance's fee and liability insurance requirements do not implicate the Second Amendment at all: they have no bearing on whether a person can "keep and bear arms."  In *Bruen*, the Supreme Court held that the Second Amendment protects conduct that falls within the Amendment's "plain text."  142 S. Ct. at 2126.   Determining the scope of the Amendment's plain text requires looking to "the Second Amendment's text, as informed by history."  *Id.* at 2127.  It is only if the text and history confirm that the regulated conduct falls within the Second Amendment's original scope that the government must "then" show that the regulation "is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2126.  Here, neither the insurance requirement nor the fee implicates the Second Amendment because these activities are outside the scope of the Second Amendment.

### 1.   The Insurance Requirement Does Not Implicate the Second Amendment.

As explained in the City's briefing, the Ordinance's requirement that gun owners carry liability insurance for firearm accidents is conduct entirely outside of the original scope of protected Second Amendment activity, as confirmed by both the Second Amendment's text and its history.

Beginning with the constitutional text, the Second Amendment addresses the right to "keep and bear arms."  The conduct of insuring liability that might arise from a firearm-related accident is an entirely different kind of activity: a financial exercise that does not alter whether someone may keep or bear arms. Individuals purchase liability insurance through a transaction with an insurance company that is unconnected to their purchase of a firearm; insurance does not restrict firearm possession or use; and if a claim is made under the policy, it would only be after a firearm accident occurs, to compensate the injured party financially and protect the gun owner's financial assets.  None of these activities has any effect on Second Amendment conduct.  Furthermore, as the City notes, the Ordinance does not condition firearm ownership on the procurement of insurance and the insurance requirement does not affect San Jose citizens' ability to "keep" arms by forcing them to obtain insurance before purchasing a gun, or by forcing them to relinquish their guns for non-compliance without due process.

This is consistent with other government insurance mandates that also raise no serious constitutional concerns even though they make insurance a prerequisite for engaging in constitutionally protected activity.  For example, California requires businesses to carry workers' compensation insurance covering liability for workplace injuries, and this law applies to all types of businesses, including those engaged in Second Amendment activity, such as gun ranges.  Yet no one could credibly argue that the workers' compensation insurance requirement implicates Second Amendment rights merely because it is related to Second Amendment activity.

Nor does the conduct of carrying liability insurance—or paying a nominal fee—possibly fall within the scope of historically protected Second Amendment activity.  There is no support for any historical understanding of gun rights including a right to *not carry* liability insurance or pay a fee.  Indeed, there has never been a "general constitutional rule that citizens must be exempted from the obligation to internalize the costs of exercising their constitutional rights."  Stephen G. Gilles & Nelson Lund, *Mandatory Liability Insurance for Firearm Owners: Design Choices and Second Amendment Limits*, 14

Engage 21 (2013).  The conduct at issue here is constitutionally sound because it does not bear on whether someone can purchase, keep, or use a firearm, and thus, "the challenged law regulates activity falling outside the scope of the right as originally understood."  *Bruen*, 142 S. Ct. at 2126 (*citing Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)).

**2.    The Fee Requirement Does Not Implicate the Second Amendment.**

As addressed in the City's briefing, and for similar reasons to those explained with respect to the insurance requirement, the Constitution's text and history also demonstrate that the Gun Harm Reduction Fee requirement—which only requires that gun owners contribute $25 to a designated nonprofit organization—does not implicate the Second Amendment because it does not infringe residents' ability to keep or bear arms.

The text is confirmed by constitutional history, which also makes clear that mere economic requirements do not burden Second Amendment rights.  Early American governments required many different kinds of financial payments associated with gun ownership and use.  But these economic requirements "posed no constitutional issues for Americans in the pre-Civil War era," and only "intensified" in the period following the Civil War.  Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Con. L. Quarterly 145, 154 (2022) (citing historical sources).  For example, some of the same 19th-century laws that required "rifle" and "pistol galleries" to pay annual sums applied equally to "bowling alleys," demonstrating that early Americans did not understand the Second Amendment to create any special constitutional protection from payments related to gun use.  *See* Laws of the State of Texas, An Act Authorizing the Corporate Authorities of the Town of Dangerfield, Fairfield and Springfield, to tax ten pin alleys, billiard tables and pistol galleries § 1 (1860); 1870 La. Acts 127, Persons, Trades, Professions and Occupations Subject to Taxation, § 3, pt. 6 (1870).

Modern courts have suggested that gun-related fees do not implicate the Second Amendment, while upholding such fees in any event.  *See Bauer*, 858 F.3d at 1227 (stating "we need not—and do not—decide whether [a firearm sale] fee implicates the Second Amendment" because it would survive under either level of scrutiny, while applying the pre-*Bruen* two-part test); *see also Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013) (declining to "definitively decide" which scrutiny standard applied, because

the fee was constitutional regardless).  Indeed, the exercise of this right entails financial costs: there is cost to purchasing a firearm, cost to store one safely, cost to obtain training to use it.

In sum, the Ordinance does not condition or restrict the manner of keeping or bearing arms and thus does not regulate conduct protected by the Second Amendment.  Because it does not, the City does not need to make any additional showing for this Court to find the Ordinance constitutional.

**B.      The Insurance and Fee Requirements Are Consistent with the Long History of Gun-Related Economic Requirements.**

To the extent that the Ordinance were found to implicate the Second Amendment by imposing a minimal financial burden, it is still constitutional because such requirements are fully "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126.  Under *Bruen*'s analogical test, there is admittedly no historical "twin" or "dead ringer" for the Ordinance.  *Id.* at 2133.  Indeed, both liability insurance and the very social, legal, and financial systems that underpin it—much like the modern firearms at issue—might have been inconceivable to the founding generation.  But *Bruen* explicitly provides that such historical "twins" are not required.  Instead, a regulation need only be analogous to, and therefore consistent with, historical regulations.

The Second Amendment is flexible enough to admit "modern regulations that were unimaginable at the founding."  *Id.* at 2132.  In order to maintain this flexibility, the *Bruen* test disregards superficial comparisons, and instead involves a higher-level analogical inquiry that focuses on "two metrics": the "how" and the "why" of the way that "regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  As *Bruen* explained, assessing and weighing a challenged regulation's "how" and "why" is necessary to determine whether the regulation imposes a "comparable burden" that is "comparably justified" when compared with founding-era restrictions.  *Id.*  If the "how" and "why" are comparable to historical regulations, then the regulation is in keeping with the "balance struck by the founding generation," and is constitutional.  *Id.* at 2133 n.7.  This focus on "balance" is not the "independent means-end scrutiny" of "federal judges" that *Bruen* rejected, *id.*, but is instead grounded in the "interest balancing *by the people*," as evidenced by historical regulations.  *Id.* (quoting *Heller*, 554 U.S. at 635).

### 1. The Supreme Court Found Surety Statutes, an Early American Historical Analogue, to Pose an "Insignificant" Burden on the Second Amendment.

"Surety statutes" are an early American analogue considered by the *Bruen* Court.  Surety statutes, enacted in nine jurisdictions in the roughly 20 years leading up to and shortly after the ratification of the Fourteenth Amendment, required individuals to post, or have a third party post, a bond before they could carry a firearm.  *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J.F. 121, 131 (2015); David B. Kopel, *The First Century of Right to Arms Litigation*, 14 Geo. J.L. Pub. Pol. 127, 131 n.14 (2016).  The *Bruen* Court rejected any notion that such requirements were "a severe constraint" on Second Amendment conduct, observing that "the surety laws did not *prohibit* public carry in locations frequented by the general community," and that the minimal economic "burden these surety statutes may have had on the right to public carry was likely too insignificant to shed light on" the regulation at issue.  142 S. Ct. at 2148–49.  At the same time, the Court recognized that these statutes imposed promoted public interests, including the "prevention" of gun harms, and "provid[ing] financial incentives for responsible arms carrying." *Id*. at 2148–50.

Similarly, the Ordinance's insurance and fee requirements pose only a minimal economic burden in order to prevent gun harms and incentivize responsible gun use.  Like surety statutes, such minimal burdens are "insignificant" for Second Amendment purposes.

### 2. The San Jose Ordinance Is Consistent with Other Government Insurance Mandates that Courts Have Found Constitutional.

The Ordinance's insurance requirement is consistent with other government insurance mandates that also raise no serious constitutional concerns even though they make insurance a prerequisite for engaging in constitutionally protected activity.  Nearly 100 years ago, in *Ex parte Poresky*, the Supreme Court considered a suit involving a Fourteenth Amendment challenge to Massachusetts' "compulsory automobile liability insurance" law.  290 U.S. 30, 31 (1933).  The Court swiftly denied the claim at issue, citing the other "decisions of this Court bearing upon the constitutional authority of the state, acting in the interest of public safety, to enact the statute assailed." *Id*. at 32.  Auto insurance has not faced serious constitutional challenge since.  Today, nearly every state requires liability insurance for car owners. *See, e.g.*, Kara McGinley & Stephanie Nieves, *Minimum car insurance requirements by state*, Policygenius (Apr. 21, 2021), https://www.policygenius.com/auto-insurance/car-insurance-required-in-every-state/.

Similarly, both state and federal courts have upheld medical malpractice insurance requirements against constitutional challenges. For example, in *McCoy v. Commonwealth of Pennsylvania*, a state court considered "the constitutionality of the mandatory insurance provisions" of a state medical malpractice insurance act under a Fourteenth Amendment challenge. 391 A.2d 723, 724 (Pa. Commw. Ct. 1978). The law required doctors to "either purchase insurance or develop a plan of self-insurance," and required the state licensure board "to suspend or revoke the license of a health care provider upon a failure to comply with the mandatory insurance provisions." *Id.* at 726. Upholding the statute, the court held that the state had the authority "to recognize the problem of malpractice insurance availability and to deal with it." *Id.* at 727.

Likewise, in *Meier v. Anderson*, when doctors challenged a related provision of the same law, a federal court held that the state's actions in "controlling the medical malpractice insurance market" were within its constitutional authority. 692 F. Supp. 546, 552–53 (E.D. Pa. 1988), *aff'd*, 869 F.2d 590 (3d Cir. 1989) (internal quotation marks omitted). More recently, in her concurring opinion addressing the individual insurance mandate contained in the Affordable Care Act, Justice Ginsburg pointed out that Plaintiffs had "abandoned any argument pinned to substantive due process" as they originally put forth and "concede that the provisions here at issue do not offend the Due Process Clause." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 613 (2012) (Ginsburg, J., concurring) (citations omitted). Though the Affordable Care Act's Individual Mandate was ultimately upheld as a tax, the substantive due process claims against it in *Sebelius* had been abandoned.

In sum, none of these well-established insurance requirements have created serious constitutional issues. The Ordinance's liability insurance requirement does not, either.

### 3. The San Jose Ordinance Is Consistent with Other Financial Requirements that Courts Have Found Constitutional.

Other economic impositions related to firearms have endured to the present day, and modern courts have not hesitated to uphold gun-related fees and costs as constitutional. *See, e.g.*, *Bauer*, 858 F.3d at 1227 (upholding "fee on firearms transfers"); *Kwong*, 723 F.3d at 168 (upholding "residential handgun licensing fee").

The upholding of fee requirements naturally aligns with the long history of federal, state, and local governments in America assessing fees since the Nation's founding.  For instance, the Post Office has charged fees for mailing letters from its inception in 1792.  Act of Feb. 20, 1792, ch. 7 §§ 9, 10 Stat. 232, 235 (establishing the Post-Office and Post Roads within the United States), https://bit.ly/3utzSCQ (setting fees to mail letters depending on distance).  Fees remain a common method for governments to efficiently target costs for services to individuals who use them the most or who create negative externalities.

For example, in California, the Transportation Improvement Fee, collected when Californians register their vehicles, funds the Road Maintenance and Rehabilitation Program; the Childhood Lead Poisoning Prevention Fee, collected from those involved in the stream of commerce of lead, or products containing lead, funds health care referrals, environmental assessments, and educational activities; and the Emergency Telephone Users Surcharge, typically charged as part of users' monthly telephone bills, funds the installation, administration, and supply of communication services for the 911 system. *California Begins Collecting Transportation Improvement Fee*, ForConstructionPros.com (Jan. 2, 2018) https://bit.ly/3RhC7Tg; California Department of Tax and Fee Administration, *Childhood Lead Poisoning Prevention Fee*, https://bit.ly/3ORDR44 (last visited July 11, 2022); California Department of Tax and Fee Administration, *Emergency Telephone Users Surcharge – Frequently Asked Questions*, https://bit.ly/3yMLDXB.  Like these fees imposed to spread societal costs, San Jose's Gun Harm Reduction Fee is an efficient method for San Jose to allocate the costs of firearm harms.

Thus, both the Ordinance's fee and insurance requirements are consistent with historical gun-related economic requirements and with American governments' history of allocating and spreading accident costs.  American governments have always imposed such financial requirements, and courts have not struck them down.

### 4. The Ordinance's Liability Insurance Requirement Is a Sensible Solution to the Difficult Societal Problem of Firearm Accidents, Which Imposes Little or No Additional Cost on San Jose Gun Owners.

San Jose, as many other governments have done in other contexts, turned to liability insurance to address problems posed by gun accidents in an effort to reduce risky activities, influence consumer behavior, and encourage safer practices related to gun ownership.  Governments have done this

successfully for decades in the context of automobile safety (auto insurance), workplace safety (workers' compensation insurance), and medical and other professional errors (malpractice insurance).  San Jose should be permitted to do the same here, harnessing the power of liability insurance to compensate victims, protect gun-owning policyholders' assets, allocate the risk of accidents, and promote public safety, *all while imposing no restrictions or conditions on ownership, possession, or use of firearms*.

As described in Section III.B above, insurance companies also have a demonstrated ability to influence individual behavior by providing financial incentives to responsible policyholders.  Here, the Ordinance guarantees that San Jose gun owners will comprise a sizable segment of the local liability insurance market.  As they have done in other contexts, insurance companies can reduce their payouts for gun accidents by incentivizing safe practices that reduce such accidents.  For example, much as liability insurance providers have incentivized safer driving and safer workplaces, insurance companies can offer premium discounts to incentivize safe gun practices.  As noted in the City's findings, these incentives might encourage firearm owners to "take safety classes, use gun safes, install trigger locks, or utilize chamber-load indicators."  San Jose Ord. No. 30716, at 4.

Meanwhile, the actual cost of compliance will be minimal for most San Jose gun owners, because the vast majority of San Jose gun owners are *already in compliance* with the ordinance's insurance requirement.  Most people, including 93 percent of homeowners, already own qualifying insurance, or can easily obtain it, in the form of homeowners' or renters' insurance.  Insurance Information Institute, *2021 Insurance Fact Book* 90.  Although the number of insured renters is smaller,[2] City residents who do not currently carry homeowners' or renters' insurance can easily obtain it with an off-the-shelf policy sold by any number of insurance companies authorized to do business in California.  Standard homeowners' and renters' insurance policies already cover liability for accidental harms, including from firearms.  *See* Kochenburger at 1275 (surveying policies); *see, also e.g.*, ISO, Homeowners 3-Special Form (HO 00 03 05 11) (2010) (standard homeowners policy form, which includes "accident[s]" resulting in both "Bodily

---

[2] *See Number of Renters Is on the Rise—But Few of Them Have Insurance*, Insurance Information Institute (Sept. 22, 2014), https://bit.ly/3NXlxW7.

injury" and "Property damage" under its definition of a covered "Occurrence," and does not exclude firearms).  Further, in an *en banc* decision, the California Supreme Court has confirmed that a claim for damage where a "gun had accidentally fired" would "clearly be covered" under a typical homeowners policy that provides coverage for accidents and does not exclude firearms.  *State Farm Mut. Auto. Ins. Co. v. Partridge*, 514 P.2d 123, 103 (Cal. 1973) (en banc).

Further, any argument that the cost of compliance makes gun ownership prohibitively expensive is premature at best, because the fee has been set at only $25, and costs of insurance will vary.  In addition, any serious concerns about cost are mooted by the Ordinance's hardship exception, which exempts "[t]hose persons for which compliance with this Part would create a financial hardship" from the insurance and fee provisions.  San Jose Muni. Code § 10.32.225 (Exceptions).  Under this exception, even those who cannot afford to comply can still own and use firearms with *no* financial burden at all.

Here, the insurance requirement is entirely of a piece with the traditional governmental role of allocating gun accident costs, as well as the historical progression toward using liability insurance to do so.  It in no way oversteps the historical bounds of Second Amendment regulation.  If anything, it is *less* burdensome on gun owners than the strict liability that governments imposed during the founding era.

**V.    Conclusion**

For the foregoing reasons, as well as the reasons set forth in Defendants' briefings, Defendants' Motion to Dismiss Plaintiffs' Consolidated Second Amended Complaint should be granted.

Dated: February 23, 2023                    Respectfully Submitted,

**COVINGTON & BURLING LLP**

/s/ Gretchen Hoff Varner
GRETCHEN HOFF VARNER (Bar No. 284980)
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: ghoffvarner@cov.com
*Attorney for Amicus Curiae*

OF COUNSEL

**COVINGTON & BURLING LLP**
SUZAN CHARLTON*
JAMES FITCH*
ELIZABETH UPTON*
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Email: scharlton@cov.com
jhfitch@cov.com
eupton@cov.com


**BRADY**
DOUGLAS N. LETTER*
SHIRA LAUREN FELDMAN*
840 First Street, NE
Suite 400
Washington, DC 20002
Telephone: (202) 370-8100
Email: dletter@bradyunited.org
sfeldman@bradyunited.org

*Attorneys for Amicus Curiae*
*\* Not admitted in this Court*